```
1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3      United States of America,      ) Criminal Action
                                      ) No. 21-mj-188
4                      Plaintiff,     )
                                      ) DETENTION HEARING
5      vs.                            )
                                      ) Washington, DC
6      Ryan Samsel,                   ) June 4, 2021
                                      ) Time:  2:15 p.m.
7                      Defendant.     )
       _____
8
                    TRANSCRIPT OF DETENTION HEARING
9                           HELD BEFORE
                THE HONORABLE JUDGE ZIA M. FARUQUI
10                UNITED STATES MAGISTRATE JUDGE

11     _____

                        A P P E A R A N C E S
12
       For the Plaintiff:     April Russo
13                            U.S. Attorney's Office
                              555 Fourth Street, NW
14                            Washington, DC  20001
                              (202) 803-1643
15                            Email:  April_russo@usdoj.gov

16     For the Defendant:     Elisabeth K. H. Pasqualini
                              EKHP Law, LLC
17                            407 N Front Street, Suite 2
                              Harrisburg, PA  17101
18                            (717) 412-4386
                              Email:  E@eklplaw.com
19
       Also Present:          Christine Schuck, Pretrial Services
20
       Proceedings reported by audio recording.
21     _____

22     Transcribing Court Reporter:
                              Janice Dickman, RMR, CRR, CRC
23                            Official Court Reporter
                              United States Courthouse, Room 6523
24                            333 Constitution Avenue, NW
                              Washington, DC  20001
25                            202-354-3267
```

1          THE COURTROOM DEPUTY:  This is magistrate case

2     21-188, the United States of America versus Ryan Samsel.  The

3     defendant is present by video.  This matter is set for a

4     detention hearing.

5          Parties please introduce yourselves for the record,

6     starting with the government.

7          MS. RUSSO:  Good afternoon, Your Honor.  April Russo

8     on behalf of the United States.

9          MS. PASQUALINI:  Good afternoon.  Elizabeth

10    Pasqualini on behalf Mr. Samsel.

11         PRETRIAL SERVICES:  Christine Schuck with pretrial

12    services.

13         THE COURT:  Thank you, everybody.

14         So let's work our way backwards.  Ms. Pasqualini, I

15    wanted first to begin with you and see if -- we had spoken of

16    (unintelligible) on behalf of the government, just to try to

17    get a grip what was going on with medical treatment services

18    not being provided to the defendant.  Has anything improved on

19    that front, or are we in the same place or -- what can you tell

20    me?

21         MS. PASQUALINI:  Your Honor, I've been trying to get

22    in touch with counsel for Rappahannock.  Today at 1:42 I got an

23    email from him -- maybe 1:40; 1:40.  And he said this:  That

24    Mr. Samsel is housed in a cell in the bottom tier and is

25    sleeping on the bottom bunk, and that he has only one cellmate,

1     which is what he has told us previously, Mr. Samsel.

2          He said Mr. Samsel has been receiving medical care --

3     which Mr. Samsel would suggest is not accurate -- and is

4     scheduled to see a neurovascular surgeon on June the 8th for a

5     consultation.  He notes, though, however -- and Mr. Samsel was

6     not aware of this -- but the Rappahannock jail requested

7     approval for this from the United States marshals at least ten

8     days ago, but has not heard back from them.  And apparently per

9     the arrangement, all medical treatment sought or planned for

10    Samsel must be reviewed and approved by the United States

11    Marshal Service.

12         Then he goes on to say, Let me know if you need any

13    help, maybe you should talk to the marshals.  I asked him, do

14    you have any specifics about what he meant by medical care that

15    Mr. Samsel has been receiving?  He says he's been seen by the

16    jail's doctor.  I think they have, actually, a certified nurse

17    practitioner; they're still qualified.  And, again, he

18    mentioned the business about the neurosurgeon.

19         He says he doesn't have any records or anything.  And

20    then he said if we needed those, that he needed a court order,

21    Mr. Samsel would have to sign something.  And I respond that

22    had Mr. Samsel will already signed those papers, but he would

23    be happy to sign them again, if need be.

24         THE COURT:  Thank you.  Appreciate you being able to

25    facilitate that.  So here's kind of my thoughts about the

1    process, before we get into the full detention hearing.  There

2    is one thing on the front end, I was hoping to hear from you,

3    Ms. Russo, and then in lieu of actually going through the whole

4    proceeding, I wanted to see if there was, perhaps, a path that

5    we could go up to resolve this.

6          So I just want to be clear, we've had -- in terms of

7    whether detention hearing was appropriate, we've had a bit of

8    litigation in other courts about that.  I think that, you know,

9    the complaint here charges a violation of (unintelligible), but

10   it doesn't state whether or not the government is seeking the

11   enhancement under (b).  And there's allegations of serious

12   conduct here, so I suspect that maybe -- but I just want

13   confirm -- that both the government and another judge, Chief

14   Judge Howell, as well as Judge Lamberth and Judge Bates, have

15   had some writings on this, and the general belief is that --

16   the general belief is that it has to be seeking that (b)

17   enhancement in order for this to become a crime of violence.

18   But I just want to pause here for a minute.

19         MS. RUSSO:  Yes, Your Honor, we are seeking that

20   enhancement because there was bodily injury to Officer 1 in

21   this case, Your Honor.  There's also an argument here by the

22   government that the barricade that were pushed into the

23   officers constituted a dangerous weapon.  So, there are two

24   different basis for that enhancement here.

25         THE COURT:  Okay.  Well, I think that that is the

1    initial conduct, and perhaps the second (unintelligible) and

2    not consider that.  I think that is a basis to go forward.  I

3    just want to make sure that I was buttoned up on that.

4         Now, I just want to understand, kind of, the goal

5    here, because this is a pretty unique order.  The defendant is

6    not seeking to be released out in the public, he's seeking to

7    be released to another facility, as I understand it.

8    Ms. Pasqualini?

9         MS. PASQUALINI:  That's correct, Your Honor,

10   Mr. Samsel has in his possession a letter from the Pennsylvania

11   Board of State Parole, giving an updated date, a max date,

12   which is 8-22 of '22, would be his maximum date.  I can

13   represent to the Court comfortably and confidently, when you

14   are charged with an offense in Pennsylvania and you are on

15   state parole, barring extremely unusual circumstances, they

16   keep you incarcerated in the jail until your new charge has

17   been resolved one way or the other.

18        So, I can state with confidence that in addition to

19   the max date of 8-22 of '22, Mr. Samsel is subject, should he

20   be convicted of anything, he's subject to lose his -- what's

21   referred to as street time, the time that he's been at liberty,

22   which is approximately two years, which state parole can tack

23   back onto that.  And they are allowed to, kind of, proactively

24   hold him.  And so, theoretically, I think that they can hold

25   him even longer than the August of that '22 date.

```
 1              THE COURT:  Is there a detainer right now that is out

 2       relating to that, or no?

 3              MS. PASQUALINI:  Yes.  He has been detained, I think,

 4       since the day, maybe, perhaps, after he was arrested.  I

 5       believe the FBI agents originally contacted his parole officer

 6       to get his address.

 7              And so, no, he is absolutely detained, both in this

 8       matter and as a result of his Pennsylvania State Board of

 9       Probation and Parole.

10              THE COURT:  Ms. Russo, I would like to hear from you.

11       My resolution is that 3142(i) allows temporary release,

12       potentially.  So after a finding of detention is appropriate,

13       3142(i) says that an order of the court of the United States or

14       requested transfer government -- let's see.  The judicial

15       officer may permit the temporary release of the person in

16       custody of the United States marshal or other appropriate

17       person, to the extent the judicial officer determines such

18       release necessary for preparation or purposes of defense or

19       other compelling reason.

20              And so my thought here -- and by mine, I mean

21       Ms. Blaine's, I have to give her credit for her proposed

22       solution -- is the temporary release, the temporary release

23       into the Pennsylvania authorities.  Once he's back there, you

24       know, there would be a detainer put on him for this, because he

25       still hasn't been released, but he would still be detained
```

1     under this matter.  If at any moment he were to be released

2     from the Pennsylvania authorities, he would come back to the

3     federal court.

4          So I just want to hear, before we get into

5     everything, that you (no audio) and if you need some time to

6     think about it and come back another time, that's fine, too.  I

7     didn't mean to put you on the spot.  You can think about -- I'm

8     just trying to think about, kind of, a way to handle this.  I

9     mean, I think -- I read your pleading, it's very thorough.

10         You know, I think that certainly under *Munchel*, you

11    know, there is a -- quite a bit of facts here that give me

12    concern about dangerousness.  And the defendant's criminal

13    history poses some concerns as well.  And so for those reasons,

14    I understand why, that, you know, I think that there is --

15    there's a good argument to be made for dangerousness.

16         I believe that, again, the defendant is not asking to

17    be released out into the public.  So I'm just trying to see if

18    there's a way, where he can get better medical care at this

19    other facility and still be detained as a backstop, that's what

20    I'm trying to do.  So if you think that's possible, if you have

21    another idea, Miss Russo, I would like to hear from you.

22         MS. RUSSO:  Judge, yeah, I would need to look into

23    this more.  I know when this has been invoked before, for

24    example, in the COVID 19 context, there wasn't a clear idea of

25    how this would work in terms of when the defendant would be

1    placed back into custody.  And so I hear your idea that

2    essentially if he were to be released on the parole case, that

3    he would then go back into federal custody.  I'm just not sure

4    how that would work practically.  So I would want to look into

5    that possibility a little bit more.

6            THE COURT:  Two thoughts, and I think one would

7    probably be to talk to the pretrial service.  But I don't know

8    if we need to, but we can certainly -- or you all can work to

9    put a detainer in, in addition, so when he's on a temporary

10   release -- and I think, you know, then again, in terms of

11   insurance for that, I'm quite certain that the defendant would

12   say under oath, and I'm sure Ms. Pasqualini would agree, that

13   if, you know, for some reason he's released, that he would

14   immediately self-surrender.  I feel confident on just that.

15   But we could have the additional detainer.  But it would take

16   some time to look into it and see if there's some other way.

17   But, I would like to at least explore that.

18           MS. RUSSO:  Yes, I'm happy to look into that, Your

19   Honor, and check in with my office about that as well and what

20   the position would be.  I also have -- the victim did wish to

21   make a statement regarding release.  So I'm happy to -- if we

22   decide to delay this so that we can look into those issues, I'm

23   happy to provide that statement at a later time, or today,

24   whatever Your Honor would prefer on that front.

25           THE COURT:  A written statement?  The person is

1    not --

2           MS. RUSSO:  Correct, Your Honor.  She provided a

3    statement by email just about an hour ago and asked me to read

4    it out loud today.

5           THE COURT:  I'm inclined to have that on the record.

6    That's fine.  Please go ahead.

7           MS. RUSSO:  Do you want me to proceed with that

8    today, Your Honor?

9           THE COURT:  Yes, that's fine.

10          MS. RUSSO:  Okay.  Okay.  Your Honor, the victim

11   writes, "On January 6th" -- she writes a statement to the Court

12   and to Mr. Samsel, she said:  "On January 6 you and a group of

13   others purposely set out to break through our police line.  You

14   purposely came into the west front of the Capitol and you

15   purposely knocked me down.  When you do that, when you set out

16   with a purpose in mind to injure another human being, you're

17   not only committing assault, but you are a thief.  You steal

18   someone's ability to have control over their own body and lead

19   a normal life.

20          "You have stolen moments away from me that I can't

21   get back.  You stole my ability to be with my fellow officers

22   while mourning the loss of my friend, Sicknick, as I was not

23   able to be fully mobile at that time.  You stole months of me

24   working alongside the country's most dedicated police officers,

25   a job that I love and work hard at.  You stole my ability to be

1   present at important events due to the physical and

2   psychological trauma that you imparted on me and my coworkers.

3   And now you're asking to be set free.

4          "When will we be set free?  When will we be set free

5   of the memories and scars of that day?  When will I be free and

6   full again?  Free of the fear that my brain injury will cause

7   me embarrassment at the best of circumstances, and further

8   injury at the worst.  Because of this I am asking that Ryan

9   Samsel not be released.  No more women should have to fear

10  injury at his hands."

11          She did express to me, Your Honor, she is not back to

12  full-time work at this time because of her injuries that were

13  sustained on January 6th.  Mr. Samsel was not the only one that

14  imparted those injuries.  I want to make that clear.  And she

15  is still having issues and seeing doctors.  Unfortunately, she

16  is fainting at random times, does not understand why that's

17  happening, has never had that happen before.  And is still

18  having some other side effects that make it impossible for her

19  to go back to duty as a Capitol police officer the way that she

20  had prior to January 6th.

21          THE COURT:  Okay.  Thank you for sharing that on the

22  record.  Ms. Russo please extend appreciation to the victim

23  from the Court.  Brave spirit to come forward and let us hear

24  what she's saying.

25          I will also note, although we've not talked about

1   this, Mr. Samsel -- in the past we've talked about, he

2   appreciates your fairness in trying to find a fair resolution

3   to resolve this matter and how you made sure that he's treated

4   fairly.  And so I appreciate that, you know, you are both

5   ensuring fairness in the prosecution, but also for victims.

6   Thank you for your continued work, Ms. Russo.

7          Again, I think where we are today is that I do

8   believe, and continue to believe detention is appropriate, but

9   I want, you know, indication, I think, to make sure that we are

10  doing it in a way that is not excessively punitive, and that if

11  Mr. Samsel is -- can receive better care, which I think by all

12  accounts, in another facility, understood his previous medical

13  conditions, I would like to continue to explore that option.

14         So, Ms. Pasqualini, I assume from your perspective

15  that this sort of proposed resolution, where there be a

16  temporary release to the state authorities, and he stays there.

17  If at any point that that would expire, that he would then come

18  back to the federal authority, that that would be satisfactory

19  from your perspective?

20         MS. PASQUALINI:  Yes, Your Honor, it would.  And I

21  certainly would be inclined, as would Mr. Samsel, should he be

22  released, he would certainly turn himself in.

23         I will tell you, there's a victim's program that

24  notifies people about seven days before people are going to be

25  released, if they're going to be released from state prison.

1   So we would know ahead of time.  As an officer of the court, I

2   would certainly share that both with Ms. Russo, with the Court.

3   So if anybody was going to -- you know, needed to readdress

4   that detention, we could do it at that time --

5          THE COURT:  Okay.  Mr. Samsel --

6          MS. PASQUALINI:  -- before it happened.  Sorry.

7          THE COURT:  No, I understand.

8          Mr. Samsel, do you understand kind of what we're

9   talking about here today?  The idea is for you to go back and

10  check to see what she thinks (unintelligible) trying to find a

11  solution where we can be fair to both sides.  I appreciate, you

12  know, Ms. Pasqualini continues to work to try to make sure

13  you're getting -- as does Ms. Russo, to make sure you're

14  getting appropriate care, and that it sounds like there's a

15  facility for you to remain in custody, but that you can receive

16  it at another facility.  So we'll see if we can figure that out

17  and come back maybe -- we'll pick a date next week, if that's

18  possible.

19         Mr. Samsel?

20         THE DEFENDANT:  There's no way I could just go to the

21  Pennsylvania state prison and let them do it?  I mean, if I'm

22  detained there?

23         THE COURT:  That's exactly what we're trying to

24  figure out, is there a way that we can send you to the

25  Pennsylvania facility and so that you can be detained there?

1    We're just trying to find out mechanically what works with

2    that, kind of, federal system; we're not just releasing people

3    to state facilities, but we're trying to find a way to do that.

4             MS. RUSSO:  Your Honor, I just want to raise two

5    issues.  I will check on this with my office, because we had

6    not discussed this as a possibility before.  But, one thing I

7    know is that there's not going to be a comfort level with

8    Mr. Samsel self-surrendering.  So we would need to make sure

9    that -- and I don't know what my office's position is going to

10   be, or my position is going to be, but if there -- we would

11   oppose anything that would allow him to self-surrender back

12   into federal custody from state custody.  I know that much,

13   because there is a concern -- and even in my motion, I sort of

14   alluded to this in my opposition.

15            But there is definitely a concern about a particular

16   witness that provided information about Mr. Samsel and we do

17   not want there to be any risk that this witness be harmed in

18   the interim with him potentially self-surrendering at any

19   point, particularly because there witness, you know, would be

20   in the vicinity of where he would be released to.

21            And then the second concern that I want to raise is

22   just that -- obviously Mr. Samsel is getting credit towards

23   whatever sentence he receives in federal court right now.  I

24   believe that he would not get that credit if he was released on

25   this case.  So, I just want to raise that as, you know,

1   obviously something for us to all be aware of, is that I don't

2   believe he would get credit for that.

3           MS. PASQUALINI:  Sure.  And on that note, I will tell

4   you, that if he is -- even if he is in the state prison -- and

5   certainly nobody wants him to have to self-surrender.  My

6   proposed solution is that, you know, a week before, whatever,

7   he's going to be released, we will be notified and the Court

8   could then -- or your office, the marshals, however it

9   mechanically happens, put the detainer on.  If he is in -- even

10  if he's in state prison and he has any type of detainer from

11  the federal court, the Pennsylvania Probation and Parole will

12  not give him time credit towards his -- either the maximum

13  sentence or any kind of time hit consequence that he gets

14  for -- if he gets convicted of anything.

15          So it becomes nothing time for him.  He gets no

16  credit, certainly he understands, towards -- towards his

17  federal sentence.  The only interest I have in making there not

18  be federal detainer until right before he would be released, is

19  that if it isn't done that way, there will be no time -- jail

20  time credit applied to any case that he has while he is housed

21  in Pennsylvania.  It's weird parole rules up here, but that's

22  how they do it.

23          THE COURT:  Okay.  I think Ms. Russo is talking about

24  on the front end, the initial concern, right, Ms. Russo?  That

25  you don't want him to self-surrender going out, or did you mean

1    coming back, or both?  I mean, both is --

2         MS. RUSSO:  Yes.  Either we -- I know that the

3    government is not comfortable and I am not comfortable with any

4    situation in which Mr. Samsel would be out in the public and

5    required to turn himself in.  We would want him to remain in

6    custody no matter what.  Because we are concerned, even a short

7    amount of time of release, with the consequences to this

8    particular witness, but also to the public would be.

9         THE COURT:  So at some point I just need to hear back

10   from you, we can pick a date, we can try to see what you can

11   suss out in terms of -- since -- start on the front end of

12   getting the defendant to be in a detention facility.  Is that

13   something that the Pennsylvania authorities -- if they lodged a

14   detainer, then I don't think he's able to be released.  If

15   you're able to follow up on that, then that's great, and we'll

16   get an answer.

17        On the back end, again, we can always enter a

18   detainer.  I hear Miss Pasqualini saying that you prefer,

19   Ms. Pasqualini, that we don't enter a detainer until further

20   down the road, I guess is what you're saying?

21        MS. PASQUALINI:  Yes.  And we certainly are not

22   asking that he be released and be able to self-surrender.

23   We're just asking that the detainer not be logged, the federal

24   detainer not be logged until shortly before he theoretically

25   would be released.  So that way it's still -- he's not getting

1    released, but he didn't get the credit towards the Pennsylvania

2    sentence while he's there.

3            THE COURT:  I think we can flag both issues.  I

4    think -- go ahead, Ms. Russo, if you want to.  But I think we

5    should just, you know, do whatever homework we all can

6    separately and then reconvene.

7            MS. RUSSO:  I'm wondering, Judge, if it would be

8    helpful if we had someone from the United States marshal

9    service at the next hearing.  One, for any sort of logistics

10   related to the thought process under 3142(i) but, two, also to

11   address Ms. Pasqualini's point about whether all medical

12   requests have to go through them, and the concern she raised

13   initially, at the beginning of this hearing.

14           THE COURT:  Sure.  I could reach out to the U.S.

15   marshal and see if he has somebody here.  But, also happy to

16   hear if you're able to provide -- find anybody from your end.

17   So we can both try.

18           MS. RUSSO:  That sounds good.  I'll reach out, Your

19   Honor.

20           MS. PASQUALINI:  What generally happens is

21   Pennsylvania is notified that a temporary release order has

22   been issued and that they have to come and get Mr. Samsel;

23   technically, within 30 days.  Sometimes it takes a little bit

24   longer than that for them to come and get him.  But, the

25   transporting of Mr. Samsel would be done by Pennsylvania.  The

1    rules, they generally have to come and pick him up.

2            THE COURT:  Okay.  Great.  Well, let's just talk and

3    see what we can figure out.

4            MS. PASQUALINI:  Excellent.

5            THE COURT:  So when do you want to reconvene?

6    Ms. Russo, how much time do you think would be helpful?

7            MS. RUSSO:  I think if we could schedule towards the

8    end of next week, that would be helpful to the government.

9            THE COURT:  Do you want to just say the 11th, make

10   sure we have enough time?

11           MS. RUSSO:  I think that's enough time.

12           THE COURT:  Ms. Pasqualini, does that sound fine by

13   you?

14           MS. PASQUALINI:  It does.  If we could do that,

15   maybe, in the morning on the 11th, that would be great.  I'm

16   also free the whole day of the 10th.  I just -- the afternoon

17   of the 11th starts to get dicey for me.

18           THE COURT:  Just so we have Rappahannock.  I think

19   the mornings -- Ms. Lavigne-Rhodes, do you want to set the

20   afternoon of the 10th?

21           THE COURTROOM DEPUTY:  Yes.  I think they can only do

22   hearings between 1 and 2:30.  That's what they had available

23   today.  I can double check.

24           They can only be scheduled after 1 p.m.

25           THE COURT:  And you can't do after 1 p.m.,

1    Ms. Pasqualini?

2              MS. PASQUALINI:  That's correct.  I could probably

3    do, like, 3:30.

4              MS. RUSSO:  That would work for the government.

5              THE COURTROOM DEPUTY:  We have a prelim --

6              THE COURT:  What's that?

7              THE COURTROOM DEPUTY:  We have a prelim at 3.

8              THE COURT:  Yeah, I don't think that will go.  That's

9    okay.

10             THE COURTROOM DEPUTY:  Okay.

11             THE COURT:  You think Rappahannock can do 3:30?

12             THE COURTROOM DEPUTY:  Yes.  I will put in a request

13   right now.  They may not have it.  I may have to give everyone

14   a call or email to switch the times a little bit.  But, it may

15   work.

16             THE COURT:  What about on Thursday?  What time do

17   they usually do these?

18             THE COURTROOM DEPUTY:  It just depends what they have

19   scheduled, and they let us know if they have any availability,

20   so --

21             THE COURT:  Yeah, great.  Let's try for 3:30.  If

22   not, then we'll be in touch by email with everybody about that

23   issue.  I can do it in a minute order.

24             MS. RUSSO:  Also, Judge, that 3 o'clock prelim is

25   mine, and it is getting continued, so -- if that's helpful.

```
 1              THE COURT:  It's helpful when the facts mirror what I

 2      just said.  Thank you.  Okay.  So --

 3              THE COURTROOM DEPUTY:  Your Honor, can we push it up

 4      to be safe, just a little bit?

 5              THE COURT:  The 3 o'clock?

 6              THE COURTROOM DEPUTY:  Um-hum.  Maybe 2:30?

 7              MS. PASQUALINI:  That's where I have a problem.

 8      Sorry.

 9              THE COURT:  Can you do 3 o'clock, Ms. Pasqualini, or

10      not?  Let's stick with 3:30.

11              THE COURTROOM DEPUTY:  Let's stick with 3:30.  I'll

12      see what this is.

13              MS. PASQUALINI:  Can I split the baby with you and do

14      3:15?

15              THE COURT:  Let's say 3:15.

16              THE COURTROOM DEPUTY:  Okay.

17              THE COURT:  Why don't you say 3 o'clock, and that way

18      by the time defendant gets there and things like that, we'll be

19      on by 3:15.  Does that sound good?

20              THE COURTROOM DEPUTY:  Yes.

21              UNIDENTIFIED SPEAKER:  That's why you get the black

22      robe.

23              THE COURT:  Absolutely.  So we'll plan for 3,

24      Ms. Pasqualini, and you'll be able to get on.  I know you're

25      juggling.
```

```
 1                    So, Mr. Samsel, does that make sense?  We're going to
 2        come back in one week and try to sort this out then.
 3                    THE DEFENDANT:  Yes, sir.
 4                    THE COURT:  Thanks for your patience, Mr. Samsel.
 5        We'll be in contact with the marshals office, as well, I will.
 6        And I'll continue to reach out to the general counsel at the
 7        jail.  Don't think that we've forgotten about you.
 8                    Ms. Pasqualini, in her email (unintelligible),
 9        Ms. Russo is there as well, and I am as well.  So don't think
10        we're forgetting.  Okay?
11                    THE DEFENDANT:  Yep.  Thank you.
12                    THE COURT:  Ms. Russo, anything else on your end?
13                    MS. RUSSO:  No, Your Honor.  Thank you very much.
14                    THE COURT:  Okay.  The parties excused.  Take care.
15        Have a good day.
16                    MS. RUSSO:  Thank you.
17                                 *   *   *
18
19
20
21
22
23
24
25
```

```
1                            CERTIFICATE

2          I do hereby certify that the foregoing is a true, correct

3      and complete transcript of the audio-recorded proceedings in

4      this matter, audio recorded on June 4, 2021, and transcribed

5      from the audio recording to the best of my ability, and that

6      said transcript has been compared with the audio recording.

7                            Dated:  June 4, 2021

8

9                            /s/_____

10                           Janice Dickman
                             Official Court Reporter
11                           333 Constitution Avenue
                             Washington, DC  20001
12                           202-354-3267

13

14

15

16

17

18

19

20

21

22

23

24

25
```