UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal Action |
| | ) No. 21-188 |
| vs. | ) |
| | ) |
| RYAN SAMSEL, | ) June 25, 2021 |
| | ) 2:39 p.m. |
| Defendant. | ) Washington, D.C. |
| | ) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE ZIA M. FARUQUI,**
**UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**

<u>**APPEARANCES:**</u>

FOR THE UNITED STATES:    DANIELLE ROSBOROUGH
U.S. Attorney's Office
555 4th Street, NW
Washington, DC 20001
(202) 252-6837
Email:  danielle.rosborough@usdoj.gov

FOR THE DEFENDANT:    JOHN M. PIERCE
Pierce Bainbridge P.C.
355 South Grand Ave., 44th Floor
Los Angeles, CA 90071
(213) 400-7125
Email:  jpierce@piercebainbridge.com

ELISABETH PASQUALINI
407 N Front St., Suite 2
Harrisburg, PA 17101
(717) 412-4386
Email:  e@ekhplaw.com

ALSO PRESENT:    CHRISTINE SCHUCK, Pretrial Officer

Court Reporter:    Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter

*This hearing was held via videoconference and*
*telephonically and is therefore subject to the limitations*
*associated with the use of technological difficulties, static*
*interference, etc.*

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  This is magistrate case

21-188, the United States of America versus Ryan Samsel.

The defendant is present by video.

Excuse me, Deputy.  Can you mute one more time for

me, please?

Thank you.

The United States of America versus Ryan Samsel.

The defendant is present by video.  This matter is set for

ascertainment of counsel.  Parties please introduce

yourselves for the record, starting with the government.

MS. ROSBOROUGH:  Good afternoon, Your Honor.

Danielle Rosborough on behalf of the United States.

MS. PASQUALINI:  Good afternoon, Judge.

Elisabeth Pasqualini on behalf of Ryan Samsel.

MS. SCHUCK:  And Christine Schuck with Pretrial

Services.

MR. PIERCE:  Good afternoon, Your Honor.

John Pierce on behalf of Mr. Samsel.  Sorry.

THE COURT:  No problem, Mr. Pierce.  We don't seem

to have the best connection with you.

You may want to either dial in in addition, or

maybe try turning off your video.

MR. PIERCE:  (Audible distorted/indiscernible.)

THE COURT:  Yes.  Mr. Pierce, it's a real bad

1    connection.  So I don't know if you want to try turning off

2    your camera, maybe that will help with bandwidth, or else

3    dial in on the phone number Ms. Lavigne-Rhodes provided.

4              Are you able to hear us okay?

5              There you go.  It seems like you are back.

6              Let's give him a minute.

7              Mr. Pierce, if you are still there, I would --

8    hopefully you can get that number; it's on the email.  You

9    can do a dial-in as Ms. Rosborough is doing.

10             There we go.

11             MR. PIERCE:  Hi, Your Honor.

12             THE COURT:  Mr. Pierce.

13             MR. PIERCE:  John Pierce.  I dialed in by phone

14   for the conference.  Sorry.

15             THE COURT:  No problem.  Perfect.  Thank you.

16             So, Mr. Samsel -- Deputy, you can unmute him,

17   please, now.  Thank you.

18             Mr. Samsel, do you want to -- the purpose of this

19   proceeding is to make sure, first, who is your lawyer.

20   Second, where are you hoping to be housed?  And, third, is

21   that something the government can concede to; and, if not,

22   then how will I resolve that dispute?

23             At our last hearing Ms. Pasqualini, with what I

24   understood was your consent, asked that you be transferred

25   to a facility in the State of Pennsylvania where you would

1   receive superior medical treatment.

2            UNIDENTIFIED MALE SPEAKER:  Judge --

3            THE COURT:  I am going to come to you.  One

4   second.  Yes.  One second.

5            I understood subsequent to that, after I entered

6   my order, that you decided that that was not what you want

7   to do, which is fine, Mr. Samsel.  I just want to get on the

8   same page.

9            So let's start with -- I understand Mr. Pierce has

10  indicated you wanted him to represent you going forward; but

11  you told me in the past that you had difficulty in some

12  situations when you were receiving a lot of phone calls of

13  who you want to be your lawyer.  So let's start with the

14  lawyer and then get to the transfer.

15           So where are we on your lawyer?  Who do you want

16  to be your lawyer, Mr. Samsel?

17           THE DEFENDANT:  Steven Pierce.

18           THE COURT:  Okay.  And you understand that that

19  means Ms. Pasqualini is going to be no longer representing

20  you and she won't be part of the case anymore?

21           THE DEFENDANT:  Yeah.

22           THE COURT:  Okay.  Great.  Ms. Pasqualini, any

23  concerns on your end?

24           MS. PASQUALINI:  No, Your Honor.

25           I believe Mr. Pierce -- I don't know whether his

1     first name is Steven; I thought it was John, but --

2               MR. PIERCE:  It's John.  John.

3               MS. PASQUALINI:  Yes.

4               That's fine.  I am good.

5               THE COURT:  Okay.  Great.  And no issues as we

6     have seen in the past, in terms of any sort of conflict or

7     anything with this counsel as I understand it, correct?

8               MS. PASQUALINI:  None of which I am aware, Your

9     Honor.

10              UNIDENTIFIED MALE SPEAKER:  No.

11              THE COURT:  All right.  Well, thank you.

12              Thank you, Ms. Pasqualini, for your service.  I

13    appreciate it.  You are excused certainly from this hearing.

14    You are welcome to stay on if you like, but I know you are

15    busy with other matters.  So thanks for taking the time to

16    be on and for your zealous representation.

17              Okay.  Mr. Samsel, I am happy to hear from you or

18    from Mr. Pierce -- whoever it's easier -- but I want to

19    understand, do you feel like you are getting adequate

20    medical care?  And, if not, where are you hoping to go?

21              I can't order the Bureau of Prisons where to send

22    you; I can make a request.  And we have kind of tried to go

23    out of our way to get you to what I understood to be a

24    facility you wanted to be at where you thought you were

25    getting, again, superior treatment than you are getting now;

1    so it sounds like that's not the case.

2          You can help educate me -- or Mr. Pierce; I defer

3    to either one of you.  Who wants to speak about that?

4          MR. PIERCE:  Your Honor, this is John Pierce.

5    I think it would be best to have Mr. Samsel address that

6    directly.

7          THE DEFENDANT:  Your Honor, so before we get

8    started, there is a female in here that would like to

9    address the Court and let them speak from the Rappahannock

10   Regional Jail standpoint on some of the situations that

11   they're dealing with, and then I can comment on a follow up

12   with her.  I don't know her name to introduce her.  Sorry.

13         MS. HACKETT:  Good evening, Your Honor.

14         THE COURT:  Hello.

15         FEMALE SPEAKER:  My name is Eva (indiscernible.)

16   I am the inmate processing manager here at Rappahannock

17   Regional Jail.

18         And as you have already stated, there has been

19   some back and forth in regards to Mr. Samsel.  I needed

20   to -- well, I thought it was in the best interest to inform

21   the Court that he still now is technically still in the

22   custody of Stafford County on the fugitive warrant for

23   Pennsylvania.  We did not receive your vacate order until

24   after the fact and after (indiscernible) issued it.  So,

25   right now, he is still being held on the fugitive warrant

1     for Pennsylvania.

2              THE COURT:  Got it.

3              MS. HACKETT:  So I guess if -- if he needs to go

4     back into the custody -- under the authority of the U.S.

5     Marshals, we would need to move, I guess, to have the

6     Commonwealth attorney in Stafford County dismiss this

7     fugitive case so, then, he would then go back into the

8     custody of the U.S. Marshals.  But as of right now, he is in

9     the custody of Stafford County.

10             THE COURT:  Understood.  I mean, I don't know that

11    the prosecutor there is going to be inclined to dismiss that

12    case; but I also understand what you are saying, that he is

13    not supposed to be in your custody.

14             I understand also -- I guess the U.S. Marshals

15    there are trying to communicate with your facility about any

16    concerns about surgery or the like at the facilities or the

17    hospitals that are quite far away.

18             MS. HACKETT:  Yes.  And that was our concern --

19    I'm sorry, Your Honor.

20             THE COURT:  Go ahead.  No.  No problem.

21             MS. HACKETT:  The concern here is the fact that --

22    you know, we house for the marshals; but due to his medical

23    status, you know, unless they're going to be sending their

24    own officers to man him during the actual, you know, medical

25    procedures, we're just not equipped at this time to have --

1    you know, set on him at the hospital while these things

2    happen.  So it's also our request that he does be

3    transferred somewhere where they're more equipped to get the

4    medical care -- well, we can get the medical care here --

5    UPA (sic) is an excellent hospital -- but we just don't have

6    the manpower here to station officers at the hospital on him

7    during that stay.

8              THE COURT:  Okay.  Thank you.

9              I appreciate you being here.  I can't say I won't

10   have more questions, but that's a great place to start.

11             MS. HACKETT:  Okay.  Thank you.

12             THE COURT:  Mr. Samsel.  Is that -- go ahead.

13             THE DEFENDANT:  So first, Your Honor, when you

14   guys were talking about the bond hearing and April Russo had

15   made a comment which -- she said that if I get shipped back

16   to Pennsylvania the time that I was in Pennsylvania would

17   not go towards the possible time that I was in their

18   custody, so it would be separated.  And she's correct on

19   that because prior to that hearing I had contacted

20   Pennsylvania myself.  I was never able to get a hold of

21   Ms. Pasqualini, so that's why I kept raising my hand -- and

22   I was getting the looks from people like put your hand down.

23             But -- I also contacted Pennsylvania on my own

24   behalf to see if anybody contacted the medical director to

25   see if -- that my medical treatment would be followed up on,

1      and he said probably not; and there's two reasons why.

2              First, I only have six months left.  The

3      calculation that I had -- that Ms. Pasqualini had provided

4      me was inaccurate.  It's only six months left until that

5      probation and parole is up, and the Department of Justice is

6      correct on that time.  So by the time I got transferred

7      there, I would have to do a 30-day quarantine, plus a 60-day

8      classification act, and then it would be 15 days for a

9      transfer.  By that -- time would be up, I would be then

10     making parole; and in that time the medical would not be

11     able to be followed up because I am past emergency procedure

12     part.  Now I am at -- I don't know the terminology they use,

13     but it wouldn't be a life-threatening emergency at this

14     point.  So just to get transferred to Pennsylvania would

15     have just set me back months anyway, and I knew that going

16     into the hearing.

17             And then I was highly upset with everybody, to be

18     honest -- I am being honest with you.  I was highly upset

19     that that court date was held without me, and then you

20     signed off on that bond without hearing my voice.  And I

21     know that's why I had to get rid of Elisabeth because, as I

22     said, you are only as good as your lawyer advocates.  So

23     it's not you I am blaming.

24             Look, I was hurt.  And you asked me three months

25     ago -- two months ago, Your Honor -- I am being respectful

1    to you, and I do respect your authority.  But you asked me

2    to be very patient and things would change, and nothing has

3    changed; it's only gotten worse.

4         I did see a vascular surgeon, and he said that he

5    personally had contacted U.S. Marshals five times -- a

6    vascular surgeon that this jail had sent me to.  He had

7    requested an ultrasound test, a venogram; and he says nobody

8    has gotten back to him.

9         Rappahannock Regional Jail said they would do

10   their part; and they have I believe.  But the problem is

11   with the U.S. Marshals; they have to approve every single

12   thing.

13        So then the surgeon said -- when I see the

14   surgeon -- he believes that the vein is fully occluded.  And

15   he says if this is the case, that they would not be able to

16   do the surgery at that particular hospital -- UVA, I think

17   it is.  Is it the hospital?

18        MS. HACKETT:  No.  They are saying that's -- you

19   would perhaps go to UVA to have it done.  They wouldn't be

20   able to do it at the hospital here.

21        THE DEFENDANT:  No.  I am just saying I went to UVA.

22        MS. HACKETT:  Okay.

23        THE DEFENDANT:  So when I went to UVA they said

24   that they don't have that particular type of surgeon there,

25   that I would probably have to be sent to a specialist in

1    D.C. or Maryland -- I think it's Johns Hopkins University

2    possibly -- and they specialize in a thoracic outlet

3    treatment.

4            He also said that he has dealt with this in the

5    past.  And what usually happens is, when they go in and do a

6    root resection and a scaling resection, they either, one, do

7    a bypass because they can't snip the vein because of the

8    rotational movement of the arm.  So, in doing that, I would

9    have to be put on a heparin drip, which is a blood thinner

10   drip, Your Honor, and/or I would have to go be put on blood

11   thinners again, and usually that has to be ultrasound every

12   day.  This jail does not have an ultrasound tech here; and

13   it would be almost nearly impossible to keep up with.

14           It's just extreme frus -- like I said, I am not

15   frustrated with you.  I am not frustrated -- I am just

16   frustrated with my whole situation.  And I'm sorry I have

17   been holding this in for two months.  And you, sir, lose the

18   mobility of your arm and somebody said, hey, be patient

19   and -- somebody in your authority -- and I hold you to it.

20   You say -- because I mean when I say -- and I know that you

21   do, too -- but when our hands are tied, it's -- it's

22   frustrating, man.

23           And my eyesight has not gotten better.  Nothing

24   has been done.  And it's at the fault of nobody but, I would

25   say, just bad luck.  And I'm sorry if I am coming off

1    adamant -- and I don't mean to; I am just very frustrated, man.

2                THE COURT:  Surely, Mr. Samsel, that is totally

3    understandable -- your frustration as you indicate -- if

4    your life is at stake and you feel like you are losing out

5    on quality of life.  But, potentially, it very could be

6    actual, right?  You are understandably very anxious to get

7    help.  No one wants to sit and be drowning with a bunch of

8    people who actually have life preservers and they do nothing.

9                I can tell you what we have done so far.  I

10   understand why it's not satisfactory.  But it is important

11   that the record is clear because this could be reviewed by

12   another judge, and I want to make sure that they understand

13   what's happened.

14               But to date -- when you initially raised your

15   concerns, I reached out to the general counsel of the jail

16   facility as well as the United States Marshals -- so the

17   presidentially-appointed marshal who oversees the judicial

18   district.

19               The general counsel is very supported.  I spoke to

20   Ms. Pasqualini.  I know that she spoke with him on multiple

21   occasions to express her concerns about medical care, and

22   that he indicated he was going to try to assist.

23               The United States Marshal indicated that he had

24   signed off on the neurovascular appointment, and that all

25   appointments that were requested will be approved as long

1    as, again, they are within policy.

2           After that, we had a hearing where you were

3    present.  And with your consent, Ms. Pasqualini said that

4    she had thought there was a better facility for you in the

5    State of Pennsylvania where you could receive better

6    treatment.  Now, you were at that hearing, sir.

7           And Ms. Pasqualini did follow up -- not only in

8    the hearing, but just to call chambers with the government

9    counsel present -- and said that the request that had been

10   made on the record which was to transfer you -- the

11   government although was objecting to -- could go forward.

12   So there was no reason to have a hearing because I was

13   trying to get you as quickly as possible to the Pennsylvania

14   state facility where, at a previous hearing that you had

15   been present at, you and your counsel had asked that you be

16   transferred to that facility to get better treatment.

17          Having a hearing, as you can see today, takes

18   additional time.  And I understood your health to be in such

19   a desire situation that I needed to get you there as soon as

20   possible, so I ruled on the papers that your counsel and the

21   government had filed.  We reached out to our courtroom

22   deputy in a very challenging circumstance to get you moved

23   as quickly as possible to Pennsylvania.

24          Now, it sounds like you then later learned that

25   transfer to Pennsylvania is going to be challenging in terms

1    of whether or not you get credit for time -- in fact,

2    whether or not you are able to get the surgery due to delays

3    in the transportation.

4         So I am totally sympathetic and want to resolve

5    this to your concerns, but I don't agree with your statement

6    that nothing has been done.  In fact, we have done quite a

7    bit, but we have more to do.  That's okay.  And we are not

8    going to stop until we get it right because, again, your

9    health is more important than someone saying that, you know,

10   well, I have tried, that's that -- or anything like that.

11        If the analysis of this outcome is based on:  Have

12   you received the care?  The answer is we have all failed.

13   And I do think that that is reasonable for you to feel that

14   way.  But I just want to be clear that it is not from a lack

15   of trying; and we will continue to try.

16        So I need to know now to the extent that,

17   Mr. Pierce -- that you have some fidelity on this; I will

18   hear from you first.  Do you have a facility that you are

19   requesting that the defendant be transferred to?

20        MR. PIERCE:  All right.  So the request right now,

21   Your Honor, is for Mr. Samsel to go back to a Bureau of

22   Prisons' facility, a federal facility.

23        I have not -- we have not identified a particular

24   facility that would be deemed the best one.  Certainly, if

25   that's necessary to do, we can do the appropriate research

1    and make that specific request.  But that's -- generally

2    speaking, unless Mr. Samsel wants to speak up and disagree

3    with me right now, that would be the request, Your Honor.

4             THE COURT:  Mr. Samsel -- okay.  Mr. Samsel, did

5    you have one in mind?  It sounds like you want to go to one

6    perhaps in Baltimore, that's close to Johns Hopkins.

7             THE DEFENDANT:  No, sir.  So, like I said,

8    Pennsylvania would not be able to -- like I said, I have

9    reached out to a medical director, and it would -- it just

10   wouldn't happen.

11            So I was thinking maybe we could work together on

12   this and maybe put me in a federal prison instead of a

13   contracted detention.  If I can go to a federal prison where

14   they have the adequate medical treatment -- like the

15   ultrasound techs in there; they have the medication; they

16   have a hospital where I could be put on a heparin drip and

17   they can work with the surgeon, whoever they -- I mean,

18   there's hospitals all over the country.  It doesn't have to

19   be Baltimore; it doesn't have to be this.

20            You know, I -- listen, as long as my surgery is

21   done, I don't really mind who does it.  But would they be

22   opposed, the government, to let me go to a federal prison,

23   not a contracted facility.  You know, a lot of these small

24   counties and FDCs are just contracted temporarily, you know,

25   for people I think.  And I hope that I can go somewhere so I

1    can be treated fairly.

2            After we are done with this issue, I would like to

3    show you some paperwork that I have to let you know what

4    else did the marshals had -- came up short on, to the best

5    my knowledge, if you would take a look at this.

6            THE COURT:  Sure.  You just provide that to your

7    lawyer, I think that's probably the best way.  He can file

8    it -- if it's sensitive, it can be filed under seal unless

9    there is a basis to do ex parte, then we can -- (audio

10   distorted/indiscernible.)

11           THE DEFENDANT:  It's basically medical bills that

12   I have been billed for medical.  And U.S. Marshals have not

13   been paying the $2.50 while I have been here, so I have been

14   paying that; that's another thing.  I have been getting the

15   medical bills, and my family is paying these medical bills;

16   and I have them right here.

17           THE COURT:  Okay.  Again, you just get that to

18   Mr. Pierce.  I mean, I don't -- that's not something I

19   normally get involved in, so I don't know what the marshal's

20   obligations are or not.  But that's what your counsel is

21   there for, he has to advocate for you.  He can look into

22   that and file a motion.  And if he has something that he

23   brings before me, I am happy to rule on it if the law is in

24   your favor.  I understand what you are saying.

25           Does that make sense?

1        THE DEFENDANT:  No, but I will agree with you.  I

2   will be honest, because --

3        MR. PIERCE:  We'll first look -- we'll proceed

4   like that with respect to that issue, Your Honor.

5        THE COURT:  Okay.  Thank you, Mr. Pierce.

6        Mr. Samsel, I mean, I can't -- my role is limited

7   as to a few things; primarily, it is about whether or not

8   you should be detained and then, after that, it's making

9   sure your constitutional rights are preserved.  So I think

10   that -- making sure your medical care is important, in terms

11   of making sure that this is not an excessive punishment.

12        But I am not sure about whether or not the

13   marshals are paying your bills is -- I can't just say, well,

14   they're supposed to do that; I mean, that's your lawyer's

15   job.  He has to then review the law and tell me what the law

16   is; and the government has to have an opportunity to

17   respond.  So I can't just have a hearing here without

18   Ms. Rosborough having an opportunity to hear a legal basis

19   for your argument and then an opportunity to respond.

20        THE DEFENDANT:  All right.  Understandable.

21        THE COURT:  So, Ms. Rosborough, I am happy to hear

22   from you.

23        MS. ROSBOROUGH:  Yes.  Thank you, Your Honor.

24        I mean, it is the government's understanding, as

25   represented by the jail, that your prior order has already

1    been acted upon and cannot be revoked at this point as

2    Mr. Samsel is practically in state custody.

3              So without trying to add to the difficulty any

4    further, I don't view that there is anything really that we

5    as the government can do because it is up to the state

6    prosecutors in the state to determine what to do with

7    Mr. Samsel if he is in their custody.

8              THE COURT:  So, I mean, Mr. Pierce I think there

9    are a couple of things you have to do here -- if you can

10   mute us at the facility, please, that would be great.

11             All right.  Mute.  There you go.  Thank you.

12             Mr. Pierce, I think there are two things.  One is,

13   you can reach out to the Pennsylvania authorities and see if

14   they will -- given my detention order is still in place, it

15   was a temporary transfer of custody, temporary release.  If

16   they will release their detainer so that we can re-order the

17   defendant back into federal custody, that would obviously be

18   helpful.

19             The other thing, alternatively, you can do is

20   perhaps look at the temporary release order and see -- prior

21   to being vacated, it was solely a temporary release; and

22   perhaps you could argue that the temporary nature of that

23   release has lapsed and so the detention order itself -- I

24   mean, the defendant was never to completely leave federal

25   custody.  It was a temporary release under the Bail Reform

1    Act to go to Pennsylvania authorities; and perhaps we can

2    argue that that has already happened, and then come back.

3    But I will look to you for some guidance there on how you

4    want to go forward.

5              I am going to take a brief two-minute recess

6    here -- or three here -- to call the U.S. Marshals Service

7    to get some updates from them as well.  So if you all can

8    just stay on hold, please, I am going to be on mute.

9              MR. PIERCE:  Yes, Your Honor.

10             (Whereupon, the proceeding pauses.)

11             THE COURT:  Sir, can you confirm the person who

12    spoke from the Rappahannock facility; was that Barbara Meade

13    who spoke previously?

14             THE DEFENDANT:  No, sir.  That was Eva Hackett,

15    H-A-C-K-E-T-T, Chief of Inmate Processing.

16             THE COURT:  Eva Hackett, Chief of Inmate Processing.

17             Okay.  You can put us back on mute.  Thank you.

18             UNIDENTIFIED MALE SPEAKER:  Come on back.

19             (Whereupon, the proceeding pauses.)

20             THE COURT:  All right.  Mr. Samsel, we're just

21    going to get the marshals in here.  We are trying to get

22    Ms. Hackett back to see what we can figure out.

23             THE DEFENDANT:  All right.  I was on mute.

24             That's understandable.

25             Before you go off, like, I want to ask you one

1    last thing.  I don't want to be just shut off and --

2         THE COURT:  I am not going anywhere.  We're

3    bringing the marshals -- the United States Marshals Service

4    in here; we're bringing back Ms. Hackett.  We are not going

5    anywhere.

6         THE DEFENDANT:  All right.  I just want to make

7    sure.  Thank you.

8         MS. HACKETT:  I am here, Your Honor.

9         THE COURT:  Hi, Ms. Hackett.  Thanks so much.

10        Deputy U.S. Marshal Haywood is on his way up.

11        MS. HACKETT:  Okay.

12        THE COURT:  He was hoping he could talk to you, so

13   I just wanted to see -- the marshal services, it sounds like

14   they're lagging a little behind.  They thought that they

15   needed to send the defendant to Charlottesville.  And it

16   sounds like that's not going to be helpful, to send him back

17   to Charlottesville; we'll all agree to that.

18        MS. HACKETT:  What, to the hospital there?

19        THE COURT:  Right.

20        MS. HACKETT:  Hold on one second.

21        I want to get -- I want to have the -- see if I

22   can get the medical director on the line.

23        THE COURT:  That would be great.

24        Mr. Samsel, as you indicated (audio

25   feedback/indiscernible) -- they indicated they would be

1    unable to help you; is that right?

2            THE DEFENDANT:  I know that for a fact.

3            I spoke to a surgeon on the outside, and they're

4    not going to be -- facilitate it and work with the jail and

5    the marshals; it's not going to work.  And that's why I am

6    asking to be transferred out of the custody of -- of here,

7    and be placed in a federal prison.  I mean, they can -- I

8    don't want their bail.  They can keep their bail; I am not

9    arguing that, and I didn't want to argue that.

10           The other thing I was going to ask is if it's --

11   if it's -- if they have to have me -- if not in a federal

12   prison, why couldn't we have worked something out with the

13   Pennsylvania medical director to where they could work

14   something out?  I mean, there's got to be options here when

15   it comes to my health.

16           I mean, I didn't do this to myself.  You know, the

17   inmates didn't do this as the FBI indicated.  I was attacked

18   by the government; and I want the government to pay for what

19   they have done, and they're going to.

20           THE COURT:  Well, my primary concern is that it --

21   it doesn't matter who did what to anybody.  You need medical

22   care; you are getting medical care, simple as that,

23   Mr. Samsel.

24           So let's just focus on seeing if we can find out

25   what facility is going to -- (audio indiscernible.)

 1              MS. HACKETT:  Okay.  Thank you.  Bye.

 2              Your Honor, I will be right back.  My office is

 3      directly across the hall.  I am being sent an email; and I

 4      am going to go print that off and bring it back over and

 5      read it to you.

 6              THE COURT:  Perfect.  Thank you.

 7              (Whereupon, the proceeding pauses.)

 8              THE COURT:  Okay.  Mr. Samsel, I have got a deputy

 9      marshal here with me and we are going to -- I know

10      Ms. Hackett is coming back here in a minute, so I am going

11      to go back on mute until she comes back.

12              (Whereupon, the proceeding pauses.)

13              THE COURT:  All right.  Ms. Hackett, let me get

14      Deputy Haywood here.

15              MS. HACKETT:  Your Honor.

16              THE COURT:  Yes, ma'am.  Ms. Hackett, I also have

17      Deputy Haywood here with me as well.

18              MS. HACKETT:  Yes.  So I have -- right now I am

19      looking over an email that was -- yesterday; it looks like

20      it was between Ms. Meade and, actually, Deputy Haywood in

21      regards to results.  I actually -- she's actually available,

22      so I am actually trying to get Ms. Meade down here so she

23      can actually speak to you on it since she is the medical

24      professional.

25              THE COURT:  That would be great.

1          MS. HACKETT:  So then she can actually verify what

2     Mr. Samsel is saying or not saying or -- however, rather

3     than me kind of being the middle guy.

4          THE COURT:  No, I appreciate that.

5          MS. HACKETT:  We are here.  Barbara Meade is here,

6     who is our director of medical services, Your Honor.

7          THE COURT:  Thank you so much.  Yes.

8          Great to see you.  Thank you so much.

9          I am trying to ascertain, first, so the defendant

10    can receive the care that he needs in Charlottesville at the

11    facility; the defendant believes he is unable to.

12    Mr. Samsel says he spoke to the surgeon and didn't think

13    that that would be feasible.

14          I ask because Deputy U.S. Marshal Haywood here --

15    one of the things the marshals medical team is looking at is

16    would they send him to Charlottesville.  So if that's not

17    going to be -- move the ball forward, then they don't, of

18    course, want to do that, then they can start looking into a

19    greater area for a facility.  But do you have any fidelity

20    for us on that?

21          MS. MEADE:  Well, the word that I got was the

22    locals didn't feel comfortable proceeding with the procedure

23    that he would need or the workup.  So they recommended he

24    went to a more academic environment, teaching -- more

25    advanced where they have a clinic, such as UVA, or one

 1    similar that can do the workup and follow through with

 2    whatever is decided was necessary.

 3              At this point in time they can't declare an

 4    urgency because they haven't done the diagnostics to

 5    determine that.

 6              THE COURT:  And when you say "UVA," I thought the

 7    defendant went to Charlottesville.  Was he not at UVA's

 8    facility's -- (audio indiscernible.)

 9              MS. MEADE:  I'm sorry.  It was a little bit rattled.

10              THE COURT:  Yes.

11              Mr. Samsel was not evaluated in person by the

12    Charlottesville University of Virginia surgeon?

13              MS. MEADE:  Yes.

14              No.  No.  He was just given a referral.  And we

15    were instructed they should be doing the diagnostics there,

16    on their campus, so that they have all of the facts.

17              (Audio indiscernible, multiple voices.)

18              THE COURT:  And Mr. Samsel -- Mr. Samsel, you just

19    reached out to them on your own; is that right?

20              THE DEFENDANT:  No.  I reached out to Pennsylvania

21    on my own to see if they would, but -- so they transferred

22    me there.  And I spoke to the surgeon and I spoke to the

23    medical team at UVA, and we went over the history.  And they

24    said because it's not an emergency at this point --

25    everything she just said is accurate.  As I said to you

1     before -- as I am being forthcoming to you as I told you.

2               I mean, if you want to get the surgeon on the

3     phone, he will tell you the same thing I am telling you;

4     that they're not going to be able to keep up with it because

5     in a process like this -- this is a vein that leads right

6     into my heart, Your Honor.  It's an important vein; it's

7     called the superior vena cava and subclavian vein.  And

8     because of the time lapse of no heparin or blood thinners,

9     it leaked into the left arm which are all major vessels.

10              So at this point a balloon plasty would be

11    irrelevant for such a condition, nor would a stent placement

12    work; it would have to be a whole total bypass from --

13    transferred from this leg to this arm -- let me finish --

14    and, in doing so, you would have to pretty much baby the arm

15    and watch it.  It could be -- every day they might have to

16    do an ultrasound to make sure nothing is occluding.

17              A hospital visit could take up to two weeks

18    possibly.  But, if not, I would have to -- almost six to

19    eight weeks -- every day would have to get an ultrasound;

20    and that particular surgeon would have to have reports

21    written there to see if it's healing properly or if the clot

22    has spread.  And doing the surgery -- it's not a very --

23    it's not a benign surgery; it could cause epidemic card --

24    what is the fluid around the heart?  What is the heart

25    encased in, the fluid?  What is it called again?

1          UNIDENTIFIED FEMALE SPEAKER:  Pericardium.

2          THE DEFENDANT:  Pericardium.  It can cause an

3    infection of the pericardium which could lead to the heart;

4    so these are things that have to be monitored, and it's

5    serious.  Not that it's -- but it's not the jail's

6    responsibility to do this, and this is what I have been

7    trying to say.

8          And then, Your Honor, before you cut me off,

9    please, listen to me.

10          THE COURT:  I am not cutting you off, Mr. Samsel,

11   I am just trying to make sure I understand.

12          You spoke to the surgeon directly at the

13   University of Virginia, that's what I am trying to confirm.

14   Right?

15          THE DEFENDANT:  Yes.  And he said -- what he said

16   was that he has reached out to the U.S. Marshals department

17   six times to let them know this, and he has not gotten a

18   response.  Also --

19          THE COURT:  Do you have the surgeon's last name?

20          THE DEFENDANT:  I do not, Your Honor.  I'm sorry.

21          But I also have paperwork that I wrote that says

22   it right here that -- it's a complete -- you know, this

23   person, that person, this communication -- I am not blaming

24   it on Mr. Haywood; I am not saying it's his fault.  It's

25   just all over the place.

1          And the eye doctor -- the eye doctor I seen, Your

2    Honor, just two days ago said I was born blind out of my

3    right eye; that's the report he got from the U.S. Marshals,

4    that I was born blind.  I hate to inform Your Honor I was

5    not born blind out of my right eye.

6          UNIDENTIFIED FEMALE SPEAKER:  No, that's not

7    what --

8          THE DEFENDANT:  No, I know -- (audio indiscernible.)

9          THE COURT:  Mr. Samsel, how did you contact the

10   surgeon if you don't know his name?  How did you get in

11   touch with him?

12         THE DEFENDANT:  The jail sent me, Your Honor.

13         I don't have my vehicle here to drive to the

14   hospital.  The jail sent me to the surgeon, Your Honor.

15         THE COURT:  No, I understand that.

16         (Audio indiscernible, multiple speakers.)

17         THE COURT:  But when you went and saw this

18   surgeon -- I thought you only talked to this person on the

19   phone.  You are saying you saw this Charlottesville,

20   Virginia physician in person?

21         THE DEFENDANT:  Yes, I did.  Yes, I did.  I was

22   transported there by the SRT team, and he explained this to

23   me.

24         What I did was, Your Honor -- what I am telling

25   you is -- please, I am asking you to listen to me.

1          The person I contacted over the telephone was a

2    Pennsylvania medical director; and he was the one that said

3    (audio indiscernible.)  But I did go to an outside surgeon

4    here, and he could not facilitate because he couldn't keep

5    up with the diagnostics, the ultrasound.  Yes, I did go; and

6    I did not take myself.

7          And I don't know -- Your Honor, I don't have

8    access to medical help, so I can't just get up and go to a

9    hospital.  If I could, I would, man.

10         You don't understand -- you don't know -- how

11   about this, Your Honor, imagine your arm being broken;

12   imagine your eye being -- you being blind and you not

13   getting medical treatment, man.

14              UNIDENTIFIED MALE SPEAKER:  Breathe down.

15              THE DEFENDANT:  How about that?

16              UNIDENTIFIED MALE SPEAKER:  Breathe down.

17              THE COURT:  Mr. Samsel, I understand --

18              THE DEFENDANT:  This is my life.  No.  This is my

19   life.  You don't understand, this is my life --

20              THE COURT:  I understand, Mr. Samsel.

21              THE DEFENDANT:  -- you are taking -- (audio

22   indiscernible.)

23              MR. PIERCE:  Ryan.  Ryan, calm down.

24              THE DEFENDANT:  This is not fair, Your Honor.

25              THE COURT:  Mr. Samsel.  Mr. Samsel, I've got you.

 1    I understand.  I am trying to work with you, Mr. Samsel.  I

 2    need you to keep working with me and be patient.

 3          I understand it's not easy to do in your

 4    situation, but it's your only option, Mr. Samsel, because I

 5    am the person who is trying to help you.

 6          So as I understand it the -- I am going to talk to

 7    Mr. Haywood now, the U.S. Marshal here.

 8          Do you have any questions?

 9          THE DEFENDANT:  Hello, Mr. Haywood.

10          MR. HAYWOOD:  Barbara, how you doing?  First time

11    meeting you and Ms. Hackett.

12          If you are able to give me a -- (audio

13    indiscernible) medical documentation and records,

14    Ms. Hackett, if you give me proper -- if you can give

15    me his -- send me his medical records (audio indiscernible),

16    you can forward it to marshals medical --

17          UNIDENTIFIED FEMALE SPEAKER:  All right.

18          MR. HAYWOOD:  -- and everyone that he talked to --

19    if I can have those phone numbers, I can forward all of that

20    information to the marshals medical and then put them in the

21    mix so that there is no -- there is no delay -- delay in

22    information.

23          MS. MEADE:  I don't have anything from UVA at this

24    point in time.  I am not quite sure when he went down there.

25          THE DEFENDANT:  I went to -- it was Lee's

1   Hospital.  They sent me to Lee.  UVA couldn't do it

2   because -- so they sent me to a place called Lee, Lee

3   Hospital.

4           MS. MEADE:  When?

5           THE DEFENDANT:  About two weeks ago.

6           MS. MEADE:  No, that wasn't UVA.  That was

7   Virginia Interventional Vascular Associates.

8           THE DEFENDANT:  Okay.  That's where I went to see --

9           MS. MEADE:  That wasn't UVA.

10          THE DEFENDANT:  Well, UVA sent me there when I

11  had --

12          MS. MEADE:  No.  We sent you, our doctor.

13          THE DEFENDANT:  No, I understand.

14          But when I spoke to the UVA guy on the telecom --

15  like this -- it was a medical thing.  We spoke, and then

16  they sent me to the hospital.  I went there in person.

17          MS. MEADE:  But it wasn't UVA.

18          MR. HAYWOOD:  So that hospital you went to, what's

19  the name of that --

20          MS. MEADE:  He went to Virginia --

21          MS. HACKETT:  It's called VIVA, V-I-V-A, which

22  stands for Virginia Interventional and Vascular Associates

23  (sic).  It's a private --

24          MR. HAYWOOD:  It's a private practice?

25          (Audio indiscernible, multiple speakers.)

1            THE COURT:  The marshals service is looking to see

2      if they can get the defendant to the University of Virginia.

3      As an academic -- it sounds like that academic

4      institution -- what you are saying, Ms. Meade -- that that

5      is who would be able to potentially have the diagnostics

6      that are necessary, such as Johns Hopkins or UVA, to treat

7      his condition.

8            MS. MEADE:  Correct, UVA.  VIVA referred him to UVA.

9            MR. HAYWOOD:  Okay.  VIVA referred him to UVA.

10           MS. MEADE:  There is a special thoracic outlet

11     syndrome clinic there, and two physicians run it.

12           MR. HAYWOOD:  Is that the information you sent in

13     the email?

14           MS. MEADE:  Yes.

15           MR. HAYWOOD:  Okay.  So I did -- I sent that

16     information to marshals medical; I was just on the phone

17     with them.

18           MS. MEADE:  Okay.  Okay.

19           MR. HAYWOOD:  Is there anything else that I need

20     from our -- this conversation --

21           MS. MEADE:  At this point --

22           MR. HAYWOOD:  -- (audio distorted) -- activity.

23           MS. HACKETT:  Yes.  This is just simply the email

24     discussion between you and Barb, Ms. Meade, yesterday; so

25     this is the information you already have.

1          MR. HAYWOOD:  Right.  But I need to get his

2     medical records, Barbara, when you have a chance.

3          MS. MEADE:  I've got them.  How do you want

4     them -- I sent you an email asking how you would like to

5     receive them.  Part of the time they ask us to mail a hard

6     copy.

7          MR. HAYWOOD:  Are you able to fax; is that an

8     option?

9          MS. MEADE:  It's actually quite a bit.

10         MR. HAYWOOD:  Quite a bit.

11         MS. HACKETT:  We can probably overnight it.

12         MR. HAYWOOD:  Okay.  I will give you the address.

13    I will call you after this, Barbara.  Give me a call on my

14    number, and I will give you the address to the courthouse.

15         MS. MEADE:  Okay.

16         MR. HAYWOOD:  And then I can carry the records to

17    the marshals medical because they only can receive it from

18    me.

19         MS. MEADE:  Okay.  That will work.

20         THE COURT:  Okay.  Give me one minute -- one

21    second, I will be right back.

22         (Whereupon, the proceeding pauses; Court mutes.)

23         THE COURT:  Ms. Meade, I have one question.

24         What do we have to do to get this -- is there a

25    way that we can -- it would help accelerate things if we

1    could get it diagnosed as an urgent condition.  Is there

2    something -- what is the process to get that diagnosis?  Or

3    how does that work?

4              MS. MEADE:  UVA is a slow process for us on this

5    side.  We submit -- supposedly the reference went down.  We

6    are awaiting notification that they're ready to see him.  We

7    haven't found -- (audio indiscernible.)

8              THE COURT:  To UVA you said?

9              MS. MEADE:  Right.  Right.  Because they --

10             THE COURT:  So you need to wait for UVA --

11             MS. MEADE:  Right.

12             THE COURT:  Sorry.  So you need to wait until UVA

13   does the diagnostic testing and until they do you can't

14   (audio indiscernible) urgent request?

15             MS. MEADE:  Exactly.

16             THE COURT:  Okay.  One moment.

17             (Whereupon, the proceeding pauses; Court mutes.)

18             MS. HACKETT:  Speak with your attorney and ask

19   your attorney to ask that question.

20             THE DEFENDANT:  Can you --

21             MS. HACKETT:  Okay.  It's already on mute.

22             (Whereupon, counsel and the defendant confer.)

23             THE COURT:  Ms. Meade, do you know the name of the

24   doctors at VIVA that Mr. Samsel saw?  Do you have those

25   records?

1          MS. MEADE:  I don't have them with me, I have them

2      in my office.

3          THE COURT:  Okay.  Great.

4          UNIDENTIFIED FEMALE SPEAKER:  I don't know if

5      they're here anymore.

6          THE COURT:  That's okay.

7          Ms. Meade, Deputy U.S. Marshal Haywood is just

8      asking as soon as this proceeding is done, when you get back

9      to your desk, you can just email -- call him; and you-all

10     can give him that information so he can speak to the doctors

11     who made that request, that will help facilitate things

12     moving along faster.

13         MS. MEADE:  No problem.

14         THE COURT:  Okay.  Great.  So I think that --

15     sorry.  One more minute.

16         (Whereupon, the proceeding pauses; Court mutes.)

17         THE COURT:  Okay.  Ms. Hackett, so Mr. Pierce is

18     going to reach out to the Pennsylvania authorities to make

19     sure that they have removed that detainer.  I mean, I

20     believe that my order indicated that the defendant was to be

21     detained for temporary release to Pennsylvania; that release

22     is over.  And so, under my understanding of my court order,

23     he was back in your -- in federal custody; but I understand

24     that you-all had some questions about that.

25         We were hoping that we could get the defendant

1    transferred pretty soon.  Can we just plan -- we can check

2    in early next week to see where things stand, but you-all

3    (audio indiscernible) while we are sorting this out.

4              MS. HACKETT:  All right.  Well, of course, he will

5    be here while it is being sorted out.  But we -- I just

6    needed to see what the result of this hearing was today so I

7    can get with the powers at our end, and staff, to expedite

8    getting -- because we technically don't need them to even

9    remove the detainer; I just need the Stafford County

10   government to actually dismiss the fugitive warrant.

11             Pennsylvania can still stay as a detainer, but

12   it's the fact that he would have to waive extradition; and

13   the extradition is what's pending.

14             THE COURT:  Right.  Well, Mr. Pierce -- I will

15   leave that to Mr. Pierce to follow up on; that's totally

16   outside of my purview.

17             MS. HACKETT:  Right.

18             MR. PIERCE:  Yes.  So, Your Honor, this is John

19   Pierce.

20             So my understanding of where things stand is --

21             THE COURT:  Sorry.  One second, Mr. Pierce.

22             Can you mute the facility again, please?  We have

23   feedback.

24             MR. PIERCE:  So I kind of feel like we're going --

25             THE COURT:  Go ahead, Mr. Pierce.

1          MR. PIERCE:  Yes.  Thank you, Your Honor.

2          So I kind of feel like where things stand is he

3     will stay in the Rappahannock facility.  I will immediately

4     have to try to make sure that the Pennsylvania, you know,

5     detainer, fugitive warrant issue is squared away.

6          But then we would get -- the idea, Your Honor, is

7     that we would -- as rapidly as soon as possible, you would

8     revoke your temporary release.  He would then be transported

9     to a Bureau of Prisons' facility, federal facility, in

10    Charlottesville.  And that -- that's what the U.S. Marshal

11    is referring to in Charlottesville, the U.S. Bureau of

12    Prisons' facility?

13         THE COURT:  So the last part is -- my temporary

14    order has already been revoked.  We vacated that order, and

15    detention is back in federal custody.

16         I think what the marshals are trying to do is

17    figure out -- the marshals medical is going to see -- given

18    that the UVA facilities are recommended, can they get the

19    defendant there -- and, you know, how quickly; or if there

20    is a better academic facility that has the support that's

21    needed, to send him there.

22         So I think they're trying to suss that out.  They

23    will need the defendant's medical records.  So Ms. Meade

24    has -- and Ms. Hackett are trying to overnight that today;

25    we'll get that.  And then Deputy Haywood will take that over

1    and carry that to the marshals medical folks for us to get

2    some plan then.  So we'll check in early next week to see

3    what we are doing to keep things moving.

4              MR. PIERCE:  Yes, Your Honor.  And greatly

5    appreciated, you know, by everybody, these efforts.

6              But just to be -- just to clarify, when the deputy

7    marshals are referring to "Charlottesville" -- I mean,

8    obviously I know Charlottesville is right where UVA is.  But

9    is he referring to a federal facility that he would be moved

10   to? -- because that affects our request.

11             I just wanted to make sure.

12             THE COURT:  I mean, I don't think they can make

13   that determination at this time.  That's the goal, yeah,

14   absolutely; but we have to see what marshals medical says.

15             MR. PIERCE:  Okay.

16             THE COURT:  There might be one there but the

17   federal facility doesn't have adequate care.  I mean, the

18   promise is to find wherever there is adequate care; that's

19   all I think that the marshals can say at this point.

20             MR. PIERCE:  Okay.  Understood, Your Honor.

21             THE COURT:  I mean, it's the same thing I am

22   saying.  It's just going to be the place where it can be

23   adequate care.  I cannot make a promise that it is or is not

24   federal, but that is what we -- I will certainly direct the

25   marshals to look for, primarily, but we need to get near

1    there.

2                   THE DEFENDANT:  Your Honor.

3                   MR. PIERCE:  Understood, Your Honor.

4                   THE DEFENDANT:  And I want -- if the U.S. Marshals

5    are there, I want them to hear.  And the reason why I am

6    trying to get to a federal penitentiary and not a federal

7    holding place where I will be just a detainee is the

8    aftercare of the ultrasound and the diagnostics that a lot

9    of these temporary holding places do not have.  And a

10   federal facility would have that, that's why I am shooting

11   to go to a federal prison rather than be a detainee at a

12   contract place; that's the whole -- again, you understand

13   what I am saying?

14                  THE COURT:  I have relayed that to the deputy

15   marshal, Mr. Samsel.  I have told them that.  I understand.

16   That's why I want to hear from the marshals medical who is

17   closest to an academic facility that can help you and what

18   is that facility's aftercare.

19                  THE DEFENDANT:  And it would be a prison and not a

20   detention center, right?

21                  THE COURT:  Well, no.  I can't promise you

22   anything, Mr. Samsel.  I promised you I am going to ask and

23   try to get that, and that is what I have asked them to do.

24   So they will then look at their -- to see what is available,

25   and then try to get you there.

1          THE DEFENDANT:  All right.  I appreciate it.  I'm

2     sorry.  Your Honor, you have got to understand my --

3          THE COURT:  Mr. Samsel.  Mr. Samsel, if I need you

4     to apologize, I will ask you to.  I don't need you to

5     apologize for anything.

6          THE DEFENDANT:  Thank you.

7          THE COURT:  Okay.  (Audio distorted.)

8          Thank you so much to Deputy Haywood, Ms. Meade,

9     Ms. Hackett.  Thank you for your diligence; I appreciate it.

10    I know this is not easy.  Thank you.

11         Mr. Pierce, anything else on your end?

12         MR. PIERCE:  Your Honor, I just want to say a

13    sincere thanks for, you know, obviously making every effort

14    to accommodate us.  I just want to say thank you.

15         THE COURT:  No problem.

16         So, Ms. Rosborough, obviously -- I don't recall if

17    we have tolled speedy trial on this -- I don't even know if

18    we have a next status date because this was an unplanned

19    hearing; but I think we should just set a status hearing

20    for, let's say, next Thursday.  We will also be in touch

21    before then, or something like that, but that will give us

22    some additional time to see where things stand; but maybe

23    you want to make a motion as to speedy trial exclusion.

24         MS. ROSBOROUGH:  Yes.  Yes, Your Honor.

25         I think two points.  I believe we are still set

1    currently for a status conference on Monday in this matter.

2           Are you -- are you intending to vacate that

3    conference?

4           THE COURT:  Yes.  That would make sense to me.

5    What do you think?

6           MS. ROSBOROUGH:  Yes.  Thank you.

7           And then -- I'm sorry.

8           MR. PIERCE:  I'm sorry.  I was just -- I was going

9    to say -- that's okay.  This is John Pierce.

10          I am actually visiting another defendant in prison

11   in D.C. Monday.  So that's actually way better for me, so

12   thank you very much.

13          THE COURT:  Okay.  So why don't we set it --

14          MS. ROSBOROUGH:  (Speakers overlapping.)

15          THE COURT:  Sorry.  Go ahead.

16          MS. ROSBOROUGH:  Sorry.  No.

17          Your Honor, I was going to make the motion that we

18   set another status conference and toll speedy trial.

19          I think, as Your Honor is aware, the government

20   has filed motions for a protective order which I believe the

21   defense has agreed to, waiting for that to get entered; and

22   then I can start engaging with discovery and the like.

23          I think we had an agreement previously with

24   Mr. Pierce to toll speedy trial and set out, you know, a

25   status conference for 30 or 45 days.  So if it's still

1    amenable to everybody, we would obviously be happy to appear

2    on Thursday but would like to set another control date 30 or

3    45 days out and toll the speedy trial until then.

4              THE COURT:  Okay.  Why don't we do that.

5              So, Mr. Pierce, any objection to -- we'll set two

6    status hearings; one next week -- just for a check-in -- to

7    see where things are as we try to make sure we move in a

8    timely fashion to make sure that Mr. Samsel gets his medical

9    care.

10             So we'll set that for -- Ms. Lavigne-Rhodes, when

11   do you think -- we could ask Ms. Hackett, she's there.  But

12   do you have -- do you want to see what time --

13             Ms. Hackett, is there a good time for next

14   Thursday to do a check-in?

15             MS. HACKETT:  Yes.  We always ask that your

16   hearings are done between the hour of 1 and 3, at least --

17   (audio indiscernible.)

18             THE COURT:  Let's do one o'clock.

19             MS. HACKETT:  Okay.  One o'clock is perfect.

20             THE COURT:  Thank you.  So we'll set it for then.

21             Ms. Meade, Ms. Hackett, you-all are welcome to

22   leave.  I'm sorry.  I don't mean to hold you there.

23             Ms. Meade, I know Deputy Haywood is waiting at his

24   desk.  So as soon as you are able to get back (audio

25   indiscernible) I'd greatly appreciate it.  Thank you for

1     what you are doing.

2            I am asking a lot for people who are already doing

3     a lot, so thank you.

4            UNIDENTIFIED SPEAKER:  Thank you.

5            THE COURT:  In terms of the speedy trial request,

6     I will find that --

7            MR. PIERCE:  Your Honor.

8            THE COURT:  Mr. Pierce, sorry.

9            Let me give the date first before I -- so we're

10    going to do our first status hearing on July 1st at 1:00 p.m.

11           We're going to do another status hearing more

12    substantively -- not about the medical issues, but just

13    about moving the case forward -- I would suggest

14    August 16th.

15           So, Mr. Pierce, does August 16th work for the

16    second status hearing?  And do you consent to the

17    government's motion to exclude time?

18           MR. PIERCE:  Yes, Your Honor.  That works with our

19    schedule, and we consent to the time exclusion.

20           THE COURT:  Okay.  Great.

21           I will exclude time between now and August 16th; I

22    think doing so is in the interest of justice, outweighs the

23    right of the public and the defendant to a speedy trial, and

24    set the hearing for that date.

25           Ms. Lavigne-Rhodes, why don't we set it for,

1    again, 1:00 p.m.

2                THE COURTROOM DEPUTY:  Yes, Your Honor.

3                THE COURT:  Okay.  So, Mr. Pierce, is there

4    anything else on your end?

5                MR. PIERCE:  Nothing from me, Your Honor.

6                Thank you.

7                THE COURT:  Ms. Rosborough?

8                MS. ROSBOROUGH:  Nothing further, Your Honor.

9    Thank you.

10               THE COURT:  Thanks so much.

11               Mr. Samsel, that's it for today.

12               Deputy Marshal Haywood is going to be talking to

13   Ms. Meade.  And then we are going to meet again next week,

14   on Thursday, hopefully to see how things have progressed;

15   but, if not, we'll discuss (audio indiscernible.)

16               In the interim, we will also -- (audio

17   indiscernible) Mr. Pierce, Ms. Rosborough, and Deputy

18   Haywood, they will be contacting me; and I will continue to

19   try to quarterback to get this across the finish line.

20   Okay?

21               THE DEFENDANT:  I appreciate it, Your Honor.

22               Listen, man, grow your beard back.  You know I am

23   a barber, right?

24               THE COURT:  Mr. Samsel, as I said, you have

25   nothing to apologize for.  I understand your frustration,

1    and I just need you to bear with me.  Bear with me, okay?

2              THE DEFENDANT:  I understand.  And, Your Honor,

3    thank you for -- listen, man, thank you.  Really, seriously,

4    thank you.

5              THE COURT:  I am doing my job.  I know you would

6    do the same, Mr. Samsel.

7              Thank you so much, everybody.

8              The parties are excused.  Take care.

9              (Whereupon, the electronically recorded proceeding

10   concludes, 3:49 p.m.)

                           *  *  *  *  *

11

                              CERTIFICATE

12

13             I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
     transcript of the FTR Gold software proceedings, and is a
14   full, true, and complete transcript of the proceedings
     transcribed to the best of my ability.

15

               **PLEASE NOTE:**  This hearing was held via
16   videoconference and telephonically in compliance with the
     COVID-19 pandemic stay-safer-at-home recommendations and is
17   therefore subject to the limitations associated with the use
     of technology, including but not limited to telephone signal
18   interference, static, signal interruptions, and other
     restrictions and limitations associated with remote court
19   reporting via telephone, speakerphone, and/or
     videoconferencing capabilities.

20

               This certificate shall be considered null and void
21   if the transcript is disassembled and/or photocopied in any
     manner by any party without authorization of the signatory
22   below.

23

          Dated this 4th day of July, 2021.

24

          /s/ Elizabeth Saint-Loth, RPR, FCRR
25        Official Court Reporter