UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,        )  Criminal Action
                                 )  No. 21-188
vs.                              )
                                 )
RYAN SAMSEL,                     )  July 1, 2021
                                 )  1:15 p.m.
              Defendant.         )  Washington, D.C.
                                 )
    * * * * * * * * * * * * * * *
```

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE ZIA M. FARUQUI,**
**UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**

<u>**APPEARANCES**</u>:

FOR THE UNITED STATES:    APRIL RUSSO
                          U.S. Attorney's Office
                          555 Fourth Street, NW
                          Washington, DC 20001
                          (202) 252-1717
                          Email:  april.russo@usdoj.gov


FOR THE DEFENDANT:        JOHN M. PIERCE
                          Pierce Bainbridge P.C.
                          355 South Grand Ave., 44th Floor
                          Los Angeles, CA 90071
                          (213) 400-7125
                          Email:  jpierce@piercebainbridge.com


Court Reporter:           Elizabeth Saint-Loth, RPR, FCRR
                          Official Court Reporter


***This hearing was held via videoconference and***
***telephonically and is therefore subject to the limitations***
***associated with the use of technological difficulties, static***
***interference, etc.***


Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1              **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  This is Magistrate Case

3    21-188, the United States of America versus Ryan Samsel.

4              The defendant is present by video.  This matter is

5    set for a status hearing.  April Russo is representing the

6    government.  John Pierce is representing the defendant.

7              THE COURT:  Thanks so much.

8              Ms. Russo, I don't see you there, but you are

9    there?

10             MS. RUSSO:  Yes, Your Honor.  I apologize.  Our

11   office Wi-Fi is blocking the Jabber product so I am

12   appearing by telephone.

13             THE COURT:  No problem.  Sounds good.  I mean, not

14   "good," but sounds good that you are there.  So thank you.

15             All right.  So I am happy to hear from you,

16   Mr. Pierce, maybe, to begin with.  You have some information

17   about what's going on?

18             I understand that your client is likely going to

19   be transferred to a new facility is what I have heard; but

20   you might have more fidelity, so let's start with you.

21             MR. PIERCE:  So I actually -- actually, I have not

22   heard that myself, Your Honor.  It's entirely possible; I

23   just have not heard that.  But I do know that Mr. Samsel has

24   some detailed thoughts on some potential -- a potential

25   location or locations that he was able to reach out and

 1    determine that, you know, there are some facilities where

 2    the medical care that he needs is kind of, like, right there

 3    and they can do the follow-up rehab.

 4             So if you don't mind, Your Honor, I defer to

 5    Mr. Samsel to give you some flesh on those bones, so to

 6    speak.

 7             THE COURT:  Sounds good.

 8             So here is what I know, Mr. Samsel; and you go

 9    after that.

10             THE DEFENDANT:  Okay.

11             THE COURT:  I just know that the marshal said that

12    Central Virginia Regional was closer to the places that they

13    found that could provide treatment, and so that's where they

14    were looking to move you.  But let's hear what you have to

15    say.

16             THE DEFENDANT:  So, yeah.  I went to Virginia

17    state court and I had a hearing; and they told me that's

18    where I'll be going.  And the reason I am going to object to

19    that, Your Honor, is I know my -- I know my history better.

20    I actually had emailed -- I emailed your chambers.  I don't

21    know if you are familiar, if you reviewed what I emailed you

22    or not, or had emailed -- (speakers overlapping).

23             THE COURT:  I didn't see it.  That's okay.  Go

24    ahead.

25             THE DEFENDANT:  So I was scheduled for surgery at

1    Einstein Medical Center at Montgomery, Pennsylvania; that

2    surgery was to be done by Jared Liebman [sic] on March 5th;

3    that was approved through my insurance company.  It was

4    called a glossectomy.  It's -- I don't know if -- I don't

5    know if it was glands or whatever; but that paperwork has --

6    it will be at your chambers.

7         And then, also, I reached out to Dr. Kotapka [sic]

8    at the University of Pennsylvania who was my thoracic outlet

9    surgeon where they have all the studies.  And when I reached

10   him on the phone, he said that -- his opinion, from what I

11   told him, is that it would be beneficial for me to go back

12   to him because he has records of all my thoracic stuff, with

13   all my imaging, and he can do comparisons and, you know,

14   decide if a surgery is necessary; what surgery would be

15   necessary if a surgery is necessary; if rehabilitation would

16   be necessary -- because sometimes you can do this without a

17   surgical procedure.

18        And I was -- and then, also, with the eye doctor,

19   in Philadelphia we have -- it's called Wills Eye; it's one

20   of the best eye facilities in the country.  If I am going to

21   be placed at a detention center and not a federal

22   penitentiary because I am presentenced -- we have FDC in

23   Philadelphia where I came from, and all these medical

24   treatments can be done right there.  And I think that's more

25   than fair -- I would hope that that's more than fair.

1          If they want to hold me at a detention center, why

2     not a federal detention center where, you know, a lot of

3     these places don't like -- even this jail, they -- I was

4     prescribed a couple of medications, and they don't approve

5     them.  They just -- because they don't.

6          So in a federal facility I was approved these

7     medications before I was transferred to Virginia when I was

8     temporarily housed there.  I was transferred to D.C.; then

9     the assault had happened, and then I was transferred here.

10    A lot of these places don't work with the outside medical

11    referrals with certain medications.  I don't know why that

12    is; it's above my knowledge.  But I think -- that's what I

13    would agree to, if that's fair.

14          Look, I am still in federal custody; I don't want

15    their bond.  We don't even have to have that hearing, that

16    they can have -- the government can have that; they can keep

17    me.

18          All I ask for is my surgery to be looked into with

19    the surgical -- the Einstein Medical Center, that paperwork.

20    Like I said, it was approved.  I was supposed to get it on

21    March 5th, but I got arrested in February.  If that can be

22    looked into, along with the treatment from the assault that

23    took place, and just house me at a federal detention center

24    instead of a county-contracted federal designation center.

25    That -- I think that's totally fair; and I don't think there

1      should be any objection to that.

2                  THE COURT:  So a couple of things, Mr. Samsel.

3                  I just want to make sure, first, to begin with

4      that the facility that you are asking for is one in

5      particular in Pennsylvania, correct?  In Philadelphia?

6                  THE DEFENDANT:  Yes, sir.

7                  THE COURT:  And what's the name of it?

8                  THE DEFENDANT:  It's called FDC, federal detention

9      center.  It's a federal detention center.

10                 THE COURT:  In Philadelphia?

11                 THE DEFENDANT:  Yes, sir.  I was already there.  I

12     came from there to D.C.; and then what happened at D.C.,

13     they switched me down here.

14                 I understand that, you know, they referred me to

15     WVA, or whatever it's called.  Your Honor, I don't want to

16     go to that hospital.  I think -- I am an innocent person.

17     And I'm sorry if you feel different, but I know I am

18     innocent.  And I think that I still have liberty and rights.

19     And I am temporarily detained under a criminal complaint; I

20     am not even indicted.  And I think that I should have the

21     right to pick where I get my medical treatment; and I am

22     respectfully asking that it be with the doctors that I know

23     and trust.

24                 I don't trust U.S. Marshals or the FBI; and I

25     don't want to go to Virginia where they have authority over

1    me.  I'm sorry.  They're the ones that assaulted me; I don't

2    know what they got.  I would rather go to doctors that I

3    have a history with.  I can be in a federal -- and I am not

4    even in a county facility; I am in a federal detention

5    center.  I think -- what else could -- that's fair.

6              THE COURT:  So did you receive -- I will answer

7    your questions -- your comments, I just want to ask one last

8    question.

9              Did you receive care from these providers when you

10   were at the federal detention center in Philadelphia?

11             THE DEFENDANT:  I received -- not from the

12   outside, no.  I did not because I wasn't there long enough.

13   But the medical treatment in the federal detention center

14   was a lot better.  They were willing to, I just wasn't there

15   long enough to receive it.  After I -- (indiscernible) the

16   medical.  But the medical care inside the facility, they

17   have rehabilitation in the federal detention center.  They

18   approved the medicines that were prescribed to me; I did get

19   that; some of them being blood thinners, some of them being

20   nonnarcotic pain medicines.  And they worked better, like,

21   they were faster.

22             Here the problem is -- when you go to these

23   detention centers in Virginia -- so the marshals have to

24   approve it; then after the marshals, then the SRT team has

25   to approve it -- and it's back and forth.  And by that time

1  it's a time delay; it becomes an issue.  And there's too

2  many -- like you said, there is only one quarterback -- and

3  I will quote you for what you said when I was having --

4  (indiscernible) there is only one quarterback.

5          I would rather be in the federal government's

6  custody and let them handle the treatment; I think that's

7  fair.

8          There is no way I am going to be able to have

9  surgery at Einstein Medical Center and being in central

10  Virginia when the federal government was already working --

11  talking to these doctors; and then I was transferred to

12  D.C., to here -- and that all got stopped.  I'd rather just

13  go the same route we're on.

14          I don't see any -- I don't see any disputes with

15  that.  Do you?

16          THE COURT:  So I have a couple of things,

17  Mr. Samsel.

18          I understand your frustration; and I will continue

19  to work and try to get you the best possible care that you

20  can get.  That's -- you know, I think that's fair; and I

21  want to do that.  I am not doing it because I have to; I

22  want to be very clear.

23          I think that there is a base line of what has to

24  be done, but we should always strive for more; in part

25  because, as you state, I am surprised and disheartened you

1    don't know whether or not I think you are innocent because

2    it should be very clear.  The law demands that I think you

3    are innocent; and if I don't think that I can't do this job;

4    I am unqualified for it, unfit.

5          So let's be very clear on one thing.  I believe

6    you are innocent because that's what the law dictates; if

7    not, then I am not following the law.  So that, in no way,

8    impacts, however, a person's guilt or innocence as to

9    whether or not they are a human being, and they deserve to

10   be treated with dignity and (indiscernible).

11         All that being said, Mr. Samsel, the things that

12   you are addressing are problems not of your case but of our

13   entire healthcare system.

14         I mean, every person does not have the right to go

15   to the provider that they want to.  In fact, very few to no

16   one wants that; you go to who your insurance will allow you

17   to.  If they have an appointment -- I am not saying that we

18   are not going to get you to Pennsylvania; but you do need to

19   get -- need to have a little bit of a course correction

20   here.

21         You are asking for very reasonable things, and I

22   want to do what I can help you.  But you have to understand

23   that this is not a principle fairness and that you get to go

24   where the best doctor is, who knows the best situation.

25         We have to find the best available doctor, but

1      "available" is important.  It's not because you are in

2      custody; that is what everyone, again, deals with.  And you

3      know, getting multiple checkoffs and, yeah, the marshals --

4      well, you know, my health insurance -- before I can take my

5      daughter to get care, I have to get something -- a prior

6      approval, and things like that.

7              So this is no different -- I mean, obviously, it's

8      much more challenging for you, and frustrating, because you

9      are in detention; so you can't just go and say:  You know

10     what, I am going to just go drive up to Pennsylvania -- so

11     that makes all of this -- I don't doubt that it makes it

12     much harder.  But, again, it's your life and your health,

13     and you only get one of those; you don't get a do-over, so I

14     get that.

15             But you need to understand that you are not

16     guaranteed the right to the doctor that you want, nor is

17     anyone else.  And so all we can do is what -- we can do our

18     best to get the best available doctor.

19             So I will talk to the U.S. Marshals Service and

20     see if we can get you back to that facility you were at.  I

21     think it's helpful that you went there, you know, because

22     that makes it a lot easier.  I think the fact that your

23     doctors that you know around there -- all of these things

24     are things that should be in your benefit and in favor of

25     your request.  You are not asking to go to California to a

1    place you have never been before with doctors that have

2    never seen you; so that is fair, you are right.

3              But you need to understand that there is a very

4    real possibility the marshal service is going to say, like,

5    look, this is not how our organization works.

6              In my years in criminal justice -- my near 15

7    years, I have never had someone who the marshals did as much

8    as they're doing to try to go out of their way to find who

9    is the best available doctor to get.  Usually they say:

10   This is available, and take that; and that's just like

11   everybody else.  That's like me going to my doctor and they

12   say, too bad; you don't get to go see the specialist at the

13   Mayo Clinic; you are going to the place down the street.

14             So they are trying.  I understand that it's an

15   outcome-based analysis; you are not getting the outcome that

16   you need to keep yourself feeling healthy.  So no matter

17   what, how hard they're trying doesn't get -- it doesn't move

18   the ball forward, let's say, for you.

19             But I will continue to stay on top of making sure

20   that they try.  I will speak to them about that and see if I

21   can get them to accommodate this decision.

22             But you need to understand -- you know, think

23   about it; our criminal system is set on a very

24   straightforward path.  It is:  If you do not like a judge's

25   decision, you appeal it to the next judge.  So there is a

1       district judge, the chief judge of our district that you can

2       take any requests to and, then, the D.C. Circuit and, then,

3       the Supreme Court.

4               So you and Mr. Pierce can talk about whether or

5       not that is a remedy that's available to you to seek a

6       different judge who will do more or order the marshals to do

7       more.  I can tell you from my review of the law, I don't

8       think that that exists.

9               Everything that I am doing now is purely at my

10      discretion, and a lot of it is at the kindness of the U.S.

11      Marshals Service -- it's that they're trying to do the right

12      thing because they don't have to do this.  So I will

13      continue to do that but, you know, maybe I am wrong.  That's

14      why you have Mr. Pierce there; he is there to correct me if

15      I am wrong, as is Ms. Russo, and say:  Judge, you do need to

16      get him to the place that he wants to go, and that's that.

17              So I will continue to work on trying to get you

18      there.  And, in the interim, I will, you know, always look

19      forward to hearing from you or your counsel.  When you do

20      want to contact me, you can.

21              I will go back and check with my clerks to see if

22      a spam filter or something blocked your email but, also, you

23      have counsel.  So our local rules say when you have counsel

24      you should be reaching out to me through your lawyer; but,

25      that's fine, you are not going to be penalized.

1        Mr. Pierce -- it's hard for him to get there because of

2        COVID, and everything else.  So you can stay in touch; keep

3        us posted.

4                But my plan right now is I am going to -- as soon

5        as we're done with this hearing, I am going to call up the

6        U.S. Marshals Service and see if they can accommodate this

7        request.

8                I would like you to provide -- can you say again

9        the name of your doctor in Pennsylvania so I can make

10       sure that they're --

11               THE DEFENDANT:  Yes.  Judge, there's actually two

12       of them.  The scheduled surgery from March 5th, that surgery

13       was scheduled for -- and I will speak slow so the court

14       reporter --

15               THE COURT:  Yeah.

16               THE DEFENDANT:  -- it was Einstein Medical Center

17       at Montgomery, Pennsylvania, his name was Jared Liebman; and

18       that was for a glossectomy; that was for the tumors that I

19       have in my chest.  That was approved through my insurance.

20               And then I have doctor -- we call him

21       Dr. Kotapka -- I'm sorry for the name, I don't know how to

22       spell it -- but it's Dr. K.  He is a neurovascular surgeon

23       at the University of Pennsylvania; that is in Philadelphia.

24       I have been seeing him, and he has been on my case for

25       probably five years or so.  I actually also had a balloon

1        plasty that was done.

2                  So Einstein and University of Pennsylvania have

3        worked together pretty extensively on my condition for five

4        to seven years.  They're familiar -- they're working

5        together, and they're familiar.

6                  Because what happens is, Your Honor, these veins

7        that you see that are prominent in my shoulder, they are

8        called collateral -- are you listening?

9                  THE COURT:  Yes.

10                 THE DEFENDANT:  Okay.  They're called collateral

11       veins; that's a secondary vascular system.  You have a deep

12       vein system and you have the superficial vein system.

13                 My deep vein system is no good, so everything I

14       have is superficial.  So when they go in to do like -- say

15       like a glossectomy, they already have out the map -- what

16       veins are now running.  So if you injure one of these veins

17       that are here, or disrupted, that will cause further damage.

18       That's why I would hope that I can go back -- even after

19       this is done, this is going to be something that I deal with

20       for the rest of my life, Your Honor.

21                 This is not something like -- you know, I don't

22       want to go down to Virginia and say, hey, I've got to drive

23       down here to do this whenever I get out of custody, and then

24       I go back up to Philadelphia; it's too much.  I'd rather

25       just continue with the treatment that I had set forth.  And,

1    like I said, I will be in FDC Philadelphia which is on 8th

2    and Arch; it's a 15-minute walk in the City of Philadelphia.

3    And I think that would be --

4            Can you shut that, ma'am?

5            THE COURT:  You are fine.  I can hear you fine.

6            THE DEFENDANT:  No.  Sorry.  There's people.

7            Shut that.  Thank you.

8            THE COURT:  You are fine.

9            THE DEFENDANT:  I don't want everybody to hear my

10   business -- or my medical stuff, sorry.

11           THE COURT:  I got you.  Sure.  That's fine.

12           THE DEFENDANT:  So that's the reason why -- and I

13   said the big thing is, like, if they send me to this central

14   regional Virginia, Your Honor -- I will explain to you,

15   after the surgery they're going to want to put me on a

16   heparin drip; they are going to want to put me on Eliquis.

17   I have been through similar situations like this.  And then,

18   when I came to this jail, they just don't approve these

19   medications; they don't.  And that is a big thing.

20           I get that the U.S. Marshals are trying.  And I am

21   not -- last week when I spoke I was extremely frustrated

22   because my situation feels -- for me -- it wasn't getting

23   any better.

24           If I go back to FDC Philadelphia, I won't be

25   able -- I don't have to miss -- I don't have to be

1    transferred by 20 different people to go to court; it's just

2    everything is simple.  It's the federal government, they

3    have more resources.  It's less:  Hey, tell him; tell him;

4    tell him; tell him to do this.  And I think it's more of a

5    direct thing, and it would be easier for everybody to

6    facilitate my medical treatment.

7              I would think that that's logical.

8              THE COURT:  Well, you know, I will just tell you,

9    again, from my own personal experience with my mother going

10   through medical treatments with long-term cancer treatments,

11   as well as for myself, it often feels illogical what the

12   healthcare system at times feels like; the hoops you have to

13   jump through.

14             And I understand from my personal perspective in

15   this position that -- overseeing the criminal justice

16   system, sort of, machinery move that there is a lot of --

17   you know, just a lot of hoops to jump through, Mr. Samsel.

18             But, you know, the good thing about being a judge

19   is that I can cut through some of that, so that's what I am

20   going to do.  I am going to keep doing that, I am not going

21   to stop.

22             THE DEFENDANT:  All right.  Thank you.

23             Your Honor, also, like I said, dude -- I am

24   telling you -- I'm sorry about your mother; I hope she's

25   doing well, I do.  If not, I will pray for her.  And I mean

1    that, I am a Christian.  And I don't -- I'm sorry if

2    (indiscernible) happens.

3              THE COURT:  Prayers are always appreciated,

4    Mr. Samsel.

5              THE DEFENDANT:  Yeah.  All right.  Because I am

6    pro-God, just to let you know that.

7              Your Honor, I went through a very hard time

8    getting approvals with my insurance company, so -- and I

9    do -- I understand the hoops and stuff like that.  So that's

10   why I said -- when I talked to you about the Einstein

11   Medical Center, it took me almost two years to get this

12   approved through my medical insurance because it had to be a

13   plastic surgeon; and they were like, oh, we don't do plastic

14   surgery.  I said -- and I had -- the doctor had to come in,

15   and the head -- the chief of the hospital:  No, it's just a

16   surgeon that does that particular surgery -- it's not that

17   he is getting a face lift or anything like that.  It's

18   sometimes a plastic surgeon is needed for a particular

19   surgery; and that's why -- what took me so long to get

20   approved.

21             Believe me, I don't care how I look to that extent

22   where I am getting plastic surgery -- (speakers overlap.)

23             THE COURT:  No, I understand.

24             I understand what you are saying, Mr. Samsel.  You

25   have put a lot of time in getting these doctors; they know

1    who you are.  So, I mean, let's just see -- I mean, there is

2    nothing -- no reason to think not.  Let's try the

3    U.S. Marshals Service and see what they say.  And see -- you

4    have already been to this place.

5                THE DEFENDANT:  Would Ms. Russo be opposed to

6    that?  I mean, she is on the line.  I think we should give

7    her a shot --

8                THE COURT:  Well, I don't think Ms. Russo -- I

9    will let her speak; but I don't think she has much equities

10   in this in terms of -- you don't understand.

11               Normally, no one gets involved in this.  It's

12   purely a marshals service decision.  And no one -- I mean, I

13   don't know that Ms. Russo has any authority to tell them

14   anything; much like I do not either.

15               I mean, the regulations, I think, allow them to do

16   this as long as they're giving you adequate treatment.  So

17   all of us are just trying to help you.

18               So, I mean, I am happy to hear from Ms. Russo, but

19   I would be surprised if she is going to object to you going

20   somewhere else.

21               Go ahead, Ms. Russo.

22               MS. RUSSO:  Judge, just a couple of things from my

23   end.  This is April Russo speaking.

24               First, with respect to some of these hearings, we

25   are getting into some details of Mr. Samsel's medical care;

1    and I heard him say today that he didn't want people to

2    overhear that.  I do not believe these hearings are under

3    seal; and I think that they are public hearings.  So I just

4    want -- if we do have a more detailed hearing about his

5    medical care, I just wanted to raise that issue in case he

6    is not aware of that.

7            The second thing is -- with respect to the federal

8    detention center in Pennsylvania -- just one concern I have

9    is that, once Mr. Samsel gets there, he may not have access

10   to the specialists that he thinks he might have access to,

11   or they may have policies that he is not yet aware of that

12   are similar to the policies that have frustrated him here.

13           I know originally he was hoping to get the state

14   custody -- thinking that things might be better if he was

15   serving his parole hold -- and, then, after the filing --

16   after Ms. Pasqualini's filing and after we had that hearing,

17   we learned some facts about what would occur if he were to

18   be transferred to state custody that made him decide he

19   didn't want to go that route; and so that same thing could

20   happen in this situation.

21           So I think it would be important to know -- as

22   Your Honor has already written down these names, I know; but

23   it would be important to know whether he would, in fact,

24   have access to these specialists.  And so I think those are

25   the main things that I would say.

1           I think sometimes that's why the marshals have to

2   do things the way they do things, because they have a good

3   understanding of perhaps how those mechanics will work in

4   any given situation -- what kind of access the defendant

5   would have to medical care.

6           THE COURT:  Well, that all sounds right to me.

7           Again, no one can make any promises at any

8   facility that someone is going to get, just like no one can

9   make any promises that even -- of a healthcare provider; but

10  I take all the points.  Thank you.

11          Mr. Pierce, anything else you want to add from

12  your end?

13          MR. PIERCE:  You know, I would just say, Your

14  Honor -- I'll kind of defer to Mr. Samsel if we do have

15  future hearings and he wants them sealed -- of course, you

16  know, I mean, we can and will make that request in the

17  future.

18          You know, with respect to Ms. Russo's comments

19  about the federal detention center and whether they can,

20  indeed, provide the care that Mr. Samsel needs -- I honestly

21  cannot speak to that.  I mean, it sounds like we're on a

22  good path with respect to Your Honor's commitment which we

23  greatly appreciate, you know, to work with the U.S. Marshals

24  to, you know, try to make that happen.  And, you know, we

25  can collectively work to try to make sure that that facility

1     would, indeed, be able to provide the care that Mr. Samsel

2     seems to, you know, think and hope that it can.

3             THE DEFENDANT:  Your Honor, and one last thing

4     before I go -- a comment.  I want to thank you.  I do

5     understand, you know, you are trying to help me; I get that.

6     I do understand that.

7             A quick thing just so Ms. Russo and my lawyer can

8     hear, that wasn't the reason why I didn't want to do the

9     Pennsylvania detention center; just so she knows.

10            I want to be honest and forthcoming.  I told

11    Elisabeth last time.  I said, hey, they have my parole date

12    wrong.  And so it was only six months -- when she sent me

13    the paperwork, it was supposed to be of 2022.  It was only

14    six months.  I didn't want to go -- I didn't want to make a

15    bond on this and go to Pennsylvania; and I get out in five

16    months, and they just let me slip through the cracks and I

17    am out.

18            Would it be nice to get out?  Yeah.  But I don't

19    want to do anything that shows my credibility as being

20    dishonest; and that's why I wanted to forth come and show

21    like, hey, look, my parole is up in six months -- it's

22    actually up in February and not in August.  That was

23    something that I didn't want to -- you know, when I spoke to

24    my lawyer last time, she's telling me to kind of hush-hush.

25    I don't want to hush-hush; I'd rather just be forthcoming.

 1    It is what it is.  It's not hidden.

 2              And I don't want no -- in simple terms -- I don't

 3    mean to be disrespectful -- I don't want no bullshit.  I

 4    want to be full, honest, and I expect the same; that's the

 5    way I want to be.  You know what I mean?

 6              I think that that would show -- if I go there and

 7    they say, oh, you said it was in August.  Even -- I believe

 8    Ms. Russo has it; it should be in February of 2022, not of

 9    August.  And I felt that that would be just a waste of

10    everybody's time -- to be transferred there a few months and

11    to come back.  And I think that's why I did that.  If it was

12    longer, then I would have went to Pennsylvania to seek the

13    medical treatment there.  But I don't want to waste their

14    time, your time, my time, or anybody else's time and put so

15    much work into this.

16              One last thing, it was also -- the federal

17    government does -- and you could look this up online.  The

18    federal government does work with these universities and

19    they also work with Wills Eye out of FDC.  And that's why --

20    you know, even if it's not a particular doctor, at least

21    they have my records at these universities for comparison

22    studies and a prognosis on what is to come; that's the

23    point.

24              THE COURT:  I got you.  I got you, Mr. Samsel.

25              THE DEFENDANT:  It's FDC.  Remember, Your Honor,

1    FDC, 8th and Arch.

2              THE COURT:  I got you.

3              THE DEFENDANT:  All right.

4              MS. RUSSO:  A couple of other quick things, too.

5              If the defendant is transferred to the detention

6    center in Pennsylvania -- I had to jump through a few hoops

7    to get the defendant transferred directly down here versus

8    what normally would happen which is -- there is an airlift

9    to Oklahoma, and Oklahoma to Pennsylvania.

10             So I know that there is a way to get him bused to

11   Pennsylvania, but I think it's something that we have to

12   specially ask for and request; and I know that's not always

13   possible.  But obviously it can take up to several months

14   for somebody to be transferred from one facility to another

15   even when the distance is as short as this.  So I think that

16   would be something that we would need to address if a

17   transfer does happen.

18             And the second thing -- I know we addressed this

19   at the very beginning of the call, but I wasn't very clear

20   on the answer.  Has the state given up primary jurisdiction

21   of Mr. Samsel at this point so that's not an issue any

22   longer?

23             THE COURT:  I believe so.  That's the way I

24   understand it because my order was vacated -- when I talked

25   to the marshals service they were under the belief that he

1    is now exclusively under federal custody.

2           MS. RUSSO:  Okay.

3           THE DEFENDANT:  I just had court, Your Honor, here

4    in Virginia.  So I had to go to a certain court here in

5    Virginia to reply to that.  So, yeah, they vacated the order

6    of writ to Pennsylvania and I am now housed under federal

7    detention solely.

8           MS. RUSSO:  And the final thing, Your Honor.

9           I know we set a date last week; my colleague

10    filled me in on the date.  I just wanted to ask whether the

11    speedy trial exclusion that was put on the record at the

12    last hearing goes to just to today's date or goes to the

13    August date that we set for a status conference?

14           THE COURT:  Well, I believe it was until August,

15    but I think you should ask to continue it to August just to

16    be sure.

17           MS. RUSSO:  And that's what I would request, Your

18    Honor, is just that the -- that there is justification in

19    this case, particularly when we have the defendant

20    potentially being transported; but, certainly, even if he is

21    not transported we're working out these medical issues.

22           I know that Mr. Pierce has agreed to a protective

23    order which just got entered, and we still need to get

24    discovery to Mr. Pierce; and we're continuing to work on a

25    resolution for this case.  So I would ask that the time be

1    excluded from now until the 15th of August as we have been

2    asked to hold off on the indictment for these reasons.

3             THE COURT:  Mr. Pierce, any objection?

4             MR. PIERCE:  No objection to that, Your Honor.

5             THE COURT:  Okay.  We'll pause the clock computing

6    speedy trial.  I find it's in the interest of justice, for

7    the reasons stated by Ms. Russo, to toll the time between

8    now and the August date as the interest outweighs the right

9    of the defendant and the public in a speedy trial.

10            So my suggestion is that -- at this point I need

11   to talk to the U.S. Marshals Service and then circle back;

12   and so that's what I am going to do.  I will set a hearing

13   on the docket, but I need to first talk to them because if I

14   just set one for Wednesday or Thursday of next week they may

15   say:  We can get this done by today or tomorrow -- I don't

16   know.

17            So I am going to talk to them; and then I will set

18   an order for a hearing to happen sometime hopefully next

19   week.

20            THE DEFENDANT:  Just to give you a heads up, Your

21   Honor, when I went to court the U.S. Marshals had left an

22   Attorney General, a district attorney here -- I don't know

23   what they go by -- they left a note saying that I am on the

24   transfer list already to be placed in central regional jail.

25   So I would ask that -- again, just sort of a reminder.

1     I'm sorry to bug you; but, dude, you don't

2  understand what it's like when you don't have a voice here,

3  man.  This is the only time I get to really talk to anybody

4  that listens.

5     I beg to do what you can do to get me into a

6  federal detention center rather than one of these county

7  ones because it is -- it's very -- like I can't even get

8  Tylenol until I talk to the SRT team; and they have to get

9  an approval from the marshals, and then it has to come back

10  down this way.  It can be months before I ever get a

11  Tylenol; that's what I am saying.  It's -- it's hard to --

12  for them to facilitate any -- and I say -- I know you are

13  going above and beyond, and I appreciate it; I do, honestly.

14  I thank all of the parties here.

15     THE COURT:  I assure you, I understand you want to

16  get this done quickly; I think everyone does --

17     THE DEFENDANT:  Also, then, Your Honor, you got to

18  lay the muscle down on them, Your Honor.  You got to lay the

19  muscle down on them, man.  Come on.

20     THE COURT:  I will do my best, Mr. Samsel.

21     THE DEFENDANT:  All right.

22     THE COURT:  I assure you I will be talking to them

23  right after this.  After we hang up, I will be talking to my

24  courtroom deputy and then to the U.S. Marshals Service, so I

25  will be in touch.

1           THE DEFENDANT:  All right.  Thank you.

2           THE COURT:  We will keep you all posted.

3           Thank you, everybody.  The parties are excused.

4           THE DEFENDANT:  Thanks.  Have a good day.

5           See you, John.

6           MR. PIERCE:  Good to see you.

7           (Whereupon, the proceeding concludes, 1:47 p.m.)

8                        *  *  *  *  *

9                        **CERTIFICATE**

10          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
certify that the foregoing constitutes a true and accurate
11   transcript of the FTR Gold software proceedings, and is a
full, true, and complete transcript of the proceedings
12   transcribed to the best of my ability.

13          **PLEASE NOTE:**  This hearing was held via videoconference
and telephonically in compliance with the COVID-19 pandemic
14   stay-safer-at-home recommendations and is therefore subject
to the limitations associated with the use of technology,
15   including but not limited to telephone signal interference,
static, signal interruptions, and other restrictions and
16   limitations associated with remote court reporting via
telephone, speakerphone, and/or videoconferencing
17   capabilities.

18          This certificate shall be considered null and void if
the transcript is disassembled and/or photocopied in any
19   manner by any party without authorization of the signatory
below.

20

21          Dated this 9th day of July, 2021.

22

          /s/ Elizabeth Saint-Loth, RPR, FCRR
23          Official Court Reporter

24

25