IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RYAN SAMSEL<br><br>    Defendant. | Case No. 1:21-cr-00537-TJK |

**Government's Status Report**

On September 14, 2021 the Court issued a minute order requesting a joint medical status report to be filed on September 20, 2021 on the issue of the production of medical records by the facility where Samsel was then housed and the United States Marshals Service ("USMS"). The defendant and Government timely filed separate status reports. In the Government's report, the Government confirmed that USMS had represented that they had provided all medical records in their possession as of the date of the filing. Those records were dated up to five days prior to the filing of the status report.

Since that time, the parties have not been before the Court. The defendant filed two additional medical status reports, the third of which was filed late Thursday night on October 14 (R. 55). This latest motion does three things (1) it requests an evidentiary hearing relating to two incidents, one of which occurred September 15 at CVRJ, and the other of which occurred October 12 at Northern Neck, with the goal of obtaining documents, video, and bodycam relating to these incidents; (2) it makes allegations relating to a recent article; and (3) it reiterates the request for medical care/records.

On the first issue, the Government is not in a position to opine on the provision of these materials but does not believe that a full evidentiary hearing is appropriate about those incidents

in this criminal prosecution of the defendant's January 6 conduct.[1] The Government does not object to the presence of someone from the facility and the USMS at the hearing. Moreover, the Government joins the defense request that this hearing, if at all possible, be held sooner than November 9. On the second issue relating to the article, there is absolutely no basis in fact for these speculations. It makes no difference to the Government whether Samsel wishes to meet or not and his violent actions at the Capitol and his prior history of assaultive and obstructive behavior speaks for itself. The other speculations are discussed and responded to in the attached sealed addendum. *See* Govt. Ex. 1, Addendum, Filed Under Seal.

Finally, the Government continues to agree with defense counsel that Samsel should have adequate medical care, should be safe, and his attorneys should have access to all of his medical records. The Government also agrees that the injuries sustained by Samsel are extremely alarming, that the defense has just cause for concern, and the Government is also concerned. However, the Government cannot refute or agree with much of what defense counsel discusses relating to his medical care in the status reports because (1) the Government does not have access to all of the medical records defense possesses; (2) as discussed at length below, Samsel's account consistently differs from the account of the facilities where he is housed; and (3) neither the Government or defense are trained medical professionals. As explained in more detail below, the facts surrounding Samsel's conditions of confinement, medical care, and the three different incidents (one at the D.C. Jail, one at CVRJ, and one at Northern Neck) remain unclear. And, while those facts and the conditions of confinement can be investigated, the court and prosecutors handling Samsel's criminal prosecution for assaultive conduct on January 6 are not investigators and this forum is not the appropriate forum to conduct that kind of

---

[1] The Government has referred the latter of these incidents for investigation after confirming with defense counsel that Samsel is alleging an assault occurred at Northern Neck.

investigation. *See* R. 51 (collecting cases).²

## I. Factual and Procedural Background

### A. Samsel's arrest, background

Samsel was first charged by criminal complaint on January 29, 2021 for his conduct at the Capitol on January 6, 2021. (R. 1). He was arrested in Levittown, PA the following day, consented to detention, and was transported to the District of Columbia. Samsel waived his Miranda rights and agreed to speak to law enforcement on the day of his arrest, admitted to going to the U.S. Capitol on January 6, and identified himself in videos and images depicting assaults on law enforcement at the Capitol.

In footage from January 6, 2021, Samsel is seen leading the mob approaching the U.S. Capitol. The vastly outnumbered USCP officers guarding the barricades to the Capitol repeatedly directed the rioters to stay back. Undeterred, Samsel marched up to the officers, removed his jacket, took a fighting stance, and began to push and pull the metal bike barricades into the officers with substantial force. As a result of Samsel's and others' actions at the Capitol, one officer fell and hit her head on the stairs behind her, and several other officers suffered injuries. The officer that fell continues to seek medical care as a result of ongoing health issues

---

² *See also United States v. Wade*, No. 307-CR-00111-RRB-JDR, 2009 WL 3837151, at *1 (D. Alaska Nov. 13, 2009) (rejecting defendant's request for evidentiary hearing and holding that "the issues exclusively related to conditions of confinement are outside the jurisdiction of this Court and are properly addressed through administrative remedies with the Department of corrections or in a civil action under 42 U.S.C. § 1983. Any claims concerning the conditions of confinement cannot be brought in the federal criminal case."); *United States v. Folse*, No. CR 15-2485 JB, 2016 WL 3996386, at *15 (D.N.M. June 15, 2016) (collecting cases) ("The general rule is that a defendant must file a separate civil action to address his conditions of confinement. . . This rule prevents prisoners and pretrial detainees from effectively bypassing the PLRA's exhaustion requirements, which apply to pretrial detainees and detainees awaiting sentencing." and explaining that allegations regarding "solitary confinement, pretrial privileges, cleanliness, shackles, telephone access, and diet. . . . He must pursue these claims through a civil rights action" and not through the criminal case.).

associated with January 6 and has not yet been able to return to work full-time.

Other videos and images of Samsel that day depict him mooning officers, taunting them by waving a flag pole in their faces and appearing to hit officers on the head with the flag/pole, and grabbing a U.S. Capitol Police Officer's protective riot shield, as well as climbing and pulling on the scaffolding outside the Capitol building.

Videos and images were recovered from Samsel and his girlfriend's cellular phones. These videos and images depict Samsel leading the charge at Peace Circle on January 6. He was the first one to approach the barriers that day (possibly the first person to enter the restricted area at the Capitol on January 6), and the crowd followed his lead. In texts with friends following the attack on the Capitol, he bragged about how he led the crowd, stating:

| | | |
|---|---|---|
| 1/7/2021 6:34:59 PM(UTC-5) | Watch vedio me yelling pull them forward I'm getting massed watch it | Native Messages |
| 1/7/2021 6:35:31 PM(UTC-5) | I'm the one yelling pull the forward I had red hat and black t shirt | Native Messages |
| 1/7/2021 6:36:15 PM(UTC-5) | Bahaha i woulda came fuck u shoulda let me known | Native Messages |
| 1/7/2021 6:36:16 PM(UTC-5) | I'm on cover of time mag I was first one over the fence bro everybody followed me we w… | Native Messages |

Samsel was on parole at the time he committed these offenses and had an open warrant in New Jersey. He has a lengthy and violent criminal history dating all the way back to 2006. The 2006 conviction was for terroristic threats, reckless endangerment, and disorderly conduct and involved Samsel trying to run someone off the road because they owed him 60 dollars. The female victim was forced to pull over, after which Samsel approached her vehicle and punched her windshield, telling her he knew where she lived and would kill her if he didn't get his money.

*See* Govt. Ex. 2, 2006 Rept. (filed under seal).[3] Then, in 2007, a police report was filed against Samsel after Samsel allegedly got into another man's car and starting hitting him in the face. Someone called an ambulance for the man, who was badly beaten, and the police observed his front teeth were missing and that his face was bloody. *See* Govt. Ex. 3, 2007 Rept. In 2009, Samsel was convicted of simple assault and reckless endangerment after he held a victim against her will for five hours, choking her to the point of unconsciousness, pushing her, beating her, and chipping her teeth. *See* Govt. Ex. 4, 2009 Rept.

Then, in 2011, Samsel was convicted of simple assault, reckless endangerment, disorderly conduct, and unlawful restraint, as well as for intimidation of a witness, for choking and beating his pregnant girlfriend. *See* Govt. Ex. 5, 2011 Rept. The allegations of that assault involved Samsel smashing a hot pizza in the victim's face, beating the victim, pouring a beer over her head, and eventually throwing her into the canal, where he then hopped down and held her head under. When Samsel finally stopped holding her, the victim ran into the street barefoot and found a police vehicle. She desperately tried to open the door of the vehicle and the officer saw her and unlocked it so she could get in. Samsel later attempted to and did interfere with her testimony about what had occurred.

---

[3] Because the exhibits contain sensitive information pertaining to victims they have been filed under seal.

> A: That Ryan had started a fight at the VFW and he blamed her for the fight. Ryan first started a verbal argument then she said he would not let her leave. They visited people and went house to house. The argument escalated from verbal to physical. He started smacking her and smashed a pizza in her face. Then while walking to his house he poured beer over her. He pushed her down then threw her into the canal. Before throwing her in, he said to her, "You have a choice right now, you can live or die or you can fight back or let me do it. She told me he jumped in with her and he pulled her under. She said she could not breathe and she was trying to rationalize with him, telling Ryan she loved him so he would let her go. She said that if she screamed or yelled for help it would have been worse, (meaning) she said she was in fear for her life. She also told her sister, "I was afraid he was going to kill me." ▮▮▮▮ did change her story and lessened Ryan's actions because she was terrified of him.

In 2015, Samsel was yet again convicted of simple assault. This involved a different victim recounting numerous assaults by Samsel, including her alleging that at one point, he had choked her to the point of unconsciousness and that, at another point, he hit her so hard she had a hematoma. *See* Govt. Ex. 6, 2015 Rept.

In 2019, a still different victim came forward, recounting several incidents of Samsel choking her to the point of unconsciousness and breaking into her house and assaulting her. She described waking up vomiting, with him still in the house. The victim also alleged that Samsel raped her multiple times, and that she had often been scared he would kill her. She had obtained a restraining order, but Samsel violated the restraining order multiple times. *See* Govt. Ex. 7, 2019 Rept. There is an outstanding warrant for Samsel's arrest based on this conduct in New Jersey. Samsel was not only wanted on that warrant at the time of the offense conduct in this case, but he was also still on parole for the 2011 conviction described above.

### b. Samsel's initial arrival in D.C.

Following his arrest, Samsel was transported to the DC jail on February 17, 2021. He retained attorney Elisabeth Pasqualini to represent him. On March 1, she informed the Government that Samsel had contracted COVID a third time and was being treated at the D.C. Jail (where he was initially housed). On March 23, Ms. Pasqualini informed the Government that Samsel had allegedly been assaulted while at the D.C. Jail. That incident was referred for

investigation to the FBI (and it remains under investigation),[4] but Samsel was treated for numerous injuries, to include (but not limited to) bilateral facial bilateral nasal bone fracture, fracture of the orbital floor, wrist injury, facial trauma, and pain in the ribs.[5] Ms. Pasqualini requested later that week that Samsel be transferred out of the D.C. Jail, indicating that he was not comfortable being there while the investigation was ongoing. The USMS confirmed that they could transfer Samsel but indicated that the transfer would be at a facility at least an hour away. The defendant indicated he still wanted the transfer, and within a week of the request, on April 6, 2021, Samsel was transferred to Rappahannock in the Richmond, VA area.

### c. Rappahannock

During the week of Samsel's transfer, a second attorney reached out to the Government, indicating that Samsel had fired Ms. Pasqualini and that they now represented Samsel. This attorney, David Metcalf, was sponsored by local counsel Robert Jenkins. Jenkins filed a motion to replace Ms. Pasqualini on March 31. (R. 12). In the meantime, Ms. Pasqualini informed the Government that she believed she still represented Samsel and had not heard otherwise from him. On April 1 and April 2, a U.S. Magistrate Judge held status hearings to determine the status of Samsel's representations. Samsel indicated that he wanted both Ms. Pasqualini and Mr. Metcalf to represent him.

A few weeks later, the attorneys informed the Government that Samsel likely only wished to continue with Ms. Pasqualini. After an additional two weeks and two additional status conferences (May 14 and May 18), Samsel confirmed that he wanted to proceed only with Ms.

---

[4] The prosecutors in this case have been purposefully walled off in large part from that investigation.
[5] The defense motion (R. 49) describes his injuries, but the Government does not have the Howard University medical records the defense possesses. The account above is from records provided to both the Government and defense counsel by USMS.

Pasqualini. Mr. Metcalf withdrew on May 18. (R. 22). On April 30, Ms. Pasqualini raised concerns about a pre-existing medical condition that Samsel had that she worried was exacerbated by the recent assault, requesting that he be seen by medical staff at Rappahannock. USMS requested a medical assessment of Samsel on May 4 and forwarded defense counsel's email to the facility.[6]

Given the potential urgent nature of Samsel's medical needs, the Government requested that Ms. Pasqualini be provided a direct contact at Rappahannock in case of emergency medical issues, and the Court granted that request, providing Ms. Pasqualini with a point of contact. On May 24, Samsel filed a motion for release from federal custody, requesting that he be transferred to state custody to serve out the time on his parole detainer (R. 23). In the filing, defense counsel indicated, "it is believed that [Samsel] has not received the follow up treatment ordered by the physicians," and that, "despite the good and appreciated efforts of the court and the government, undersigned's efforts to communicate with counsel for the institution [Rappahannock] regarding Mr. Samsel's medical care have gone unanswered thus far." *Id.* Defense counsel later indicated that the defendant believed he would get better care at the state facility.

At a hearing on June 4 before U.S. Magistrate Judge Faruqui,[7] at which Samsel was present, the Court asked, "the defendant is not seeking to be released out in the public, he's seeking to be released to another facility, as I understand it. Ms. Pasqualini?" Defense confirmed that this was accurate. (Tr. June 4, 2021 at 5). The Court asked Samsel if he understood, and Samsel confirmed that he wanted to go to the state facility. "There's no way I

---

[6] The Government initially attempted to reach out to the facility directly, but was told by the facility and then by USMS that all such requests must go through USMS.
[7] From May until this case was indicted, Judge Faruqui agreed to preside over matters involving Samsel in order to ensure that the parties and Samsel had one person to go to with concerns or questions and in order to schedule frequent status hearings based on the concerns raised.

could just go the Pennsylvania state prison and let them do it?" *Id.* at 12.  At the end of the hearing, the Court again confirmed that Samsel understood that the Court was going to try to grant his request to transfer to a state facility.  Samsel confirmed he did, and the Court told Samsel that the Government, defense counsel, and himself were going to work together to see what could be done about the transfer. *Id.* at 20.  Samsel thanked the Court. *Id.*

The Government opposed Samsel's release from custody, but was amenable to the idea of him being in state custody with a federal detainer. (R. 25; *see also* R. 27: Tr. June 4, 2021). In other words, the Government supported Samsel being in the place where he felt he could get the best medical treatment, but not his release.  The Court agreed to Samsel's request, placing him in state custody, but also agreed with the Government that a federal detainer should be in place. (R. 28).  In the Government's motion, the Government explained, "The Government does not dispute that Samsel has medical conditions that are alarming.  Nor does the Government in any way suggest that the Court should not take into account those conditions.  They are mitigating here, but they simply do not overcome other aspects of Samsel's history and characteristics, which leave little doubt that Samsel's release would put the public at-risk." (R. 25).  At the June 4 hearing, the Government also requested that the U.S. Marshals Service come to the next hearing to sort out defense counsel's claim that Rappahannock had represented that USMS had to approve all medical care requests and that there was a delay in the approval of those requests.  (Tr. June 4, 2021 at 16).[8]

Subsequent to the Court's Order, on June 14, attorney John Pierce sent an email to the Court and stated in that email and subsequent to it that Samsel had not authorized Ms. Pasqualini to file the motion requesting a transfer, that Samsel did not want a transfer, and that he wanted the

---

[8]  At this hearing, the Court also commented that Samsel had previously noted the Government's efforts in trying to make sure he was treated fairly. *Id.* at 11.

Order vacated and for Samsel to remain in federal custody. The Court forwarded the correspondence and held an assessment of counsel hearing on June 21 and June 25 to determine whether Samsel truly wanted to switch attorneys again (R. 29); *see also* (Tr. June 24 at 4-5).

At the June 25, 2021 hearing, Ms. Pasqualini withdrew from the case. During that hearing, the Court advised Samsel "I can't order the Bureau of Prisons where to send you; I can make a request. And we have kind of tried to go out of our way to get you to what I understood to be facility you wanted to be at where you thought you were getting, again, superior treatment than you are getting now." (July 1 Tr. at 5). Also, on or about June 25, Rappahannock indicated that they could no longer house Samsel. *Id.* at 8-9.

USMS arranged a transfer to Central Virginia Regional Jail, but Samsel objected to the transfer. The Court stayed the transfer for eight days, holding a status hearing on July 1. Samsel indicated that he had specific doctors in Pennsylvania (a Dr. Liebman and a doctor at Penn) that he had been seeing for a glossectomy and his thoracic condition. (July 1 Tr. at 4). He requested a transfer to FDC in Philadelphia. *Id.* He said he had no objection to detention but wanted it to be a federal detention facility, in part because, in his view, the approval process for medical care between USMS and SRT was taking too long. *Id.* at 5. The U.S. Magistrate Judge noted that he would check into the request, but that Samsel should "understand that you are not guaranteed to the doctor that you want, nor is anyone else," and that, in his 15 years in the criminal justice system, "I have never had someone who the marshals did as much as they're doing to try to go out of their way to find who is the best available doctor to get." *Id.* When Samsel asked what the Government's position was, the U.S. Magistrate Court answered, "I don't think [the Government] has much equities in this – Normally no one gets involved in this. It's purely a marshals service

decision. And no one – I mean, I don't know that Ms. Russo has any authority to tell them anything; much like I do not either." *Id.*

### c. Central Virginia Regional Jail

The judge consulted with USMS about Samsel's desired move to Pennsylvania and also requested that defense counsel determine whether certain doctors Samsel had mentioned had seen him or could see him if he were transferred. USMS informed the judge:

> They made contact with office staff at Dr. Liebman's office. Mr. Samsel was being seen by Dr. Liebman, a plastic surgeon, for concerns unrelated to thoracic outlet syndrome. There is no specialty care needed that is urgent nor specific to this particular providers abilities.
>
> Conversation with Penn Medicine indicated there was no record of the prisoner being seen by vascular surgery. There is record of primary care visits only. **Unless more specific provider information is available, it is not possible to receive direct feedback regarding transfer of care.**
>
> Given the diagnosis of thoracic outlet syndrome, the presence of providers specializing in this condition at UVA, and the recommendation of VIVA for UVA evaluation, the USMS considers work-up at UVA to be advantageous to ensuring Mr. Samsel receives timely evaluation and/or treatment deemed necessary.

On July 12, 2021, Samsel was transferred to CVRJ where he remained until September 29, 2021. While at CVRJ, Samsel had ten or more visits with various medical professionals, including a visit with the University of Virginia's vascular specialists.

In August, Samsel requested new counsel, and, on August 16, John Pierce withdrew from the case, and Stanley Woodward and Juli Haller entered appearances. On August 25, the grand jury returned a seven count indictment against Samsel, charging him with assaults on two different officers, obstruction of an official proceeding, committing acts of violence on Capitol grounds, and two counts of civil disorder. (R. 46). On September 11, current defense counsel filed an Emergency Motion for Order Regarding Medical Treatment and Records (R. 49). The motion requested "instanter such medical treatment and medications as are medically necessary" and to produce all medical records "in their custody and control." *Id.* The motion also states that Samsel

has "lost vision in his right eye, has suffered seizures, and has continuing pain and suffering in relation to the thoracic outlet syndrome . . . and a general lack of follow up care, and rehabilitative care." *Id.*  While unable to agree or disagree with the representations in the motion as to what had been withheld or what medical conditions Samsel had been diagnosed with, the Government did not oppose the motion for medical records or necessary medical treatment and medications and still does not oppose that motion.

On September 13, 2021, the USMS transmitted medical records to Haller and Woodward. The next day, on September 14, 2021, the USMS sent additional medical records to Samsel's attorneys. In that correspondence, USMS noted that all requests for care were approved by MMB the same day they were received and that there were no outstanding requests for care awaiting MMB review.

That same day, on September 14, the Court arraigned Samsel on the charges and requested a joint status report on production of medical records to be filed by the parties September 20. One day later, the Government and USMS received emails from both defense counsel in which both suggested Samsel had been assaulted by staff at CVRJ, although with differing versions of the event. The Government immediately followed up with USMS, who followed up with the facility. The facility's account of what occurred differed from either of the two accounts provided by defense counsel, and the facility denied that any assault took place. The consistent theme between all accounts, however, appeared to be that there were injuries[9] and that the injuries were sustained

---

[9] The facility report noted "mild redness on the left side of [Samsel's] face and cheek bone area."

while Samsel was being transferred from one cell to another. Similarly, the facility and defense attorneys differed on their account of the types of injuries sustained and the extent of them.

According to the facility, Samsel was examined that night and the following day. The nurse who examined Samsel the following day stated that she had visited Samsel, that "he was definitely in no distress"; that his meal log "showed he had eaten breakfast, lunch, and dinner"; that when she approached his cell he was "nonchalantly speaking to someone on the phone"; that he was "talkative and smiling" and had "denied any current complaints except for some tenderness to his left cheek"; that "He denied any vomiting currently, stating that he vomited a few times in the middle of the night last night but he thought it was due to stress and nerves"; and that he had a meal cooking in his sink and was given an ice pack.

On September 20, the parties each filed a first medical status report, as ordered by the Court. (R. 50). In their status report, the defense recounted some of the details from the September 15 medical examination report, requested additional medical records, and noted some records they still did not have. *Id.* They also requested that USMS and a representative from CVRJ come to the next hearing. *Id.* Six days after the incident described above, Samsel was transported to the emergency room. Again, Samsel and the facility gave differing accounts of why he was transported and what the diagnosis was. (R. 54). On October 4, Samsel filed a Second Medical Status Report (R. 54). In that report, defense counsel explained that they had a video call with Samsel approximately eight days after the incident and observed significant bruising on his face and eye and a large welt on his back. *Id.* at 2.

### d. Northern Neck

In the interim, prior to the defense filing but post-September 15 incident, on September 29, Samsel was transferred to Northern Neck Regional Jail. Upon his transfer to Northern Neck

Regional Jail, Samsel was screened by the medical professionals at the jail. On or around September 28, defense counsel sent a request to USMS that Samsel be transferred back to the D.C. Jail instead of Northern Neck, indicating that he wanted to go back there and was comfortable doing so. On October 5, 2021, Samsel requested a kosher diet. The records do not reflect any requests by Samsel for medical treatment from his intake on September 29, 2021 through the date of his dietary request. According to the medical records, the next day, on October 7, 2021, Samsel was seen for possible medical complaints, but reported no complaints.

Then, on October 12, defense counsel indicated that Samsel had been assaulted by corrections officers at Northern Neck. (*See* R. 55 at 3-7). The facility did not have the same account of what occurred. However, both accounts consistently reported that Samsel sustained some kind of injury. On October 12, 2021, Samsel was evaluated at approximately 4:00 p.m. A few hours later, at approximately 6:35 p.m., Samsel was discovered laying face down in his cell having seizure like activity. Samsel was taken to medical to be evaluated. Samsel stated he did not recall how he ended up on the floor. Samsel, against medical advice, signed a refusal for the recommended medication to treat seizures. Samsel was placed under observation and the officers were advised to notify medical and the duty nurse of any changes in Samsel's condition. A few hours later, on October 13, 2021, at approximately 3:35 a.m., Samsel stated that "he was using the bathroom, then he woke up in the corner of the cell on the ground." The records discuss a possible syncopal episode and report that the bruising on his left cheekbone was from Samsel's apparent fall when he went to use the bathroom and also suggest that Samsel bit his lip during that fall. *But see* Defense Third Medical Status Report at 3-6 (providing additional detail and differing with

respect to some of the details in the reports). The Government has referred this incident to the FBI for investigation.[10]

### III.   Conclusion

This is not a case in which the Government is indifferent. In fact, in the approximately two months that defense counsel have been representing Samsel, more than 60 emails have been exchanged between them, the Government, defense counsel, and various representatives from the USMS and the facilities related to Samsel's medical complaints and medical records, in addition to numerous conference calls. These figures do not include numerous emails and calls relating to discovery and issues in the criminal case against Samsel. The medical records the Government does have show that Samsel has had more than twenty medical appointments with a variety of specialists.

The injuries Samsel has sustained are alarming, regardless of the cause. And, Samsel should have his medical records. But, the reports and differing accounts above cannot be sorted out in the criminal case. And, the appropriate place to sort out these allegations and Samsel's conditions of confinement is not in this case.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar Number 415793

By:   /s/April Nicole Russo
April Nicole Russo
PA Bar No. 313475
Assistant United States
Attorney 555 Fourth Street,

---

[10] As with CVRJ and Rappahannock, Northern Neck provided a direct contact at the facility for the attorneys (the superintendent).

NW Washington, D.C. 20530
(202) 252-1717
april.russo@usdoj.gov

*/s/ Danielle Rosborough*
Danielle Rosborough
D.C. Bar No. 1016234
Trial Attorney, National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
202-514-0073
Danielle.Rosborough@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

RYAN SAMSEL

Case No. 1:21-cr-00537-TJK

**Defendant.**

**CERTIFICATE OF SERVICE**

On October 21, 2021, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed and served via the CM/ECF system, which will automatically send electronic notification of such filing to all registered parties.

/s/April Nicole Russo

April Nicole Russo
PA Bar No. 313475
Assistant United States
Attorney 555 Fourth Street,
NW Washington, D.C. 20530
(202) 252-1717
april.russo@usdoj.gov