```
1                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
2

3       United States of America,      )  Criminal Action
                                        )  No. 21-cr-537
4                       Plaintiff,      )
                                        )  STATUS CONFERENCE
5       vs.                             )
                                        )  Washington, DC
6       Ryan Samsel,                    )  November 9, 2021
                                        )  Time:  2:00 p.m.
7                       Defendant.      )
        _____
8
                        TRANSCRIPT OF STATUS CONFERENCE
9                             HELD BEFORE
                      THE HONORABLE JUDGE TIMOTHY J. KELLY
10                     UNITED STATES DISTRICT JUDGE
        _____
11
                          A P P E A R A N C E S
12
        For Plaintiff:       April Nicole Russo
13                           Danielle Rosborough
                             U.S. Attorney's Office
14                           555 4th Street, NW
                             Washington, DC  20001
15                           (202) 252-1717
                             Email:  April.russo@usdoj.gov
16                           Email:  Danielle.rosborough@usdoj.gov

17
        For Defendant:       Stanley Edmund Woodward, Jr.
18                           Brand Woodward Law
                             1808 Park Road NW
19                           Washington, DC  20010
                             (202) 996-0113
20                           Email:  Stanley@brandwoodwardlaw.com

21                           Julia Haller
                             Law Offices of Julia Haller
22                           601 Pennsylvania Avenue, NW, Suite 900
                             Washington, DC 20036
23                           (202) 352-2615
                             Email:  Hallerjulia@outlook.com

24

25
```

2

| | |
|---|---|
| 1 | Also Present:      Derrick Heywood - U.S. Marshal Service |
| | Diedre Lewis - CVRJ |
| 2 | Major Davis - CVRJ |
| | Captain English - NNRJ |
| 3 | Captain Luna - NNRJ |

```
 1    Also Present:         Derrick Heywood - U.S. Marshal Service
                            Diedre Lewis - CVRJ
 2                          Major Davis - CVRJ
                            Captain English - NNRJ
 3                          Captain Luna - NNRJ

 4
      Court Reporter:       Janice E. Dickman, RMR, CRR, CRC
 5                          Official Court Reporter
                            United States Courthouse, Room 6523
 6                          333 Constitution Avenue, NW
                            Washington, DC  20001
 7                          202-354-3267

 8                                *   *   *

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              THE COURTROOM DEPUTY:  We're on the record in

2     criminal matter 21-537, *United States of America versus Ryan*

3     *Samsel*.  Present for the government are April Russo and

4     Danielle Rosborough.  Present from the United States Marshal

5     Service is Derrick Heywood.  Present from the Central Virginia

6     Regional Jail are Major Davis and Medical Supervisor Diedre

7     Lewis.  Present from the Northern Nick Regional Jail are

8     Captain English and Captain Luna.  Present for the defendant

9     are Stanley Woodwrd and Julia Haller.  And also present is

10    defendant Ryan Samsel.

11             THE COURT:  All right.  Good afternoon to everyone on

12    the line here.  We've got, hopefully, a number of things to

13    cover today in the limited time we have.  But I thought the

14    first thing we could do, I was trying to get everyone's name

15    who's here.  And I appreciate everyone -- I appreciate everyone

16    being here, including the representatives from the

17    incarcerative -- the facility where the defendant is and has

18    been incarcerated pending trial.

19             I guess the first thing, why don't I -- as I read the

20    report that the parties submitted, what struck me -- and maybe

21    just the most productive place to start here -- is that it

22    seems like the vast majority of the records that defense

23    counsel have identified that they're interested in seeing that

24    are missing, looks like they relate to records generated when

25    the defendant was present at the CVRJ.  And it sounds like we
```

1      have representative from the CVRJ here today.

2              Is that -- first of all, Mr. Woodward, would you

3      agree that it looks like the vast majority of the records are

4      from that period of time?

5              MR. HEYWOOD:  I do agree, Your Honor.  There are, of

6      course, records we highlighted from all of the facilities where

7      Mr. Samsel has been detained.  There are a number of records

8      that we have not received that would have been generated while

9      he was in the custody of CVRJ.

10             THE COURT:  Right.  Looks like, certainly, the vast

11     majority.  I mean, I can hear from the folks in charge of

12     individual facilities, I guess, if it comes to it.  But in

13     terms of streamlining things, does someone from the Department

14     of Justice, one of the prosecutors want to address kind of

15     where we are in terms of making sure that the defendant has all

16     the records that he's entitled to?  It seems like there has

17     been some progress, but looking at this list, it looks like

18     there are many records, at least from CVRJ, that remain

19     outstanding.

20             MS. RUSSO:  Sure, Your Honor.  April Russo on behalf

21     of the government.  So after the last hearing, the government

22     did seek out a list of potential items that might be missing

23     from the defense.  I'm not sure it's exactly identical to the

24     list that we put in the filing.  However, that list was

25     transmitted to CVRJ and also to Northern Neck.  And CVRJ is

1      here and they can talk more and explain more.

2            But, they indicated to us, through the Marshal

3      Service, Your Honor, that they -- the problem with these

4      records is that they're from outside facilities and I think

5      that -- I know Northern Neck had spoken to how they handled

6      that at the last hearing.  I think CVRJ handles that

7      differently.  What they indicated to the government, they can't

8      obtain some of those records because of problems with HIPAA and

9      things like that from these outside facilities.  And so I think

10     they could speak more directly on -- to that.  But I think that

11     was the concern that they had.

12            I mean, I know that there are some records that they

13     are still seeking from Northern Neck.  Some of those look like

14     they may be more recent records that maybe just haven't been

15     obtained by Northern Neck yet.  We did also forward that list,

16     as well, to them.  And I do know that at the last hearing

17     Northern Neck had indicated that they would produce records by

18     close of business.  They did produce records.  How extensive

19     those records are and whether those satisfied all of defense's

20     concerns, you know, I can't speak to.  But they did produce

21     records on that day, per what they told the Court.

22            THE COURT:  All right.  Why don't I hear from, I

23     guess, the representatives from CVRJ about their process and

24     procedure and how Mr. Samsel is going to be able to get the

25     records -- these records that his counsel has identified.

1            MAJOR DAVIS:  Do you want to address that, Ms. Lewis?

2            MS. LEWIS:  Your Honor, it's always been my

3    understanding that we are only legally able to release records

4    that initiated from this facility.  And that is what we have

5    sent to Mr. Samsel's counsel.  The rest of the records on this

6    list originated at other health care facilities.  So, basically

7    the records are their property and Mr. Samsel's property; I

8    can't legally release those.

9            THE COURT:  But you have them?

10           MS. LEWIS:  Yes.  They were released to us so we

11   could care for him.  But it's my understanding that I can't

12   release them to a third-party.

13           THE COURT:  But he's asking for them.  He's not a

14   third-party in this.  They're for his treatment, right?

15           MS. LEWIS:  I understand that.  But, again, the

16   way -- the way that I was always educated on the HIPAA rules,

17   is that I can only release records that originated from here,

18   not that I have requested from other institutions.

19           THE COURT:  Okay.  I guess someone is going to have

20   to point to me -- I mean, I've ordered the government to

21   provide those records, to the extent that they exist, to him.

22   So if you all have -- if somebody on behalf of the government

23   can point me to law that prevents that, then I'm happy to take

24   a look at it.  But until then, it seems to me -- I've ordered

25   it to happen and so it should happen.

1          MS. LEWIS:  And that's fine with me.  Again, I was

2     just trying to follow the law.  I've always been told that I

3     can't release them, they're not our property.

4          THE COURT:  I hear you.  I hear you.  And I'm

5     happy -- let me put it this way:  Is there anyone on this call

6     representing the defense, representing the government, is there

7     anyone on this call that knows of a legal reason why Mr. Samsel

8     wouldn't be able to -- why I wouldn't be able to order that

9     these records be turned over to Mr. Samsel?

10         MR. WOODWARD:  No, Your Honor.

11         MS. HALLER:  No, Your Honor.

12         MR. WOODWARD:  And had, you know --

13         THE COURT:  All right.  So, you know, I guess the

14    question is whether -- I mean, I think when the government

15    takes someone into custody and they -- the government then, at

16    least through these other facilities, has records that are

17    relevant to a defendant's medical condition and that defendant

18    wants them, I just -- I don't -- you know, I'm not a HIPAA

19    expert at all.  But no one here seems to -- can identify me a

20    specific reason why Mr. Samsel shouldn't have those records,

21    and so I'm going to simply just order that they be turned over,

22    unless some party is -- again, I don't want to order something

23    that's contrary to law or get you all crosswise with the law.

24    So, if someone can -- if someone can provide me a citation or

25    can cite me a law why that shouldn't happen, I'll certainly

1    reconsider.  But, I think the way we leave it now, we actually

2    leave it now, is that those records should be turned over to

3    Mr. Samsel's counsel, assuming, you know, he has the

4    appropriate releases and all the rest of that, which I assume

5    he does.

6                MR. WOODWARD:  Your Honor, if I can just address that

7    point.  You know, yes, we're frustrated, so I'll begin with

8    that, with that acknowledgment.  When we were last before you

9    on the 28th, there was a clear direction from the Court that

10   the records were to be provided to us, and now we stand before

11   you today, almost two weeks later, and we have not received the

12   records that we identified for the government almost

13   immediately following the proceeding.  And until we spoke to

14   the government yesterday as part of our effort to draft a joint

15   report -- and Your Honor should know, that defense counsel went

16   out of its way to craft that report in a way that could be

17   signed jointly by both sides.

18                You, obviously, have seen our other status reports in

19   this case.  We learned yesterday for the first time that CVRJ

20   has the records but is refusing to produce them, despite the

21   Court's order.  And so it would be our clear position that any

22   opportunity to object to the production of these records has

23   been waived.

24                I would also highlight for Your Honor that this is

25   not the consistent practice of CVRJ.  Records they've already

1    produced to us include third-party materials.  So, for example,

2    they've provided to us, through U.S. Marshal Service, which is

3    how we were instructed to obtain the records, on August 17th,

4    medical submission requesting that Mr. Samsel receive physical

5    therapy, and attached to that are records from the University

6    of Virginia Hospital Center, a third-party of records, you

7    know, treatment that he received while in CVRJ's custody.  So

8    it's -- we're frustrated because every time I think --

9              MS. LEWIS:  I don't know how he got it.

10             MR. WOODWARD:  It's now been months since we filed

11   our emergency motion for medical records and we haven't

12   received the records we were initially seeking all those many

13   months ago.

14             So, our concern here remains that we continue to

15   appear before you, we don't get the records that we're asking

16   for.  Ms. Russo represented that she forwarded requests to CVRJ

17   and NNRJ, but there's two other facilities that haven't been

18   referenced or otherwise invited to attend today's status

19   conference.  You know, medical records generated at

20   Rappahannock and CTF, which we've asked for and haven't been

21   provided.

22             THE COURT:  Mr. Woodward, I was surprised when I

23   didn't get a request.  I think, in the last order I entered, I

24   sort of invited the parties to let me know if there's someone

25   else who needs to be ordered to appear before me, and I don't

1     think either party asked me to expand the list of invitees, if

2     you will.  So I sort of assumed that at least for some --

3     before I got the report, I assumed that good progress had been

4     made because there wasn't a request for me to order-to-appear

5     representatives of any of those other facilities.

6              So, I hear what you are -- I hear your frustration.

7     I hear your frustration.  But it sounds like, given that no one

8     can -- I mean, I do think that -- I don't know about your

9     waiver, but I guess my point is, you know, maybe there has been

10    some misunderstanding.  The CVRJ folks were here.  I appreciate

11    you being here.  And again, if you can cite to me something

12    more than just your, sort of, understanding, I sort of -- I'd

13    consider that.  But I don't have that.  I just have --

14             MS. LEWIS:  Your Honor, this is Ms. Lewis.  I -- when

15    I first started working in this setting, I was told that by the

16    person who hired me, and I did not verify it.  And, so, I have

17    consistently never released records from another entity.  In

18    fact, when Mr. Samsel's attorneys first began asking for

19    records back in August, I have an e-mail he sent me saying, you

20    know, are you sure you've sent me everything?  And I said yes,

21    I sent you everything that I'm legally, you know, allowed to

22    send you; meaning I can't send you records that did not

23    originate from us.  And so, if that -- if I was mistaken, he

24    didn't tell me that.

25             THE COURT:  Okay.  And I'm not trying to -- look, I

1    hear what you are saying.  And I know -- I suspect -- well, I
2    suspect you're not a lawyer.
3              MS. LEWIS:  No, sir.
4              THE COURT:  And so, I'm not trying -- this isn't --
5              MS. LEWIS:  I mean, I'm just trying to do the right
6    thing, you know, to protect us, to protect him.  You know, I
7    wouldn't want to release medical records that I wasn't legally
8    entitled to release.
9              THE COURT:  Sure.  I understand that.  So, again, if
10   someone from your facility wants to let me know why in some --
11   the next time we're here why this is unlawful, then they can
12   make that -- you know, you can make their argument.  But until
13   I hear from them, we've got a man here whose medical records --
14   you know, whose medical records you have, whose lawyers have
15   every, it seems to me, every right and interest in knowing what
16   is going on with their client.
17             And so in the absence of any other authority, again,
18   I'm going to order that those records be turned over.  And if
19   someone from your facility has a problem with that, they can
20   appear and raise whatever arguments they want.  But I've
21   ordered that to happen.
22             MS. LEWIS:  And that's fine.  I would think if
23   there's a court order, doesn't matter what the law says.
24             THE COURT:  Well, no.
25             MS. LEWIS:  I feel fine with releasing them with a

1    court order.

2              THE COURT:  Understood.  And I'm not -- the courts

3    order things all the time and folks come in and say, Judge,

4    you're mistaken, you shouldn't do that, and here's why.  I

5    haven't heard that.

6              MS. LEWIS:  That's a lawyer.

7              MR. WOODWARD:  Your Honor, that is our point, is that

8    there was a court order, it was issued two weeks ago.  The

9    government had every opportunity to come to you and advise you

10   that they cannot comply with the order, and that hasn't been

11   done.

12             THE COURT:  I think -- you know, Mr. Woodward, I

13   think part of the problem is, obviously, if I were talking

14   directly to Ms. Russo, for example, and this was all within her

15   power, that would be a different thing.  So this is kind of a

16   strange --

17             MR. WOODWARD:  I agree completely.  You hit the nail

18   on the head.  There is a problem with the way this medical

19   record --

20             THE COURT:  Right.  Right.

21             MR. WOODWARD:  -- the provision of records and then

22   the treatment that follows.  And we have enormous concerns that

23   that's going to be rectified moving forward, because here we

24   are again, two weeks later, and we don't see a clear solution.

25             THE COURT:  Well, I don't know that there -- I don't

1    know what the solution -- I don't know what more you need to

2    say.  A representative from CVRJ just said there's a court

3    order and we're going to produce the records.  Am I wrong about

4    that?

5              MS. LEWIS:  No, sir.  We didn't --

6              MAJOR DAVIS:  We didn't know anything about the 28th

7    and a court order.

8              THE COURT:  I hear you.  Look, I don't want to spend

9    any more time on this than I need to.  Let me turn to the

10   prosecutor, Ms. Russo.

11             I think what you need to make clear, not just the

12   good folks from CVRJ who are here now, but all these providers,

13   to let them know that there is an order requiring that these

14   records be produced to the defendant and -- yes, Ms. Russo?

15             MS. RUSSO:  Yeah, I have a couple things to say about

16   what Mr. Woodward said.  Within 24 hours after our last

17   hearing, less than 24 hours, we asked for a list of everything

18   that needed to be provided, Judge.  We have to go through

19   United States marshals, which is what we do.  You know,

20   Mr. Heywood was at the last hearing, that was provided.  We

21   have asked that each of the filings that have been filed be

22   provided to the facilities.  And so it is a little bit

23   frustrating to hear Mr. Woodward's account of what had

24   happened.  But, as Your Honor has mentioned, we do not have

25   control over every facility and every facility has their own

 1    policies, and when I -- you know, I didn't know that CVRJ had

 2    records that they weren't producing.  I just thought that the

 3    records were at these other facilities and that they hadn't

 4    obtained them from the other facilities.  And what CVRJ is

 5    saying today makes sense to me, but they didn't quite

 6    understand there was an order.

 7            We are working this out.  I understand it's

 8    frustrating, but, you know, Ms. Rosborough and I are trying our

 9    best.  This is not our area, but we are trying our best, and

10    the only thing that we can do is communicate with the marshals

11    and request the records through the marshals, which is what we

12    can continue to do.

13            THE COURT:  I hear you.  And I'm not trying to put

14    the blame on any one person, but -- and you can, though,

15    understand Mr. Woodward's frustration when there's, again, a

16    game -- I don't mean a game like that one, this is like a game

17    of telephone where one side seems -- there are various layers

18    here and we're all not necessarily communicating, like you just

19    said; well, you didn't know that they had the record, as

20    opposed to having to get them from a third-party.

21            So let me just say this, because I don't want to

22    burn, unfortunately, any more time on this and I don't know if

23    there's anything -- we've already, hopefully, had a little

24    breakthrough here.  And, frankly, this is the kind of thing

25    that if all of you would get on a conference call that doesn't

1    burn my time having to lead it and walk through -- and I

2    understand there are -- you have to go through the marshals.  I

3    don't think any regulation prohibits everyone from being on a

4    joint conference call in which you try to communicate what I

5    have ordered to some of these facilities and the facilities can

6    comply or show up and tell me why they're not going to comply.

7    So, I think we now know CVRJ understands the situation.

8              You know, I've got a couple other things I want to go

9    through here, and we can talk about -- maybe the answer is --

10   let me ask the folks from CVRJ:  How quickly could those

11   records be provided to Mr. Samsel's attorneys?

12             MS. LEWIS:  So, we got an email with a -- dated

13   November 8th, with a list of records that, I guess, his counsel

14   is requesting.  So, I mean, I could get these today, the ones

15   that pertain to us.

16             MAJOR DAVIS:  I would say, why don't we print out his

17   whole file again?

18             MS. LEWIS:  Do you know how many pages that is?

19             THE COURT:  It's a lot of pages.  But, in fairness,

20   folks, what they really need, and the reason you have a list is

21   because his attorneys have gone through the records -- and,

22   Mr. Woodward, you can stop me if this is not correct -- but the

23   reason they have a list is because they've gone through other

24   records, records they've received and have, sort of, figured

25   out, reverse engineered, if you will, the fact that other

1    records must exist.  But they're trying to figure out what's

2    going on with their client's health so, it's really -- that

3    was, I think, something they generated that would be helpful.

4         But the reality is, if you have other records that

5    just don't happen to be on that list that they don't have, they

6    need those records because they need to know what's going on

7    with his health, what -- you know, he's been incarcerated now

8    for months and he's got -- well, let me put it this way:

9    They're very concerned about his health for a variety of

10   reasons, and I don't think those concerns are ill-founded.  So

11   whether it's on the list or not, they need to have the medical

12   records that reflect what's going on with their client's

13   health.

14        MAJOR DAVIS:  Tomorrow morning we're going to print

15   out his entire file and mail it to, I guess, his attorney and

16   Marshal Service.

17        THE COURT:  Very well.  Why don't I -- I'll leave it

18   there and you can connect with his attorneys.  Or, Ms. Russo,

19   perhaps someone can, hopefully, connect you folks with his

20   attorney to figure out the best way to get those records to

21   him.  I don't know what the best way to do that is, and I don't

22   want to spend time here today to do it.  But, does that make

23   sense?  You can connect and make sure.  If that can go out very

24   promptly, Mr. Woodward, why don't I just -- I mean, I think we,

25   hopefully, had a breakthrough here.

1          MR. WOODWARD:  Your Honor, I also don't want to waste

2     the Court's time, but I would just observe that we've only

3     dealt with one of the facilities.

4          THE COURT:  I get it.

5          MR. WOODWARD:  There are records from NNRJ that we

6     requested from Ms. Russo on the 29th of October that we still

7     have not received.

8          THE COURT:  Let me -- those are the folks -- we have

9     folks from Northern Neck here, so why don't I hear from them.

10    But, although, it may be a situation where they simply -- the

11    records are sort of in -- they may be more recent records that

12    they just haven't processed yet.  But let me hear from the

13    folks from Northern Neck, and thank them for being here.

14         CAPTAIN LUNA:  Your Honor, yes.  Last time we met,

15    that same day, everything that we had current to that date -- I

16    believe it was the 28th -- we sent everything we had.  Since

17    then Mr. Samsel has had a couple of appointments and a couple

18    more things added to medical file, which we can send to U.S.

19    Marshal Derrick Heywood today.

20         THE COURT:  Okay.  All right.  So you don't think --

21    there's no reason why, very promptly, the defense won't have

22    all the records that you all possess regarding Mr. Samsel?

23         CAPTAIN LUNA:  No, there's no reason -- we should be

24    able to send the latest information that we have from his last

25    doctor's appointment.

1    MR. WOODWARD:  Your Honor, forgive me.  I know I

2    sound like a broken record.  My concern continues to be that

3    that was the promise that was made before.  The records that

4    NNRJ transmitted to us did not include any third-party records,

5    including records related to his treatment after the incident

6    that occurred on October 12th, which had been two weeks prior

7    to the 28th.  And, yes, the representation was made that they

8    had access to the third-party records at the last hearing, but

9    here we are again, two weeks later.  And I think the underlying

10   concern that I have, and I think Your Honor will share, is that

11   we don't want to have to come back here every two weeks to

12   continue to remind folks that we've made this request for

13   records.

14        THE COURT:  I agree, although we only -- you know,

15   again, without any -- the other facilities here, that,

16   unfortunately, might be required.

17        But let me just ask, again -- and I apologize, I

18   didn't get to note all of your names as quickly as I might

19   have -- but the folks from Northern Neck, is that -- will the

20   records that you provide to the defense include -- I understand

21   that you all are not going to go out and obtain records, but

22   the records that you have that may be from third-party

23   providers -- other providers, you are able to provide those

24   records as well, is that correct?

25        CAPTAIN LUNA:  Yes, sir, we can provide those records

1    and we can get those today.  So that should be no issue.  We'll

2    send them to the U.S. Marshals, Derrick Heywood, and then go

3    from there.

4              THE COURT:  So, Mr. Woodward, I think you're going to

5    get, at least from the providers we have -- or, the providers,

6    the facilities that we have with us today.  It sounds like

7    there's not going to be any issue going forward, if there was a

8    misunderstanding or confusion about what should be provided.

9    And I think, before we wrap up today, we'll just -- what I'll

10   do is just ask, we'll figure out a time for me to get an update

11   on this and we'll see where we are, and if I have to bring

12   back -- and I'll ask whether it's Ms. Russo and Ms. Rosborough

13   and/or the marshals, Marshal Heywood, who is here, to reach out

14   to those other facilities and have the same kind of

15   communication we had today with the two facilities and make

16   sure this happens.  And I'll get an order -- I'll get a -- I'll

17   order an update at some appropriate time that we'll figure out

18   before you leave today, and hopefully this issue is on its way

19   to resolution.

20             MR. WOODWARD:  I think, Your Honor, I mean -- I

21   almost wonder whether -- I will say, for the record, that

22   Ms. Russo and Ms. Rosborough have been completely helpful in

23   this entire process; they are very responsive to us, they speak

24   to us at 9 o'clock at night when there are issues that we've

25   brought to their attention.  You know, as you mentioned,

1    there's this game of telephone that's being played, and I don't

2    place any fault in that game at the feet of either

3    Ms. Rosborough or Ms. Russo, that we continue to work very

4    collaboratively with as we chase these records.

5         My request would be if there could be a stick here,

6    something to ensure this happens moving forward, that there's

7    something that is going to -- I just, again --

8         THE COURT:  I'll just say -- I'll just say this,

9    Mr. Woodward, if I -- if I get -- we'll figure out a timing for

10   the report.  But, I mean, given what I have ordered -- I mean,

11   the next ratchet up for me would be for an order to show cause

12   why someone or something -- someone somewhere is in contempt.

13   So, I mean, we'll -- I think I will cross that bridge when we

14   get to it.  But I think -- from what I am hearing here today, I

15   don't think -- at least as to the facilities we have with us

16   today, I don't think that's going to be a problem.  And given

17   that it seems, to me, to be a large chunk of the documents

18   you've identified, I understand that's not -- you need all what

19   you need, but I think we're going to make substantial progress,

20   and we'll see -- we'll see what happens with regard to the

21   other facilities or where we go from here.

22        MS. HALLER:  Thank you, Your Honor.  For both of us,

23   we say thank you.  Julia Haller.  I would only raise one other

24   point with Your Honor, that was the motion in document 49,

25   which is the issue related to the 24/7 lockdown that Mr. Samsel

```
1    has been under since we filed our motion and before that.  The
2    motion was filed on 9-11.  Since that date he continues to be
3    in 24/7-hour lockdown.  We did confer with counsel yesterday in
4    doing our joint status report and they do not object or have
5    any objection to having him have access to law library, to
6    having him have an hour outside a day and that kind of thing
7    and not be in 24/7 hour lockdown.  So we raise it with Your
8    Honor, as we did in our motion, as one point that's still out
9    there that has been -- if we could just address that, Your
10   Honor.
11            THE COURT:  Well, I think, Ms. Haller, I think that
12   really is squarely not something I can order, as far as -- I
13   understand the limits of my authority.  So, I mean, I -- I
14   think that I -- if you have the government -- if you have the
15   prosecutors with you on that request, that is exactly the kind
16   of -- let's just put it this way:  I certainly could order --
17   it seems to me I can -- I could have the folks who are in
18   charge of your client's care right now explain why they're
19   doing what they're doing.  But I don't believe I have -- no one
20   has appointed me to any authority that I have to micromanage --
21   maybe that's not the right word -- but, to manage his
22   conditions, the conditions at which he's being held.
23            So, my suggestion -- but, I mean, anyway, so I see
24   you were about to say something.  Go ahead.
25            MS. HALLER:  Thank you, Your Honor.  I understand
```

```
 1    your point.  We can follow up with a supplement, Your Honor,
 2    and address any legal questions Your Honor may have on this
 3    point.
 4            And, yes, we understand that while this is before the
 5    Court, it hasn't been fully briefed.  And we can fully brief
 6    it, of course.  You know, the custody and care of Mr. Samsel
 7    includes his constitutional rights, which includes access to
 8    the law library.  And it is those issues, and based on his
 9    constitutional rights, really, more in custody, in detention,
10    in pretrial detention, Your Honor --
11            CAPTAIN ENGLISH:  Your Honor, I would like to speak
12    to that when I get a moment.  This is Captain English from
13    Northern Neck.
14            THE COURT:  Yes.
15            CAPTAIN ENGLISH:  Mr. Samsel is not on 24/7 lockdown.
16            THE COURT:  I'm sorry.  Hold on one second.  Ms.
17    Haller, are you finished?  I'll hear you.
18            CAPTAIN ENGLISH:  I apologize.
19            THE COURT:  No, no, that's all right.
20            Ms. Haller, why don't you just finish making your
21    point.
22            MS. HALLER:  No, Your Honor, that's fine.  I don't
23    need to take up more of your time.  I just wanted to add that
24    while there may have been certain -- and we don't need to get
25    into a fact question.  The reality is we know he's been in
```

1   many -- 99 percent of the time in 24/7 lockdown.  And the

2   challenge is, we understand that he does not have privileges

3   that include going outside or the law library or other

4   privileges that inmates do get in pretrial detention.

5          We also believe and have an understanding -- but we

6   do not have firsthand information -- but our understanding is

7   there is a marking on him that he has to be handcuffed at all

8   times, which is not typical with pretrial defendants in jail.

9          So, we would respectfully submit that this issue as

10  to the custody and the constitutional rights -- that we can

11  fully brief -- you know, that we bring before this Court so we

12  can maintain his access -- it sounds small to us -- to the law

13  library.

14         THE COURT:  No, no, I take your point.  And I'm going

15  to hear from you, Captain, in one moment.  But let me just make

16  the point that, obviously, I was speaking before in general

17  about his conditions.  But, obviously, you are correct.  To the

18  extent that his conditions prevent him from participating in

19  his defense, that's a problem, it seems to me, that's my

20  business.  I take your point on that.  I don't know that we're

21  quite there yet.

22         But, Captain, why don't you address what Mr. Samsel's

23  current conditions are and why they are -- why they are what

24  they are.

25         CAPTAIN ENGLISH:  Yes, sir, Your Honor.  First, I

1   would like to say, we do whatever the Court asks us to do,

2   whatever U.S. Marshals or AUSA ask us to do.  At this time

3   we've been asked to keep him in PC, protective custody.  On

4   that status he is on 23 and 1, not 24/7; 23 and 1.  He comes

5   out one hour a day for a shower and use the TV.  However, he

6   also is allowed to go to the rec yard, outside and inside, for

7   a minimum, Department of Corrections standards, twice a week.

8   He's offered that.

9           THE DEFENDANT:  That's not true, Your Honor.  That's

10  not true.  That's not true.

11          THE COURT:  Mr. Samsel, Mr. Samsel, you'll get a

12  chance --

13          THE DEFENDANT:  That's not true.  He told me to keep

14  my mouth shut.  This is the gentleman who assaulted me last

15  week and I had to go to the hospital because that man told

16  me -- he's the one that beat me up and told me to keep my mouth

17  shut and not say nothing at this Court hearing.  He's the one

18  put me in the hospital.

19          THE COURT:  Mr. Samsel, you'll get a chance.  You'll

20  get a chance.

21          Continue, sir.

22          CAPTAIN ENGLISH:  And Ms. Haller is absolutely

23  correct, every inmate's constitutional right is to be allowed

24  the law library.  If he were to requested that, I would allow

25  him to have that every single night, should he request it.

 1    This is the first I've heard of it.  Inmates typically write a

 2    request form and I approve it and would allow that.

 3              So that said, if the Court would want to change that,

 4    or the U.S. Marshals, we would be glad to be on administrative

 5    seg.

 6              As far as the handcuffs go, that's because he's in

 7    administrative seg.  Every inmate is supposed to be cuffed when

 8    out of their -- when they come out in the hallway.  Just to

 9    this court hearing, he is to be handcuffed.

10              As to Mr. Samsel's allegations, he and I have had

11    many -- I wouldn't say many, probably two or three

12    conversations, on camera, where there's civil conversations.  I

13    have no idea what his allegations are or anything that he just

14    mentioned.

15              THE COURT:  All right.  Look, Ms. Haller, as far as

16    the law library goes, you just heard that this is -- now this

17    is sounding like the document issue all over again.  You just

18    heard that, gee, if he just requested it, he would be able to

19    use the law library every day.  So, I'm going to leave that

20    with you all because it sounds like there's a ton of space

21    between where things are and where they could be, as far as his

22    access to the law library and other means he may have to

23    participate in his defense.

24              MS. HALLER:  Thank you, Your Honor.

25              MS. RUSSO:  Judge?

1          THE COURT:  Miss Russo, yes.

2          MS. RUSSO:  Just one quick thing I did want to put on

3     the record today.  The government had, on October 7th, due to

4     concerns we had about Samsel's safety that day, that we relayed

5     to defense, we did ask and recommend to the Marshal Service

6     that he be placed in protective custody.  That was pending his

7     conversation with Mr. Woodward and Ms. Haller, when they spoke

8     to him and he indicated that he did not want to be in

9     protective custody any longer.

10          The government has no -- if that is the sole basis --

11    and I don't know that that is, and I think they take into

12    account many things and there could be other factors -- but to

13    the extent it is based on our email on October 7th, given that

14    defense counsel has spoken to Mr. Samsel and they all feel that

15    he will be safe enough outside of protective custody, we have

16    no problem or objection, if that's the basis for him to be

17    released back.

18          THE COURT:  All right.  Again, this feels like all

19    this could have been -- that if the parties had discussed all

20    of this, without necessarily it being during the middle of a

21    federal criminal status conference, who knows what progress

22    could have been made?  But now they know that now the marshal

23    knows that you don't have that request.  Again, I'm not

24    expressing any view, other than the view that Mr. Samsel's got

25    to be able to have -- be able to participate in his own

1      defense.  But other than that, I'm going to leave it to the

2      marshals, the prosecutor -- Mr. Samsel, I'll hear from you in a

3      second.  Okay?

4              But with regard to the specifics of his incarceration

5      and whether that can be -- whether that's appropriate to change

6      those conditions, for the moment I'm going to let -- because

7      it's obvious to me that you all haven't had a conversation

8      about this, I'm going to let -- I'm going to let you all

9      discuss it and see where things land.

10             Mr. Samsel, I told you I would hear from you.

11             MR. WOODWARD:  Before Mr. Samsel speaks, Your Honor,

12     I think I can make a couple points that he is intending to

13     make.  Because I'm sorry that it seems that we haven't had the

14     opportunity to discuss this, that's actually not the case.  We

15     discussed with Ms. Russo and Miss Rosborough the solitary

16     confinement yesterday and the government asked we leave it out

17     of the status report based on the representation that they

18     would be talking to the facility about this.

19             The suggestion that Mr. Samsel, all he needs to do is

20     submit a request to go to the law library is ironic because

21     they denied his request for a pen or a pencil.  So it's unclear

22     to us exactly how he would make that request.  They did the

23     same thing two weeks ago when they suggested he wasn't making

24     medical requests.  He didn't have access to a pen or pencil or

25     piece of paper in order to make those.  And so other than

1   bringing these issues before your attention, Judge, I just

2   don't know who else to call.

3          We've spoken to the Mr. Heywood, we've spoken to Miss

4   Russo and Miss Rosborough, we've spoken to the superintendent

5   at NNRJ and nothing seems to be happening.

6          THE COURT:  Captain, how is it appropriate for

7   Mr. Samsel to make his request to use the law library?  How can

8   he actually do that, like, on a very practical level?  What

9   would he do to do that?

10         CAPTAIN LUNA:  Yes, sir.  So I was having technical

11  issues.  I would be glad to give Mr. Samsel as many pens or

12  paper that he needs.  He has money in his account, he can order

13  pens and pencils.  He's ordered -- I'm looking at it right now,

14  one, two, three commissary -- five to six times already, so he

15  can order pen or paper off there.  However, I'd be free to give

16  him one, if he needed one.  This just came to my attention.  So

17  the fact that he never had pen or paper is completely and

18  utterly false.

19         THE COURT:  All right.  So, again, if we -- it sounds

20  like you're going to get some requests from Mr. Samsel to use

21  the law library.  So when next we are here, I'm sure this will

22  be --

23         THE DEFENDANT:  I get my turn, right?

24         THE COURT:  Yes.  Yes, sir.

25         I'm sure it will be an issue we discuss, so I'll keep

1    a lookout for his requests.

2            Mr. Samsel, yes, sir.

3            THE DEFENDANT:  Hey, I'm sorry, Your Honor, but it

4    goes beyond that.  I'm locked in a cell.  I'm supposed to get

5    23 and 1.  What it says on paper and what the -- you can review

6    the cameras and you can see how often I come out.  They don't

7    let me out.  I went ten days without a shower.  Your Honor, I

8    was in sol and told to keep my mouth shut after -- after a

9    newspaper article that was not true.  And there is an active

10   federal investigation going on that you know of, and the

11   cameras will tell the truth of what happened.

12           Your Honor, I did refuse seizure medication because

13   I've never had a seizure.  I was assaulted that day.  When I

14   went to the hospital, I had a fractured skull and dislocated

15   wrist, and it was done under the watch of the Captain English.

16           Your Honor, I do not feel safe at this facility, and

17   he knows what they're doing.  And, Your Honor, they know

18   exactly what they're doing.  Your Honor, I did order

19   commissary, you're right.  But he doesn't tell you that I'm on

20   limited commissary.  They restricted pens here, went back to

21   pencils.  When I asked for that, because they take all the pens

22   out of the indigent kits, when I asked for a pen, they said

23   there's no more pens left, we have to use pencils.

24           I'm not going to blow up when I -- Your Honor, and I

25   would ask that Julia Haller explain how -- help me explain when

1    I -- I don't have my call button in my cell when I needed

2    medical emergency after they assaulted me.  They told me the --

3    Your Honor, I wasn't able to bang on the door.  I can't bang on

4    the door because there's nobody on the block.  It's just a

5    block and an empty cell, that's it.  There's no help.

6           So I called my attorneys and said, listen, I need

7    medical help.  The EMS came to the -- my attorneys called and

8    when EMS came to this jail.  The jail denied them access and

9    said, No, he's completely fine.  When they found me unconscious

10   three hours later, the doctor said, Wait until I get to the

11   hospital, we'll send him then.  When I got -- when I got back

12   down to medical here, they said, No, he has to go now.  So when

13   they shipped me to the hospital, they said, Hey, he has a

14   dislocated wrist and he has a broken eye socket and a fracture

15   in his scull.  Your Honor, that doesn't happen from falling off

16   a bunk that's 12-foot.  I've never fell off a bunk.  That's

17   what husbands tell their wives to say when they abuse them.

18          And I request, Your Honor, that Julia give you -- and

19   can explain better than I can, and ask for her to be able to

20   tell you about the situation.  And then, afterwards, my phone

21   call was suspended for ten days because I made a 911 call for

22   help.  And I asked Julia to pick up where I left off, please.

23          Thank you for the chance, Your Honor.  You don't

24   understand the frustrations and the fear that I'm living under,

25   the authorities.

1          MS. HALLER:  The challenge we have, Your Honor, and

2     I'll make this very brief, is that because Mr. Samsel has been

3     under continuous administrative segregation, on administrative

4     segregation, whether it's 24-7 or 23 and 1, the question of

5     administrative segregation is a question we have not been able

6     to address.  We have raised it in the motion filed on 9-11.  It

7     has continued since that time.  And we can further brief it.

8          But to his point on access to emergency care, it has

9     been extraordinarily difficult.  We have tried to ask for help

10    at certain times, like on October 12th; it was the only time

11    that counsel intervened and asked for emergency help, because

12    he was able to call us.

13          The challenge we have is just -- and counsel has been

14    really helpful, government counsel is really helpful.  The fact

15    is Mr. Samsel does not need to actually be in administrative

16    segregation.  And to that point we would request that we can

17    work with the marshal service and the government to have him

18    potentially moved to Alexandria, where there's a federal

19    facility, where in the federal facility they have medical

20    services.  And it would make the most sense -- right now he's

21    in a facility that's over three hours away from us, being

22    counsel in the Washington, D.C. metro area.  And I personally

23    have been to the facility to visit him.  They were extremely

24    helpful and gave me privileges to be able to meet with him in a

25    room.

1           The facility has been very helpful, but it's a jail

2     and Mr. Samsel is a federal -- is in federal custody, making

3     everything challenging because he's under different

4     requirements than, necessarily, the jail has.

5           So, it would be really helpful to be in a federal

6     facility.  We would put that out there.  We can fully brief

7     this.  And that's all.  Thank you, Your Honor.

8           THE COURT:  And, Ms. Haller, one thing, again, I do

9     know is that, again, I don't have the ability to order, you

10    know, to order the particulars of -- I don't believe I do, to

11    the particulars of where he is housed.  That having been said,

12    if the parties are in agreement, you're raising the broader

13    issue, and Mr. Samsel, the broader issue of where he's -- the

14    facility at which he's maintained and housed.  I know that that

15    issue has a long history in this case, predating my -- the

16    case's assignment to me about where he would be.  And there was

17    some confusion, just from looking at the docket I can see that.

18    But I don't know the particulars of it and I don't think it's

19    productive for us to wade into it right now, other than for me

20    to say, look, obviously, as the case moves forward, if it can

21    be accommodated and if -- I guess it's two things.  One is the

22    government and the marshals.  The prosecutors and the defense

23    should confer about whether these administrative -- these

24    procedures are necessary.  Nothing, you know, could be further

25    outside my area of expertise than whether they are.  So, you

1    all should do that.  And if that also means that if those can

2    be relaxed and everyone agrees they should be, if that means --

3    if that -- or for any other reason the parties think it would

4    be better for Mr. Samsel to be in a different facility, then

5    certainly I'm not going to stand in your way.  The question is

6    whether I really can order anything in that regard.  And I

7    suspect, again, that, again, barring something bumping up

8    against his constitutional rights, that's not something I can

9    do.

10             Let me just encourage you all to talk about that

11   because, obviously, to the extent -- I think we're all -- we

12   all are in agreement that the easier -- it will be a better

13   situation if he can have more access to his lawyers.

14             MR. WOODWARD:  Your Honor, if I might just observe, I

15   actually am not sure -- I think I might respectfully disagree

16   with your ability to order his transfer.  I would note that

17   Judge McFadden just transferred an inmate on Friday, Judge

18   Lamberth did so last week, as well.  In fact, Judge Ellis, in

19   the Eastern District of Virginia, famously transferred an

20   inmate from Northern Neck to Alexandria, also.

21             So, there is precedent for that.  And I think the

22   position of the government would be that it's not -- they don't

23   have a role in this process, that it's for the Court to

24   determine the best pretrial detention facts and circumstances

25   for a given defendant.

1          THE COURT:  Well, you know, maybe you're right.  I

2     think often what happens, though, it certainly -- it

3     certainly -- well, I'd be interested to know, in either of

4     those cases whether it was over the objection of any party or

5     whether the Court was essentially, sort of, ordering something

6     that all of the parties agreed should happen.  Let's put it

7     that way.  And I think that strikes me as a very different

8     circumstance.

9          MR. WOODWARD:  In the case of Paul Manafort's

10     transfer, it was over the objection of Mr. Manafort's counsel.

11     They objected to his transfer from Northern Neck to Alexandria

12     and Judge Ellis overruled their objection and proceeded with

13     the transfer anyway.

14          THE COURT:  All right.  Well, look, if I -- I'm

15     nothing if not persuadable.  So if you have authority and you

16     want to present it to me, I'll certainly look at it.  But I

17     think, in the first instance, it certainly, I think, behooves

18     all of you -- again, whether I end up ordering it, sort of --

19     what is effectively something that all the parties agree on or

20     whether I do it over the objection of one party or the other, I

21     think, it strikes me, just because of the level of detail that

22     you all know the facts of this case about, both the defense

23     side and the prosecutor's side, I think it behooves --

24     certainly will make it, strikes me, that, again, given the

25     level of -- the depth of knowledge both sides have here, if you

1    all come to me, tell me I have the authority to do it, you're

2    in agreement that I should, then that's a very different

3    situation.

4         So let's put it this way:  I think -- sounds like

5    this is a live issue, it's not really directly teed up for me

6    in the most -- in the most timely way, at least not teed up

7    with all the facts that are most recent -- sort of teed up with

8    the most recent facts.  You all let me know, and if you think I

9    can transfer him and you all agree, I'll look at that authority

10   and decide.  But in the interim, it strikes me that you all

11   should do some -- you know, you all should discuss that,

12   Ms. Russo.  Do you -- what's -- I just want to -- I'm putting

13   this on your plate as well.  But, again, just because I want to

14   get your reaction about my authority, but also whether you

15   think it would be productive for you all to discuss this.  I

16   know -- again, I know there's this history that predates the

17   case being assigned to me, so maybe you'll have a different

18   view.  But if -- do you think it would be productive for you

19   all to have that discussion?

20        MS. RUSSO:  Just a couple things, Judge.  So, right

21   now there's actually ongoing motions in many district courts

22   about this because of the fact that about a few hundred

23   individuals at the D.C. jail are being transferred.  So what

24   we're seeing is many motions asking for offenders to be

25   transferred to CTF, which is still -- the conditions are

1    considered acceptable at CTF.  And, so, I can tell you, the

2    government has been taking the position in these motions that

3    the United States Marshal Service is the one that -- that they

4    have the authority to do the transfers and that there isn't

5    authority beyond that.

6              So -- and I don't want to misstate anything, but I

7    believe that's been our position.  So I do also think that

8    courts are going to have to be very much addressing this in the

9    next few weeks and entering orders, and there may be some

10   things that we can use from those orders and motions.

11             THE COURT:  Sure.

12             MS. RUSSO:  One other thing I wanted to say, going

13   back to something that we talked about earlier, is about the

14   four different facilities.  My understanding, based on the list

15   that defense provided to us, is that there's nothing

16   outstanding from Rappahannock -- and I just want to get

17   clarification on that while I can, just in case I'm

18   misunderstanding something -- and that there's only one thing

19   that's outstanding from the D.C. jail.  And some records have

20   been provided, but not all from March 21st.  I just want to

21   make sure I'm correct about that.  And I will try to set up a

22   conference call with the defense, with the marshals, with the

23   facilities that are not here today.

24             MR. WOODWARD:  We're happy to take this discussion

25   off record with Miss Russo and Ms. Rosborough.  I just say that

1    Your Honor already acknowledges the issue we have, which is I

2    wanted to make sure we have everything.  We're working with a

3    client who has limited means to document the treatment he's

4    been receiving.  So that's the difficulty we're facing.

5              MS. RUSSO:  The only reason I mentioned it, Judge, is

6    because there was mention of why aren't the other two

7    facilities here?  I did ask NVRJ to be here.  I didn't think

8    there was a need for Rappahannock.

9              THE COURT:  In fairness, neither did Mr. Woodward.

10   So I didn't mean to put that on you.

11             THE DEFENDANT:  Are you going to assure me that I

12   wouldn't be assaulted again here by any CSO?  Your Honor, you

13   have authority.  You were appointed by United States President

14   of American.

15             THE COURT:  Mr. Samsel, Mr. Samsel.  I'll talk to you

16   about that in a moment, but let me just close off this point

17   with your lawyer, okay?

18             So, Ms. Russo, so I didn't mean to -- any party could

19   have requested that.  But the point, I guess, I would also just

20   say, is I do think if -- as you represented earlier, Ms. Russo,

21   if the government -- the government, the prosecutors don't

22   think that these measures are needed anymore, again, I just

23   think that that's the kind of thing that you all, in

24   conjunction with the marshals and defense counsel -- I'll leave

25   that to you, at least in the first instance, to work through.

1    And again, on the transfer, you're right, we may make some law

2    on this, who knows?

3            But, again, I think this is not necessarily -- well,

4    I think it's at least potentially a situation where all the

5    parties might agree on a way forward to move Mr. Samsel

6    somewhere else that would make it easier for him to have access

7    to these different things, and also given his medical

8    situation.

9            So, again, I know there's a history there that

10   predates me and I don't want to make you have to revisit it.

11   But, I think it's -- it should be a point of discussion between

12   you all and the defense.

13           All right.  Well, where do the parties take -- I

14   mean, we're now kind of left in a situation where I almost feel

15   like hearing from you in the relatively near future, or coming

16   back in the relatively near future might make sense, only

17   because we'll see if these records -- the record issue sort of

18   clears itself up, and maybe you all would want to -- and maybe

19   there is something you all will ask me to order regarding where

20   Mr. Samsel is housed, I don't know.  Or maybe you'll tell me

21   you've agreed, regardless of what I would order, you don't need

22   that, you don't need an order, but you all have agreed he'll be

23   moved someplace else.

24           I've got -- the government has asked for, in a past

25   motion, one of the other things that's on the docket that I was

1    going to raise with you all, is this issue of a trial date, and

2    whether the government still wants a very quick trial date?  Or

3    whether -- the other thing I can do is set a motion schedule

4    that at least gets us closer to that date, for filing pretrial

5    motions.

6         I don't know, in light of everything we've discussed

7    here today -- and I'll certainly hear from the defense on this,

8    too.  But, Ms. Russo what do you think as far as -- what's your

9    request of me as far as structuring how we move forward here?

10        MS. RUSSO:  Well, Your Honor, I think the -- the last

11   time delay was excluded it was to October 14th.  So that's the

12   date.  And the government filed a motion for excludable delay

13   from the 14th forward.  But right now, Your Honor, that

14   motion -- if that motion is not granted, the government's

15   understanding of the clock would suggest that we would need to

16   be in trial within the next 20 days.

17        So, we are going to renew our motion for excludable

18   delay and extend it to today's date, November 9th.  And we

19   think we have good reasons for that motion.  I know the defense

20   opposes that motion.

21        I also wanted to mention, in the defense filing

22   opposing that motion, they mentioned that it has been a long

23   time since this case was initially charged, which is true.  The

24   reason the government delayed indictment as long as it did is

25   because the previous attorneys working on the case were

```
1    interested in a resolution and requested that we not indict.

2    And when we -- when Mr. Woodward and Ms. Haller joined the

3    case, it's not that they're not interested in a resolution, but

4    they said we want an indictment, and we did, within a few

5    weeks.  And then with the superseding indictment, we have not

6    moved forward because, again, we thought we were potentially

7    working towards a resolution.  And we had notified the defense

8    that there would be superseding charges if the case was not

9    resolved.  At this point it's our understanding that because of

10   their opposition to the excludable delay motion, that we should

11   be moving forward with the superseding.

12          So all this to say, Judge, we plan to supersede and

13   we plan to add charges, and we plan to do so within the next

14   week or two.  So it should not be long.  We don't want to delay

15   proceedings further, and so maybe that's pertinent to the trial

16   date.  And I think perhaps a trial date -- setting a schedule

17   with at least a tentative trial date in 2022, plus motions

18   deadlines, makes sense to the government.  And we would

19   support, sort of, a plan like that, to have a motions hearing

20   date and a trial date.

21          THE COURT:  Mr. Woodward, let me hear from you on

22   this, too.  Look, I'm trying to be -- I understand you all

23   want -- you know, I understand that you all want the medical

24   records and want to make sure that your client -- his medical

25   needs are met.  I do think, as a practical matter, as I hear,
```

1    especially, for example, as Ms. Haller indicated, that you

2    don't have a situation here where -- I mean, I can't even

3    imagine how much -- how many minutes or hours you all have been

4    able to interact with Mr. Samsel since you came into the case

5    in August.  And it doesn't strike me that given the

6    voluminousness of discovery here and how difficult it's been

7    for you to be able to talk to your client, that as a practical

8    matter you wouldn't be ready to try the case within a matter of

9    weeks.  So, what is your suggestion on how we -- how we, sort

10   of, structure things going forward?

11           MR. WOODWARD:  Your Honor, your observation is fair.

12   I think our counter would be that neither will the government.

13   They have -- if they only have 20 days to prepare for trial,

14   they have an abundance of discovery to provide for us.  But I'm

15   also mindful that I'm not sure that, practically speaking, the

16   Court can seat a jury in 20 days.  I'm aware that there's a

17   tremendous backlog and that the Chief Judge has already found

18   that -- the interest of justice for prioritizing cases.

19           So I don't have an expectation that the Court will be

20   able told hear a trial in 20 days.  But just as defense counsel

21   has yeoman's work in front of them, the government won't be

22   ready in 20 days either, so I don't think it's fair to put that

23   on defense counsel.

24           Now, what I do think, based on what has come up

25   today, Your Honor, we obviously have serious concerns about the

1          conditions of Mr. Samsel's pretrial detention.  And so what we

2          might consider doing is setting a briefing schedule on the

3          conditions of Mr. Samsel's pretrial detention, setting a

4          hearing for that.  Of course, under 3161(h)(1)(J), the Court

5          can exclude time while a pretrial motion is under advisement,

6          and that could put us in a better posture to understand where

7          we are going moving forward.

8                    I don't want to commit at this juncture, but I can

9          see us very reasonably renewing Mr. Samsel's request to have

10         pretrial detention revoked.  That was something that Judge

11         Faruqui had agreed to and then, through prior counsel, that was

12         undone.  But I think maybe revisiting all of this -- and I'm

13         not sure what resolution we come up with with the government,

14         we will meet and confer with them, we will see if we can have a

15         resolution.  And if we can, perhaps if we can set a briefing

16         schedule and a hearing on the current status of Mr. Samsel's

17         detention, that might obviate some of the concerns the

18         government has about the speedy trial clock.

19                   THE COURT:  And that might be, depending on your

20         discussions with the government.  Like you said, it could be --

21         it could be a motion that would be deemed, you know, under the

22         appropriate -- the BRA factors, making the argument that he

23         should be released.  It also could be, as sort of what

24         Ms. Haller mentioned earlier, something more limited and

25         targeted to say, well, we think, you know, Judge, you have the

1      authority to move him, or you have the authority to order A, B,

2      or C or whatnot, right?

3              So it could be an open-ended sort of motion -- not

4      open-ended when it's filed.  But the point is, depending on

5      your interactions with the government, that could be -- you

6      know, that could take a lot of different directions.

7              MR. WOODWARD:  But, importantly, the observation I'm

8      wanting to make is that it could drastically change the

9      position that defense counsel took in their last opposition to

10     the government's request to toll.  And so we just don't know

11     what we don't know until we get there.

12             THE COURT:  Right.  Right.  So, you know, Ms. Russo,

13     what's your view on that?  It would -- it would -- setting that

14     up would allow Mr. Woodward to make whatever arguments, you

15     know, that flow from your discussions regarding his conditions

16     of release, address my authority to take whatever action he

17     would like.  And that would allow -- and that issue will get

18     fleshed out, that will allow you to continue to produce

19     discovery to the defendant, and all the rest, and might allow

20     us -- if I, for example, were to grant your motion, because I

21     do think, realistically, the backward looking part of your

22     motion, I think -- so we still have October 14th to today, if I

23     remember correctly.  Ms. Russo, is that right?

24             MS. RUSSO:  (Nods head.)

25             THE COURT:  The backward looking nature of that,

1    given the pandemic, given the voluminous nature of discovery,

2    given the fact that -- given the conditions of Mr. Samsel have

3    not allowed his lawyers to meet with him very much, I can't

4    imagine why those combinations of reasons -- I'm not going

5    to -- I'm not going to toll the speedy trial during that

6    period.

7             And if we set a period of time then to prepare the

8    motion, I can also do it going forward for preparation of this

9    motion regarding his conditions of release, we can set a

10   briefing schedule on that and a hearing date, let's say early

11   next year, and that would allow that to be teed up, at least

12   that -- that would then be teed up and the defense would have

13   that to be able to -- you know, that to be able to make sure

14   their concerns regarding their client's conditions of release

15   and confinement are addressed and it would give the parties an

16   opportunity to continue to produce discovery; the government

17   can continue to produce discovery, the defense to continue to

18   review it.  And might also, who knows, allows -- things may

19   also free up in terms of my ability to schedule a trial earlier

20   in the new year.

21            So we could set it, maybe, a motions date -- hearing

22   date for that in, let's say, January and go from there.  How

23   does that sound to you, Ms. Russo?

24            MS. RUSSO:  So, I think the hearing date in January

25   sounds fine.  I think a hearing on his conditions and his

1    request for release, if that's what his requests are being, or

2    something different from that, you know, of course we'll have a

3    hearing on that.  I do think that there is separate reasons for

4    the government request's for excludable delay that are

5    important.  And I'm not sure that that kind of motion tolls the

6    clock.  I know many kinds of motions do, I'm not sure that

7    particular one does.

8            But I think it's important, one, Judge, that this is

9    a complex case and both defense counsel, in a prior filing, and

10   ourselves have recognized that, and that alone is a basis for a

11   finding of excludable delay.  And then under 3161, and then in

12   addition to that the pandemic, and also what Your Honor

13   mentioned about the fact that the parties have been working on

14   the medical records and some of these other issues and,

15   therefore, haven't been preparing for the case in the way that

16   they might have been had that not been an issue.

17           So I think there are all of those things to consider.

18   And then, of course, there's going to be a superseding

19   indictment.  And it makes sense for judicial economy for these

20   charges all to be charged together because the superseding

21   indictment, I can tell you, will be related to other actions

22   Mr. Samsel took on January 6th.

23           THE COURT:  Mr. Woodward, I think Ms. Russo may be

24   right, that I don't know that this kind of motion wouldn't toll

25   speedy trial, just by operation of you either preparing or

1    filing.

2         MR. WOODWARD:  I cited -- I do actually think I cited

3    the wrong statute, its 3161 (h)(1)(H).

4         THE COURT:  Well, if you're just citing that general

5    part of the statute that says motions toll, pretrial motions, I

6    mean, obviously that is true in general.  But I'm not 100

7    percent sure if a motion to -- for conditions -- for his

8    conditions of release would.  I just don't have that.  I don't

9    know that off the top of my head.

10        But, on the other hand, if this is something that the

11   defense would agree to toll time, regardless of what the

12   particulars of the operation of law -- whether that tolls it by

13   operation of law, that's another way to proceed as well, if you

14   think it's in the interest of justice to toll so that all these

15   things can happen.

16        MR. WOODWARD:  I think, Your Honor, that -- well, let

17   me first ask, Your Honor, whether the hearing could possibly be

18   held before January, or not?  I don't think we need long to

19   brief this.  I don't want to speak for the government, but you

20   heard Mr. Samsel, he remains concerned for his safety.  So this

21   is something we would want to a address rather promptly with

22   Your Honor, potentially even, you know, imminently.  And so

23   setting a hearing sooner than January would be a preference for

24   defense counsel.

25        THE COURT:  You know, the other way to do this,

1  though, is that you may well not even have a -- I mean, I

2  almost feel like there's a lot of -- you know, there's a lot of

3  discussion that may happen between the parties that may obviate

4  the need for this particular motion anyway.  So, as much as

5  I -- I mean, the other option is to just come back on a

6  relatively short timeframe, couple of weeks, and see what

7  the -- and then at that point see what the parties have agreed

8  to, if anything, regarding all of this, and at that point be in

9  a position to decide where to go.  And I would exclude time, in

10  the interest of justice, retroactively to October 14th and

11  prospectively to whatever our next status date would be.  I'll

12  get an update from you all about where the records are at that

13  point, I'll also get an update from you all about what, if

14  anything, you might have agreed to regarding his -- his

15  conditions and his -- his conditions of confinement.  And at

16  that point that will all have run to ground and we can -- and

17  again, I'll -- if -- especially if the parties agreed to it.

18         But I think I have every reason, for the reasons

19  Ms. Russo laid out, to exclude time for a few weeks for these

20  purposes in the interest of justice, and then we see where we

21  are at that point, whether it's -- there's going to be a

22  motion.  We might be able to set, again, if we're looking -- if

23  the parties are -- we'll have a new indictment, perhaps, and at

24  that point the parties may, you know, want to set a motion

25  schedule on other types of motions, substantive motions

1        attacking the new charging document.

2              MR. WOODWARD:  Sure, Your Honor.  I think, as long as

3        Your Honor agrees that setting the status would not preclude

4        from filing a motion in the interim, just so that we could kick

5        off the briefing schedule.

6              THE COURT:  No.

7              MR. WOODWARD:  But nevertheless, with the utmost

8        respect to the Court and to the government, I think, on behalf

9        of our client, we would continue to object, just for the

10       reasons we put in the papers and the history in this case.  But

11       we certainly understand the Court's rationale and reasoning in

12       ordering otherwise.

13             THE COURT:  So that's what I think we should do as,

14       you know -- hopefully our next status won't be as -- will be a

15       little more smooth on the medical records and other points.

16       And, no, certainly, if the defense thinks that it makes sense

17       to file a motion beforehand, I'm not going to say you can't do

18       that.

19             Let's try to set a date in the relative future for us

20       to come back and have a little more clarity, or have more

21       clarity on his conditions, what the position of the parties is

22       going to be there.  And at that point, you know, I think the

23       parties, you should think about -- and then we'll have a new

24       charging document, maybe, if that happens by then, and I think

25       we'll be in a better position to sort of plot the course

1    forward on the case.

2              So, I am going to ask Ms. Harris now -- oh, just

3    looking here, at the calendar, we want to have Mr. Samsel with

4    us and so, I don't know, Ms. Harris, do you know the

5    particulars on when that facility can, you know, when it's --

6    when we are likely to be able to have him available?

7              THE COURTROOM DEPUTY:  Yes.

8              THE COURT:  Are there days of the week?  I can't

9    remember?

10             THE COURTROOM DEPUTY:  Monday through Friday, but

11   either between 2 p.m. and 4 p.m., and the hearing has to be

12   over by 4 p.m., so --

13             THE COURT:  All right.

14             THE COURTROOM DEPUTY:  Schedule no later than 3:30

15   for 30 minutes.

16             THE COURT:  Okay.  So, as I'm looking at things here,

17   the day I'm thinking this -- well, and let me just -- I'm going

18   to ask Ms. Russo if -- does two weeks seem like enough -- I

19   want to give you all enough time to the extent there are things

20   you're going to be talking to the marshals about or your

21   supervisors about or whoever you need to talk to about his --

22   Mr. Samsel's conditions, I want to give it enough time to kind

23   of -- those discussions to happen.  And so I don't want to come

24   back and have you say, well, we're not -- you know, we haven't

25   been able to run things to ground.  Does two weeks sound

1    acceptable?

2            MS. RUSSO:  Yeah.  I was thinking that as well, Your

3    Honor.  As long as we don't have to come to court on

4    Thanksgiving, two weeks is perfect.

5            THE COURT:  You will not have to do that.  Two weeks

6    is that Tuesday.  So, you know, even the day before -- you

7    know, the day before the day before Thanksgiving.

8            So my thought, Ms. Harris, if we can set it at

9    2 o'clock on the 23rd, is to do that.  Ms. Harris, is there any

10   reason why we couldn't do that?

11           THE COURTROOM DEPUTY:  I can tell it can't be at

12   2 o'clock on the 23rd.  There is somebody already in that slot.

13           THE COURT:  You can tell.  All right.  What about

14   3 o'clock?

15           THE COURTROOM DEPUTY:  I have to put the request in

16   to see.  I can't confirm it.  It's not showing on our calendar.

17   But she still has to request it and make sure it's good for the

18   facility.

19           THE COURT:  All right.  But we think it can happen?

20           THE COURTROOM DEPUTY:  There's nothing in the slot on

21   this one.  And I don't know -- it's not just our court that's

22   using the rooms.

23           THE COURT:  Right.

24           THE COURTROOM DEPUTY:  So I can't say one way or

25   another.  It's just nothing showing on our calendar.

1          THE COURT:  All right.  So let's be optimistic here

2     today.

3          MR. WOODWARD:  We still have two officials from NNRJ

4     with us who may have more information.

5          THE COURT:  Yeah, I don't know if those folks are in

6     the scheduling, in the video conferencing scheduling business.

7          Are the folks here -- the folks that are here from

8     Northern Neck, can they shed any light on this?

9          CAPTAIN ENGLISH:  No, sir.  We don't do the

10    scheduling.  However, if it were to go over the 4 o'clock limit

11    the clerk said, we -- you know, we would make that happen, if

12    it went over.

13         THE COURT:  Okay.

14         CAPTAIN ENGLISH:  If the 3 o'clock slot is open,

15    we'll make it happen.

16         THE COURT:  All right.  That's appreciated about

17    that, and hopefully it won't require that.  But let's just,

18    then, be optimistic and set it down for two weeks from today,

19    at 3 o'clock on November 23rd.  And hopefully, again, we'll be

20    largely past at least the records issue at that point and then

21    we'll also be in a position to discuss if the parties have come

22    to any agreements on Mr. Samsel's conditions and, you know, we

23    can -- we can go from there.

24         THE DEFENDANT:  Your Honor, what about the security

25    footage from the assault that took place?  Can you subpoena?

1    Can I put that on the record?  I want you to review that,

2    Judge.  You decide, please.

3              THE COURT:  Right, Mr. Samsel, that sounds like it's

4    the subject of -- what I have ordered and I've tried to make

5    sure --

6              THE DEFENDANT:  I want release from here.  I'll go to

7    any other jail.  I am not safe here, Your Honor, I'm not.  Not.

8              THE COURT:  Mr. Samsel, with regard to where you are,

9    that's going to be something that the -- your lawyers and the

10   prosecutor --

11             THE DEFENDANT:  I know, but it's an infringing on my

12   criminal case.  You don't -- there's certain things I don't

13   understand.  It's infringing.  And I don't think the government

14   is going to be too pleased, either.

15             MS. HALLER:  Ryan, just --

16             THE COURT:  Mr. Samsel, we're going to be back here

17   in two weeks and they're going to have discussed where you're

18   best housed and we'll see if they have an agreement on where

19   that might -- that might happen.  But, we'll be back in just

20   two weeks.

21             THE DEFENDANT:  Thank you.  Thank you, sir.

22             THE COURT:  Yes, we'll discuss that.  Okay.  So we'll

23   set that over.  And I am going to find then, retroactively to

24   October 14th and going forward to December 23rd -- I'm sorry,

25   to November 23rd -- November 23rd -- I'm going to find that

1    time period excludable under the Speedy Trial Act because the

2    ends of justice that are served by taking such action outweigh

3    the best interests of the public and the defendant in a speedy

4    trial.

5         I'm doing so here for a couple of different reasons.

6    I think, most obviously, this is a case with voluminous

7    discovery, perhaps more discovery than any case in the history

8    of the Department of Justice.  Now, not all of that is directly

9    related to Mr. Samsel, but much of it is -- it's information

10   that he or his attorneys are going to, at minimum, need to be

11   aware and, at a maximum, want to review in detail.  So, that's

12   number one.

13        Number two is the attorneys that are presently

14   representing Mr. Samsel are relatively new to the case.  They

15   came in the case, if memory serves, it was in mid-August,

16   August 16th or thereabouts.  And so, they have not had very

17   much time and opportunity to review all that discovery.

18        And, three, they have not had, as is quite evident

19   from all the proceedings that we've had and my review of the

20   docket, they have not had much of an opportunity to confer with

21   Mr. Samsel.  And they are concerned that Mr. Samsel himself is

22   not -- in the conditions in which he's being held, does not, at

23   least to this point, has not been able to avail himself of the

24   law library and other ways of participating in his defense.

25        So, I think, realistically, for all those reasons,

1    for him to be able to be -- for him and for Mr. Samsel and his

2    attorneys to be able to be prepared for trial, that period of

3    time should be excludable.

4         The other reason is, as is laid out by Chief Judge

5    Howell in a series of standing orders, there are public

6    health -- public health concerns, obviously, with the pandemic

7    that have severely limited the ability of this courthouse to

8    host jury trials.  And in the continuity of operations plan

9    that is now in effect, all jury trials, in terms of jury

10   selection, have to use the ceremonial courtroom.

11        And so, that has created a situation where, I know,

12   retroactively and until -- and until November 23rd, that there

13   is no -- there will not be the ability of -- for us to be able

14   to use the ceremonial courtroom to pick a jury consistent with

15   the public health and consistent with the ability of this

16   courthouse to try other cases for -- limited number of other

17   cases for defendants that have been pending far longer than

18   Mr. Samsel.

19        So, for both of those reasons, I will exclude the

20   speedy trial during that period because the ends of justice are

21   served by taking such action, outweigh the best interest of the

22   public in a speedy trial.

23        So when we come back on the 23rd, we will, you know,

24   go ahead, and at that point, hopefully, we'll have, again,

25   Mr. Samsel's issues regarding his conditions of release and

1    where he is housed, perhaps there will be movement on those and

2    we'll discuss at that point, and perhaps in two weeks we'll

3    have a new charging document, and I think at that point we'll

4    reset.  And if we need to set a briefing schedule at that point

5    or things have already begun on a motion regard Mr. Samsel's

6    conditions, we can do that.  We can set -- and I think,

7    depending upon what's returned in the indictment, perhaps,

8    again, we can tee up motions that would attack the indictment

9    at that point.

10            Let's see.  I think the other things -- frankly,

11   there were a few other things I wanted to clean up on the

12   docket, but those are the major ones.  And given we've gone an

13   hour and a half already and I have another matter shortly, I

14   think there are things we could take up in two weeks, to clean

15   up at that point.

16            So, Ms. Russo, is there anything else you think I

17   need to address here today?

18            MS. RUSSO:  The only thing I wanted to mention, Your

19   Honor -- and this understanding could be wrong -- but Your

20   Honor's mentioned his access to his attorneys a couple of

21   times.  I know that we were copied on an email that the

22   superintendent said he had set up a phone for Mr. Samsel, you

23   know, to speak to his attorneys directly.  I know that there

24   have been some snags with that.  But my understanding is there

25   is a phone in his cell in which he can speak to his attorneys

1    at any time.  So, I want to say, I don't think that's a current

2    issue.  I could be wrong.

3            CAPTAIN LUNA:  It's accurate, Ms. Russo.  Before

4    today's hearing he had made 155 calls from the date of entering

5    our facility.

6            MS. HALLER:  I'll just respond to that, for

7    clarification of the record.  I don't think the Court was

8    referencing the phone call issue.  We do now have phone access,

9    we are not denying that or disputing that.  We were simply

10   referencing, I think, what the judge picked up on, is when I

11   said that NNRJ is over three hours away from the D.C. metro

12   area, so it makes in-person visits -- while NNRJ was very

13   helpful in helping us get a visit with Mr. Samsel, there is,

14   physically, challenges to take six hours out of the day to see

15   him in person, and to those issues.  But we totally appreciate

16   and are grateful that we do have phone access.  Thank you.

17           THE COURT:  I appreciate --

18           CAPTAIN LUNA:  Just so Ms. Haller knows, I know

19   they've taken advantage of it here recently, but we do have

20   free video visitation for attorneys, as well.

21           MS. HALLER:  Thank you.

22           THE COURT:  Sir, I really appreciate you, Captain,

23   mentioning those things.  Well, I'll leave it at that.  Thank

24   you for clarifying that.

25           I still think the findings with regard to counsel's

1    ability to confer with the defendant are valid insofar as we're

2    talking about his ability to see video, to see documents, to

3    see other forms of discovery, the voluminous discovery that's

4    been produced.  Surely that, given -- especially given the long

5    time to drive to the facility and the relatively short time

6    counsel have been on the case, I think warrants the exclusion,

7    as I mentioned it.

8              I'll go back to you, Ms. Russo.  So any other -- but

9    thank you for that clarification.

10             Ms. Russo?

11             MS. RUSSO:  No, Your Honor, that was all.  I just

12   wanted to make sure that it was clear, because they made that

13   effort.

14             THE COURT:  Yes, if I had made that effort, it would

15   be important to put that on the record.

16             Counsel for Mr. Samsel, anything further you think I

17   need to address here today?

18             MR. WOODWARD:  No.  Thank you, Your Honor.

19             THE COURT:  All right.  So, we'll see you all in two

20   weeks, on the 23rd, at 3 o'clock.  Until then, the parties are

21   dismissed.

22             MS. HALLER:  Thank you, Your Honor.

23             MS. RUSSO:  Thank you very much, Your Honor.

24                        *   *   *

25

1                   CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4     foregoing constitutes a true and accurate transcript of my

5     stenographic notes and is a full, true and complete transcript

6     of the proceedings to the best of my ability.

7                             Dated this 2nd day of December, 2021

8

9

10                          _____

11                          Janice E. Dickman, CRR, CMR, CCR
                            Official Court Reporter
12                          Room 6523
                            333 Constitution Avenue, N.W.
13                          Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25