IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR No. 1:21-cr-00537-TJK-1

v.

                                  Washington, D.C.
RYAN SAMSEL,                       Tuesday, September 14, 2021
                                  3:00 p.m.

          Defendant.
- - - - - - - - - - - - - - - - x

_____

         TRANSCRIPT OF ARRAIGNMENT & STATUS CONFERENCE
         HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
              UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    April N. Russo, Esq.
                          U.S. ATTORNEY'S OFFICE
                          Appellate Division
                          555 Fourth Street, NW
                          Washington, DC 20001
                          (202) 252-1717

For the Defendant:        Stanley E. Woodward, Jr., Esq.
                          BRAND WOODWARD LAW
                          1808 Park Road, NW
                          Washington, DC 20010
                          (202) 996-7447

                          Juli Z. Haller, Esq.
                          LAW OFFICES OF JULIA HALLER
                          601 Pennsylvania Avenue, NW
                          Suite 900
                          S. Building
                          Washington, DC 20036
                          (202) 352-2615

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1        **P R O C E E D I N G S**

2                THE DEPUTY CLERK:  We are on the record in

3    criminal matter 21-537, United States of America v. Ryan

4    Samsel.

5                Present for the Government is April Russo; present

6    for the defendant are Stanley Woodward, Jr., and Juli

7    Haller; also present is the defendant, Mr. Samsel.

8                THE COURT:  All right.  Well, good afternoon to

9    everyone.

10                MS. HALLER:  Good afternoon, Your Honor.

11                THE COURT:  I hear a bit of an echo.  So if each

12    of you could mute where you are unless you're speaking, that

13    would be appreciated.

14                We are here for, at least in the first instance,

15    Mr. Samsel to be arraigned.

16                So let me ask defense counsel first just confirm

17    whether you consent to your client being arraigned via

18    videoconference the way we are proceeding here today.

19                MR. WOODWARD:  Thank you, Your Honor.  Stanley

20    Woodward for Mr. Samsel.

21                I think the echo might be coming from you, Ryan.

22    If you can mute your line in there.

23                THE DEFENDANT:  (Indicating.)

24                MR. WOODWARD:  You are muted?

25                THE DEFENDANT:  (Indicates affirmatively.)

1          MR. WOODWARD:  Okay.

2          THE COURT:  Okay.

3          MR. WOODWARD:  Not from him, then.

4          So yes, given the global [sic] 19 pandemic and the

5    situation we continue to find ourselves in, the defense does

6    consent to proceed virtually for this proceeding.  Thank

7    you, Your Honor.

8          THE COURT:  All right.  So Ms. Harris, if you

9    would go ahead and arraign the defendant.

10          THE DEPUTY CLERK:  Yes, Your Honor.

11          Ryan Samsel, in Criminal Matter No. 21-cr-537, you

12    are charged with 18 United States Code Section 231(a)(3),

13    civil disorder; 18 United States Code Sections 111(a)(1) and

14    (b), 2, assaulting, resisting, or impeding certain officers

15    using a dangerous weapon and inflicting bodily injury; 18

16    United States Code Sections 1752(a)(4), (b)(1)(A), (b)(1)(B)

17    and 2, engaging in physical violence in a restricted

18    building or grounds with a deadly or dangerous weapon and

19    resulting in significant bodily injury; 40 United States

20    Code Section 5104(e)(2)(F) and 2, act of physical violence

21    in the Capitol grounds or buildings; and 18 United States

22    Code Sections 1512(c)(2) and 2, obstruction of an official

23    proceeding.

24          Mr. Woodward, does your client waive the formal

25    reading of the indictment?  And for the purposes of this

1    arraignment, how does he wish to plea?

2              MR. WOODWARD:  Yes, ma'am.  On behalf of

3    Mr. Samsel, we will waive the formal reading of the

4    indictment.  We would request the entry of a plea of not

5    guilty as to each count in the indictment.  And we would

6    respectfully assert Mr. Samsel's Fifth and Sixth Amendment

7    rights, including his right to a speedy trial.

8              THE DEPUTY CLERK:  A plea of not guilty is

9    entered, Your Honor.

10             THE COURT:  All right.  Very well.

11             Now that that has been accomplished, let me turn

12   to the motion that counsel has filed.

13             Let me just say at the outset, Mr. Samsel, I'm

14   sure it is -- among other things that have been -- that are

15   frustrating to you has been the fact that now your case has

16   been assigned to me and you've had -- you had many -- I know

17   from reviewing some of the transcripts, you had many

18   appearances, (inaudible) -- Judge Faruqui.  I know that

19   there was -- you and he and -- had a lot of different

20   occasions for this issue of your medical treatment to be

21   raised and for Judge Faruqui to do what he could to try to

22   alleviate the situation.  Obviously, that has not happened.

23   So let me just pledge to you from the outset that there are

24   -- while there are limits to what I can order and there are,

25   frankly, limits to what our medical system and the marshals

1    system will permit -- there are limits to the particulars

2    of, for example, what doctor you might want to see, just

3    like there are for everyone else, but I'm going to do my

4    level best to make sure you get the treatment you need

5    within the authority I have.  So again, I know it's probably

6    frustrating that you had one judge you were before for a

7    while, and also, maybe, part of the frustration you might

8    have even is the fact that you've now changed lawyers and --

9    a number of times as far as I can see, but you've got a

10   lawyer now.  You've got me as -- going forward.  We're going

11   to do our best to make sure that you get the treatment you

12   need.

13            So let me -- I've, obviously -- it was filed as an

14   emergency motion just the other day and the Government

15   hasn't responded.  I think I'll, you know -- I'll hear from

16   you first, Mr. Woodward.  I -- again, by way of background,

17   I did review some of the transcripts in the case to try to

18   get myself somewhat up to speed.  And it seems, at a minimum

19   in the first instance, you -- your request for the medical

20   records seems like, sort of, the foundational thing you need

21   to, kind of, figure out where to go from here as far as your

22   client is concerned.  So I want to focus on that since I

23   can't -- I think it seems difficult to order treatment that

24   neither one of us knows exactly what that treatment would

25   be.  So I'll -- I guess I'll just hear from you on what you

1    would like to update me on.  Again, I've read the motion.

2    My plan is to simply -- today, at least in the first

3    instance, is to ask the Government their view about the

4    medical records issue.  And I, you know -- candidly, either

5    order, (inaudible) -- simply just have the Government file a

6    -- task the Government with making sure that you get all

7    those records promptly and have them file -- no matter when

8    we come back, have them file a piece of paper -- a status

9    report with me -- maybe, even the parties file it jointly --

10   to make -- to update me, really, within a very short period

11   of time as to the status of your request to have all the

12   medical records.  It seems to me that's a reasonable first

13   step to making sure he gets what he needs.

14            But, Mr. Woodward, I'll hear from you.

15            MR. WOODWARD:  Thank you, Your Honor.

16            And actually, I can give you a little bit of a

17   good report.  And let me start by saying -- and you don't

18   hear this from defense counsel very often -- but I applaud

19   the Government's effort to assist us in getting Mr. Samsel's

20   medical records.  Yesterday morning, they arranged for us to

21   have a conversation with a member of the U.S. Marshals who

22   is responsible for Mr. Samsel while at the Central Virginia

23   Regional Jail, you know?  He promised us -- and, in fact,

24   did deliver on that promise -- to provide us with medical

25   records.  And earlier today, we received a substantial

1    amount of medical records.  I won't represent to you or to

2    my client that we have them all, given that they're coming

3    through the grapevine, if you will, but I -- we do now have

4    a better insight.

5            Part of the problem -- and we're happy to

6    supplementally brief this, if that's helpful to Your Honor

7    -- but there's a bit of he-said-she-said happening here.

8    What I had -- what I personally had previously been told by

9    authorities with the Central Virginia Regional Jail is that

10   they were waiting for the Marshals Service to approve the

11   treatments that had been medically ordered.  Of course, I

12   wanted to see that that had actually been ordered in

13   documentation before coming to Your Honor.  I've now seen

14   that these treatments have been ordered.  And now, the

15   Marshals Service has shown me documentation that the

16   treatment was approved, and it was approved some time ago.

17   So for example, the -- after Mr. Samsel had been seen at the

18   University of Virginia Medical Center, he was ordered to

19   undergo physical therapy to treat the numbness in his left

20   arm and fingers.  The U.S. Marshals Service had approved

21   that treatment, and yet it's been over a month and he still,

22   to my knowledge, has not received any physical therapy.

23           In addition, the records that we have received

24   today -- and I'm a little bit reticent to go through his

25   entire medical history on a public line, of course -- but

1    I -- what I will say is that there is -- there's clearly

2    confusion in the documentation and there are notations

3    between people -- there are -- rather, there are notations

4    by officials with the Central Virginia Regional Jail in

5    which they appear to be calling the doctors that have

6    treated Mr. Samsel, questioning the orders that those

7    doctors had entered, and changing that treatment in the

8    record and getting different procedures ordered for

9    Mr. Samsel.

10          He has asked us, Your Honor, to have him open up

11   his shirt there and show you that --

12          Don't do it yet.  Let the judge say it's okay.

13          I can represent to the Court that his -- that he

14   has been bleeding -- he's bleeding through his shirt.  He

15   showed us before you came on.  There is something wrong with

16   his chest.  I don't know what it is.  I'm not a doctor.  But

17   I have been working with Mr. Samsel for over a month, and to

18   my knowledge, since August 6th, he has not been treated by

19   an additional medical professional outside of the Central

20   Virginia Regional Jail.

21          THE COURT:  All right.  Mr. Samsel, if you want to

22   show me, that's fine.  I take your word for it, but I'll --

23   I'm happy to see it, especially given that this is -- we

24   have a public audio line, but there's no video at least

25   going out to the public.

1          THE DEFENDANT:  (Indicating.)

2          THE COURT:  All right.  I see.  I can see it.  I

3     can see it, sir.

4          All right.  So Ms. Russo, let me turn to you.

5     I -- I'm certainly, I think, in the first instance -- it

6     sounds like, first of all, which is good news, that there's

7     been some progress made at least as far as, (inaudible) --

8     go from the time this -- the motion was filed until now.  My

9     -- and so my inclination is to, sort of, task you with --

10    because you're the representative of the Government I have

11    on the call -- on today's -- at today's hearing, to have you

12    come back in a few days and file a status report in which

13    you represent hopefully that, to your knowledge, all the

14    records that are in the -- based on your conversations with

15    the various entities that you'd be -- that need to produce

16    medical records, that Mr. Woodward and his client have

17    everything in terms of medical records.  That's, sort of,

18    step one.  And then I'm certainly, (inaudible) -- the

19    parties about where we should go from here making sure that

20    Mr. Samsel gets the treatment he needs.  It does seem quite

21    strange to me that these procedures, at least, the marshals

22    have authorized them and they haven't taken place.

23          So Ms. Russo, can you shed any light on all of

24    that.  And do you have any concerns or reason to think I

25    shouldn't just task you with coming back in a few days and

1    filing something and letting me know that the defense has

2    all the records that they've asked for?

3            MS. RUSSO:   Judge, one of the problems is that,

4    just like with inmates in the Bureau of Prisons where we,

5    the Government, does not have control over the way that BOP

6    necessarily does something, the Government is not only -- we

7    can't get these medical records ourselves; right?   I --

8    perhaps there's a way, but I think the defendant would have

9    to sign some sort of consent form to release the medical

10   records to us.   And so the United States Marshals Service

11   and the facility really have control over that aspect of it.

12   And certainly, we have contact information for them and

13   have, you know, tried to assist in whatever way we can.   At

14   this moment, the United States Marshals Service is in direct

15   contact with defense counsel.   So that -- because United

16   States Marshals Service is the one that have -- all the

17   medical care has to be approved through.   So I think that

18   hopefully will facilitate things.

19           In terms of the facility, I know that in the past,

20   Judge Faruqui has actually brought in some of the nurses

21   from the facility to speak about this because, again, that's

22   not something that the Government necessarily can control,

23   is how the facility manages his medical care because they

24   have their own rules and procedures for how they do that,

25   but I'm happy to reach out to the facility and let them know

1   that they need to, you know, bring a representative at a

2   hearing to, kind of, shed some light on what's going on.

3   I'm happy to facilitate whatever I can.  I just want to make

4   that distinction, which is that we don't have control

5   necessarily of what the facility's rules or procedures are

6   for getting medical care, and the United States Marshals

7   Service is, obviously, a separate entity from us, although

8   we coordinate with them.

9          THE COURT:  Sure.  No, I understand both of the,

10  (inaudible) -- very well that you are -- number one, you're

11  not -- you can't order the marshals around or the Central

12  Virginia Regional Jail around with regard to medical

13  treatment, number one, or necessarily with regard to

14  producing these medical records to the defense.  On the

15  other hand, you can let them know that I'm highly interested

16  in making sure that the defendant -- the defendant, after

17  all, regardless of anything else, it seems to me, has a

18  right to his own medical records, period.  And so if you

19  can't tell me that -- or if they can't tell you and then you

20  can't tell me that, in fact, all the medical records they

21  have have been turned over to the defense, that's -- we'll,

22  (inaudible) -- that problem next and I'll be asking both of

23  you what you think I have the lawful authority to do in that

24  case and we'll -- hopefully, we will get to that point when

25  we're, (inaudible) -- talking about medical records, for

1    goodness' sake.

2         But it seems to me -- Mr. Woodward, obviously, you

3    -- why don't I do this.  You -- Mr. Woodward, you do have --

4    and I think it's good -- it sounds like Mr. Samsel has --

5    the -- hopefully, the revolving door of counsel has stopped

6    and we'll have two folks that are -- that -- both

7    Mr. Woodward and the Government, that is -- who are, sort

8    of -- can work through this at least with regard to the

9    records in the first instance.

10        So I take your point, Ms. Russo, and I'm not going

11   to be -- I don't expect -- and I understand the limits of

12   your authority here.  But I do think, at a minimum -- and,

13   maybe, I'll --

14        Again, because, Mr. Woodward, you've rightfully --

15   you've opened up a direct line of communication between

16   yourself and the marshals -- I don't know -- Mr. Woodward,

17   have you been directly -- also directly in contact with the

18   officials at the CVRJ?

19        MR. WOODWARD:  I have been directly in contact

20   with them; however, I have received contradicting

21   information from the officials at the jail.

22        THE COURT:  Okay.

23        MS. HALLER:  And if I may --

24        THE COURT:  So --

25        MS. HALLER:  -- Your Honor?

```
1              THE COURT:  Please.

2              MS. HALLER:  Sorry.  I'm Juli Haller.  I'm

3     co-counsel with Mr. Woodward.

4              THE COURT:  Please.

5              MS. HALLER:  We've had a tremendously difficult

6     time in getting private communications with our client in

7     CVRJ.  So to the extent that we've been able to communicate,

8     we can -- we did receive some records from the jail itself.

9     Initially, the problem was that they would not produce

10    third-party records to us.  We did get the signed

11    authorization through them, because they had to take it to

12    the client to sign it.

13             THE COURT:  Right.

14             MS. HALLER:  So it's been a progress -- it's been

15    a work in progress, but new records are coming in.  So to

16    Your Honor's point on the status report regarding the

17    records, I think that's really helpful because we can figure

18    out what we're still missing.

19             THE COURT:  Right, and I understand.  It's just

20    going to be you all representing to me jointly from the

21    Government and the defense what your -- what representations

22    they made to you.  Have you been satisfied -- have you been

23    told that -- by the marshals and by the jail that you have

24    everything that you're supposed to have, yes or no?  And if

25    you don't -- I know the answer no is -- right now is no.
```

```
 1        But my point is, whatever date we set, you all will tell me

 2        that, and then we'll all figure out together what I have the

 3        authority to do to make that happen.  It just seems to me --

 4        and while I get that we come up pretty quickly to a hard --

 5        to a barrier as far as what I can order regarding, for

 6        example, where the defendant is held and what treatment is

 7        approved and all the rest of it, I just -- someone's medical

 8        records are their medical records.  So I just can't see any

 9        reason why those records are not all being promptly provided

10        to you as long as you -- as you've mentioned, have the

11        authorization -- (inaudible.)

12               So that's my suggestion as, sort of, step one.

13        And we can -- based on that report I get from you, we can go

14        from what -- I mean, I think, obviously, you should all,

15        (inaudible) -- probe about why he hasn't received the

16        treatment and, when we're together next, we can figure out

17        next steps.  But I think in the first instance, getting the

18        medical records -- especially, Mr. Woodward, given what you

19        represented about, at least in your view, what the records

20        reflect, it seems to me that's a good first start to make

21        sure you promptly get every record -- piece of -- every

22        record that's out there to come up with a game plan about

23        what you think should happen next.  Is that fair?

24               MR. WOODWARD:  Yes, Your Honor.

25               THE COURT:  Okay.
```

1           MS. RUSSO:  Your Honor --

2           THE COURT:  Yes?

3           MS. RUSSO:  -- just one other point I wanted to

4      make about this.

5           So back at -- a while ago -- Mr. Samsel started

6      out at the D.C. Jail.  Understandably, he wanted to be

7      transferred out of that facility.  He was transferred down

8      to Rappahannock.  When he was at Rappahannock, he was

9      represented by Ms. Pasqualini.  And at one point, she had

10     reached out because she was unable to get in touch with the

11     facility and there was some urgent medical care, but she was

12     concerned about that at that time.  At that time, I had

13     reached out to the facility.  I found a contact to reach

14     out.  And I was told by the facility that I needed to go

15     through the Marshals Service; that they cannot communicate

16     directly with me.  I then confirmed that with the Marshals

17     Service.  So I raised this at a hearing with the -- with

18     Judge Faruqui just that in urgent situations like this, if

19     no one can get directly in contact with the facility, it

20     seems like that could be problematic because sometimes you

21     wouldn't have time to react to the situation to go through

22     the Marshals Service.  And at that time, Judge Faruqui had

23     put counsel in direct contact with the Rappahannock

24     facility -- had put Ms. Pasqualini in direct contact with

25     them so that at least she could reach out to them if there

1    was an urgent matter.

2          So my understanding is that now Mr. Woodward and

3    Ms. Haller have that direct contact person at the facility

4    who may or may not always provide them consistent answers, I

5    understand, but I did want to just point that out that my

6    contact -- I myself cannot contact directly the facility.  I

7    have to go through the United States Marshals Service, and

8    the facility will just direct me to the Marshals Service if

9    I ask them questions, if that makes sense.

10          THE COURT:  It makes sense.  And so that's fine.

11   And in your -- if that's what you've been told, that's what

12   you've been told.  I'll say -- I'll take, as part of the

13   joint report, anything -- Ms. Russo, that doesn't mean you

14   can't ask a question through the marshals, and the marshals

15   should be able to -- it's a game of telephone, I understand,

16   and that's a problem -- and you'll receive what you receive.

17          But I would like to know jointly from both sides

18   where each side thinks things stand with regard to the

19   medical records issue on a relatively quick turnaround here

20   so that I can know one way or the other that they have all

21   the medical records they need, and if not, we'll be back and

22   I will ask the parties what they think I have the power to

23   order at that point because, again, I just haven't been in

24   this position, frankly, and I think it would be a fairly

25   amazing thing for a -- for one of these facilities to

1   withhold from someone their own medical records.  So

2   hopefully, we don't get there, but we will see.

3          So the question, then, is -- from me to you all is

4   what you think a productive -- I mean, I want to give you

5   enough time to, kind of, let this -- at least the medical

6   records issue play itself out and have -- come back in a

7   meaningful amount of time.  So not, you know, tomorrow.  But

8   on the other hand, I don't want to let this linger, and I

9   want to make sure we have movement.

10          So Mr. Woodward, what -- if I -- what would you

11  suggest as far as a date by which I could have a -- and

12  also, we have the limits, as you all know as well as I do,

13  on the ability to hook into the facility and to have

14  Mr. Samsel with us.  So give me a suggestion as far as when

15  you think I can -- I should order a report from you all that

16  builds in enough time for you all to press the facilities on

17  this -- the marshals and the facility and can report back to

18  me.  And then, maybe, when should we schedule a next date

19  that I can, sort of -- depending on your -- what you report

20  back to me, we can devise a plan on how to go forward,

21  whether you get those records or don't get them.  My --

22  well, anyway, Mr. Woodward, let me ask you for your thought

23  on that in the first instance.

24          MR. WOODWARD:  Sure, Your Honor.  I -- actually,

25  speaking of the facility, I'm concerned that, maybe, we've

1  lost Mr. Samsel.  If Ms. Harris could tell us whether he has

2  been disconnected or just the video is off?

3          THE DEPUTY CLERK:  No.

4          THE DEFENDANT:  I'm still here.

5          THE DEPUTY CLERK:  You have four individuals on

6  your screen?

7          MR. WOODWARD:  Okay.  No, I don't see him, but I

8  just --

9          THE DEPUTY CLERK:  Yes.  So --

10          MR. WOODWARD:  -- wanted to confirm.

11          THE DEPUTY CLERK:  But what you can do is if you

12  hover your mouse over your screen and pull up the keypad, if

13  you click 8 on the keypad, it will allow more people to show

14  on your screen instead of just the four, but he's still

15  there.

16          MR. WOODWARD:  Thank you, Ms. Harris.

17          THE DEPUTY CLERK:  You're welcome.

18          MR. WOODWARD:  So I think that probably --

19  let's -- my proposal would be that the status report be

20  filed within a week.  So Monday or Tuesday.  And then if

21  your calendar permits, we could come before you at the end

22  of next week to revisit either medical records or treatment

23  as we uncover over the course of the next 10 days or so.

24          THE COURT:  Ms. Russo, what do you think of that

25  timeline?  I think I -- that's about what I -- that's

 1    roughly what I was thinking.

 2                MS. RUSSO:  That seems reasonable to me, Your

 3    Honor.

 4                THE COURT:  All right.  So I'm going to ask for

 5    that report -- we'll ask for it on -- I'll ask for it on

 6    Monday, the 20th; that the parties just file a joint status

 7    report reflecting all the information both sides have --

 8    whatever representations both sides can make about what they

 9    know about whether the defense has been provided all the

10    relevant medical records.

11                I think the next question -- when I could -- and

12    when we would be able to do this with Mr. Samsel.  I don't

13    --

14                Ms. Harris, can you tell me what your

15    understanding of the time limitations with regard to the

16    facility we need to connect to are.  In other words, are

17    there days of the week that are -- is there any -- first of

18    all, is there any way you can tell me right now whether the

19    time slot is free or not?  I assume not, but let me ask that

20    first.

21                THE DEPUTY CLERK:  No, I can't tell what's

22    available, but anything that we schedule, the earliest they

23    take hearings is 3:00 o'clock in the afternoon.

24                THE COURT:  Right.  Okay.

25                THE DEPUTY CLERK:  And then I would have to --

1    once you pick a date, I would have to confirm with Ms. White

2    if that's available.

3              THE COURT:  All right.  I mean, the other thing we

4    could do --

5              And, Mr. Woodward, I don't know if you -- well,

6    you could waive your client's appearance for purposes of a

7    follow-up hearing if we can't get him on quickly.  I have a

8    trial that begins in two weeks.  It may go for as long as

9    three weeks.  So I want to get you in before that.  Why

10   don't we try --

11             Ms. Harris, you said the earliest is 3:00 o'clock

12   or the latest?

13             THE DEPUTY CLERK:  The earliest.

14             THE COURT:  Okay.  Let me propose -- looking at my

15   calendar, a date and time that I could do might be -- well,

16   let's say 3:00 o'clock on -- well, let's see -- no, that's

17   in person -- why don't I say -- why don't we say 4:00

18   o'clock on the -- Thursday, the 23rd, if counsel and -- if

19   counsel are available.

20             Is that good for you, Ms. Russo?

21             MS. RUSSO:  It's not, Your Honor, but let me

22   double-check with my co-counsel.

23             THE COURT:  Okay.

24             (Brief pause.)

25             Mr. -- while she's looking, is that good for the

 1   defense?

 2              MR. WOODWARD:  Yes, it's good for us, Your Honor.

 3              THE COURT:  All right.

 4              MS. RUSSO:  And my co-counsel says she can cover

 5   that day.

 6              THE COURT:  Okay.  Meaning, cover the other thing

 7   or cover this thing?

 8              MS. RUSSO:  The 4:00 o'clock on the -- Thursday,

 9   the -- September 23rd, I believe it is.

10              THE COURT:  Right.  Meaning, she would cover for

11   you in this case or --

12              MS. RUSSO:  Yes, she's my partner --

13              THE COURT:  Okay.

14              MS. RUSSO:  -- in the case.  So she can handle the

15   hearing and -- but we'll be able to file the joint status

16   report before I leave.

17              THE COURT:  All right.  Okay.  So let's take a

18   stab at that, Ms. Harris.  You can try to -- you can --

19   we'll try to set that up.

20              If we cannot and if, for some reason, we can't get

21   a line into the facility, we'll contact you and try to see

22   what our options are at that point.  Either -- there are --

23   I have a limited number of other spots it might work in, if

24   the parties are available; if not, the parties may -- at

25   least the defense may think about waiving his appearance for

1    that, but we'll -- one way or the other, we'll try to get

2    you in toward the end of the week that following week, but

3    for now, we'll set it for the 23rd at 4:00 o'clock.

4            All right.  So that's at least -- hopefully,

5    we've, (inaudible) -- path forward on making sure that you

6    all get what you need in terms of knowing what Mr. Samsel's

7    conditions of -- condition is and then advocating for him to

8    get particular treatments.

9            I guess, then, I should just ask the parties, are

10   they willing, at least until the 23rd, to waive the Speedy

11   Trial Act between now and then?  Are there -- is the defense

12   willing -- is the defense asking for that?

13           MR. WOODWARD:  I'm afraid, Your Honor, that we're

14   -- this is a difficult question and the -- frankly, I'm at a

15   bit of a loss.  This is an incredibly unusual case.  On the

16   one hand, this is a case where we anticipate the video and

17   photographic evidence that continues to be identified and

18   produced will be helpful to him.  And so I'm not inclined to

19   tell Your Honor that we'd like a trial date today either

20   knowing that we're awaiting, you know -- in a filing earlier

21   today, the Government represented there would be 15,000

22   hours of video and Ms. Haller and I can't physically review

23   all of that.  On the other, he remains detained.  And, as

24   you're now well aware, this medical issue is, you know --

25   it's exacerbated his pretrial detention.

1          What I'd be inclined to do is to ask Your Honor to

2     hold in abeyance a ruling on pretrial until this next status

3     when I hopefully will have a better sense of whether things

4     are going to move forward with respect to getting

5     Mr. Samsel, rather, the medical attention that he so

6     desperately needs or not, in which case, I think Your Honor

7     can anticipate that we'd be asking you to set a hearing on

8     revisiting the detention status of Mr. Samsel.

9          THE COURT:  Well, I mean, and you'd be -- and at

10    that point, you'd be willing to exclude -- you'd agree to

11    exclude that time?

12         MR. WOODWARD:  I don't know, Your Honor, because I

13    don't know what I don't know.  And so it's --

14         THE COURT:  Right.

15         MR. WOODWARD:  -- difficult --

16         THE COURT:  Go ahead.  Go ahead.

17         MR. WOODWARD:  It's difficult for me to --

18    frankly, to advise Mr. Samsel on waiving that right when it

19    could be another seven months before he's receiving the

20    treatment that he's been asking for all along.  And so you

21    can appreciate that from the defense perspective, we're

22    incredibly frustrated.  The case itself is complex.  The

23    Government has represented that in these cases.  And yet,

24    Mr. Samsel's case is especially difficult, given this

25    medical issue and the situation that he finds himself in.

```
 1            I do want to say just to clarify the record, I'm

 2     not aware of Mr. Samsel having been -- having requested a

 3     transfer from D.C.  It, obviously, did happen.  I --

 4     there's -- there are obvious reasons why it might have

 5     happened.  But I'm not sure that Mr. Samsel himself asked to

 6     be transferred out of D.C.  And so -- just to the extent

 7     that that would suggest that any of these difficulties are

 8     being brought on by his request for that transfer.

 9            THE COURT:  All right.  Well, I -- certainly, I

10     don't take Ms. Russo as trying to suggest that.

11            MS. RUSSO:  (Indicates negatively.)

12            THE COURT:  And I see her shaking her head.

13            Ms. Russo, is the Government requesting that I

14     exclude the time between today and the 23rd?

15            MS. RUSSO:  Yes, Your Honor.  So were we not to do

16     an excludable delay, we're looking at an October trial date.

17     And while I am sympathetic and understand what the defendant

18     is discussing, they have filed a motion, we are working on

19     doing a joint status report regarding that motion, and there

20     are victims in this case.  And so, you know, if nothing

21     else, at some point, I need to relay to the victims what our

22     trial date may or may not be and start prepping them for

23     that date.  So we are already three weeks into our speedy

24     trial time.  From the 25th, which was the date of

25     indictment, our time has been running.  So I would ask that
```

1    the time be excluded at least until that date.  And if

2    counsel isn't ready to set a trial date at the next hearing,

3    I'm going to be asking, again, for a period of excludable

4    delay, because if we're not ready to set a trial date, I do

5    need to relay that to the victims, and I won't be able to

6    start preparing for trial if we don't have a date.

7              THE COURT:  All right.

8              Well, I think, unfortunately, the thing that is

9    also -- I have to take into consideration here is the order

10   that Chief Judge Howell entered most recently that, for

11   public health purposes -- she filed it on August 25th of

12   2021 -- the most recent order that governs how this

13   courthouse is hosting, on a limited number of -- basis, jury

14   trials and how we are limiting the number of jury trials

15   that take place in the courthouse for public health reasons

16   due to the pandemic and in particular the resurgence of the

17   pandemic in recent weeks and -- weeks and months, and it

18   makes a number of factual findings which I will adopt in

19   this case as well consistent with that order.  And I think,

20   for the reasons set forth in that order, I will -- between

21   that and, frankly, it sounds like, from the representations

22   that have made -- been made by Mr. Woodward, that either

23   there's a lot of discovery to be produced or that was just

24   produced in this case.  It doesn't seem reasonable to me

25   that we're -- that a trial, (inaudible) -- be had -- that

1    the defense would be in a position to defend a trial

2    particularly in that -- in this little bit of time.

3              So for all the public health reasons that have

4    been laid out -- and I should add, you know, the order --

5    obviously, what the court is doing is prioritizing cases in

6    which defendants are held, number one -- and, obviously,

7    Mr. Samsel meets that criteria -- but we're also

8    prioritizing the length of detention.  And it is

9    unfortunate, but due to the pandemic, I know we have many

10   cases in which folks have been detained longer than

11   Mr. Samsel.

12             So in any event, I think, for the reasons of the

13   complexity of this case as well as the public health reasons

14   laid out in Chief Judge Howell's order on August 25th, I

15   will exclude the Speedy Trial Act from today's date until

16   the 23rd because the ends of justice that are served by

17   taking such action outweigh the best interests of the public

18   and the defendant in a speedy trial.  Again, I've laid out

19   the reasons that I'm doing so in this matter, but I will

20   exclude them in the interests of justice for that period of

21   time.  And, you know, we'll take it one step at a time here

22   as far as what other stretches of time we may exclude as we,

23   (inaudible) -- and why.

24             All right.  So I will see -- I'll see the report

25   on the 20 -- well, let me make sure -- on the 20th and we'll

1    see everyone back here -- cross our fingers we get a line

2    into the facility -- on the 23rd.

3              Is there anything further from the Government?

4              MS. RUSSO:  No, Your Honor.  Thank you very much.

5              THE COURT:  All right.  Anything further from the

6    defense?

7              MR. WOODWARD:  No, Your Honor.

8              If I just may tell Mr. Samsel that we'll arrange

9    to have a call with you as quickly as we can, Ryan.

10             Thank you, Your Honor.

11             THE COURT:  All right.  Very well.  We'll see you

12   all next week.  Until then, the parties are dismissed.

13             MS. HALLER:  Thank you.

14             (Proceedings concluded at 3:48 p.m.)

15             * * * * * * * * * * *

16             **<u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>**

17        **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby**

18   **certify that the above and foregoing constitutes a true and**

19   **accurate transcript of my stenographic notes and is a full,**

20   **true and complete transcript of the proceedings to the best**

21   **of my ability, dated this 3rd day of December 2021.**

22        **Please note:  This hearing occurred during the COVID-19**

23   **pandemic and is, therefore, subject to the technological**

24   **limitations of court reporting remotely.**

25                            **<u>/s/Timothy R. Miller, RPR, CRR, NJ-CCR</u>**
                             **Official Court Reporter**

1          United States Courthouse
            Room 6722
2          333 Constitution Avenue, NW
            Washington, DC 20001
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25