**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case Number 1:21-cr-00537-JMC-1** |
| **RYAN SAMSEL,** | : | |
| **JAMES TATE GRANT,** | : | |
| **PAUL RUSSELL JOHNSON,** | : | |
| **STEPHEN CHASE RANDOLPH,** | : | |
| **and JASON BENJAMIN BLYTHE,** | : | |
| | : | |
| **Defendants.** | : | |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT SAMSEL'S**
**MOTION FOR REVIEW AND REVOCATION OF PRETRIAL DETENTION ORDER**

The United States of America respectfully submits that this Court should deny the motion, ECF 142, seeking the release of defendant Ryan Samsel, a recidivist offender convicted for crimes of violence who is now indicted for further assaults during the breach of the U.S. Capitol on January 6, 2021. Detention is proper, among other reasons, for a defendant whose violent history includes a prolonged and brutal attack against a victim who was pregnant; assaults occurring while the defendant was subject to probation; assaults that were followed by witness intimidation and efforts to obstruct testimony; and assaults conducted not only in public locations but within the defendant's own residence. Notably, the defendant himself has persistently rejected the suggestion of bail in this case. Moreover, his primary complaint concerns the conditions of his confinement, as reflected in his proposal for alternative relief consisting of continued detention in a different facility.[1] Even where the conditions of the defendant's custody merit consideration, they are not

---

[1] ECF 142:31 ("in the alternative, the safety of the community would reasonably be assured by Mr. Samsel's release to the Pennsylvania Department of Corrections").

properly addressed in this context and do not provide a proper statutory basis for revocation of an appropriate order of detention, as explained below.

## BACKGROUND

The defendant left a peacefully attended rally that was still in progress to breach the grounds of the U.S. Capitol, ignoring barricades and clearly posted signs that closed the area to the public.  Although still on parole, and subject to an open warrant, with others he insulted and aggressively confronted uniformed police officers, and then leveled barricades with enough force to cause serious injury.  The defendant later bragged that he led the crowd in a confrontation against officers.  In effect, the defendant opened the gates to the January 6 insurrection, and with the crowd he claimed to lead, forced law enforcement to retreat from barriers they manned.  Disregarding at least two separate lines of defense and his clear recognition of injury resulting from the breach of police lines, the defendant chose to pursue his unlawful and hazardous penetration of restricted Capitol grounds, intruding up to the Capitol's western front, where he confronted and fought with additional officers as part of a growing and increasingly dangerous mob.

As a result, on January 21, 2021, a sealed complaint charged defendant Ryan Samsel with obstruction in violation of 18 U.S.C § 1512(c)(2), assaults on a federal officers in violation of 18 U.S.C. § 111, and participation in a civil disturbance in violation of 18 U.S.C. § 231(a)(3).  He was arrested in the Eastern District of Pennsylvania and made his initial appearance in that district on February 3, 2021, in Case No. 2:21-mj-00197 (E.D. Pa.) (ECF 1).  He waived removal and stipulated to pretrial detention pending further proceedings. *Id.* (ECF 2).  On February 19, 2021, the defendant made his initial appearance in the District of Columbia where he did not contest detention and waived written findings of fact supporting an order of detention.  Minute Entry of February 19, 2021.  On August 25, 2021, a grand jury returned an indictment charging the

defendant, ECF 46, and later returned superseding indictments, ECF 61, 69, and 80. The defendant faces charges under 18 U.S.C. § 231(a)(3); 18 U.S.C. § 111; 18 U.S.C. § 1752; 40 U.S.C. 5104(e)(2)(F); and 18 U.S.C. 1512. Separate counts for assault under Section 111 include charges involving the use of a deadly or dangerous weapon and the infliction of bodily injury. *E.g.*, ECF 80:2.

In May, 2021, the defendant moved for release from temporary federal detention; however, he did not request bond. Instead, he sought release from federal to state custody pursuant to a Pennsylvania detainer issued for his violation of parole, claiming that the state facility could more readily provide him with medical treatment. ECF 23. The United States at that time opposed the defendant's release from federal detention. ECF 25.

On June 4, 2021, Magistrate Judge Zia M. Faruqui held a detention hearing. ECF 27. During that hearing, the magistrate judge considered the factors identified in *United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021), ECF 27:7, and concluded that "detention is appropriate." ECF 27:11. In light of defense representations that the defendant would have better access to medical care for pre-existing conditions and for treatment of post-detention injuries, the magistrate judge instructed the parties to report back concerning his inquiry "if there's a way, where he can get better medical care at this other facility, and still be detained as a backstop . . ." ECF 27: 7-8, 11, 12, 15, 20.

On June 10, 2021, the magistrate judge issued an order for the defendant's detention under 18 U.S.C. § 3142(e)(1), concluding:

> The Court finds that the serious and dangerous nature of the Defendant's instant charges, the strength of the evidence supporting those charges, the Defendant's lengthy history of assaultive conduct, and the risk that the Defendant will use violence against the democratic process in general or certain individuals in particular, all weigh in favor of his detention pending trial. See 18 U.S.C. § 3142(g)(1)-(4). Further, based on the Defendant's lengthy criminal history and the

allegation that he committed the instant offenses while he had an open warrant and
while on parole for a different matter, see Opposition at 1, the Court finds that "no
condition or combination of conditions will reasonably assure . . . the safety of any
other person and the community." 18 U.S.C. § 3142(e)(1).

ECF 28:2.  After imposing detention, the order then determined pursuant to 18 U.S.C. § 3142(i)

that the defendant would be transferred temporarily to the custody of the Commonwealth of

Pennsylvania to receive medical treatment.  *Id*.  Four days later, however, the magistrate judge

vacated the portion of his order addressing the defendant's transfer to Pennsylvania after receiving

a report that "the Defendant had retained new counsel and was now opposed to this transfer."  ECF

30.

A hearing followed.  ECF 38.  Counsel for the defendant confirmed that the defendant

preferred to remain in federal custody. ECF 38:4 ("So he definitely would like to stay in the federal

system"), 38:5-6 ("So what he would like to do, ideally, is actually return to a federal facility. …

So, ideally, he would like to be in the federal system and actually be put back in a federal prison

facility; that is what he is asking for").

A few days later, the magistrate judge held an additional hearing to question the defendant,

who explained that Pennsylvania would not, in fact, be able to arrange for medical care.  ECF 39:9.

Again, his attorney stated that "the request right now, Your Honor, is for Mr. Samsel to go back

to a Bureau of Prisons facility, a federal facility."  ECF 39:14. When asked to confirm this the

defendant stated, "I was thinking maybe we could work together on this and maybe put me in a

federal prison instead of contracted detention . . ."  ECF 39:15.  At a later point in the hearing, the

defendant stated, "I don't want their bail.  They can keep their bail; I am not arguing that, and I

didn't want to argue that."  ECF 39:21.

The magistrate conducted a status conference on July 1, 2021.  ECF 44. The defendant

reiterated his request to be held in a federal facility that could address certain medical needs, and

stated:

> Look, I am still in federal custody; I don't want their bond.  We don't even have to have that hearing, that they can have – the government can have that; they can keep me.

ECF 44:5.  The defendant advised that he wanted to be housed at the Federal Detention Center in Philadelphia, Pennsylvania.   ECF 44:6.  He explained, "I would rather be in the federal government's custody and let them handle the [medical] treatment; I think that's fair."  ECF 44:8.

In November, 2021, the question of the defendant's custodial status resurfaced in a motion reversing course and renewing the defendant's application for a temporary transfer of custody to the Commonwealth of Pennsylvania, which had issued a detainer arising from the defendant's violation of his state parole.  ECF 63:4 (referencing the need for medical treatment as a compelling reason supporting transfer).  The motion was granted without opposition from the United States.  ECF 65.  By March 2, 2022, the defendant completed his sentence for the parole violation and was transferred to the Federal Detention Center in Philadelphia.   *See United States v. Samsel*, No. 2:22-mj-00325-1 (E.D. Pa. Mar. 2, 2022)(ECF 1).  He appeared virtually before a magistrate judge in the District of Columbia on March 17, 2022.  *See* docket entry of March 17, 2022 setting return on arrest warrant.  He is currently detained at the United States Penitentiary (USP) in Lewisburg, Pennsylvania.

The defendant now demands release based primarily on his assertion that, as he knew it would, completion of his term for a state parole violation occurred before he could arrange for certain medical procedures through the state facility where he was temporarily housed.[2]   In

---

[2] On June 25, 2021, the defendant explained that his parole violation sentence was no more than six months, and that after transportation to a Pennsylvania facility, he would undergo a 30-day quarantine and 60-day classification period.  By that time, the defendant would not be eligible

addition, he objects, unreasonably, to the length of his detention[3], contends that Bail Reform Act factors were not properly applied, and invokes conditions of confinement as grounds for release from federal custody.  As explained below, conditions of confinement do not provide appropriate grounds for the defendant's release; the Bail Reform Act was properly applied, and the length of detention does not justify release either as a matter of law or in light of the defendant's insistence that he did not want bail.

## LEGAL ANALYSIS

A defendant must be detained pending trial if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e).  If a magistrate judge orders a defendant detained, the defendant may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. 18 U.S.C. § 3145(b).  Review of the detention order is *de novo*.  *United States v. Chansley*, 525 F.Supp. 3d, 151, 160 (D.D.C. 2021). When conducting such review, a district court judge need not "start from scratch."  *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990); *United States v. King*, 849 F.2d 485, 491 (11th Cir.

---

for non-emergency medical treatment; thus, he had withdrawn his initial request for the transfer to Pennsylvania.  *See*  ECF 39:9, as noted above.

[3] In this case, at least until the filing of the above-captioned motion, the defendant has not only consented to detention but insisted on remaining detained.  The length of his detention arises largely from the impact of the covid-19 pandemic and the defendant's repeated decisions to change counsel.  The defense cites no authority supporting relief based on the length of the defendant's detention, let alone any authority finding a due process violation, *see* ECF 142:32, or other basis for relief, where the defendant has consented to detention and explicitly (and repeatedly) rejected bail.  Since the defendant has failed to develop his objection to the length of detention or support it with any legal authority, this court should reject any challenge based on the duration of detention. *See also United States v. Ali*, 543 Fed.Appx. 1 (D.C. Cir. 2013)(two-year detention period did not show violation of due process).

1988).  As long as it conducts an independent review of the record, the court is free to simply adopt the findings of the magistrate judge or to make its own findings of fact.  *Id.*  Even when analyzed in the context of *de novo* review, the defendant's contentions fail to justify release.

The defendant's position regarding conditions at USP Lewisburg or at prior detention facilities does not amount to "material bearing on the issue [of] whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of the community." 18 U.S.C. § 3142(f).  Thus, objections to the conditions of his confinement do not alter the analysis required under the Bail Reform Act, 18 U.S.C. § 3142, *et seq*.  The defendant has an extensive criminal history consisting of multiple assaults against different victims, including one the defendant knew was pregnant at the time of his attack.  He has assaulted victims while on probation or parole, and within the confines of his residence.  He is the subject of a restraining order which he has violated on multiple occasions.  The grand jury's indictment and three superseding indictments have established probable cause to believe that the defendant has engaged in additional assaults and aggression directed at uniformed and armed law enforcement officers, and officers in riot gear.  Such facts are relevant considerations under the statute and demonstrate that there are no conditions or combination of conditions that would ensure the safety of the community. As discussed below, the defendant should remain detained.

I. Bail Reform Act Factors Remain In Favor Of Detention

The Bail Reform Act authorizes detention pending trial where, as here, the defendant is charged with a crime of violence.  18 U.S.C. § 3142(f)(1)(A).[4]  Counts Two, Three, Five, Six and

---

[4] The statute defines a crime of violence as (A) "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," (B) "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of

Seven, Nine, and Twelve of the current indictment, ECF 80, fall within this definition.  To assess whether a defendant should be detained as a danger to the community, a court must address (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021)(quoting 18 U.S.C. § 3142(g)(1-4)); *United States v. Chrestman*, 525 F.Supp. 3d 14, 23, 25 (D.D.C. 2021). Those who "actually assaulted police officers and broke through windows doors and barricades, and those who aided, conspired with, planned or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Munchel*, 991 F.3d at 1284.  Each of the factors listed above justify detention.

    A.  The Nature And Circumstances Of The Offenses Charged

Analysis of the nature and circumstances of the charges for January 6 defendants should address whether the defendant is charged with a felony; whether the charged offenses are violent; whether the offense conduct involved planning; whether the defendant coordinated with others, including during the riot; whether the defendant assumed a *de facto* leadership role, including by encouraging misconduct by others; whether the defendant confronted law enforcement, which implicates "grave concerns"; and other relevant individualized considerations.  *Chrestman*, 525 F. Supp. 3d at 26-27.

In this case, the indictment charges the defendant with numerous felonies.  Several of the charged offenses are violent and involve the use of a dangerous weapon.  The nature and severity

---

committing the offense," or (C) "any felony under chapter 77, 109A, 110, or 117." 18 U.S.C. § 3156(a)(4).

of the defendant's offenses merit his detention.

Recordings of the defendant's arrival at the Capitol show he was no mere follower, and far more than an observer.  Video shows that the defendant had charged ahead of the crowd that reached the Capitol grounds with him.  The defendant crossed a fallen bike rack, and then led the way to the next line of barricades manned by officers.  Moving directly to the barrier, the defendant confronted police, pausing to look over his shoulder at the crowd arriving behind him.  He began to shake the barrier, then paused to confront an officer, assuming an increasingly combative posture.  The defendant's altercation was briefly interrupted when a member of the crowd pulled him aside to advise him to stay calm and refrain from confronting the police.  The defendant rejected this counsel and resumed his efforts to forcibly remove the barrier separating him from uniformed officers.  His aggression involved using the metal barricade as a dangerous weapon and causing serious, long-lasting injury to a police officer.[5]

Thus, the defendant falls within the category of offenders who actually assaulted police and broke through barricades, who aided and coordinated with others, and who did more than merely cheer or wander through restricted space.  While the defendant is not solely responsible for the officer's injuries, the harm the officer suffered resulted from his coordinated participation with other rioters in the forcible removal of metal bike-rack barriers.  Video shows the defendant aggressively and violently pushing and pulling the barricades with other rioters in a joint effort to break the police line.

In messages sent on January 7, 2021, the defendant stated:

 "Just to know I was on the front lines makes me proud I got them moving in"

---

[5] The record before the magistrate judge, and now this Court, includes a victim-impact statement describing the profound and lasting impact of the officer's injuries.  ECF 27:9-10.

"Watch vedio [*sic*] me yelling pull them forward I'm getting massed [*sic*] watch it"

"I'm the one yelling pull the forward I had red hat and black t shirt"

"I'm on the cover of time mag I was first one over the fence bro everybody followed me …"; and

"I wana face joe Biden and attack him."

These messages support recorded evidence that the defendant led the way for the crowd that followed him and that he intended to encourage the mob to follow his example, providing further reason to find he is charged with offenses that were dangerous, serious, and grave.

Recorded evidence also reflects that the defendant paused to assist the officer injured from the initial attack against the police line.  While that is commendable, what follows is not.  The defendant paused to watch the continuing melee between police and the crowd, already aware that efforts to remove barriers had caused injury.  With that awareness, and with the chance to observe the ongoing physical altercation between officers and the crowd, the defendant did not desist.  He continued his intrusion as far as the Capitol's lower west terrace.  He encountered pepper spray, and a rioter struck by a rubber bullet.  He could not have had clearer evidence that his intrusion was unlawful, in defiance of law enforcement, and a source of hazard and injury.  Nevertheless, the defendant fought his way to the next "front line" of officers defending the lower west terrace, confronted and assaulted those officers, and struggled against officers in riot gear while attempting to grab an officer's riot shield.

Nearly every factor to consider establishes that the defendant is among the more culpable class of offenders from January 6.  He was not merely part of a crowd during a riot.  His movements through the crowd, *Chrestman*, 525 F.Supp. 3d at 27, demonstrate his desire to lead others and be the first to breach police lines.  His messages the following day confirm his intent.  His rush to the

front of the crowd similarly shows he was not thoughtlessly following the actions of others in a mob; instead, he created the example for others to follow.  As his aggression escalated, the defendant, unlike other rioters, had the opportunity to pause and reconsider when he was pulled aside and encouraged to be calm. He did not do so, continuing and escalating his unlawful aggression and violence.  And the morning after the siege of the Capitol, at 10:36 a.m. on January 7, the defendant declared himself "proud I got them moving in."  The defendant may not have organized the siege of the Capitol in advance, but his conduct and his words reflect that once there, he assumed a role in leading the breach and the earliest assaults.

Thus, his attempt to argue that he is detained simply for being charged, ECF 142:17, or merely being part of a mob, ECF 142:18-19, is unpersuasive.  The nature and circumstances of the offenses charged support detention, and they are not the only factor that does.

B.  The Weight Of The Evidence

This factor also supports detention.  The weight of the evidence against the defendant is overwhelming.  His conduct was captured on multiple videos that show his first confrontation with police, his attempt to forcibly remove barriers, the injury to a police officer during that effort, his presence beyond those barriers at the lower west terrace, his additional confrontation and assault of officers in riot gear at that second location, and his hand grabbing and pulling an officer's shield. The defendant wore distinctive clothing (white sweat pants, a black shirt, a denim jacket, and a red hat) which appears clearly in recorded evidence, which he described in a message on January 7, and which, excepting the sweat pants, officers recovered during execution of a search warrant. Contents of the defendant's phone revealed that he discussed preparations to go to Washington D.C. for the January 6 rally; he took videos and photographs in the vicinity of the Capitol and within the restricted area; and he circulated newspaper articles covering his approach to barriers.

The defendant admitted to federal agents that he was present at the Capitol on January 6 and that he was the individual in the video recordings.

The defendant does not, and cannot, diminish the quality of the evidence against him. Instead, he cites non-binding Ninth Circuit decisions, ECF 142:20-21, holding that the Bail Reform Act cannot be used to pre-determine guilt. *But see United States v. Kelly*, No. 19-CR-286, 2020 WL 2528922 at *2 (E.D.N.Y. May 15, 2020)(since an indictment properly returned by a grand jury conclusively determines the existence of probable cause, a court does not act unfairly against a defendant by taking the charges into account). The United States does not seek predetermination of guilt, but does note, consistently with the directives of the statute, that its evidence is strong, and that outside of the Ninth Circuit, the weight of the evidence may be considered equally with other statutory factors. *See United States v. Calabrese*, 436 F.Supp. 2d 925, 927 n.4 (N.D. Ill. 2006)(finding no support for minimizing the weight of the evidence as a Bail Reform Act factor); *see also United States v. English*, 629 F.3d, 311, 317 (2d Cir. 2011)(affirming detention order by judge who observed that the weight of the evidence "is one of the most important factors"). The defendant's attempt to suggest that the weight of the evidence factor only applies to evidence of danger or flight risk, ECF 142:20, has been rejected in this district. *United States v. Taylor*, 289 F.Supp. 3d 55, 66 (D.D.C. 2018). In any event, the weight of the evidence against this defendant wholly fails to support his release.

C.  The Defendant's History And Characteristics

Under this factor, the Court must consider defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings," 18 U.S.C. § 3142(g)(3)(A); and "whether, at the

time of the current offense or arrest, [defendant] was on probation, on parole, or on other release,

*Id.* § 3142(g)(3)(B).  This statutory prong strongly supports detention.

As noted above, the defendant has an extensive and disturbing criminal history. It includes an arrest on May 9, 2006 for terroristic threats, reckless endangerment of another, and disorderly conduct.  The arrest occurred because the defendant tried to run someone off the road over a $60 debt.  He forced the victim to pull over, approached her vehicle and punched her windshield, telling her he knew where she lived and would kill her if he didn't get his money.  On August 2, 2006, he received a sentence for two years' probation, ECF 6:7 (reporting disposition).  The term of probation did not conclude until August 2, 2008.

Before resolving his May 9 arrest, however, on July 25, 2006, the defendant was arrested for possession of marijuana and drug paraphernalia.  He was convicted for the marijuana offense on February 28, 2007 and sentenced to a year of probation which terminated on August 2, 2008, ECF 6:6 (reporting disposition).

While apparently still subject to that term of probation, the defendant was arrested on November 17, 2006 for trespass, disorderly conduct, and theft by unlawful taking; on February 28, 2007, he received a sentence of confinement for 1-18 months.

On June 29, 2007, the defendant was arrested for simple assault and disorderly conduct. In this case, the defendant got into another man's car and began hitting him in the face. Someone called an ambulance for the man, who was badly beaten, and the police observed his front teeth were missing and that his face was bloody.  This assault resulted in a November 15, 2007 sentence

to two years of probation, ECF 6:6 (reporting disposition).  The defendant's probation was revoked and the defendant was re-sentenced to confinement for 1-2 years, *id*.[6]

On February 26, 2009, the defendant was arrested for simple assault, reckless endangering, disorderly conduct, harassment false imprisonment, and unlawful restraint.  In this case, the defendant convinced the victim to come to his residence to receive money for a debt. For approximately four to five hours, the defendant held the victim at his residence where he repeatedly punched, pushed, and choked the victim, and caused injuries including chipped teeth and swelling and discoloration to the head, face, hip, neck and thigh. He received a July 27, 2009 sentence of two years' probation, ECF 6:5 (reporting dispotion); his probation for this offense was also revoked and replaced with a sentence of confinement for 1-2 years, *id*.

On October 14, 2010, the defendant was arrested for conspiracy to intimidate a witness/victim false testimony; terroristic threats with intent to terrorize.  On July 5, 2011, the defendant was convicted of simple assault, reckless endangerment, disorderly conduct, and unlawful restraint, as well as for intimidation of a witness, for choking and beating his pregnant girlfriend.  The allegations of that assault involved the defendant smashing a hot pizza into the victim's face, beating the victim, pouring a beer over her head, and eventually throwing her into a canal, which he then jumped into and held the victim's head under water. When the defendant finally stopped holding her, the victim ran into the street barefoot and found a police vehicle. She desperately tried to open the door of the vehicle until the officer saw her and unlocked it so she could get in.  According to the victim, if it weren't for the officer, "I might not be alive."   The

---

[6] The defendant has claimed that he actually assaulted this victim twice, stating that he kicked in the victim's front door and punched him in the face.  According to the defendant, a scar on his hand is from this victim's teeth.,

defendant later attempted to and did interfere with her testimony about what had occurred.  He was sentenced to confinement for 4-10 years, ECF 6:3 (reporting disposition).

In 2015, another victim came forward.  This victim reported numerous assaults by the defendant, including one at the defendant's residence where he choked the victim until the victim lost consciousness.    Four days before this incident, the defendant had choked the victim from behind with his forearm.  On yet another occasion, the defendant punched the victim in the face, causing a black eye, then demanded that she provide a false explanation for the injury.  The victim was able to produce a photograph of the injury and a text message from the defendant with the false cover story.  When the victim reported the defendant's most recent assault, the defendant was on parole.  The defendant was convicted for simple assault and harassment-subject other to physical contact, and on February 17, 2017 he received a sentence of confinement for 6-12 months, ECF 6:5 (reporting disposition), with supervision until February 24, 2022.  On February 2, 2021, the Pennsylvania Parole Board lodged a detainer against the defendant for violation of Parole.

In 2019, yet another victim came forward, recounting several incidents of the defendant choking her to the point of unconsciousness and breaking into her house and assaulting her.  She described waking up vomiting, with him still in the house. The victim also alleged that the defendant raped her multiple times, and that she had often been scared he would kill her. She had obtained a restraining order, but the defendant violated the restraining order multiple times.  There has been an outstanding warrant for the defendant's arrest based on this conduct.  At the time of the offense conduct for the above-captioned case, the defendant was wanted on that warrant and was still on parole.

The defendant has a history of persistent violence that has continued long before the assaults and other offenses now charged in his pending indictment.  A defendant's history of

violence offers some of the strongest evidence of his future dangerousness. *United States v. Fairlamb*, 535 F.Supp. 3d 30, 43 (D.D.C. 2021)(citing *Maryland v. King*, 569 U.S. 435, 453 2013 and *United States v. Tortora*, 922 F.2d 880, 888-89 (1st Cir. 1990))(other internal citation omitted); *see also Munchel*, 991 at 1283-85 (looking to violent conduct on January 6 as probative of future dangerousness). The defendant has no fewer than 9 prior convictions, *see* ECF 6:1, including convictions for simple assault, unlawful restraint, recklessly endangering others, making terroristic threats, and intimidating witnesses and victims. *Compare Fairlamb*, 535 F.Supp.2d at 41-42 (defendant with prior convictions for unlawful handgun possession, aggravated assault, and simple assault would not be deterred by threat of future punishment). His history supports a finding of dangerousness as well as detention.

The defense unpersuasively tries to counter the history above by describing ties to Pennsylvania. Strong ties to a community, however, are not inconsistent with violence or dangerousness; indeed, the arrest and conviction history set forth above involves offenses the defendant committed in the area where he lived[7], as well as inside of his own residence. Moreover, the defendant's ties may not be quite as strong as he asserts. For example, according to the defendant, "during covid," and while he was on parole, the defendant relocated to Florida "without telling anyone" and stayed there in an AirBnB property for six months.

The defendant also incorrectly accuses the United States of inaccurately representing his history, because, according to the defendant, either he was not convicted for certain conduct or because the United States has not disclosed the defendant's arrest and prosecution record. As a

---

[7] Online public records from a Pennsylvania court list the defendant's local convictions. *See* https://ujsportal.pacourts.us/Report/CpCourtSummary?docketNumber=CP-09-CR-0004533-2016&dnh=fGRHphEDSaMDD9pVEIgFAQ%3D%3D. A summary which is part of those records is attached.

preliminary matter, the United States has produced the defendant's National Crime Information Center (NCIC) report to the defense. Other than the restraining order violation, which is the subject of an outstanding warrant, the history described above consists of nothing but convictions. [8] Insofar as the defendant objects to information provided by victims, there is no requirement, statutory or otherwise, for a court evaluating detention to limit its consideration only to conduct explicitly determined by a judge. "The court may also consider prior arrests or charges brought against a defendant even where those actions did not result in convictions." *United States v. Taylor*, 289 F.Supp. 3d 55, 70 (D.D.C. 2018)(and cases cited therein); *United States v. Acevedo-Ramos*, 755 F.2d 203, 209 (1st Cir. 1985)(quoting Senate Judiciary Committee Report's conclusion that it would be inappropriate in a detention hearing to ignore a lengthy history of prior arrests, particularly if there were convictions for similar crimes, or, if there were evidence that failure to convict resulted from the defendant's intimidation of witnesses). The offense conduct described in this section is documented in sealed exhibits filed in support of the United States' prior opposition to the defendant's temporary release from federal custody, ECF 25. Those exhibits contain victim accounts corroborated by the observations of officers, reports of other witnesses, photographs, and text messages, among other evidence. Evidence from the defendant further corroborates certain reports, including a scar he bears on his hand from the tooth of a victim who was punched in the mouth. The defendant has provided no reason to consider the evidence in the sealed exhibits to be unreliable, especially in light of the corroboration described within those

---

[8] If anything, it is the defense that errs in its description of the defendant's history. The defendant's last arrest was not 10 years ago, as claimed, *see* ECF 142:23. The defendant was arrested on December 13, 2015 in Bucks County, Pennsylvania in Case No. CP-09-CR-000453302016. He was charged with simple assault and harassment-subject other to physical contact and negotiated a guilty plea to both charges.

exhibits.  In sum, his history supports a finding of dangerousness and the need for continued detention.

D. The Nature And Seriousness Of The Danger

As it has before, the defendant's release poses a real and serious danger to the community. The substantial evidence of his conduct in this case, including his assault on officers, shows a disregard for the safety of others, the rule of law, and the democratic process.  Indeed, "if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does." *Fairlamb*, 535 F.Supp. 3d at 39.  Moreover, the defendant's individual actions place him under *Munchel* in the most serious category of offenders.  This determination arises not, as the defendant maintains, from any failure to distinguish the defendant from other members of a crowd; instead, the defendant earned his membership with the most serious offenders through his own specific conduct that included his rush to the barricades, assaults on officers, the failure of injury to others to influence his behavior, and his boastful pleasure with his actions the following day.

Although demanding individualized review particular to this defendant, his motion unpersuasively and inconsistently attempts to minimize evidence of the defendant's danger with superficial comparisons to defendants in other January 6 cases.  Such claims, in effect, of disparity are not properly part of Bail Reform Act determinations.  "The Bail Reform Act does not call for consideration of potential disparities between defendants." *Fairlamb*, 535 F.Supp. 3d at 44. Like Fairlamb, even if others are only likely to commit violence as part of a mob, this defendant's criminal history demonstrates he is willing to commit violence without one.

Ryan Samsel hurts people.  His convictions demonstrate as much.  Recorded evidence reflects that his years of assaultive behavior resumed on January 6, 2021.  This Court need not

ignore the evidence of consistent harm the defendant has inflicted on others, and it matters little whether future assaults are triggered by political activity or the defendant's penchant for violence. The Bail Reform Act calls for the protection from such violence that detention provides.

The defendant's proposed alternatives to detention are meritless.  GPS monitoring will not preclude another assault.  Confining the defendant to his residence will not provide protection from an offender who commits assaults while at home, and as also reported by victims, who has relatives discourage victims from testifying. *See also United States v. Choudhry*, 941 F. Supp. 2d 347, 359 (E.D.N.Y. 2013) ("It is well established that home detention and electronic monitoring may be insufficient to protect the community against dangerous individuals, particularly where those individuals have the ability to command others to do their bidding.") (citations omitted). Releasing the defendant to the Pennsylvania Department of Corrections is not feasible; the defendant has completed his Pennsylvania parole violation sentence, and there is no longer a basis for that state to confine him.  The defendant should remain in detention.

II. <u>Conditions At USP Lewisburg Are Not A Changed Circumstance Warranting Release</u>

Since his initial appearance, the defendant has been held at the D.C. Jail, the Central Virginia Regional Jail, Northern Neck Regional Jail, Rappahannock Regional Jail, a Pennsylvania facility, the Philadelphia, Pennsylvania Federal Detention Center, and now USP Lewisburg.  Many of these placements occurred in conjunction with the defendant's own requests for relocation.  He now claims that his mid-March transfer to Lewisburg has interrupted efforts to obtain medical care and he objects to conditions preceding his release to general population that are no longer in place.[9]

---

[9] It is not unusual following a transfer to a different federal facility to delay an inmate's placement into the general population pending screening or intake evaluations.  After arriving at Lewisburg, the defendant was quarantined as a standard precaution against the covid-19 virus.

While conceding that the instant motion "is not the proper forum for to litigate the conditions of his confinement," ECF 142:25, the defendant in the same sentence asks the Court to engage in precisely such litigation, providing no legal support that the Court can consider any aspect of confinement as a purported basis for release.

Conditions of confinement are not among the statutory factors that Congress has directed courts to consider when applying the Bail Reform Act.   18 U.S.C. § 3142(g).   Moreover, to determine whether the defendant's detention conditions qualify as grounds to review the order for his detention, the Court must look to whether the conditions of custody have "a material bearing" on the detention determination. 18 U.S.C. § 3124(f).  They do not.

In *United States v. Lee*, 451 F.Supp.3d 1 (D.D.C. 2020) (opinion by Ketanji Brown Jackson), the Court explained how the then new covid-19 pandemic could not affect the nature and circumstances or the weight of the evidence against the defendant. *Lee,* at 8. The same analysis applies here. The conditions at the jail do not change the analysis regarding the circumstances of the defendant's conduct, the weight of the evidence, or his specific criminal history and characteristics.

The relevant inquiry here, as in *Lee*, is whether conditions at USP Lewisburg would alter the Court's analysis of the fourth detention factor: "the nature and seriousness of the danger to any person or the community that would be posed by person's release." 18 U.S.C. § 3142(g)(4). The defendant proffers conditions which are no longer an issue, such as the temporary quarantine that preceded his current release to general population or conditions at facilities where he is no longer held.   Since the quarantine is no longer in effect, it has no bearing on the defendant's dangerousness; it is no longer even a condition of his confinement.

The defendant maintains that he does not have access to his medical records since his

20

arrival at USP Lewisburg. This claim, at best, does not appear to be fully accurate.  In this case, the Court ordered production of the defendant's medical records during his custody to defense counsel.  Defense counsel have acknowledged receipt of voluminous records.  *E.g.*, ECF 63:3 (defense counsel's statement noting voluminous production of medical records); 67:6-7 (applauding government's efforts to effectuate production of medical records and acknowledging receipt of "a substantial amount" of such records).  Since the defendant does have access, at a minimum, to a substantial amount of records through his counsel, the statement that the defendant "continues to be denied access to medical records," ECF 142:26, appears at best to be overstated. Records of the defendant's medical treatment within the Bureau of Prisons are centralized.  Thus, medical providers within Lewisburg have access to the defendant's records from other federal detention centers or BOP facilities and can use those records for his care.

When the defendant arrived at Lewisburg, that facility did not have access to his records from non-BOP state institutions where the defendant had been detained.  To address specific reports from the defendant about his health, on March 15, 2022, a doctor asked the defendant to get word to his attorney that the doctor needed records to confirm the defendant's reports.  The BOP has also issued its own requests for the defendant's records to the DC Jail.  It does not appear that the BOP is treating the defendant's health with indifference, and in addition to seeking records from defense counsel, the BOP has initiated its own requests for additional medical records.  In any event, neither the BOP's nor the defendant's own access to medical records sheds light on whether the defendant is a danger to the community.

The defendant also protests that his transfer to USP Lewisburg has interrupted efforts to schedule certain medical treatments.  Notwithstanding such proffers, the Bail Reform Act is not focused on the benefit of a defendant's release as part of its analysis. *Lee*, at 9. As the Court

explained, "this argument would require the Court to ignore the fact that the relevant statutory inquiry is *not* the benefits that a defendant's release would bring (however significant) or the harms that his incarceration would cause (however substantial). Rather, the statute requires the Court to evaluate "*the danger*" that "would be posed *by the person's release.*" *Id.* at 9. The defendant's danger to the community if released is cognizable given assaults against law enforcement on January 6, his nine criminal convictions that include assaults and witness intimidation, and the reports from victims that describe acts of brutality.

The United States agrees that the defendant should receive proper medical care. Similarly, the United States does not dispute that while detained, the defendant has been injured. The cause of his injuries remains the subject of a separate investigation.[10] Until completion of a meaningful investigation, the government counsels caution in reaching conclusions about the origin of the defendant's injuries.

To the extent the Court considers a form of temporary release pursuant to 18 U.S.C. § 3142(i), the government submits that the defendant's motion does not support a compelling reason for release, particularly given his relocation to Lewisburg. Temporary release is not supported by conditions at other institutions where the defendant is no longer housed. The Lewisburg facility is intended to house pretrial detainees, with access to video teleconference capabilities, attorney-client communication, and law libraries. The process of designation is complicated, requiring steps to determine whether a prisoner is suitable for a certain environment, assessing security risks and medical concerns. It would be frankly presumptuous for any litigant before this Court to assume

---

[10] It is not accurate to say that it "is undisputed that Mr. Samsel has been involved in three separate incidents with correctional officers that required his being transported to emergency medical facilities for treatment." ECF 142:1. The cause of the defendant's injuries is under investigation and so far as the prosecution in this case is aware, has yet to be determined.

that he, above all other inmates, merits release, absent an appropriate, individualized assessment.

Moreover, the defendant has not suggested a viable alternative custodian. He has not established, now that the term for his parole violation has concluded, that the Pennsylvania Department of Corrections would accept him. Even if it could, the defendant has not shown that his medical records would reach that facility any sooner than they can be provided to Lewisburg.

If the defendant has issues with conditions at Lewisburg, he is not without recourse. He can pursue administrative remedies within the BOP. He can request defense counsel to provide available medical records to Lewisburg, assuming he has not already done so. If these options prove to be unsatisfactory, his complaints about medical treatment are better suited for a different vehicle. *See Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("[A] § 1983 action is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life."); *United States v. Banks*, 422 F. App'x 137, 138 n.1 (3d Cir. 2011) (per curiam) ("We agree with the District Court that a motion filed in his criminal case was not the proper vehicle for raising the claims about prison conditions contained in that motion."); *United States v. Garcia*, 470 F.3d 1001, 1003 (10th Cir. 2006) (noting that, because the defendants' "challenge[s] to the conditions of confinement . . . were raised in motions filed in their respective criminal cases . . . they were properly denied by the district court"). Instead, the proper way to challenge potentially unsanitary or unsafe conditions at the jail is to file a civil suit. *See, e.g.*, *United States v. Folse*, Nos. CR 15-2485 JB, CR 15-3883 JB, 2016 WL 3996386, at *15 (D.N.M. June 15, 2016) ("The general rule is that a defendant must file a separate civil action to address his conditions of confinement."); *United States v. Luong*, No. Cr. 99-433 WBS GGH, 2009 WL 2852111, at *1 (E.D. Cal. Sept. 2, 2009) ("As several courts have recognized, the proper procedure to redress a defendant's grievances regarding treatment within a jail or prison is to file a civil suit against the relevant

parties . . . rather than a motion in his criminal case."); *United States v. Wells*, Cr. No. 3:02CR-20-H, 2007 WL 3025082, at *2 (W.D. Ky. Oct. 15, 2007) ("[T]o the extent Wells is challenging his condition of confinement by claiming that his life is in danger, the appropriate course would be to file a civil action against the alleged wrongdoers, not a Rule 60(b) motion in his criminal action."); *United States v. Bencomo-Chacon*, No. CR.A. 07CR00095MSK, 2007 WL 2021850, at *3 (D. Colo. July 11, 2007) ("The Government argues that the Court cannot order that the Defendant receive any particular treatment within this context of this case, and that any claim of inadequate treatment must be made in a civil lawsuit. . . . The Court agrees that a request for provision of particular medical treatment cannot be maintained within the context of a criminal case."); *Campbell v. McGruder*, 416 F. Supp. 100, 101 (D.D.C. 1975) (addressing "class action brought by unconvicted pre-trial detainees incarcerated at the District of Columbia jail"); *see United States v. Cote*, No. 219CR134FTM38NPM, 2020 WL 4339351, at *2 (M.D. Fla. July 28, 2020) ("The only parties to this criminal action are the Government and Defendant. But Defendant's claims of not receiving a medical test involve the Marshal and Sheriff of Glades County who are responsible for his custody and care. Entertaining Defendant's motion would thus implicate serious due process concerns for them."). A motion to revoke detention is not the appropriate mechanism for resolving the defendant's objections to conditions within the BOP.

## CONCLUSION

The Court should deny the defendant's request for release because the defendant's danger to the community has not changed. Evidence of his assaults on January 6 has not changed. His violent criminal history has not changed. The concerning allegations about the lack of proper medical treatment appear to no longer apply to the defendant as he been relocated, as he previously requested, and the BOP is making efforts to obtain complete medical records and engaging the

defendant in that process.  The safety of the community at large is a paramount concern that the Court must consider in making the legally required case-by-case detention determination required by the Bail Reform Act.  Accordingly, for the foregoing reasons, the Court should deny the defendant's motion.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:     *s/Karen Rochlin*
Karen Rochlin
Assistant United States Attorney Detailee
DC Bar No. 394447
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov