### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Criminal No. 1:21-cr-00537-TJK** |
| **v.** ) | |
| ) | |
| **RYAN SAMSEL,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### STATUS REPORT

Defendant Ryan Samsel, by and through the undersigned counsel, hereby files this Status Report pursuant to the Court's May 10, 2022, Minute Order concerning Mr. Samsel's transfer to a tertiary research center. Defense counsel met and conferred with government counsel on May 12, 2022, at which time government counsel presented defense counsel with three proposals for a potential draft Order "regarding Defendant Samsel's transfer to a tertiary research center" as requested by the Court. For the reasons that follow, none of these proposals satisfy the Court's Order that Mr. Samsel in fact be transferred to a tertiary research center. Indeed, as early as April 27, 2022, this Court asked the government to ascertain "whether a medical transfer to a tertiary research center is possible" and to date the government has yet to answer this question with any specifics whatsoever. Now, with the filing of its own Status Report, the government asks this Court to Order simply that Mr. Samsel, "receive an independent medical evaluation at a tertiary research center," but otherwise provides no information about what "center" this would involve, when such "evaluation" would occur, and whether the government and/or U.S. Marshal's Service *could even facilitate* the provision of care. The only reasonable inference to be drawn from this delay is that the government has not because it can not.

At the outset, Mr. Samsel would be remiss not to reiterate his assertion that the government has not met its burden of establishing that the Court shall order Mr. Samsel's continued pretrial detention.  Only "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an *identified and articulable threat* to an individual or the community, . . . [*may*] a court . . . disable the arrestee *from executing that threat*."  *United States v. Munchel*, 991 F.3d 1273, at 1282 (D.C. Cir. 2021) (emphasis added) (*quoting United States v. Salerno*, 481 U.S. 739, 751 (1987)).  Despite numerous attempts to do so, the government has yet to demonstrate, let alone demonstrate by clear and convincing evidence, that Mr. Samsel poses an "identified and articulable threat" to any individual or the community as a whole.

Rather, the government appears now to rely on its assertion that there are no conditions or combination of conditions that would "disable" Mr. Samsel from "executing that threat." *Munchel*, 991 F.3d at 1282.  This is so, it is suggested, because Mr. Samsel previously committed criminal acts while released on probation and/or parole.[1]  But this assertion ignores the order in which the government must meet its burdens.  "If, after a hearing . . . , the judicial officer finds that no condition or combination of conditions will reasonably assure . . . *the safety of any other person and the community*, such judicial officer shall order the detention of the person before trial."  18 U.S.C. § 3142(e) (emphasis added).  Thus, only after the government has identified an "articulable threat to an individual or the community," *Munchel*, 991 F.3d at 1282, must the government additionally demonstrate, also by clear and convincing evidence, that no condition or combination of conditions that would "disable" Mr. Samsel from "executing that

---

[1] The government has had ample opportunity to elaborate on the nature and seriousness of these offenses.  Neither in its opposition to Mr. Samsel's initial request for temporary release to receive necessary medical treatment, nor in its gratuitous status report filed four (4) months later, nor in its opposition to Mr. Samsel's request for the revocation of the Court's pretrial detention Order does the government cite a finding of fact by a judicial officer to have considered the allegations and resulting charges as against Mr. Samsel.  His past convictions consist largely of misdemeanors that date back to his early twenties and have virtually nothing to do with the allegations of the events of January 6.

threat." *Id.  See also United States v. Cross*, 389 F. Supp. 3d 140, 142 (D. Mass. 2019) ("The acts charged against the defendant are horrendous in nature.  Moreover, the Court is not persuaded that defendant's most recent attempt to contact a minor was a mere fantasy, as he suggests.  Nevertheless, the Court finds, pursuant to the factors set forth in § 3142(g), that the government has failed to meet its burden of proving, by clear and convincing evidence, that no condition or combination of conditions will reasonably ensure community safety.  Here, defendant's dangerousness is mitigated by the fact that his crimes are no longer unknown to his family or the public and, if released, he will be subject to very strict conditions.").

To that end, both *United States v. Hale-Cusanelli*, 3 F. 4th 449 (D.C. Cir. 2021), and *United States v. Fairlamb*, 535 F. Supp. 3d 30 (D.D.C. 2021), on which the government has previously relied in support of pretrial detention, extensively addressed the government's demonstration of how no condition or combination of conditions would have prevented the defendants in those cases from executing the specifically articulated threats that had been proffered by the government.  *See Hale-Cusanelli*, 3 F. 4th at 454, 456 ("Here, the District Court made a *forward-looking* determination about the serious risk of obstruction of justice and threats to witnesses as the basis for detention[; and] [t]he court also rejected Hale-Cusanelli's suggestion that he was no longer a threat to the CHS because the CHS had moved, observing that Hale-Cusanelli 'may well have known where [CHS] has moved,' and the CHS 'may well have moved back.'" (emphasis added)); *United States v. Fairlamb*, 535 F. Supp. 3d at 45 ("First and foremost, the home detention conditions allow the defendant to enter the world and encounter other people for many purposes.  Though they would prevent the defendant from going to the movies, the proffered list is so littered with such broadly worded exceptions that it's barely 'detention' at all.").

Moreover, the circumstances here are readily distinguishable from his past stints of parole and/or probation. *First*, Mr. Samsel is agreeing to submit to the conditions of home confinement GPS monitoring for which his minute-by-minute location will be monitored by pretrial services. *Second*, the offenses with which Mr. Samsel have now been charged are federal felonies carrying a maximum penalty of twenty years imprisonment. *Third*, the necessity of his release is bolstered by his current medical condition which precipitates the necessity of this status report.

Turning then to Mr. Samsel's need for medical care, the government has proffered three proposals, none of which reasonably assure that Mr. Samsel will obtain the medical treatment he needs. The government's initial proposal, described as the simplest approach, is that Mr. Samsel *could remain* at USP Lewisburg and *could receive* treatment at the Geisinger Medical Center, with which USP Lewisburg has a preexisting relationship. This suggestion, however, is belied by the memorandum of Lewisburg's Clinical Director, Dr. Andrew Edinger, who originally recommended that, "In a private practice setting, I would refer this patient to a high level, multi-specialty, tertiary research center for medical care . . . "Dr. Edinger concludes that he is, "very concerned that his medical condition requires treatment which cannot be provided here." Dr. Edinger further recommends that the Warden "consider recommendations to the court for consideration of release to home confinement near a tertiary research center so that he can more easily access the sophisticated medical treatment indicated for his condition." Notably, Dr. Edinger's follow up memorandum did not retract this specific recommendation, concluding that Dr. Edinger "stand[s] by [his] recommendation that this be done at a tertiary center with expertise in this area" (this language was the specific language removed from Dr. Edinger's declaration). Memo. From Dr. Andrew Edinger, MD, Clinical Director, to Stephen Spaulding,

Warden (April 28, 2022) (Attached hereto as Exhibit A).  This recommendation as well as Dr. Edinger's observation that:  "I am concerned that performing surgery on his left breast problem could result in complications of a post-operative seroma and redevelopment of the same problem elsewhere in the breast area," were tellingly absent from the declaration he ultimately filed with the Court.

The government has also proposed that Mr. Samsel *could remain* at USP Lewisburg and *could* receive "a work up" at Lancaster General Health, which is part of the University of Pennsylvania Health System.  However, the government cannot confirm whether the U.S. Marshal's Service will in fact facilitate Mr. Samsel's receipt of treatment, much less a "diagnostic work up" at Lancaster or whether Lancaster will in fact agree to treat Mr. Samsel while he is in the custody of the U.S. Marshal's Service.  The government's proposed order for the Court is thus based purely on conjecture and is merely speculative.[2]  Moreover, Lancaster is roughly 102 miles from USP Lewisburg, while the University of Pennsylvania Medical Center, a world-renowned academic medical center, is roughly only 168 miles away from USP Lewisburg. It is difficult to understand why the U.S. Marshal's Service *could* facilitate Mr. Samsel's treatment at Lancaster, *but not* at the world-renowned academic medical center just 66 more miles away and where Dr. Edinger has recommended Mr. Samsel receive treatment.  In Dr. Edinger's words: "In Central Pennsylvania, I would not refer him to our local tertiary center, Geisenger Medical Center.  I believe that his condition would be best treated at tertiary research centers like, Hershey Medical Center, *the University of Pennsylvania*, or Johns Hopkins

---

[2] Contrary to the government's May 13, 2022, Status Report (ECF No. 156), at the Parties' May 12, 2022, meet and confer, the government advised defense counsel that they had not confirmed that the U.S. Marshal's Service could facilitate Mr. Samsel's treatment with the University of Pennsylvania Medical Center.  Moreover, the government expressed skepticism that the University of Pennsylvania would accept Mr. Samsel as a patient.

University in Baltimore." Supplement Ex. A at 3 (Apr. 26, 2022) (ECF No. 150) (emphasis added).

Rather, the government's final proposal[3] is that Mr. Samsel *would* be transferred to FDC Philadelphia, where he *could* receive treatment at the University of Pennsylvania Medical Center. Again, the government's proposal relies on mere speculation and conjecture. The government has only proposed a possible diagnostic "work up" but has not confirmed whether the U.S. Marshal's Service would facilitate Mr. Samsel's receipt of treatment at the University of Pennsylvania Medical Center or whether the hospital would agree to provide Mr. Samsel treatment while he was in the custody of the U.S. Marshal's Service. Moreover, the government has advised that it "may not be in Mr. Samsel's best interest" for him to transfer to FDC Philadelphia.



---

[3] The proposed order attached to the government's May 13, 2022, Status Report is even less than the government had previously proposed. It allows the government to transfer Mr. Samsel to any "appropriate Bureau of Prisons facility for the purpose of receiving the independent medical evaluation . . . at a tertiary research center. (ECF No. 156). Mr. Samsel has previously expressed his concern regarding his repeated transfer to various facilities.
[4]

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

Given the apparently inability of the government and/or the U.S. Marshal's Service to transfer Mr. Samsel to a tertiary research center, Mr. Samsel again respectfully requests at a minimum a temporary release to facilitate his receipt of treatment. The Court can continue to hold Mr. Samsel's pretrial detention determination in abeyance and Order, pursuant to 18 U.S.C. § 3142(i), that Mr. Samsel be temporarily released for the purpose of seeking medical treatment as Judge Kelly ordered on November 29, 2021. (ECF No. 65). Section 3142(i) permits the temporary release of a pretrial detainee to an "appropriate person" upon a determination that "such release [is] necessary for . . . another compelling reason." *Id.*

Here, Mr. Samsel has time and again demonstrated a compelling reason by extensively documenting the medical treatment he seeks. Medical records post his detention repeatedly reflect that he suffered from an orbital fracture (Howard / DC Jail / Rappahannock / UVA). Medical records from before and after his detention reflect that he may suffer from gynecomastia (Einstein Health Network, Philadelphia / Central Virginia Regional Jail). Medical records from before and after his detention reflect some diagnosis of thoracic outlet syndrome with subclavian vein occlusion and medical records following his arrest relatedly reflect subclavian vein thrombosis (University of Pennsylvania / DC Jail / Rappahannock / Central Virginia Regional Jail / University of Virginia). In addition, medical records following his arrest reflect wrist scapholunate joint widening (Howard / DC Jail / Central Virginia Regional Jail); as well as loss

of vision (Rappahannock / University of Virginia).  For all of these conditions, Mr. Samsel requests the opportunity to be treated by specialists for the purpose of definitively determining what further treatment is necessary.

Specifically, while in the custody of the Pennsylvania Department of Corrections, Mr. Samsel successfully made an appointment in May and June to see Dr. Jared Liebman, MD, an Attending Physician of Plastic and Reconstructive Surgery at Einstein Healthcare Network, Dr. David Mintzer, MD, Chief of Pennsylvania Hospital's Hematology and Oncology Section; and Dr. Roman V. Petrov, MD, a board-certified thoracic and cardiac surgeon.  Dr. Liebman had previously scheduled surgery on Mr. Samsel and together with Drs. Mintzer and Petrov, Mr. Samsel expects that he can receive an accurate assessment of his thoracic outlet syndrome and/or vein thrombosis and whether there is any connection to his previously-diagnosed gynecomastia and/or gland enlargement, tertiary care recommended by Lewisburg's Clinical Director, Dr. Edinger.  The necessity of such treatment is documented by the evaluation he received, while detained, at the University of Virginia Medical Center, the records from which reflect a Venogram identifying (i) an acute embolism and thrombosis of subclavian vein, bilateral; (ii) a chronic embolism and thrombosis of axillary vein, bilateral; (iii) a chronic embolism and thrombosis of subclavian vein, bilateral; and (iv) phlebitis and thrombophlebitis of other sites. Additionally, co-morbitities are summarized as (a) enlarged lymph nodes left axilla, stomach and back of neck, and groin; (b) elevated Serum creatinine; (c) multiple nasal bone fractures, right side orbital fractures; (d) orbital nerve damage, loss of vision right eye; and upper extremity varicosities.

Mr. Samsel also had successfully made appointments to see Dr. Noah Levinson,MD, a neurology specialist affiliated with Temple Health, to diagnosis the source of his partial vision

loss, as well as to evaluate the result of having suffered at least two documented concussions, among other nervous system injuries.  Mr. Samsel has also successfully made an appointment to be treated by the office of Dr. John K. Eshleman, DO, where he had previously received treatment, including physical therapy, following a car accident.  In short, there is no simple solution, as proposed by the government, to ensure Mr. Samsel receives comprehensive tertiary medical care as recommended by Lewisburg's Clinical Director, Dr. Edinger.

In addition, Mr. Samsel has identified an "appropriate custodian," approved by pretrial services, who can aid in ensuring Mr. Samsel complies with all the conditions of Mr. Samsel's temporary release.  And while defense counsel understands pretrial services has expressed some concerns regarding Mr. Samsel's proposed residence, the Court can condition Mr. Samsel's temporary release upon the resolution of those concerns to pretrial's satisfaction and Mr. Samsel will readily accept the most stringent of conditions available to pretrial to ensure his compliance while temporarily released.

[SIGNATURE ON NEXT PAGE]

Dated: May 13, 2022

Respectfully submitted,

/s/ Stanley E. Woodward, Jr.
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD, LP
1808 Park Road, Northwest
Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

/s/ Juli Z. Haller
Juli Z. Haller, (DC 466921)
The Law Offices of Julia Haller
601 Pennsylvania Avenue, Northwest, Suite 900
Washington, DC 20004
Telephone: (202) 729-2201
HallerJulia@outlook.com

*Counsel for Defendant Ryan Samsel*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                                      |     |                                    |
| ------------------------------------ | --- | ---------------------------------- |
| **UNITED STATES OF AMERICA,**        | )   |                                    |
|                                      | )   |                                    |
|                                      | )   | **Criminal No. 1:21-cr-00537-TJK** |
| **v.**                               | )   |                                    |
|                                      | )   |                                    |
| **RYAN SAMSEL,**                     | )   |                                    |
|                                      | )   |                                    |
| **Defendant.**                       | )   |                                    |
|                                      | )   |                                    |

## CERTIFICATE OF SERVICE

On May 13, 2022, the undersigned hereby certifies that a true and correct copy of the

foregoing was electronically filed and served via the CM/ECF system, which will automatically

send electronic notification of such filing to all registered parties.

                    */s/ Stanley E. Woodward, Jr.*
                    Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
                    BRAND WOODWARD LAW, LP
                    1808 Park Road, Northwest
                    Washington, DC  20010
                    202-996-7447 (telephone)
                    202-996-0113 (facsimile)
                    Stanley@BrandWoodwardLaw.com

                    *Counsel for Defendant Ryan Samsel*