IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) <br> ) <br> ) Criminal No. 1:21-cr-00537-TJK <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| v. | |
| RYAN SAMSEL, | |
| Defendant. | |

**OPPOSITION TO SECOND MOTION TO EXTEND DEADLINE FOR EVALUATION**

COMES NOW, Defendant, Ryan Samsel, through undersigned counsel, and respectfully submits this Opposition to the Government's Second Motion seeking an Order to extend the deadline for a previously ordered independent medical evaluation of defendant Samsel for the reasons state below:

1. On May 17, 2022 this Court issued an order that state "within fourteen (14) days of the date of this Order, or a longer period for good cause shown, Mr. Samsel shall receive an Independent Medical Evaluation at a tertiary research center."  (ECF 159).

2. The Government sought and obtained an earlier extension of that deadline arguing that standard procedures required a transfer to a Federal Detention Center in Philadelphia, Pennsylvania.  (ECF 164 at ¶ 2).

3. In said filing, the government went further detailed that *"[a]s part of standard procedures resulting from the pandemic, the FDC has placed the defendant in quarantine."* (*Id.*)

4. The government further documented, *"the continued need for precautions in response to the covid-19 pandemic benefit the defendant, FDC staff and inmates, the Marshals, and staff and other patients at the facility where the defendant's evaluation will occur pursuant to the Court's Order."* (*Id.* at ¶ 7).

5. The government made clear that the request for the Extension rested on the fact that *"the need for either the Marshals, the FDC, or both to coordinate logistical and security concerns, and to coordinate those concerns with the schedule at a tertiary care facility further support a finding of good cause."* (*Id.*)

6. According to the latest filing, Mr. Samsel arrived at the Federal Detention Center in Philadelphia, Pennsylvania ("FDC") on or about May 23, 2022. (ECF 171 at ¶ 2). On or about Wednesday June 1, 2022 undersigned counsel received an e-mail communication from the government that Mr. Samsel was no longer under quarantine. Therefore, Mr. Samsel was under quarantine for ten (10) days, despite Mr. Samsel having come from one BOP facility at Lewisburg, and transported presumably under conditions that would be deemed safe and not require "quarantine." It should be noted that during this time, undersigned counsel had no access to speak with Mr. Samsel.

7. Further, in that same filing for an extension on May 27, 2022, the government made clear in a public record that they are monitoring Mr. Samsel's calls, and they allege that "…*within a day of his arrival at the FDC,*

*the defendant was recorded speaking on a monitored call where he chastised the recipient for not being aggressive enough. The defendant then discussed harming FBI agents…"* and that *"the defendant has been placed in the FDC's special housing unit following the call, but cannot currently assess the extent to which increased security concerns with the defendant will impact plans for his evaluation."* (*Id.* at ¶ 4.)

8. We submit that Mr. Samsel's constitutional rights are in jeopardy, not only because of lack of access to his own counsel, but also the lack of access to his well-being, in constant 24/7 lockdown since his move from Lewisburg, and Defendant Samsel has been placed in an untenable situation.

9. In the most recent request to delay the Court's Order for an Independent Medical Evaluation, the government submits that,

   *'On June 10, the prosecution contacted Deputy Regional Counsel for the Bureau of Prisons, who directed further inquiry to BOP Regional Counsel. Regional Counsel explained on June 10 that efforts were to schedule the defendant's evaluation were continuing and further explained:*
   
   a. *"Such arrangements are made through an outside contractor that functions as an HMO for the BOP. To proceed with scheduling, the BOP must provide a referral."*
   b. *"The defendant has refused to allow medical staff at the FDC to evaluate him. This refusal was ongoing as of June 10…"*
   c. *"The BOP cannot produce the necessary referral without conducting an examination of the defendant.'"*

   (ECF 171 at ¶ 9).

10. However, having BOP perform yet another evaluation was not part of the government's representations or the Court's Order for an *Independent Medical Evaluation* at a tertiary research center. (ECF 164, and respectively, ECF 159).

11. The government has repeatedly stated that "to accomplish the objectives of the order [that Mr. Samsel shall receive an Independent Medical Examination at a tertiary research center] the defendant was transferred to the Federal Detention Center in Philadelphia, Pennsylvania (FDC)." (ECF 164 at ¶ 2).

12. The government could easily refer to the findings of Dr. Edinger from Lewisburg, who is also a BOP doctor. On May 5, 2022, Dr. Edinger testified that,

    Yes. He definitely has a severe problem. That's a given. And it's one that I would proceed cautiously with. And it's one where, in private practice, when I was in private practice, I would have utilized a high level tertiary center, like the University of Pennsylvania or Johns Hopkins or places like that, where they do a lot of research and bring in the very best individuals to deal with this type of problem.

    (Transcript of Status Conference Before the Honorable Jia M. Cobb, United States District Judge, May 5, 2022, at p. 40 L.22-25 -p. 41 L. 1-4).

13. The government never represented that a preliminary evaluation by, yet another BOP facility would be necessary. Clearly the government overlooks the findings from Dr. Edinger, but also the records from the UVA, which is a tertiary care center that Defendant was previously taken in August of 2021, under detention and while in federal custody.

14. UVA documented: **08/05/21, Diagnosis:**

    1. Acute embolism and thrombosis of subclavian vein, bilateral
    2. Chronic embolism and thrombosis of axillary vein, bilateral
    3. Chronic embolism and thrombosis of subclavian vein, bilateral
    4. Phlebitis and thrombophlebitis of other sites

    **Co-morbitities:**

Enlarged lymph nodes left axilla, stomach and back of neck, and groin, August 2015; Elevated Serum creatinine August 2015; Multiple nasal bone fractures, right side orbital fractures; Orbital nerve damage, loss of vision right eye; Upper extremity varicosities.

15. At the same hearing, the Defendant himself asked the court,

Will I be able to see Dr. Liebman, who was at Einstein who was familiar with the venogram and also the interventional radiologist, which was Dan DeCotiis at Einstein, along with he worked with those imagings. So he can get a better surgery with the glansectomy or removal. I mean, since he was already working on it and I visited him -- it's actually at Montgomery, which is about 17 miles outside the Philadelphia area. Since he's familiar, would I be able to possibly revisit him? And that's because I don't want to keep starting over and over and over, and it keeps getting pushed back please. That's all I ask.

(Tr. p.66 L. 13-23).

16. And the Court responded:

THE COURT: Sure. I think that is a fair and reasonable request, and I'm going to task your attorneys in working with Ms. Rochlin. I don't know what the limits of my authority are with respect to ordering specific -- what I can order but I'm giving you the homework. Obviously, it makes sense to me for Mr. Samsel to go to a center that he has been to before. Perhaps if he can see the specialists that he's already seen, that are more familiar with him, that would be great. But I don't know how this works. So, Mr. Samsel, you've made that request. I think it's a reasonable one. If we're able to do it and accommodate it, I'm tasking your lawyers with figuring that out, but I think it's reasonable for you to suggest that.

(Tr. p.66 L. 24-25 - p.67 L.1-11).

17. As Mr. Samsel previously argued that,

The government has also proposed that Mr. Samsel *could remain* at USP Lewisburg and *could* receive "a work up" at Lancaster General Health, which is part of the University of Pennsylvania Health System. However, the government cannot confirm whether the U.S. Marshal's Service will in fact facilitate Mr. Samsel's receipt of treatment, much less a "diagnostic work up" at Lancaster or whether Lancaster will in fact agree to treat Mr. Samsel while he is in the custody of the U.S.

5

Marshal's Service. The government's proposed order for the Court is thus based purely on conjecture and is merely speculative. Moreover, Lancaster is roughly 102 miles from USP Lewisburg, while the University of Pennsylvania Medical Center, a world-renowned academic medical center, is roughly only 168 miles away from USP Lewisburg. ... Rather, the government's final proposal is that Mr. Samsel would be transferred to FDC Philadelphia, where he could receive treatment at the University of Pennsylvania Medical Center. Again, the government's proposal relies on mere speculation and conjecture.

(ECF 158, 05/13/22).

18. In the same filing we explained yet again that,

Here, Mr. Samsel has time and again demonstrated a compelling reason by extensively documenting the medical treatment he seeks. Medical records post his detention repeatedly reflect that he suffered from an orbital fracture (Howard / DC Jail / Rappahannock / UVA). Medical records from before and after his detention reflect that he may suffer from gynecomastia (Einstein Health Network, Philadelphia / Central Virginia Regional Jail). Medical records from before and after his detention reflect some diagnosis of thoracic outlet syndrome with subclavian vein occlusion and medical records following his arrest relatedly reflect subclavian vein thrombosis (University of Pennsylvania / DC Jail / Rappahannock / Central Virginia Regional Jail / University of Virginia). In addition, medical records following his arrest reflect wrist scapholunate joint widening (Howard / DC Jail / Central Virginia Regional Jail); as well as loss of vision (Rappahannock / University of Virginia). For all of these conditions, Mr. Samsel requests the opportunity to be treated by specialists for the purpose of definitively determining what further treatment is necessary.

(*Id.*)

19. To date, none of this treatment has occurred, and the Court's 14 day Order is frustrating for Mr. Samsel, who has since been kept in lockdown with no genuine access to counsel. Mr. Samsel has been detained since his arrest on January 30, 2021 under extremely difficult conditions including several continuous weeks of solitary confinement and other incidents, as previously set forth in earlier status reports. (*See* ECF 49, 54, 55).

6

20. By way of relevant background, in ECF 49, Undersigned Counsel documented that,

    On or about March 21, 2021, Mr. Samsel was viciously assaulted while in the custody of the District of Columbia Department of Corrections, and while detained in "administrative segregation"—the latest euphemism for solitary confinement. He was taken to Howard University Hospital the next day, on March 22, 2021, where he was admitted and treated for injuries including, but not limited to head strike and loss of consciousness, bilateral eye ecchymosis, acute kidney injury, injury of the wrists, fracture of the orbital floor (right side / closed fracture), bilateral facial bilateral nasal bone fracture, and thoracic outlet syndrome.  Ultimately, as a result of the brutal assault, Mr. Samsel lost vision in his right eye, has suffered seizures, and has continuing pain and suffering in relation to the thoracic outlet syndrome as well as a cystic condition (that may have been aggravated in the assault), and a general lack of follow up care, and rehabilitative care. There has been no genuine mitigation and instead, Mr. Samsel's condition appears to have grown in severity.

    (ECF 49, 09/11/21).

21. Undersigned Counsel further documented that,

    Of note, on September 15, 2021, the day after the Court's last status conference, Mr. Samsel was an involved in an incident with the correctional officers at the Central Virginia Regional Jail ("CVRJ"). Late that evening, officers came to Mr. Samsel's cell to move him back to solitary confinement.  According to records provided by the U.S. Marshals Service ("USMS"), Mr. Samsel reported that he was "dropped while being removed" from his cell.  The medical records further provide that after receiving medical attention in solitary confinement, Mr. Samsel had "mild redness on the left side of his face at the cheek bone area."  Further, in subsequent correspondence … shared with Defense Counsel, a CVRJ nurse advised that she visited Mr. Samsel the next day, that she gave him an ice pack and they discussed his vomiting a few times in the middle of the night, which is not documented in the records produced.

    (ECF 50, 09/20/21).

22. To date, undersigned counsel has not been able to get the records from the Emergency Room visit that night.

23. The third assault happened or about October 12th, 2021. while Mr. Samsel was in federal custody and housed at a facility known as NNRJ, Northern Neck Regional Jail.  Undersigned Counsel documented the following:

24. On [October 12, 2021], a 10-33 was called and Medical was asked to assess inmate. I, EMT F., assessed Inmate Samsel for any injury. A hands-on assessment was performed, only to find two areas of friction burn no larger than 2" in diameter on the top of inmate's head. At the time of being assessed, inmate stated he was not in any pain. There was no bleeding or swelling. Inmate Samsel was alert and oriented to person, place, time, and event. Once inmate was taken back into the cell, inmate was assessed, finding no other injuries beside the friction burn listed above. Nothing further to report at this time. Then, approximately two and a half hours later, the NNRJ "Synopsis of Care" medical report provided by the U.S. Marshal's Service provides:  1033 called in E-Pod around 1835. When going into the pod, Inmate Samsel was lying face down in the cell. I, Nurse A. ran to get the emergency bag. When coming back to the pod, Inmate Samsel was being rolled over by EMT F. . . . Inmate Samsel had a quarter size goose egg to the L eyebrow, some redness on his chest, and bruises on his hands *from previous altercation*. Inmate Samsel given icepack during this time. Dr. D. called and advised do not send to EMS . . . .Of note, Nurse A identified a "goose egg" that EMT F had failed to observe just two and a half hours earlier… Following the incident, defense counsel visited Mr. Samsel in person who appeared visibly shaken, badly bruised on his face and wrists, and clearly in distress. Counsel was not permitted a cell phone during their meeting with Mr. Samsel, however, below is a picture of Mr. Samsel during an unrecorded fifteen-minute video-conference permitted with counsel earlier October 13, 2021:



25.

(ECF 55, 10/14/21).

26. The government treats this pre-trial defendant who brought no weapons on January Sixth, who is shown in multiple public videos that Mr. Samsel then helped Officer Edwards stand up from where she had fallen, (see also ECF 1-1, 01/29/21, 21cr00188-mjf ("Samsel picked O-1 up off the ground")), never is that allegation the government has recognized, considered; instead the government alleges not only that is he a danger to the community, but he is a danger within their facilities and have never let him outside, and limited his access to counsel, kept away from any law library to work on his case, and refused to comply with their own representations on proper medical treatment, so that he may otherwise focus on the defense of his case.

27. In conclusion, we respectfully request this Court to deny the further delay of access to treatment for Mr. Samsel, and to require that the government comply with the Court's original order, and its own original representations, or, without further delay, return Mr. Samsel to Lewisburg, so that he can then be considered for treatment from there.

[signature next page]

Dated: June 14, 2022  Respectfully submitted,

*/s/ Stanley E. Woodward, Jr.*
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD, ATTORNEYS AT LAW
1808 Park Road NW
Washington, DC 20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*/s/ Juli Z. Haller*
Juli Z. Haller, (DC 466921)
The Law Offices of Julia Haller
601 Pennsylvania Avenue, N.W., Suite 900
Washington, DC 20004
Telephone: (202) 729-2201
HallerJulia@outlook.com

*Counsel for Defendant Ryan Samsel*

## CERTIFICATE OF SERVICE

On June 14, 2022 the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed and served via the CM/ECF system, which will automatically send electronic notification of such filing to all registered parties.

*/s/ Juli Haller*
Juli Z. Haller, (DC 466921)