UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Case Number 1:21-cr-00537-JMC |
| RYAN SAMSEL, et al., | : | |
| | : | |
| Defendants. | : | |

UNITED STATES' RESPONSE IN OPPOSITION
TO DEFENDANT SAMSEL'S "STATUS REPORT"

The United States of America respectfully submits this Response to defendant Ryan Samsel's Status Report, ECF 180, a filing which seeks relief in the form of transportation "forthwith" from one Bureau of Prisons (BOP) facility to another, and otherwise attempts to renew an earlier motion, ECF 142, seeking revocation of the order for his pretrial detention.[1]  The filing contains omissions, factual inaccuracies, and fails to provide appropriate support for the relief it seeks.  For the reasons provided below, this Court should decline to issue a proposed order, ECF 180-3, let alone one requiring action "forthwith," that commands the defendant's transfer to a specific BOP facility when such a transfer rests within the discretion of the United States Marshals (USMS).

While the defendant's application is properly denied, the United States is not indifferent to this Court's separate concerns, raised during a July 7, 2022 status conference.  This response will also attempt to address this Court's concerns causing consideration of such a recommendation.[2]

---

[1] This Court denied that motion,  ECF 142, and the defendant has filed an appeal with the United States Court of Appeals for the District of Columbia Circuit which has been docketed under Case No. 22-3034.

[2] From the July 7 status conference, the United States understands that the Court is not considering the defendant's attempt to relitigate his challenge to detention and obtain temporary release.  Such

## I.  The Defendant's "Status Report" Applies For An Order And Should Be Treated As A Motion

The defendant's July 6, 2022 filing, although captioned as a status report, contains: 1) a "Renewed Request for Temporary Release," ECF 180:3, 2) a "Request for Transfer to USP Lewisburg," ECF 180:4, 3) arguments and case citations throughout, 4) a conclusion containing a prayer for relief, ECF 180:5, and 5) an attached proposed order.  "A party applying to the court for an order must do so by motion."  Fed.R.Crim.P. 47(a).  The difference between a motion and a status report is not without consequence.  For example, unlike a status report, a party must serve a written motion at least seven days before a hearing date.  Fed.R.Crim.P. 47(c).

The defendant's written Status Report stated the grounds on which it was based and the order it sought.  *See* Fed.R.Crim.P. 47(b).  In every respect but its name, the Status Report is identical to a motion.  It should be treated as one, and it should be denied.

## II.   The Defendant Fails To Establish Adequate Factual or Legal Grounds for the Relief He Seeks

### A.  *Legal Standards*

Congress has legislated that the United States Marshals "shall provide for the safe-keeping of any person arrested, or held under authority of any enactment of Congress, pending commitment to an institution."  18 U.S.C. § 4086.  Courts around the country have repeatedly held that under

---

an approach is appropriate in light of the defendant's pending appeal where he argues, as he did before this Court, that his physical condition warrants his release.  Insofar as the defendant now seeks relief based on the same subject matter as his pending appeal, there is no jurisdiction to grant relief.  *United States v. Cronic*, 466 U.S. 648, 667 n. 42 (1984); *United States v. Anderson*, 545 F.3d 1072, 1080 n. 8 (D.C. Cir. 2008), *cert. denied*, 556 U.S. 1263 (2009); *United States v. DeFries*, 129 F.3d 1293, 1302 (D.C. Cir. 1997)(per curiam)("the filing of a notice of appeal, including an interlocutory appeal, 'confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal'")(quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)).  Accordingly, and for the sake of brevity, the United States will not address the defendant's attempt to relitigate detention unless this Court directs otherwise.

this grant of authority, absent a finding of a constitutional violation, the USMS has discretion regarding housing decisions. *See, e.g.*, *United States v. Jones,* 19CR00333-MO-4, 2020 U.S.Dist. LEXIS 122631 * (D. Oregon, July 13, 2020) (finding the Court lacks authority to order U.S.M.S. to place defendant in any particular facility); *United States v. Wattenbarger*, No. 1:06CVCR0171 OWW, 2007 WL 214565, at *1 (E.D. Cal. Jan. 25,2007) ("The Court defers to the United States Marshal's Service, which is charged by law with assuring the security of the Court, pretrial detainees, and all persons appearing in the Court."); *United States v. Bigham*, No. 14-CR-20676, 2016 WL 738045, at *2 (E.D. Mich. Feb. 25, 2016)("Defendant has provided no authority empowering a district court to direct the U.S. Marshals Service to house a criminal defendant at any specific location.").  Similarly, it is the USMS that has authority over the medical care and treatment of detainees.  *United States v. Espinoza-Arevalo*, No. 14-00332-02-CR-W-BP, 2015 WL 9598299, at *3 (W.D. Mo. Dec. 30, 2015).

Although the Due Process Clause prohibits the punishment of a pretrial detainee before an adjudication of guilt, *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), "a restriction on a pretrial detainee does not constitute punishment unless it is (1) intended as punishment or (2) unrelated to a legitimate government objective," *Cordova v. City of Albuquerque*, 816 F.3d 645, 655 n.5 (10th Cir. 2016).  *Cox v. Denning*, 652 Fed. Appx. 687, 692 (10th Cir. 2016) (unpublished). Thus, "[i]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." *Bell*, 441 U.S. at 53. The transfer or housing of a pretrial detainee "to less amenable and more restrictive quarters for nonpunitive reasons" does not constitute punishment in violation of the Due Process Clause.  *Phillips v. United States*, No. 220-3006-SAC, 2022 WL 705335 at *3 (D. Kan. Mar. 9, 2022).  Thus, absent extraordinary circumstances, courts will not interfere with

the USMS' determination of where a prisoner should be housed.  *See Moyers v. Shudan*, No.3:07-CV-393, 2009 WL 1813969, at *2 (E.D. Tenn. June 24, 2009).

### B.  *Relevant Background*

A superseding indictment charges the defendant with serious felonies including crimes of violence arising from his role in the siege of the United States Capitol on January 6, 2021.  ECF 80.  To avoid repetition, the United States refers to the procedural and factual history contained in its opposition, ECF 147, to the defendant's earlier motion to revoke the order for his pretrial detention.  *Id*. at 2-5.

Details relevant here include the following.   As a  Pennsylvania resident, the defendant was held initially after his arrest at the BOP's Federal Detention Center in Philadelphia (the FDC) until his removal to this district.  He stipulated to detention before a Philadelphia magistrate judge and did so again before a magistrate judge in this district.  Until his April 1, 2022 motion seeking revocation, ECF 142, the defendant affirmatively consented to his detention and at times vehemently opposed release.

Throughout the pendency of this case, the defendant has raised issues concerning his health.  The United States has consistently maintained that the defendant should receive appropriate medical care.  Although the defendant has objected to his care, his demands for relief have not remained consistent.  For example, he urged the Court to find a way to transfer his custody to a Pennsylvania Department of Corrections facility, theorizing that he could receive the treatment he demanded more easily from there.  After a magistrate judge acted on that request, the defendant reversed course and opposed the transfer to state custody.  The defendant informed the magistrate that he wished to remain in federal custody, and even requested a transfer to the FDC.  The defendant later reversed himself again, requesting a transfer to a State of Pennsylvania facility.

4

The transfer occurred; however, Pennsylvania eventually returned the defendant to federal custody and he was placed in the FDC again in February, 2022.  Following that placement, the defendant filed no objections concerning the FDC.

In mid-March 2022, to honor an order from this Court, ECF 119, the defendant was transferred from the FDC to USP Lewisburg.[3]  Approximately two weeks later, the defendant filed his motion to revoke detention, arguing among other claims in the motion and resulting litigation that he needed medical care from providers in Philadelphia.

On May 3 and 5, 2022, this Court held a hearing to address the motion to revoke.  On May 5, the Court declined to release the defendant, and focused on his health concerns.  Transcript of Status Conference, May 5, 2022 (Tr.) at pp. 52-53, 61. The Court made clear the objective of getting the defendant to a tertiary research center. Tr. at p. 61.  To that end, the Court directed the parties to confer and submit a proposed order to facilitate the defendant's transport to such a facility (expressing a preference for but not requiring a medical examination at the University of Pennsylvania).  Tr. at p. 60. The Court tasked counsel for the parties with resolving where the defendant would go and what type of doctor would evaluate him.   Tr. at pp. 63, 71.  The Court ultimately ordered the parties to file the proposed order by May 13, 2022.  *See* Minute Order of May 10, 2022.[4]

The defense did not attempt to contact the prosecution to confer about the proposed order. The prosecution was able to contact the defense on May 12, 2022, and, as previously described in

---

[3] On March 15, 2022, Dr. Andrew Edinger, the Clinical Director at USP Lewisburg, asked the defendant to arrange for his counsel to transmit medical records documenting the defendant's claims about his health.  The records were not provided in response to that request.  Several weeks later, when the issue came to the attention of the United States Marshals Service (USMS), the Assistant Chief of the USMS Medical Branch provided the medical records to USP Lewisburg.

[4] During the status conference, the defense represented to the Court that it would provide a list of doctors to the prosecution by May 9, 2022.  Tr. at 70.  This never occurred.

a Status Report, ECF 156, attempted without success to discuss alternatives for the defendant's medical evaluation. The United States submitted its own proposed order with its Status Report in an effort to comply with the Court's prior order. ECF 156-1. The defense filed a sealed status report, rejecting all of the prosecution's proposed options for the defendant's evaluation, including options that avoided the need for the defendant's transfer from USP Lewisburg, and insisting instead on the original defense request for revocation of detention. The defense offered no alternative proposals for an examination in discussions with the prosecution and its sealed status report did not offer any proposed order for the Court to consider.

On May 17, 2022, this Court issued an order addressing the defendant's medical evaluation. ECF 159. The order provided that:

> within fourteen (14) days of the date of this order, or a longer period for good cause shown, Mr. Samsel shall receive an independent medical evaluation at a tertiary research center. To the extent feasible, the Court recommends that the evaluation be conducted by the University of Pennsylvania Medical Center in Philadelphia, Pennsylvania;

> the evaluation shall provide a comprehensive physical assessment of Mr. Samsel and shall identify what if any procedures he requires and whether or not any procedure is elective or required on an urgent basis;

> defense counsel shall, within five (5) days from the date of this order, provide to the prosecution any of Mr. Samsel's medical records in defense counsel's possession that are not already part of records provided to the Bureau of Prisons; the prosecution shall arrange to provide those records to the United States Marshals Service and the Bureau of Prisons, so that the records can be made available to the tertiary research center as needed for the independent medical examination;

> Mr. Samsel shall be transported to an appropriate Bureau of Prisons facility for the purpose of receiving the independent medical evaluation; and …

> no less than three (3) days before Mr. Samsel is transferred from the Bureau of Prisons' facility in Lewisburg, Pennsylvania where he is currently housed, the Bureau of Prisons, the United States Marshals Service, or government counsel in this case shall notify defense counsel of the details of the upcoming transfer, including the name of the tertiary research center where Mr. Samsel will receive the evaluation.

ECF 159 (cleaned up).  The Court also issued an order denying the defendant's motion for revocation of the pretrial detention order.  ECF 161.

The defense was advised on May 20, 2022 that the transfer would begin on May 23, 2022. On May 20, 2022, the defense filed a sealed motion, ECF 162 (Sealed), seeking an emergency stay of the defendant's transfer and an order to show cause based on the government's supposed failure to comply with the notice provisions of this Court's transfer order, ECF 159.[5]  This Court denied the motion.  *See* Minute Order of May 23, 2022.  The notice requirement in the Court's order was later vacated.  *See* Minute Order of May 31, 2022.  The defendant arrived at the FDC on May 23, and was placed in a quarantine.

In early June, the defendant was released from the quarantine; however, in a monitored telephone call, the defendant was recorded discussing a ruse involving a request for an interview with law enforcement in order to gain the opportunity to assault an FBI agent.  The defendant also mentioned plans to stay constantly armed with a knife and stab police if he encountered them. Soon after, FDC authorities screened a letter from the defendant stating that politicians in office "needed to go" and that a woodchipper sounded like a good idea; the letter also expressed the defendant's belief that he would be on the news where he could tell people to get their weapons and "f***ing go!" The defendant was placed in the FDC's Special Housing Unit.

The defendant refused to allow FDC medical personnel to evaluate him.  Moreover, after his arrival at the FDC, it remained unclear whether the defendant would or would not consent to

---

[5]The defendant also claimed to seek a stay because of the potential for quarantine following transfer to a different BOP facility.  The defense had been aware, however, of the potential for a quarantine since at least May 5, *see* Tr. at 63 (claiming that detainees at the FDC are "typically" held in "solitary confinement"), and also as a result of May 12 discussions with the prosecution when attempts were made to suggest alternative evaluations that would not require a transfer and the resulting need for quarantine.

an examination even at a tertiary care facility.  *See, e.g.*, ECF 180-2:3-4 (defendant's decision whether to consent to the examination depended on disclosure, if any, of general timing of the examination).

This Court granted two extensions of the deadline for the defendant's evaluation.  On June 28, 2022, the defendant was brought to Thomas Jefferson University Hospital, and it appears, submitted to examination.  The attending physician who conducted the examination has requested additional scans before a follow-up examination.  FDC personnel have submitted requests to schedule the scans.  The defendant nevertheless has demanded release from detention or alternatively, his transfer from the FDC to USP Lewisburg "forthwith."

### C.  *The Defendant Misconstrues and Mischaracterizes Records From His Examination*

To obtain relief, the defendant attempts to characterize his June 28, 2022 examination as a purported failure by the government to provide adequate care.  It was not.  He claims that summary records from his examination portray dire health problems.  They do not.

In an effort to portray his examination as a "charade," ECF 180:1, and a "deprivation of medical care," ECF 180:4, the defense inaccurately claims that the hospital did not receive any of the defendant's medical records.  As an initial matter, this Court's order required production of the defendant's medical records "as needed" for his exam.  ECF 159.  The defense provides no information about when any determination was made that the defendant's earlier medical records were needed, or whether any such records were even requested before the exam.  Defense counsel contacted the prosecution during the exam to advise that the hospital was seeking specific records and to communicate with Dr. Edinger, the Clinical Director from USP Lewisburg who had previously evaluated the defendant.

8

The prosecution responded by immediately contacting USP Lewisburg, but was advised that the doctor would not be made available.  The prosecution then contacted the hospital, confirmed the hospital's ability to receive records electronically, created an account to transmit the medical records, transmitted them, and confirmed that the records were received by both a nurse and the physician evaluating the defendant, all with the understanding that the records were received before the conclusion of the exam.  The prosecution also contacted the FDC and was advised that the FDC's Clinical Director and medical officer were available to confer with the hospital.  Defense counsel was notified by electronic mail on June 28 that records were transmitted and FDC personnel were available.  These details are not mentioned in the "Status Report." Because Dr. Edinger was not available to confer during the defendant's exam, the doctor's April 21, 2022 memorandum, ECF 150-1, and subsequent declaration, ECF 151-1, were also provided to the hospital.  Thus, the hospital did receive medical records.

Defense claims that the records attached to the "Status Report", ECF 180-1, reflect urgency also fail to withstand scrutiny.  The physician who saw the defendant has recommended a follow-up appointment "in about 4 weeks," ECF 180-1:4, a schedule that is not consistent with emergency or urgent care.  The priority assigned to each of the scans to occur before the follow-up is "routine." ECF 180-1:1.

The "Status Report" misinterprets and exaggerates one portion of a BOP form, ECF 180-1:1, which lists specific deadlines.  The dates in this document, according to the FDC, represent deadlines for submitting scheduling requests and not deadlines to complete additional appointments or scans.  They do not signify medical urgency or a serious health issue.  Neither the provision of prior medical records nor the page the defendant cites indicate any current deprivation of care, let alone facts that support judicial intervention with his care.  The "Status Report"

identifies no statement from any health care provider or expert that the defendant has been deprived of proper care.  Moreover, the defendant has been refusing care from medical staff at the FDC. *See* ECF 171:1, 2-3 (describing defendant's continuing refusal of care).  The defendant cannot credibly have it both ways—refusing available care while claiming indifference to health conditions supposedly requiring urgent attention.  The content of his "Status Report" lacks sufficient or persuasive factual support for the relief it seeks.

### D.   *This Court Should Deny The Defendant's Application For A Transfer*

The defendant now demands to return "forthwith" to the same BOP facility he previously protested was inadequate.  If such a transfer occurs, it will interfere with the continued care the FDC is arranging based on the June 28 examination.  Such a transfer may potentially result in another period of quarantine.  Any transfer does not necessarily guarantee a change in the defendant's placement in a Special Housing Unit.

Aside from any such practical considerations, however, this Court's analysis of the defendant's demand for a transfer should begin with relevant statutory authorities.  When a person has been arrested and ordered detained by a federal court pending trial, Congress has provided under the Bail Reform Act of 1984 that "the court shall direct that the person be committed to the custody of the Attorney General for confinement in a corrections facility....".  18 U.S.C. § 3142(i)(2).  Moreover, the provisions of 18 U.S.C. § 4086 provide:

> United States Marshals shall provide for the safe-keeping of any person arrested,
> or held under authority of any enactment of Congress, pending commitment to an
> institution.

*See also* 28 C.F.R. § 0.111(k)[6]; *United States v. Bingham*, No. 14-CR-20676, 2016 WL 4944138,

---

[6] This regulation states that the Director of the USMS shall direct and supervise all activities of the USMS including "[s]ustention of custody of Federal prisoners from the time of their arrest by

at *3 (E.D. Mich. Sept. 15, 2016)(finding that Section 4086 governs pretrial detainees' demands for transfer).

Courts considering Section 4086's broad grant of authority to the USMS when confronted with a demand for transfer from a pretrial detainee:

> have uniformly concluded that determining a detainee's placement is within the sole discretion of the USMS and, where applicable, have refused a detainee's request to be transferred to another facility. *See, e.g.*, *United States v. Dixon*, 2021 WL 4129623, at *2 (D.N.D. Sept. 9, 2021); *Phillips v. United States*, 2022 WL 705335, at *2 (D. Kan. Mar. 9, 2022); *Cometa*, 2018 WL 11247169 at *1; *Espinoza-Arevalo*, 2015 WL 9598299, at *3; *Valdez v. U.S. Marshal Serv.*, 2014 WL 4103204, at *4 n.5 (W.D. La. Aug. 13, 2014); *United States v. Stile*, 2013 WL 12195872, at *2 (D. Me. Nov. 27, 2013); *Saunders*, 502 F. Supp. 2d at 496; *Falcon v. U.S. Bureau of Prisons*, 852 F. Supp. 1413, 1420 (S.D. Ill. 1994), *aff'd on other grounds*, 52 F.3d 137 (7th Cir. 1995).

*United States v. Thomas*, No. 3:20-CR-51 (SRU), 2022 WL 2315624, at *4–5 (D. Conn. June 28, 2022); *see also United States v. Owle*, No. 2:09CR27, 2010 WL 3259790, at *5–6 (W.D.N.C. Aug. 18, 2010) ("Because the care of a custodial defendant is left to the sound discretion of the Marshal, who is ultimately responsible for defendant's well being, the court takes no role in determining what is or is not the appropriate care"), *review granted, judgment aff'd*, No. 2:09 CR 27, 2010 WL 3522258 (W.D.N.C. Sept. 7, 2010).

The "Status Report" does not address Section 4086 or any of the decisions cited above. Instead, the defense asks this Court to consider *United States v. Medina*, 628 F.Supp. 2d 52, 56 (D.D.C. 2009).  In *Medina*, the Honorable Royce C. Lamberth ordered the transfer of detainees in a multi-defendant drug-trafficking case from the D.C. Jail to a Community Treatment Facility to promote access to discovery and to counsel.  Judge Lamberth rejected the reasoning in a

---

a marshal or their remand to a marshal by the court, until the prisoner is committed by order of the court to the custody of the Attorney General for the service of sentence, otherwise released from custody by the court, or returned to the custody of the U.S. Parole Commission or the Bureau of Prisons."  28 C.F.R. § 0.111(k).

memorandum from the Department of Corrections (DOC) that he lacked authority to order such a transfer, but did so because the DOC provided authority relevant to convicted prisoners rather than detainees.  628 F.Supp. 2d at 54 ("Cases cited and relied on by the DOC that relate to convicts, therefore, have little or no relevance here.  The Court paid little or no attention to cases cited by the DOC relating to convicted prisoners")(references to cases cited by the DOC omitted).  The *Medina* decision made no reference to Section 4086, related regulations, or other authorities addressing the scope of USMS discretion.  Ultimately, however, and over the objection of the defendants in *Medina*, Judge Lamberth vacated his transfer orders, and allowed for those defendants to remain at the D.C. Jail.  628 F.Supp. 2d at 58.  Accordingly, *Medina* in no way refutes the authority and broad discretion granted to the USMS, and it is not a persuasive case for the defendant or one that compels this Court to grant the transfer the defendant demands.

Moreover, consistently with the cases cited above, *Medina* recognized that "the Court is not generally concerned with the day-to-day administration of detention facilities. '[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration' and it would 'not be wise for [courts] to second-guess the expert administrators on matters on which they are better informed.' *Id*. at 55 (quoting *Bell*, 441 U.S. at 531 (1979)).  That decision is also consistent with the cases cited herein addressing the limits of a district court's role in the administration of detention to enforcement of constitutional protections.[7]

---

[7] In an apparent effort to conform to the facts of *Medina*, the defense contends that access to counsel will be improved if the defendant is at USP Lewisburg, ECF 180:5, but provides no specifics about USP Lewisburg explaining why or how that would be the case, and this contention is too vague to merit relief.  The defense has sought and received orders from this Court requiring the FDC to arrange for legal calls; however, since those requests have not been litigated, the Court has not heard the FDC's frustration with its ability to contact counsel to arrange for legal calls, and is presumably unaware that the FDC is now maintaining a log of its efforts to reach counsel to schedule legal calls.  To be clear, the United States has no objection with facilitation of communication between counsel and the defendant; however, access to counsel is one of the

The "Status Report" fails to justify judicial intervention in the form of a transfer or otherwise because it fails to meet the standard for such relief.  A defendant's constitutional rights, including the right to due process, are not violated just because of housing in a prison setting. *E.g.*, *Phillips v. United States*, No. 22-3006-SAC, 2022 WL 705335 at *2 (D. Kan. Mar. 9, 2022).  When a detainee properly raises a claim of unconstitutional conditions of confinement in the correct forum, the claim is evaluated under the Due Process clause of the Fourteenth Amendment.  *Bell*, 441 U.S. at 535.  To raise such a claim, the detainee must show a restriction that is intended as punishment or that is unrelated to a legitimate governmental objective. *Id*.  Conclusory allegations without supporting facts are insufficient to state a claim on which relief under *Bell* can be based, and a detainee must provide more than labels and conclusions or a formulaic recitation of the elements of a cause of action. *Phillips*, 2022 WL 705335 at *3.  Here, like the defendant in *Phillips*, Samsel has not alleged facts that show his treatment constitutes punishment or even that his treatment differs from similarly situated detainees.  He has not alleged that his housing or his medical care (when he accepts it) is unrelated to legitimate governmental interests in the management and treatment of a violent felon who continues to issue threats while incarcerated.  His mere reference to language in *Bell*, without more, is not enough to warrant action.  Moreover, a detainee's dispute with decisions about medical care do not trigger review in a criminal case, but fall instead within the broad discretion of the detainee's custodian.  As one court has explained:

> What medications or treatment a defendant may or may not need are left to the sound discretion of the United States Marshal, who contracts with jail facilities or doctors and other medical personnel to evaluate the needs of each detainee. Just as in the private world, one doctor may believe a patient needs one type of medication while another doctor at another institution may believe a patient needs another medication. A federal court simply lacks jurisdiction in the criminal case to

---

factors that the USMS balances for housing decisions, and the defense has not established that different housing will resolve communication issues with a defendant who has also refused legal calls.  *See* ECF 180-2:3.

determine what is or is not appropriate care. Instead, federal courts only have civil authority in such matters as provided in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), *Carlson v. Green,* 446 U.S. 14 (1980), and as specified in the Federal Torts Claims Act. See *Petrazzoulo v. U.S. Marshals Service,* 999 F.Supp. 401, 406 (W.D.N.Y.1998).[8] Because the care of a custodial defendant is left to the sound discretion of the Marshal, who is ultimately responsible for defendant's well being, the court takes no role in determining what is or is not the appropriate care.

*United States v. Burgess*, No. 1:09CR17, 2010 WL 2465553, at *3–4 (W.D.N.C. June 14, 2010), *report and recommendation adopted*, No. 1:09-CR-17, 2010 WL 3122634 (W.D.N.C. Aug. 9, 2010).

Earlier in this case, the defendant requested transfer to the FDC.  In February, the defendant was moved from the FDC to USP Lewisburg, and argued that he should be released from Lewisburg because of its supposed inadequacies.  Then the defendant sought a stay of this Court's transfer order so he could remain at Lewisburg.  He now seeks an order for his return to Lewisburg. In every instance, including the demands in the "Status Report," the grounds for the defendant's requests amount to objections to decisions that Congress has delegated by statute to the USMS, as explained above.  The defendant can direct his objections to the USMS, and he can pursue administrative remedies offered within the BOP.  He can pursue a civil action against the appropriate parties in the appropriate venue.  The relief the defendant moves for, however, is not properly raised in his criminal case and should be denied.

### III.   *Despite Separate Concerns, This Court Should Refrain From Seeking The*

---

[8] In its earlier opposition to the defendant's release from detention, the United States cited decisions holding that claims based on conditions of confinement are properly raised in separate civil actions. ECF 147:23-25.  This is no less true when the relief requested is a transfer within or to a different detention facility, as reflected in the citation above to *Burgess.  See also United States v. Rojas-Yepes*, 630 F.Supp. 2d 18, 20 (D.D.C. 2009)(defendant seeking transfer from administrative segregation to general population); *United States v. Braswell*, No. 1:18-CR-0034-DAD-BAM, 2018 WL 3583112 at *1 (E.D. Cal. July 25, 2018)(defendant seeking transfer after physical assault); *United States v. Thomas*, No. 3:20-CR-51 (SRU), 2022 WL 2315624, at *4–5 (D. Conn. June 28, 2022)(transfer sought because of bedding, lockdowns, and medical issues).

### *Defendant's Immediate Transfer From The FDC*

During the July 7 Status Conference, the Court noted the difficulty of scheduling video-teleconference (VTC) hearings involving the FDC.  The prosecution understands Court's concerns, and following the July 7 status conference confirmed that the Regional Counsel of the BOP is aware of and addressing this issue.

The United States further agrees with the Court that a district court judge may request or recommend a defendant's transfer to the USMS.  *See, e.g.*, *United States v. Stile*, No. 1:11-CR-00185-JAW, 2013 WL 12195872, at *2 (D. Me. Nov. 27, 2013).  The Court has informed the parties that it is prepared to recommend that the USMS move the defendant to USP Lewisburg which currently seems better able to facilitate VTC appearances for the defendant.

For several reasons, however, the United States urges the Court to avoid recommending any immediate transfer.  First, the next court proceeding in the above-captioned case is not scheduled until September 7 at 2:00 p.m.  *See* Minute Entry for Video Status Conference docketed on July 8, 2022.  The defendant's follow-up examination in Philadelphia is to occur sooner, in approximately four weeks.  ECF 180-2:4.  Other medical procedures are to occur in advance of the follow-up.

These procedures will not occur if the defendant is transferred to Lewisburg.  The FDC cannot arrange for treatment of a detainee it does not house.  USP Lewisburg cannot arrange for treatment outside of a certain geographic area.  USP Lewisburg may render an assessment, as it has before and which the defendant found objectionable, that procedures scheduled now can in fact appropriately be delayed.  Alternatively, since USP Lewisburg falls within a different health care network, its providers or contractors may decide that certain procedures and examinations need to be redone.  Allowing the FDC to continue with ongoing arrangements for the defendant's

15

care will avoid the potential for unnecessary duplication and wasted efforts.

The defense has said that the defendant will not consent to further treatment. The defendant, however, has made such claims before, including prior to the June 28 examination, which he ultimately consented to. The defendant has vacillated and made inconsistent requests for relief over the course of this case, requesting movements and medical care that he later objects to. It would be prudent and would conserve resources to provide the chance for the recommended procedures and follow-up appointment to occur in a manner that does not interrupt the defendant's continuity of care, not only because this will benefit the defendant but because it will allow for resolution of matters that are otherwise likely to generate and prolong litigation.

A transfer at this time would, at best, only delay the defendant's care. Days pending and during any transfer would be lost. Upon arrival at USP Lewisburg or another facility, the defendant would undergo screening and perhaps a quarantine that could also delay care. Absent a transfer, such delays would be unnecessary. Insofar as the defendant's own desire for a transfer (and stated intention to refuse further care) is motivated by his objection to placement in the FDC's Special Housing Unit, the defense merely assumes a transfer will change this type of placement when there is no such guarantee.

More generally, Courts have repeatedly recognized that the "open ended" grant of authority to the USMS:

> favors judicial deference to the USMS regarding the placement of detainees. *Cometa v. Doe*, 2018 WL 11247169, at *1 (M.D. Fla. Aug. 15, 2018). The USMS must evaluate many complexities in determining placement, including "expense, administration, payment, [and] access to the premises," *Saunders v. United States*, 502 F. Supp. 2d 493, 496 (E.D. Va. 2007), as well as whether a facility "ha[s] room to house a prisoner, whether appropriate medical or psychiatric care is available for an inmate's specific needs, whether the inmate must be separated from other inmates in the custody of the Marshal, [and] whether the inmate will have reasonable access to his attorney given his proximity," *United States v. Espinoza-Arevalo*, 2015 WL 9598299, at *5 (W.D. Mo. Dec. 30, 2015).

> In light of the USMS's broad grant of authority and its important policy interests, district courts have uniformly concluded that determining a detainee's placement is within the sole discretion of the USMS and, where applicable, have refused a detainee's request to be transferred to another facility.

*United States v. Thomas*, No. 3:20-CR-51 (SRU), 2022 WL 2315624, at *4–5 (D. Conn. June 28, 2022). Transportation of a detainee is not without its own costs, security concerns, resource allocation, and logistics, which are independent of housing concerns. Efforts to minimize the need for transportation and changes in housing are appropriate.

Accordingly, the United States urges this Court to refrain from requesting or recommending the defendant's transfer until after his follow-up examination. After the date of the follow-up, the United States can file a report with this Court and the Court can then make a recommendation, if any, should the Court still consider a transfer to outweigh other concerns. Similarly, the United States requests that the Court refrain from making any order for a transfer applicable "forthwith," since that term signifies an immediacy which may be inconsistent with the USMS's needs to plan for secure transportation and ensure that necessary resources and logistics are available.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:    *s/Karen Rochlin*
Karen Rochlin
Assistant United States Attorney Detailee
DC Bar No. 394447
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov