# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case Number 21-CR-537 (JMC)** |
| **RYAN SAMSEL,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT RYAN SAMSEL'S MOTION FOR PRETRIAL RELEASE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to Defendant Ryan Samsel's Motion for Release, ECF 264, and the defendant's supplement to that motion, ECF 265. The defendant's filings showcase Mr. Samsel's continued willingness to spin falsehoods as a means of securing release from pretrial detention: they include photographs he staged, assault allegations he unambiguously mischaracterized to the Court as recently as the August 30, 2023, hearing, and medical issues he continues to exaggerate, if not invent. Even if the motion were premised on factually accurate information, the legal arguments in support of the defendant's motion have by and large already been briefed and rejected by this Court and the Court of Appeals for the District of Columbia. Although the defendant demands relief based on recycled assertions that his pretrial detention precludes access to counsel, he actually has the ability to communicate with counsel, but does not do so, instead holding lengthy media interviews on contraband cell phones.

Fundamental to the defendant's temporary release and due process arguments, the defendant's motion should be denied, because he has continued to demonstrate that he presents a danger that forecloses conditions of release to reasonably assure the safety of the community. For

example, while in custody awaiting trial in this matter, the defendant wrote "I also belive [sic] when I get on the new's I'll tell people get your wepon's ready kiss your kidd's good by and let's fucking go! … I will die happy now after all this government has done to me hell pay back's." Such overt demonstrations of violent intent, coupled with his inability to follow even the most basic rules while in Bureau of Prisons ("BOP") custody, show the unlikeliness that he would comply with any set of pretrial release conditions the Court might impose.

## **BACKGROUND**

I.     Procedural History

On January 29, 2021, Magistrate Judge Zia M. Faruqui issued an arrest warrant charging the defendant with offenses stemming from his actions on January 6, 2021, the date that a joint session of the United States Congress had convened to certify the vote count of the Electoral College of the 2020 Presidential Election. The operative indictment in this case, issued by the grand jury on February 15, 2023, charges the defendant with Obstruction of Law Enforcement During a Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2 (Counts One and Eleven); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, Inflicting Bodily Injury, and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1), (b), and 2 (Counts Two, Three, and Thirteen); Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) (Count Twelve); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A) (Count Five); Disorderly Conduct And Violence In A Restricted Building Or Grounds With A Deadly Or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A) (Count Six); Engaging in Physical Violence In A Restricted Building Or Grounds With A Deadly Or Dangerous Weapon, Resulting in Significant Bodily Injury, and Aiding and Abetting,

in violation of 18 U.S.C. §§ 1752(a)(4), (b)(1)(A), (b)(1)(A), and 2 (Count Seven); two misdemeanor counts for Disorderly Conduct And Violence In A Capitol Building Or Grounds, in violation of 40 U.S.C. § 5104(e)(2) and 18 U.S.C. § 2 (Counts Eight and Nine); and Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Ten). ECF 45.

The defendant was first ordered detained by a Philadelphia magistrate judge and again before a magistrate judge in this District. He first moved to revoke the order for his pretrial detention on May 24, 2021, ECF 23. After briefing and oral argument, this Court denied the motion. Minute Entry June 4, 2021. The defendant moved to revoke pretrial detention a second time on April 1, 2022, ECF 142, which the Court again denied, ECF 161. The defendant appealed to the Court of Appeals for the District of Columbia, which affirmed this Court's decision. *United States v. Samsel*, No. 22-3034 (D.C. Cir. July 22, 2022) (*per curiam*); ECF 196-1. On September 2, 2022, the defendant moved for a third time for release from custody, this time seeking temporary release under 18 U.S.C. § 3142(i), alleging that release was justified on two grounds: that Federal Detention Center Philadelphia ("FDC Philadelphia"), where he was detained at the time, inhibited his ability to prepare his defense, and release was required for him to receive urgently needed medical treatment. ECF 191. The Court denied this motion, finding "neither of the reasons identified by Defendant to be sufficiently compelling as to justify his temporary release under 18 U.S.C. § 3142(i)." October 3, 2022 Minute Order.

Trial was originally set in this matter for March 6, 2023. May 3, 2022 Minute Entry. The defendant moved to continue this trial date. ECF 229. After trial was reset to April 24, 2023, the defendant joined the other parties in an additional continuance motion, resulting in the current October 23, 2023, trial date.

II.    Chest surgery evaluations

In denying the defendant's second motion for pretrial release, the Court ordered that the government transfer the defendant to the University of Pennsylvania Medical Center to evaluate whether and to what degree of urgency he required surgery on his chest. ECF 159. On June 28, 2022, the defendant was taken for a medical evaluation, which resulted in a decision to arrange for additional scans, consisting of a chest x-ray, mammogram, and ultrasound before another follow up at the University of Pennsylvania, which the examining physician sought at a date "in approximately four weeks." On July 21, 2022, the defendant refused to undergo the chest x-ray. On August 2, 2022, the defendant received a mammogram and ultrasound, which resulted in no suspicious findings. On August 8, 2022, the defendant was examined by an Assistant Professor of Surgery, who discussed the results of the tests with the defendant; namely, that there were no suspicious findings seen on the recent imagings. *See* ECF 189.

In denying his third motion for release, the Court again directed the government to facilitate evaluation as to whether chest surgery was necessary. Minute Order October 3, 2022. On November 19, 2022, the defendant received a consultation from an outside vascular surgeon, who did not recommend surgery. *See* Exh. 3. On December 16, 2022, the defendant moved the Court to order the BOP to provide chest surgery. ECF 229. The Court denied this motion, finding that the defendant failed to show that he was receiving inadequate medical treatment that resulted in his alleged inability to prepare for trial. Jan. 30, 2023 Minute Order.

III.    Transfer to MDC Brooklyn

The defendant was transferred to Metropolitan Detention Center Brooklyn ("MDC Brooklyn") on April 25, 2023. The defendant was in general population at MDC Brooklyn from the date of his arrival until August, 2023, when he was placed in the facility's Special Housing

Unit ("SHU") for violations of BOP policy. In particular, on August 28, 2023, after a hearing with the defendant, a Discipline Hearing Officer issued a report finding that the defendant possessed and used an unauthorized cell phone over the course of several months at MDC Brooklyn. *See* Ex. 2.

The MDC Brooklyn officer found that the defendant used this cell phone between April and July 2023 to call individuals outside BOP's monitoring system, speak with members of the news media, and post on social media. Between April 26, 2023 and July 24, 2023, at least one video interview and 12 audio interviews featuring the defendant were posted online.[1] The defendant also began operating a Twitter (or "X") account[2] from MDC Brooklyn on May 23, 2023

---

[1] https://rumble.com/v2knmhw-ryan-samsel-calls-gateway-pundit-with-breaking-news-on-proud-boys-trial.html (April 26, 2023)
https://rumble.com/v2m92rw-j6-ryan-samsel-ray-epps-cruel-and-unusual-day-848-justice-in-jeopardy.html (May 5, 2023)
https://rumble.com/v2m8idg-j6-political-prisoner-speaks-out-jim-jordan-and-congress-abandon-j6ers-in-d.html (May 5, 2023)
https://rumble.com/v2n4b3u-cowboy-logic-051323-ryan-samsel-j6er.html (May 13, 2023)
https://rumble.com/v2pduk4-j6-prisoner-ryan-samsel-describes-brutal-beatings-by-prison-guards-as-he-aw.html (May 22, 2023)
https://rumble.com/v2pv19q-ryan-samsel-tortured-and-caged-846-days-and-counting-.....html (May 24, 2023)
https://twitter.com/i/spaces/1gqxvygYYoAJB?s=20 (May 26, 2023)
https://rumble.com/v2qsv80-j6-ryan-samsel-twitter-space.html (May 29, 2023)
https://frankspeech.com/video/tamara-scott-show-david-sumrall-ryan-samsel (June 5, 2023)
https://www.bitchute.com/video/G8jgsQzcUQSG/ (June 23, 2023)
https://rumble.com/v2wqzy0-j6er-ryan-samsel-thanks-the-gateway-pundit-readers-for-calls-and-protest-to.html (June 27, 2023)
https://rumble.com/v2x8lpk-never-before-seen-j6er-interviews-with-video-from-inside-d.c.-gulag-and-beg.html (June 30, 2023)
https://rumble.com/v326bg0-j6-justice-in-jeopardy-day-929-ryan-samsel-offensive-action.html (July 24, 2023)

[2] While the account is not marked "verified" by Twitter/X, the account username is Samsel_Ryan, the publicly displayed name is "Ryan Samsel," and the picture associated with the account is a photograph of the defendant that appears to have been taken near the U.S. Capitol on January 6, 2021. The first post from the account was dated May 23, 2023, less than one month after the defendant began using an unauthorized cell phone to speak with news media at MDC Brooklyn, and the most recent post is dated August 6, 2023, days before his use of an unauthorized cell phone

and posted to it regularly for months until shortly before being placed in the SHU in August.[3]

Of particular concern, the defendant repeatedly posted the phone number for this Court's chambers asking for members of the public to flood chambers with calls:

> • On August 4, 2023, the defendant tweeted, "PLEASE PASS THIS ALONG EVERYBODY RYAN SAMSEL ASK FOR THE PUBLIC TO CALL HIS JUDGE IN SUPPORT OF MEDICAL HELP PLEASE CALL JUDGE COBB AND LEAVE A MSG EVERYDAY PLEASE WE BEG FOR PUBLICS HELP JUDGE JIA COBB [phone number omitted] PASS THIS AROUND WE NEED HELP THE MORE THE BETTER OF CHANCE."[4]

> • On July 15, 2023, the defendant posted chambers' phone number and a link to an unauthorized recording of the Court's January 13, 2023 hearing. The defendant wrote, "I have not received medical yet please help by calling judge jia cob at [phone number omitted] in support of my pretrial release for medical as Americans we are innocent b4 proven guilty by our peers,Help pass this along J6er Ryan Samsel Speaks At 1-13-23 Hearing"[5]

> • On June 25, 2023, responding to a post that was later deleted, the defendant stated, "Please pass this along and i also ask for ppl to show this to judge jia cobb who belives that no violation took place. Rember i have been denied all medical treatment to this date bc of judge jia cobb DC district judge."[6]

> • On June 7, 2023, the defendant posted a photo of himself with his head wrapped in a bandage, along with the text, "Please pass this along to everyone you know and email this to judge Jia Cobb as she could have prevented this but due to her strong hatred toward me others have suffered email her her hate has been turned into love [chambers' email address omitted]."[7]

---

was detected and he was placed in the SHU.

[3] Although pretrial detainees can communicate via email with friends and family, they are not permitted to have general internet access.

[4] https://twitter.com/samsel_ryan/status/1687622245441581057?s=20.

[5] https://twitter.com/samsel_ryan/status/1680404214902661122?s=20.

[6] https://twitter.com/samsel_ryan/status/1673031941296369664?s=20.

[7] https://twitter.com/samsel_ryan/status/1666548012762497024.

The defendant also appears to have used a cell phone or camera to stage photographs of manufactured squalor at MDC Brooklyn. Specifically, photographs the defendant shared with news media—and included in support of the present motion, ECF 264 at 5—show the defendant cramped in a broom closet as if it were his cell. A BOP employee confirmed that the broom closet is readily accessible by MDC Brooklyn pretrial detainees in general population to access cleaning supplies. The defendant can be seen in the broom closet in the standard boxer shorts issued to MDC Brooklyn pretrial detainees, posing as if asleep on a yoga mat available to MDC Brooklyn pretrial detainees to use for exercise. At all times at MDC Brooklyn, the defendant was housed in a cell (not a broom closet), with a bed (not a yoga mat), and a jumper, socks, shoes, and t-shirt (not just boxer shorts).

At MDC Brooklyn, pretrial detainees in general population may receive and possess hard drives containing discovery, and they may access this discovery using computers within the general population unit. Within the SHU at MDC Brooklyn, pretrial detainees may not possess hard drives in their cell, but they may request computer access to review discovery in a designated area of the SHU. Legal counsel may schedule VTC or phone calls with clients in pretrial custody at MDC Brooklyn through an online portal. *See* https://www.federaldefendersny.org/mdc-legal-calls-faq. Attorneys and attorney support staff may visit pretrial detainees in person any time during legal visiting hours without making an appointment in advance; legal visiting hours at MDC Brooklyn run from 8 a.m. to 7 p.m. on weekdays, and from 8 a.m. to 3 p.m. on weekends. During in-person legal visits, the legal visitor can review audio and video discovery with her or his client.

On August 20, 2023, shortly after the defendant was placed in the SHU pending a hearing on the incident report he received for violating MDC Brooklyn rules concerning unauthorized phone usage, he was in a physical altercation with his cellmate. At an August 30, 2023 hearing

before this Court, the defendant stated on the record that as a result of this altercation, his tooth was cracked, a nerve was exposed, and he was rendered unable to eat or drink anything for six days.[8] The defendant said he feared his condition was life threatening and that MDC Brooklyn had ignored all of his entreaties for help.

Medical records obtained after this hearing show that the defendant grossly misrepresented this episode. The records reflect that the defendant was seen by medical staff the day *before* the fight occurred, and he reported, "I was chewing on something, and [my tooth] broke off." Ex. 1 (08/19/23 report). He was prescribed ibuprofen, and the dental duty officer was notified. *Id*. On August 22, 2023, two days after the reported fight, the defendant was treated for bruising on the right side of his face and scattered abrasions on the side of his face and neck sustained during the altercation. *Id*. (08/22/23 report). On August 22 and 25, 2023, the defendant was also treated by medical staff for gastrointestinal complaints, vomiting and loss of appetite as a result of no longer having access to suboxone, which he reported purchasing from other detainees and taking daily prior to entering the SHU. *Id.* (08/22/23 and 08/25/23 reports). On August 30, 2023,[9] the defendant was seen by both a doctor and a nurse; this time, he requested suboxone for one day to "help him detox." *Id.* (08/30/23 report). On August 30, 2023 (after the hearing before this Court), the record reflects that the defendant requested follow up for his tooth and informed the doctor that he needed surgery on his chest. *Id.* As set out in the report, the plan was to order medications to treat the defendant's symptoms and schedule a follow-up to discuss his surgery, as requested by the defendant. *Id.*

---

[8] A similar description of the assault was included in a supplement by the defendant to the present motion filed on the morning of the Aug. 30, 2023 status hearing in this matter. ECF 265 at 1-2.

[9] The listed time for his visit was 4:30 p.m. on August 30, 2023, which means that this visit occurred just hours after the 10:30 a.m. hearing before this Court that same day.

In summary, the defendant broke a tooth before the assault; medical staff responded and treated the defendant. The defendant got into a fight with his cellmate; medical staff responded and treated the defendant. The defendant suffered from gastrointestinal issues because of suboxone withdrawal; medical staff responded and treated the defendant. After the hearing, the defendant met with medical staff and informed them that he needed surgery.

## **LEGAL STANDARDS**

### I. Temporary Release, 18 U.S.C. 3142(i)

Under Section 3142(i), a court that has ordered a defendant's detention "may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or other appropriate person, to the extent that the judicial officer determines such release to be necessary to the preparation of a person's defense or for another compelling reason." 18 U.S.C. § 3142(i). This provision applies in "extraordinary circumstances." *United States v. Rebollo-Andino*, 312 Fed.Appx. 346, 348 (1st Cir. 2009); *United States v. Hill*, No. 3:17-CR-276, 2020 WL 4208936 at *2 (M.D. Pa. July 22, 2020) ("Release under § 3142(i) is intended for 'extraordinary circumstances' which are exceedingly rare") (quoting *Rebollow-Andino*); *United States v. Blue*, No. ELH-19-286, 2020 WL 60443328 at * 4 (D. Md. Oct. 9, 2020) ("courts have invoked § 3142(i) parsimoniously and for truly extraordinary circumstances"). A defendant moving under Section 3142(i) bears the burden of showing that he is entitled to relief. *United States v. Chansely*, 525 F.Supp.3d 151, 160 (D.D.C. 2021); *United States v. Riggins*, 456 F.Supp.3d 138, 149 (D.D.C. 2020).

### II.     Due Process Clause

In the context of pretrial detention, the Due Process Clause requires that one's detention while awaiting trial be for the purposes of "permissible regulation" rather than "impermissible

punishment." *United States v. Salerno*, 481 U.S. 739, 747 (1987). To this end, "it is well-settled that so long as pretrial detention is administrative rather than punitive, it is constitutional." *United States v. El-Hage*, 213 F.3d 74, 79 (2d Cir. 2000). There is not a particular length of time when pretrial detention becomes impermissible punishment rising to the level of a Due Process Clause violation; this analysis requires "case-by-case" examination. *United States v. Briggs*, 697 F.3d 98, 101 (2d Cir. 2012). When analyzing whether a defendant's pretrial detention violates the Due Process Clause, courts have considered the length of the detention, the extent of the prosecution's responsibility for delay of the trial, the gravity of the charges, the complexity of the case, and the strength of the evidence upon which detention was based. *El-Hage*, 213 F.3d at 79; *Briggs*, 697 F.3d at 101; *United States v. Nordean*, No. CR 21-175 (TJK), 2022 WL 2292062, at *2 (D.D.C. June 24, 2022); *United States v. Hare*; 873 F.2d, 796, 801 (5th Cir. 1989). "While the length of pretrial detention is a factor in determining whether due process has been violated, the length of detention alone is not dispositive and 'will rarely by itself offend due process.'" *United States v. El-Hage*, 213 F.3d at 79 (quoting *United States v. Millan*, 4 F.3d 1038, 1044 (2d Cir. 1993)).[10]

## ANALYSIS

The defendant's two arguments for temporary release from custody under Section 3142(i) are nearly identical to the two he raised last year arguing for temporary release. They were denied then and are equally meritless today. The defendant's chest surgery is not urgent—certainly not so

---

[10] The defendant filed the motion with the Court under the title "Motion for reconsideration of detention order . . . ," but the only two legal bases identified in the motion itself are the Fifth Amendment's Due Process Clause and 18 U.S.C. § 3142(i). To the extent that the defendant also seeks to reopen his detention hearing, he has failed to identify any new or material information sufficient to reopen the detention proceedings under 18 U.S.C. § 3142(f). *See United States v. Bikundi*, 73 F. Supp. 31, 55 (D.D.C. 2014) (quoting *United States v. Ali*, 534 Fed.Appx. 1, 2 (D.C. Cir. 2013) (per curiam)) ("[M]ere passage of time, without a substantial change in the underlying reasons . . . for pretrial detention is generally not sufficient to warrant reconsiderations, particularly where a trial date has been set in the near future.").

urgent that it must take place before his Oct. 23, 2023 trial date—and the defendant continues to have access to counsel and electronic discovery while in the SHU at MDC Brooklyn. The defendant's due process argument falls equally flat when his pretrial detention is considered against the ample and ever-growing evidence supporting his pretrial detention under the Bail Reform Act, the severity and complexity of the charges against him, and the defendant's own contributions to the delay of his case reaching trial.

I. The Defendant's Arguments For Release Under Section 3142(i) Are Meritless

Under extraordinary circumstances, a district court may permit the "temporary release" of a defendant who has been detained. 18 U.S.C. § 3142(i). The defendant's motion, however, does not appear to seek his release on a temporary basis. His motion invokes Section 3142(i) on two separate grounds, but he provides no end date for the "temporary" release for either reason. Insofar as the defendant demands release that is either permanent or indefinite, the relief he seeks exceeds what the statute allows. To obtain temporary release, the defendant must show that such release is "necessary for preparation of [his] defense or for another compelling reason." The defendant has not made this showing.

A. *Temporary release for the defendant to receive chest surgery is wholly unjustified.*

First, the defendant argues that the Court is "required" to release him from custody to obtain chest surgery, cursorily citing Section 3142(i) without reference to any case law supporting the proposition that temporary release to obtain medical treatment could be justified here under Section 3142(i). The defendant cites zero new information that, if found credible, would reflect that his need for chest surgery has become more urgent than it was during the prior occasions when the Court considered this issue. That fact itself supports the opposite conclusion that there is no exigent need for this surgery within the next two months, prior to the October 23 trial date in this

matter. Even if Section 3142(i) were a low bar for individuals to meet—rather than one reserved for "extraordinarily rare" circumstances, as courts have consistently held—the defendant would still fail to meet it here given the absence of evidence supporting his motion.[11]

> B.  *Temporary release under Section 3142(i) for trial preparation is equally unjustified.*

Alternatively, the defendant claims his inability to prepare for trial at MDC Brooklyn constitutes a second extraordinary situation justifying his temporary release under Section 3142(i). While release for trial preparation is more commonly raised under this provision, the defendant again comes nowhere close to justifying release on this basis.

By the defendant's own articulation of the legal standard governing Section 3142(i), ECF 264 at 17, two factors must be shown for temporary release to be justified: (1) that his temporary release is necessary for the preparation of his defense or another compelling reason; and, (2) that he could be released to the custody of an "appropriate person." *United States v. Dhavale*, No. 19-MJ-00092, 2020 WL 1935544 (D.D.C. Apr. 21, 2020).

Nowhere in the motion does the defendant address the second factor: that there is a suitable individual to assume custody over the defendant if he were to be temporarily released to prepare for trial. Only in the concluding section of the motion does he state, "Upon the issuance of such an Order, the defendant will provide to the Court a release plan including a location for him to reside and a suitable third-party custodian." This failure alone justifies denial of temporary release.

The defendant's motion for temporary release under Section 3142(i) is also deficient because of his failure to show that temporary release is necessary for the preparation of his defense. He briefly identifies two justifications: first, that he cannot review video evidence without counsel

---

[11] The defendant also fails to provide where this operation might occur, when this facility could potentially schedule this operation, and, particularly relevant to the October 23 trial date, what the expected recovery time for this surgery might be and how that may impact the defendant's ability to prepare for trial.

present, and second, that the injuries, relocations, and assaults he alleges have "worked to undermine the working relationship between the defendant and his counsel of choice by creating obstacles to his ability to meaningfully contribute to and assist in the preparation of his defense."[12] ECF 274 at 18. Judge Kollar-Kotelly rejected an application under Section 3142(i) under similar circumstances where the defendant abused confidential attorney-client communications opportunities to instead participate in media interviews, *Chansely*, 525 F.Supp.3d at 172. Here, the defendant used a contraband cell phone for public conversations with bloggers instead of private conversations with his attorney, but the reasoning in *Chansely* applies with equal force. As noted above, MDC Brooklyn has well-established systems to provide defendants with access to discovery and video conferencing with lawyers. The defendant's willful refusal to take advantage of those systems, favoring instead, interviews with the media, undermines his claim that he does not have opportunities to work with defense counsel in preparation for trial.

To the extent that the motion for temporary release asserts that the defendant must personally review each and every item produced in discovery, the motion is incorrect. *See* Tr. at 65; *see also, United States v. Celis,* 608 F.3d 818, 840-41 (D.C. Cir. 2010) (rejecting argument that it was necessary to translate all discovery material for represented defendant who was detained and did not speak English); *Carillo v. United States,* 995 F. Supp. 587, 591 (D.V.I. 1998) ("[T]here is no constitutional duty to share discovery documents with petitioner. Petitioner cites no case law for this proposition, and this court finds none"); *United States v. Ingram*, No.

---

[12] The defendant also raised that it is burdensome for his defense counsel to travel to MDC Brooklyn to meet with the defendant for trial preparation and to meet with him during trial outside of the courtroom. While the government does not view the defendant's location at a federal facility in a major metropolitan area accessible via 1.5-hour flight from this District as a circumstance so extraordinary as to warrant temporary release under Section 3142(i), the government spoke with U.S. Marshals Service personnel familiar with this matter, and they explained that the defendant will be transferred to a facility in the D.C. metropolitan region the week prior to trial until the proceedings conclude.

3:19CR113-MCR, 2021 WL 4134828, at *3 (N.D. Fla. Sept. 10, 2021) (professional obligations of defense counsel did not mandate that defendant see every item of available discovery material and court was not aware of any such constitutional requirement); *United States v. Thompson*, No. 2:10-CR-200-DBH, 2013 WL 1809659, at *6–7 (D. Me. Apr. 29, 2013) (rejecting argument that defendant needed to personally review discovery in order to enter valid plea because Courts appoint lawyers for defendants in criminal cases so that the lawyers can do the legwork in preparing for trial and give sound advice about whether a defendant should go to trial or plead guilty), *aff'd*, 851 F.3d 129 (1st Cir. 2017); *United States v. Stork*, No. 3:10-CR-132 JD, 2014 WL 1766955, at *7 (N.D. Ind. May 1, 2014) (a defendant represented by counsel does not have a right under either the Constitution or the Federal Rules of Criminal Procedure to be provided with discovery personally) (collecting cases); *United States v. Neff*, No. 3:11-CR-0152-L, 2013 WL 30650, at *6 (N.D. Tex. Jan. 3, 2013) ("Contrary to what Defendant contends, he does not have a constitutional right to a personal laptop to help his attorney prepare his defense. Defendant is represented by counsel, who does not have any limitations on computer access or usage"), *aff'd,* 544 F. App'x 274 (5th Cir. 2013); *cf. United States v. Faulkner*, No. 3:09-CR-249-D(02), 2011 WL 3962513, at *4 (N.D. Tex. Sept. 8, 2011) (denying motion to continue trial because detained but represented defendant had not completed review of digital discovery); *see also United States v. Deering*, 179 F.2d 592, 596 (8th Cir. 1999) (holding district court did not abuse its discretion in failing to permit a defendant the right to personally inspect the government's "open file" and instead permitting his stand-by counsel to do so).

Read in the best light for the defendant, his motion identifies inconveniences pertaining to trial preparation resulting from his detention. Courts have consistently rejected claims that the inconveniences of detention are adequate grounds for temporary release. *United States v. Otunyo*,

No. CR 18-251 (BAH), 2020 WL 2065041, at *10 (D.D.C. Apr. 28, 2020) (agreeing that if every pretrial detainee is entitled to temporary release to aid working with counsel, then the exception in Section 3142(i) would swallow all detention orders) (internal citations and quotations omitted); *Krol*, 2022 WL 16948611, at *12 ("Although Krol himself may not be allowed access to electronic devices, his defense counsel has not averred that counsel is barred from bringing electronics into the jail to show Krol the relevant video evidence. The limitation on Krol's access, while inconvenient, does not lead the Court to conclude that release would be *necessary* for Krol to participate in his defense"); *United States v. Buswell*, No. 11-CR-198-01, 2013 WL 210899, at *7 (W.D. La. Jan. 18, 2013) (90-minute commute to jail and complexity of case with thousands of documents requiring thousands of hours to review was common to all incarcerated defendants and did not justify release); *Petters*, 2009 WL 205188, at *2 ("While this case may, in fact, be complicated and require Defendant to review hundreds if not thousands of documents and meet with his lawyers for dozens of hours, that fact, standing alone, simply does not justify Defendant's release" and "accepting such an argument would mean that the more complicated the crime, the more likely a defendant should be released prior to trial. This is clearly an absurd result"); *United States v. Blue,* No. CR ELH-19-286, 2020 WL 6044328, at *7 (D. Md. Oct. 9, 2020), *appeal dismissed*, No. 21-4500, 2021 WL 7569805 (4th Cir. Sept. 23, 2021) (defendant's detention at Northern Neck, a two and one half hour commute from the courthouse, was an inconvenience and did not establish necessity required for temporary release under Section 3142(i)).

The defendant's attempt to utilize Section 3142(i) is deficient in several respects. This Court should deny his application for temporary release.

II.     The Defendant's Detention Does Not Violate Due Process

Finally, the defendant argues that his continued pretrial detention violates his right to due process under the Fifth Amendment. Thirty-three months is a significant length of time for one to remain in pretrial detention, but the duration of custody by itself will rarely support a finding that pretrial detention has become punitive absent corroboration from other relevant considerations. *E.g.*, *United States v. El Hage*, 213 F.3d 74, 79 (2nd Cir. 2000) (addressing 30-33 month period of detention); *United States v. Nero*, No. 17-CR-20183-5, 2021 WL 1137988 at *3 (E.D. Mich. Mar. 25, 2021) (defendant's detention of 45-54 months was not unprecedented; rejecting claim of due process violation and collecting cases with similar periods of detention), *aff'd*, 854 Fed.Appx. 14 (6th Cir. 2021).

Here, while the defendant has remained in custody awaiting trial for a long period of time, this has occurred despite the government's efforts to advance this case to trial, not because of any failure by the prosecution. The defendant's continued detention is further supported by the overwhelming evidence justifying the defendant's detention—evidence that has only grown during this period of detention—the seriousness of the charges, and the complexity of the defendant's case. These considerations make clear that the defendant's detention continues to accomplish the permissible, regulatory pursuit in bringing the defendant to trial expeditiously while protecting the safety of the community.

The defendant cites *United States v. Zannino*, 798 F.2d 544, 548 (1st Cir. 1986) to establish the framework for his argument, but this case demonstrates the importance of considerations aside from the length of pretrial detention where the dangerousness of a defendant to the community has been clearly established, where delay is attributable in part to the defendant's medical conditions, and where the government has fastidiously sought to advance the case to trial. The First Circuit

emphasized the importance of examining the cause of the delay and the evidence indicating the dangerousness of a defendant, "[o]therwise, courts often would be forced by the duration of detention alone to release a palpably dangerous defendant." *Id.* at 548. Consideration of those additional factors here—the gravity of the charges, the evidence justifying detention, the complexity of the case, and whether the government is responsible for the delay—establish that the defendant's detention does not offend due process.

*A. The Charges Against the Defendant Are Serious.*

"The gravity of the conduct that occurred at the U.S. Capitol on January 6, 2021, cannot be understated." *United States v. Sabol*, 534 F.Supp.3d 58, 71 (D.D.C. 2021); *see also United States v. Cua*, No. 21-107 (RDM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) ("This was a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself"). During the course of the January 6, 2021, siege of the U.S. Capitol, multiple law enforcement officers were assaulted by an enormous mob, which included numerous individuals armed with baseball bats, stun guns, fireworks, and pepper spray, among other dangerous weapons.

The defendant was a singular, pivotal part of the mob that stormed the Capitol that day. He walked at the front of the very first group of individuals who violently breached the restricted perimeter on U.S. Capitol grounds. The defendant assaulted several law enforcement officers with weapons including a metal fencing barricade and 2x4 piece of wood, and interfered and impeded law enforcement officers by shoving, and yelling at them, grabbing on to an officers' riot shield and waiving a flag in their faces, obscuring their view of the riotous crowd. The defendant and his co-defendants set the tone of brazen violence that would eventually drive the Congressional proceedings to a halt for hours.

The defendant is charged with four separate counts for assaulting police officers, a felony count for obstructing the official proceeding to certify the 2020 Electoral College vote, and additional felony charges for his violent and disruptive conduct on Capitol grounds. He is recorded from various angles on video from several independently verifiable sources as he and his co-defendants drove metal bike racks into Capitol Police officers. The defendant did not stop there. Further video evidence captures the defendant storming onto the West Plaza area of the Capitol grounds, where he fought with police officers, screamed in their faces, made obscene gestures toward them, and threw a two-by-four plank of wood at officers as they attempted to defend the Capitol building from the crowd of rioters. Such conduct implicates "grave concerns." *See Chrestman*, 525 F.Supp.3d at 26-27. Several of the assault counts against the defendant carry a statutory maximum penalty of incarceration for 20 years. If convicted of Count Two of the indictment, charging the defendant with 18 U.S.C. 111(b), the defendant's recommended sentencing range under the U.S. Sentencing Guidelines would likely be 151–188 months.[13] By any measure, the charges against the defendant are grave, and he is facing a minimum recommended range of 12.5 years in jail. This factor weighs against any argument for release based on due process concerns.

### B. The Prosecution Has Not Delayed This Case.

The government has diligently worked to advance this case toward trial since its inception. The defendant conflates the government's motions to toll time under the Speedy Trial Act due to the volume of discovery in the broader January 6, 2021 investigation as being the proximate cause

---

[13] The defendant has a Criminal History Category of at least IV. Count Two of the Indictment has an estimated total offense level of 31 based on a Base Offense Level 14 under U.S.S.G. § 2A2.2(a), use of a dangerous weapon enhancement adding 4 levels under U.S.S.G. § 2A2.2(b)(2), causing serious bodily injury adding 5 levels under U.S.S.G. § 2A2.2(b)(3), an additional two points for conviction under 111(b) under U.S.S.G. § 2A2.2(b)(7) and additional 6 points for an official victim under U.S.S.G. § 3A1.2.

for all delays in this case, but that is highly reductive and contrary to the particular facts of this case. In fact, as early as September 23, 2021, the government moved the Court, when Judge Timothy J. Kelly was presiding over the matter, to set a January 13, 2022, trial date, ECF 52, though the Court declined to do so. *See* Minute Order September 28, 2021. Trial was later set in this matter for March 6, 2023. *See* May 3, 2022 Minute Entry. The defendant moved to continue this trial date. ECF 229. After trial was reset to April 24, 2023, the defendant joined the other parties in an additional continuance motion, ECF 248, resulting in the current October 23, 2023, trial date.

In addition to the complexity of this case and the significant pretrial litigation that has taken place, this case was also slowed by the Covid-19 pandemic's impact on this District. The global pandemic has forced courts to adapt in unprecedented ways and cannot be blamed on the United States or the defense. *E.g.*, *United States v. Nero*, 854 Fed.Appx. 14, 18 (6th Cir. 2021) (when the delay is attributable to the Covid-19 pandemic, courts have concluded that the delay is beyond the government's control); *United States v. Nikparvar-Fard*, No. CR 18-101-1, 2021 WL 2160545, at *5 (E.D. Pa. May 27, 2021) (stating that the judicial system's response to a public health crises and suspension of trials was not attributable to either party); *United States v. Shipp*, No. 19-CR-29 (NGG) 2020 WL 3642856 *3 (stating that the significant length of the defendant's pretrial detention did not violate due process in light of the extenuating circumstances of the Covid-19 pandemic and the danger the defendant presented to the community).

### C. Evidence Supporting The Basis of The Defendant's Detention Is Strong

The decision to detain the defendant and the evidence supporting that decision have withstood appellate review, providing at least one reason to conclude that the evidence for detention is strong. The defendant offers no new evidence that undermines this Court's original

findings or the reasoning of the D.C. Circuit. Footage from a variety of sources show that the defendant disobeyed, interfered with, and assaulted uniformed police officers for hours. Anti-riot measures, including the use of tear gas and pepper spray did not deter him. He led and encouraged and joined with others attempting to breach police lines and assault officers. He seriously injured at least one officer. Indeed, the evidence supporting detention has only grown stronger since this Court's original determination: 1) The defendant is now charged with an additional assault against police officers; 2) the United States has a recording of the defendant expressing his intention to injure law enforcement officers; 3) The defendant has written a letter explaining that he wishes to incite additional violence and encourage the public to grab their weapons; and 4) The defendant has engaged in obstructive behavior, including the falsifications offered to support his pending motion for release.

Beyond the defendant's activities on January 6, 2021, the defendant has a long and violent criminal history including convictions for felony counts of witness intimidation and simple assault. In fact, the defendant committed the crimes in this case while on parole in the state of Pennsylvania, further demonstrating his complete lack of respect for the law and the mandates of any court.

The defendant's BOP disciplinary record generated since his arrest only strengthens the case for his detention. Even within the controlled environment of various detention facilities, the defendant has persistently flaunted BOP rules and regulations, and he has further shown the danger he would pose to the community if released. For example, on June 2, 2022, FDC personnel screened an outgoing letter from the defendant where he stated, "all these poltions in office need to go, A woodchiper sounds good" and "I also belive when I get on the new's I'll tell people get your wepon's ready kiss your kidd's good by and let's fucking go! … I will die happy now after

all this government has done to me hell pay back's."

The defendant would not abide by any conditions this Court might impose to ensure the safety of the community if the defendant were released. Just this year the defendant has shown a brazen willingness to attempt to mislead or interfere with the administration of his case. As discussed above, the defendant appears to have used a contraband cell phone to post hostile remarks toward this Court and to post the address and phone number of chambers. The defendant appears to have crudely staged photos of his purported conditions of incarceration, and as recently as August 30, showed no hesitation in making false statements to the Court on the record.

The evidence supporting the defendant's detention was abundant when he was first detained, and it has only grown since. This factor weighs heavily against finding a Due Process Clause violation.

D. *The Complexity Of This Case Warrants The Defendant's Continued Pretrial Detention.*

The defendant notes that the global discovery production in this case is voluminous, and the government agrees. The volume of materials supports a delayed trial date. *See, e.g.,* 18 U.S.C. § 3161(h)(7)(B)(ii) (complexity is a factor supporting delay for the ends of justice under the Speedy Trial Act). Accordingly, the interests of the defense in reviewing discovery weigh against rather than for finding a due process violation. *See also United States v. Nero*, 2021 WL 1137988 at *2 (E.D. Mich. Mar. 25, 2021) (rejecting due process challenge to 45-54 months of detention where delay resulted from defense counsel's legitimate desire to review an extraordinary amount of material as well as from an unprecedented world-wide pandemic and finding neither party was at fault for delay), *aff'd,* 854 Fed.Appx. 14 (6th Cir. 2021). Particularly in light of the ample pretrial litigation in this case, this factor weighs against the defendant's due process claim.

## **CONCLUSION**

The defendant's alleged lack of medical treatment and lack of ability to prepare for trial are without merit. The defendant has access to counsel and has the ability to review electronic discovery. The adequacy of the defendant's medical care has been established time and again. The defendant's request for temporary release comes nowhere near the required statutory showing, and the defendant's due process claims ring hollow against his misconduct in pretrial custody and his misrepresentations to the Court. His motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    *s/ Joseph Hutton Marshall*
JOSEPH HUTTON MARSHALL/ALEXANDRA F. FOSTER
Assistant U.S. Attorneys
Washington, D.C. Bar Nos. 1721890/470096
601 D Street, N.W.
Washington, D.C. 20579
(202) 809-2166
Joseph.hutton.marshall@usdoj.gov/alexandra.foster@usdoj.gov