# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:21-cr-00537-JMC** |
| | : | |
| **RYAN SAMSEL,** | : | |
| **JAMES TATE GRANT,** | : | |
| **PAUL RUSSELL JOHNSON,** | : | |
| **STEPHEN CHASE RANDOLPH,** | : | |
| **JASON BENJAMIN BLYTHE,** | : | |
| | : | |
| **Defendants.** | : | |

## UNITED STATES' TRIAL BRIEF

The United States, by and through its attorneys, submits this trial brief to summarize the facts of this case and anticipated issues for trial, and to address the issues raised in Johnson's Trial Memorandum and Grant's Trial Brief. ECF 291, 293.

## I.    STATEMENT OF FACTS

The five defendants charged in this case – Ryan Samsel of Pennsylvania, James Tate Grant of North Carolina, Paul Russell Johnson of Virginia, Stephen Randolph of Kentucky, and Jason Blythe of Texas – each travelled to Washington, D.C. intent on blocking the certification of the 2020 Presidential election. Together, they participated in the first breach of the restricted Capitol grounds on January 6, 2021, and led the initial attack on United States Capitol Police (USCP) officers. Their attack paved the way for thousands of rioters to storm the Capitol grounds.

Between approximately 12:40 and 12:50 p.m., defendants Samsel, Grant, Johnson, Randolph, and Blythe joined with other rioters at the Peace Circle, a traffic circle with a large statue in the middle at the end of Pennsylvania Avenue on the northwest side of the Capitol grounds. The sidewalk at the edge of the Capitol grounds across the street from the Peace Circle

statue was blocked by linked bike-rack barricades that had been put in place to mark the western boundary of the restricted area. The Pennsylvania Walkway is a footpath that runs from the West Plaza of the Capitol building to the sidewalk across the street from the Peace Circle statue. A second barricade of bike racks, with signs that read "Area Closed By Order of the United States Capitol Police Board." and reinforced with snow fencing and zip ties, barred the way up the Pennsylvania Walkway towards the Capitol building. At around 12:50 pm, five USCP officers, including Officers D.C. and C.E., were positioned at the top of a staircase and behind the second barricade on the Pennsylvania Walkway. From that elevated vantage point, they could observe a crowd amassing in the Peace Circle. USCP Sergeant T.L., who led their unit that day, was nearby on the West lawn and also observed the crowd as it approached the barricades. By 12:50 p.m., the growing crowd significantly outnumbered police officers.

Undeterred by the barricades and uniformed law enforcement officers, at approximately 12:53 p.m., Samsel opened a section of the first metal bike rack barricade, which demarcated the restricted area, at the sidewalk across from the Peace Circle statue. He walked onto the restricted grounds and toward the officers on the Pennsylvania Walkway. This marked the first breach of the restricted perimeter. The officers descended the stairs to man the barricade on the Pennsylvania Walkway. Grant followed closely behind Samsel and waived the crowd forward onto the restricted grounds. Sergeant T.L. joined C.E., D.C. and three other officers on the Pennsylvania Walkway barricade. Johnson, Blythe and Randolph and others in the crowd followed Grant and Samsel across the first barricade and walked towards the officers standing behind the second barricade. At around that same time, Johnson shouted a series of exclamations, including "Let's go!" "We pay your bills!" and "You back the fuck off!" over his megaphone.

Samsel and Grant began to forcibly push and pull on the barricade. The officers held onto the barricade. Samsel stopped pushing long enough to remove his denim jacket and hand it to someone off-camera and turn his red "Make America Great Again" hat around backwards. Johnson handed off his megaphone and backpack to someone behind him in the crowd. Randolph began to forcibly push and pull on the fence directly across from Officer C.E. Grant, Johnson, and Samsel joined Randolph in lifting the linked metal bike rack barricade off the ground. Blythe moved forward and grabbed the barricade with the other four defendants, and the five defendants drove the metal bike rack barricade into Sergeant T.L. and Officers D.C. and C.E.

As they drove the metal bike rack barricade at the police line, Officer C.E. was struck in the face with one of the bike racks. The force threw her back and caused her to slam her head twice: first against a metal handrail, then against the stairs. She lost consciousness and suffered a concussion. Officer D.C. was driven several feet backwards by the metal bike rack barricade until the back of his body ran into the stairwell and handrail behind him.

After the five defendants pushed the metal bike rack barricade into the USCP Sergeant and Officers, Randolph jumped over the barricade and grabbed Officer D.C. Sergeant T.L. fought to separate Randolph from Officer D.C., but Grant and Blythe then joined in the assault on D.C. and tried to pull D.C. towards the rioters. Another officer intervened and forced Randolph, Grant and Blythe to release Officer D.C. and back away.

By this point, the barricades were down, and the officers outmanned. The defendants and the rest of the rioters quickly overwhelmed the police line, and the USCP officers retreated back towards the Capitol building. The rioters, including the five defendants, walked towards the Capitol building, onto the West Front.

USCP officers, who were eventually reinforced by arriving MPD officers, were able to establish a new defensive line at the West Front. Rioters fought against the police line in this area with makeshift projectiles, chemical spray, and a wide assortment of weaponry brought by members of the crowd or seized from sites under construction for the upcoming inauguration. Officers attempted to disperse and defend against the crowd with non-lethal force, including defensive chemical sprays and flash bangs. These measures, along with a broadcasted dispersal order, were underway while the defendants remained at the Capitol's West Front.

Despite police efforts to disperse the crowd and defend the Capitol, these five defendants continued to fuel the riot by assaulting other officers (Samsel), inciting the crowd over a megaphone (Johnson), entering the Capitol Building (Grant), and climbing to the Upper West Terrace (Randolph and Blythe); all of them remained at the Capitol for hours. Samsel's additional assaultive and destructive conduct included grabbing the riot shield of a law enforcement officer while rioters were attempting to overtake police and penetrate into the Capitol building; tearing through the tarp in the scaffolding on the Capitol grounds; throwing a pole at officers; and taking a 2x4 plank of wood from the scaffolding and throwing it at a group of Metropolitan Police Department (MPD) officers as they struggled to maintain the police line against the attacking mob.

Grant climbed through one of the broken windows next to the Senate Wing Door and into the Capitol building at approximately 2:50 p.m. He then stormed the halls with other rioters and was recorded with others inside Senator Merkley's office. Grant stayed in the Capitol building for approximately 28 minutes.

Blythe stayed on the Capitol grounds for hours. He climbed the media tower at the steps of the Capitol and joined others in resisting officers who were trying to clear rioters off the Upper

West Terrace. At around 4:38 p.m., officers had to forcibly remove Blythe from the area while he fought to resist them.

Johnson moved with rioters to the West Plaza. Using his megaphone, Johnson loudly and continuously shouted commands to the crowd, alerted them to what he perceived to be happening inside the building, and encouraged them to take action to stop the Congressional proceedings taking place inside the Capitol. Johnson referenced Congress, saying that they were "debating because they're scared" of the crowd. He discussed the official proceeding and "the vote" Congress was undertaking inside. He also encouraged rioters to "flank" the building and recruited rioters on the West Front to move around to the East Front to "surround the building."

Randolph also remained on Capitol grounds for hours, eventually climbing onto the Upper West Terrace, where he observed law enforcement engaged in a struggle with rioters inside and outside the inaugural archway (also known as "the tunnel").

For their actions on January 6, 2021, the defendants are all charged with Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2 (Count 1); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon or Inflicting Bodily Injury and Aiding and Abetting, in violation of 18 U.S.C. § 111(a)(1), (b), and 2 (Counts 2 and 3); Entering and Remaining in a Restricted Building or Grounds while Using or Carrying a Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A) (Count 5); Disorderly and Disruptive Conduct in a Restricted Building or Grounds while Using or Carrying a Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A) (Count 6); Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, Resulting in Significant Bodily Injury, and Aiding and Abetting, in violation of 18 U.S.C. §§ 1752(a)(4), (b)(1)(A), (b)(1)(B), and 2 (Count 7); Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. §

5104(e)(2)(D) (Count 8); Act of Violence in a Capitol Building or Grounds and Aiding and Abetting, in violation of 40 U.S.C. §§ 5104(e)(2)(F) and 18 U.S.C. § 2 (Count 9); and Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count 10). ECF 245. In addition to the charges against all five defendants, specific defendants have been singled out for their criminal acts on January 6, 2021. Randolph is charged with Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count 4) for his subsequent attack on Officer D.C. Samsel is charged with additional counts of Civil Disorder, in violation of 18 U.S.C. §§ 231(a)(3) (Count 11); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count 12) for the attempt to rip away a riot shield from a Capitol Police Officer; and Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Aiding and Abetting, in violation of 18 U.S.C. § 111(a)(1), (b), and 2 (Count 13) for throwing a plank of wood at police officers. Grant is additionally charged with Entering and Remaining in Certain Rooms in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C) (Count 14) and Parading, Demonstrating and Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 15) for entering the Capitol building and then entering a Senator's office.

## II.   TRIAL PROCEDURE

The trial is scheduled to begin on October 23, 2023. All five defendants waived a jury and requested a bench trial. For efficiency, the parties expect to stipulate to the testimony from three trial witnesses, Senate witness Daniel Schwager, U.S. Secret Service Inspector Lanelle Hawa, and Safeway representative Edgar Tippett, incorporating transcripts of their prior testimony and the referenced exhibits in earlier January 6 trials. *See* Gov. Exhs. 1201-1203.

In brief, Mr. Schwager testified that on January 6, 2021, he was the general counsel to the Secretary of the United States Senate. In that role, Mr. Schwager testified regarding the Certification of the Electoral College vote, including an explanation of provisions governing the Certification proceeding. Mr. Schwager also testified about the Certification proceeding as it occurred on January 6 and 7, 2021. *See* Gov. Exh. 1202.

As the Liaison to the Capitol for the U.S. Secret Service, Inspector Lanelle Hawa testified about her security preparations in anticipation of the Certification proceeding and how the breach of the Capitol came to pose a severe threat to the safety of Vice President Pence and his wife and daughter, who were also Secret Service protectees that day. *See* Gov. Exh. 1201.

Finally, Edgar Tippett, a District Manager with Safeway, testified that the riot culminating in the Capitol breach significantly disrupted business in the Safeway stores in the District of Columbia that day and forced their early closure. *See* Gov. Exh. 1203.

In addition to Hawa, Schwager and Tippett, the government expects to call USCP Lieutenant George McCree, USCP Officers Caroline Edwards and David Cruz, USCP Sergeant Tim Lively, MPD Sergeant Luke Foskett, MPD Captain David Augustine, Dr. Molly Price and FBI Special Agents Stewart Curcio, James Farris, Craig Noyes, Kacy Jones, Desiree Maldonado, and Jimmy Beacham.

In his Trial Memo, Johnson argues that Dr. Price can solely testify about C.E.'s statements to Dr. Price and the medical records. Johnson concedes that the treating physician - in this case, Dr. Price - may testify to statements made by the victim "to the physician . . .for purposes of seeking a medical diagnosis or treatment, which are admissible under a hearsay exception (Fed. R. Evid. 803(4)) [and] facts . . . necessary to admit the patient's medical records in evidence as business records pursuant to Fed. R. Evid. 803(6)." Johnson Trial Memo at 3. Should the

Government offer testimony from Dr. Price, it would be limited to the doctor's observations during examinations, as well as the symptoms that the victim relayed to the physician for purposes of seeking medical care. Some of the symptoms the victim suffered include brief loss of consciousness at the time she struck her head, pain and swelling to the face and back of the head, dizziness spells and syncope, memory loss and cognitive difficulty, nausea, light sensitivity, balance issues, and recurring headaches. The treating physician generated medical records of the victim's reported symptoms, course of treatment and diagnoses. The Government plans to admit portions of these records pursuant to Fed R. Evid. 803(6). It follows, that Dr. Price may therefore speak to what she wrote down and why, but not necessarily the basis for her scientific opinions, unless the defense opens the door and seeks to challenge the basis for such opinions contained in the records.

Finally, the United States has provided notice of intent to offer evidence pursuant to Rule 902(14) of the Federal Rules of Evidence for cell phone extractions for the phones associated with Jason Benjamin Blythe, James Tate Grant, Ryan Samsel and Sommer Johnson.

## III.   JURY INSTRUCTIONS AND THE ELEMENTS OF THE CRIMES

While this matter will be tried to the Court, the government submits the elements of the charged offenses in the Substantive Legal Instructions, attached hereto, as an aid to the Court. Given the issues raised by Defendants Grant and Johnson in their trial briefs, the government focuses on three issues in its trial brief, the causation element as to Count Two, whether defendants used the metal barricade as a deadly or dangerous weapon, and the authentication of third-party video exhibits.

### A.  Assault of C.E. (Count Two)

Defendant James Grant argues in his Trial Brief that he may not be found guilty of Count Two of the Fourth Superseding Indictment because he disputes that he caused bodily injury to Officer C.E.  ECF No. 293 at 3.  Grant's argument fails because the United States can convict him under Count Two without proving that the victim officer suffered any bodily injury.  Count Two charges a violation of 18 U.S.C. § 111, which provides alternative grounds for conviction, not all of which require proof of bodily injury.  *See, e.g.,* 18 U.S.C. 111(a)(1) (requiring proof of physical contact or intent to commit another felony, but not bodily injury, to secure a felony conviction for forcibly assaulting resisting, opposing, intimidating, impeding or interfering with a federal officer); *United States v. Gutierrez*, 745 F.3d 463, 471 n.9 (11th Cir. 2014) (noting that Section 111(a)(1) does not require proof of bodily injury).

Grant's challenge thus has no application to the Section 111(a)(1) component of Count Two.  His contentions are only relevant to one of two alternatives present in the Count Two's charge under 18 U.S.C. § 111(b).  Section 111(b) creates criminal exposure for defendants who commit one of the acts listed in Section 111(a) and either use a deadly or dangerous weapon or inflict bodily injury.  Grant protests that the bodily injury prong of Section 111(b) requires proof that he directly caused bodily injury.  Even if this Court agrees, however, with Grant's direct causation standard for Section 111(b)'s bodily injury prong, he is wrong to suggest that the failure, if any, to show direct causation requires acquittal under Count Two even under the provisions of Section 111(b) .  The United States may still convict under Section 111(b) if it can prove Grant used a deadly or dangerous weapon, or under Section 111(a)(1), where, as noted above, bodily injury is not an issue.  Thus, Grant's assertion of a causation standard does not foreclose conviction under Count Two.

At most, Grant's contention can be read only as a more limited argument concerning the standard of proof for conviction under Section 111(b)'s bodily injury prong, rather than an argument bearing on the standard applicable to Section 111(b) as a whole or the entirety of Count Two.  Even limited to its proper scope, Grant's challenge does not foreclose conviction under Section 111(b)'s bodily injury prong.

In relevant part, Section 111(b)  provides that "whoever, in the commission  of any acts described in [Section 111(a)] … inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both."  *Compare, e.g.,* 21 U.S.C. § 841(b)(1) (imposing a more severe penalty if death or serious bodily injury "results" from the use of a controlled substance); 18 U.S.C. § 1365(a) (imposing a more severe penalty if death, or serious bodily injury to any individual, results from tampering with consumer products); 18 U.S.C. § 3663 (for purpose of ordering restitution, defining victim as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered").  Unlike these and other statutes, Section 111(b) does not contain language addressing causation.

Nevertheless, Grant asks this Court to adopt the most restrictive causation standard by interpreting the word "inflict" as narrowly as possible.  At the very least, his approach is inconsistent with Congress' reason for enacting Section 111, which was to broadly prevent harm, or threats of harm, to certain federal officials.  *United States v. Feola*, 420 U.S. 671, 678-84 (1975).

In this context, Grant argues that the term inflict imposes a heightened causal relationship between his conduct and the victim officer's injury.  He overlooks decisions finding this argument lacks merit.  For example, in *United States v. Garcia-Camacho*, 122 F.3d 1265, 1269 (9th Cir. 1997), the court of appeals concluded that arguments that to inflict means more than to cause "fail." In *Garcia-Camacho*, the defendant lunged at an agent and struggled with him as the agent

attempted to place the defendant under arrest.  During the struggle, the agent fell, badly breaking his ankle.  The court of appeals cited Webster's Third New International Dictionary (1976) and its definition of inflict: "to lay a blow on; to cause something damaging or painful to be endured."  *Id*. (cleaned up).[1]  Although the victim agent could not testify that Garcia-Camacho struck his ankle, the court of appeals noted that the injury occurred while the agent and the defendant were in "close locked combat" and the fact that Garcia-Camacho "did not kick the Agent's ankle or otherwise come into contact with it does not demonstrate that his behavior was not the cause of the injury." The court of appeals concluded that on these facts, Garcia-Camacho did directly cause the agent's injury, affirming the conviction under Section 111(b).  *See also United States v. Willix*, 723 Fed.Appx. 908, 912 (11th Cir. 2018) (declining to recognize distinction between "inflict" and "mere proximate cause" and affirming conviction under Section 111(b) where district court did not define "inflict" in jury instruction and rejected the defendant's proposed instruction defining inflict more narrowly than cause).

Because Section 111 does not provide a definition of inflict, the opinion in *Garcia-Camacho* correctly examined its ordinary meaning.  *See United States v. Robertson*, No. 22-3062 ---F.4th---, 2023 WL 6932346 at *6 (D.C. Cir. Oct. 20, 2023) (because Congress had not defined corruptly in 18 U.S.C. § 1512, court must look to the word's ordinary meaning).  Here, this Court should also apply the ordinary meaning of the word inflict, and reject Grant's attempt to inject a heightened causation standard for bodily injury.

In effect, Grant seeks to define "inflict" in a way that requires the United States to show that his, and only his, forcible conduct caused officer C.E.'s injury. ECF 293 at 6-7 (arguing the

---

[1] That definition remains in Merriam-Webster's online dictionary.  *See* https://www.merriam-webster.com/dictionary/inflict#:~:text=%3A%20to%20give%20by%20or%20as,something%20unpleasant)%20to%20be%20endured (last checked October 21, 2023).

supposedly "intervening" conduct of his codefendants defeats causation and requires acquittal). No authority he invokes supports such a requirement. Inexplicably, Grant invokes jury instructions from *United States v Schwartz*, 21-cr-178l (APM), a case that did not contain any charges under Section 111(b)'s bodily injury prong.  He cites *United States v. Pitt-Des Moines, Inc.*, 970 F.Supp. 1359 (N.D. Ill. 1997), a non-binding out-of-district decision addressing motions in limine in a prosecution for violation of 29 U.S.C. § 666(e), which makes it an offense to violate OSHA regulations, standards, rules, or orders where that violation caused death to any employee.  Because *Pitt-Des Moines* involved a statute with a causation requirement, unlike Section 111(b), and because that decision did little more than reference causation in the context of evidentiary issues, the decision provides little or no guidance for this Court and does not constitute persuasive authority for the Grant.

Other opinions Grant cites acknowledge, in *dicta*, that certain injuries may be too attenuated to qualify as injuries a defendant has inflicted, but these decisions also fail to support Grant's appeal for heightened causation.  One such example is *United States v. Jackson*, which involved a defendant who fled from United States Marshals and resisted arrest.  Marshals tackled Jackson, who squirmed.  An officer trying to handcuff Jackson tore a ligament in his thumb.  After Jackson's jury trial, the Seventh Circuit found the evidence against Jackson was sufficient to convict, because the government did not need to prove Jackson's intent to cause bodily injury to an officer under Section 111(b).  The Seventh Circuit also rejected Jackson's claim that he did "inflict" injury, stating:

> Likewise Jackson inflicted Scott's injury no matter what was in Jackson's mind. Doubtless "inflict" is more restrictive than "cause"; if Jackson had not resisted, but Scott had tripped on his untied shoelaces while walking over to apply handcuffs, it would not make sense to say that Jackson had "inflicted" an injury. But the actual injury occurred while Scott was grappling with Jackson, who applied force directly to Scott's person. This satisfies the normal understanding of "inflict."

*Id*.  The evidence in this case is strikingly similar to the evidence found sufficient in *Jackson*.  Like Jackson, Grant's conduct was directed to a group officers.  Like Jackson, Grant struggled with officers, and during the struggle, an officer was injured.  Grant did not push a barricade against a single officer; he joined his codefendants in an attack against an entire line of officers he sought to break, and the physical force he applied to bike-rack fencing connected by fasteners and snow-fencing was not directed to any particular officer.  The injury to officer C.E. occurred as Grant and his codefendant's grappled with officers; his physical force against the barrier knocked C.E.'s head into a handrail and stairs.  In the same sense that Jackson did so, Grant inflicted injury.

In *United States v. Zabawa*, 719 F.3d 555 (6th Cir. 2013), another non-binding out-of-district case Grant invokes,  the Sixth Circuit held that "inflict" required that the defendant be the "direct physical cause" of the injury.  *Id.* at 561.  In *Zabawa*, which involved a physical confrontation between an inmate and corrections officers, the victim officer discovered a cut above his eye after a protracted struggle with the defendant, and he could not say when or how it occurred, or even whether it might have been the victim officer himself who caused the injury.  *Zabawa*, 719 F.3d at 561.  That is not the case here.  There is no question when or why Officer C.E. struck her head multiple times; it occurred directly after and as a result of Grant and his co-defendants lifting metal bike racks—linked, bound, and wrapped together—and drove them into Officer C.E. and her fellow officers.  Grant does not argue that Officer C.E. sustained her injuries outside of the charged assault, or that her own actions caused her injuries.  This case does not present the concerns that the court in *Zabawa* sought to address, just as it is a far cry from the example in *Jackson* of an arresting officer tripping over his own shoelace.

Moreover, none of the cases Grant cites address the crux of his argument.  In effect, he seeks to avoid conviction under Section 111(b) because he acted jointly with his codefendants.  He

argues the United States can only convict him under Section 111(b)'s bodily injury prong if it can

show his actions alone caused Officer C.E.'s injuries.  In *Paroline v. United States*, 572 U.S. 434,

454 (2014), addressing a restitution provision explicitly requiring proximate cause, the Supreme

Court noted that:

> alternative and less demanding causal standards are necessary in certain
> circumstances to vindicate the law's purposes. It would be anomalous to turn away
> a person harmed by the combined acts of many wrongdoers simply because none
> of those wrongdoers alone caused the harm. And it would be nonsensical to adopt
> a rule whereby individuals hurt by the combined wrongful acts of many (and thus
> in many instances hurt more badly than otherwise) would have no redress, whereas
> individuals hurt by the acts of one person alone would have a remedy.

*Id*.  The conduct in this case is consistent with the description provided in *Paroline* because Grant

himself sought action by a crowd, waiving it towards the barricade, and then acted jointly with his

codefendants by lifting the barricade and shoving it into officers.  He did not, unlike the thousands

of unknown perpetrators in *Paroline*, act separately from others who harmed the same victim.

Grant acted in concert with his codefendants. He knew he was acting with others, and the force

applied against the officer was applied simultaneously by all codefendants.

The government's evidence at trial will establish that when Grant and his co-defendants

lifted the metal bike racks and drove them into officers, it was far more than "mere fortuity" that

this knocked one officer back with such force as to cause serious head injuries.  *Paroline* addressed

the victim's losses attributable to the defendant, who was one of thousands of individuals who

possessed child pornography that depicted the victim, and it found that a theory of aggregate

causation would be inappropriate where the defendant was one of thousands who acted in the

aggregate to harm the victim.  *Paroline*, 572 U.S. at 452.  Such circumstances are a far cry from

the discrete causal chain where Grant and his four co-defendants lifted bike racks and together

drove them into Officer C.E. with sufficient force to cause her bodily injury.

Grant's argument is also unfounded because he is subject to conviction pursuant to 18 U.S.C. §2, which provides a theory of criminal liability, not a separate offense. *United States v. Ginyard*, 511 F.3d 203, 211 (D.C. Cir. 2008). "All that is necessary is to show some affirmative participation which at least encourages the principal offender to commit the offense, with all its elements, as proscribed by the statute." *United States v. Ali*, 718 F.3d 929, 936 (D.C. Cir. 2013). In addition to being directly liable, Grant may also be found guilty of assaulting Officer C.E. with a deadly or dangerous weapon or while inflicting bodily injury because he aided and abetted others in committing this offense. To do so, the Court must find that the government proved beyond a reasonable doubt the following elements:

(1) That others assaulted officer C.E. with a deadly or dangerous weapon or while inflicting bodily injury by committing each of the elements of the offense charged.

(2) That the defendant knew that assaulting officers with a deadly or dangerous weapon or while inflicting bodily injury was going to be committed or was being committed by others.

(3) That the defendant performed an act or acts in furtherance of the offense.

(4) That the defendant knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense of assaulting officers with a deadly or dangerous weapon or while inflicting bodily injury.

(5) That the defendant did that act or acts with the intent that others commit the offense of assaulting officers with a deadly or dangerous weapon or while inflicting bodily injury.

To show that the defendant performed an act or acts in furtherance of the offense charged, the government must prove some affirmative participation by the defendant which at least encouraged others to commit the offense. That is, the Court must find that the defendant did, in some way, aid, assist, facilitate, or encourage others to commit the offense.

The bar for aiding and abetting is a low one. "In proscribing aiding and abetting, Congress used language that 'comprehends all assistance rendered by words, acts, encouragement, support, or presence'— even if that aid relates to only one (or some) of a crime's phases or elements." *Rosemond v. United States*, 572 U.S. 65, 73 (2014) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993)). "One need not participate in an important aspect of a crime to be liable as an aider and abetter; participation of 'relatively slight moment' is sufficient." *United States v. Bowen*, 527 F.3d 1065, 1078 (10th Cir. 2008) (quoting *United States v. Isaac-Sigala*, 448 F.3d 1206, 1213 (10th Cir. 2006)). Accordingly, "[t]he affirmative act requirement for accomplice liability raises no more than a low hurdle for the government's proof to clear[.]" *United States v. Delgado*, 972 F.3d 63, 74 (2d Cir. 2020). A defendant need not "provide more than a 'minimal' amount of aid to qualify as an aider and abettor. Indeed, as one venerable treatise put it, 'the quantity of assistance [is] immaterial, so long as the accomplice did something to aid the crime.'" *Id*. (quoting *Rosemond*, 572 U.S. at 73). Even accepting Grant's assertion that Samsel and Randolph are guilty of the assault on Officer C.E., *see* Grant Trial Brief at 6-7, there is no question but that Grant's act of lifting and pushing the barricade at the USCP officers aided and abetted at least Randolph's and Samsel's assault on Officer C.E.

Grant has not shown any basis for his acquittal under Count Two. He has not shown a basis for acquittal under Section 111(b). He fails to persuasively show any requirement to import heightened causation requirements into the bodily injury prong of Section 111(b), especially when

the Ninth and Eleventh Circuit courts of appeal has declined to do so.  Accordingly, this Court should adopt the legal instructions the United States has proposed and reject Grant's analysis.

### B.  Deadly or Dangerous Weapon

 The jury instructions define an object as a "deadly or dangerous weapon" in one of two ways. First, an object is a deadly or dangerous weapon if it is inherently or obviously dangerous or deadly. Such inherently dangerous weapons include guns, knives, and the like. Alternatively, an object is a deadly or dangerous weapon if the object is capable of causing serious bodily injury or death to another person and the defendant used it in that manner. In determining whether the object is a "deadly or dangerous weapon," the finder of fact can consider both the physical capabilities of the object used and the manner in which the defendant used it.[2]

Interpreting Section 111(b), courts have focused on the defendant's use of the object, not solely on its inherent qualities. "[T]he object's latent capability . . . coupled with the manner of its use, is determinative." *United States v. Loman*, 551 F.2d 164, 169 (7th Cir. 1977) (citation omitted). Under section 111(b), almost anything can be a deadly or dangerous weapon if used in a violent fashion. *See, e.g., United States v. Sanchez*, 914 F.2d 1355, 1359 (9th Cir. 1990) (citing cases involving "mop handle" and "mouth and teeth"); *Loman*, 551 F.2d at 169 (citing cases involving "a wine bottle," "shoes," "a rake," and "a chair leg"). In the sentencing context, at least

---

[2] *United States v. Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002) ("For an object that is not inherently deadly . . . the following additional element is required: (4) the object must be capable of causing serious bodily injury or death to another person *and* the defendant must use it in that manner."); *United States v. Smith*, 561 F.3d 934, 939 (9th Cir. 2009) ("An object is a dangerous weapon . . . if it is either inherently dangerous or otherwise used in a manner likely to endanger life or inflict great bodily harm. . . . Inherently dangerous weapons . . . are obviously dangerous objects such as guns, knives, and the like.") (quotation marks omitted); *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982) ("Thus, the term 'dangerous weapon' is not restricted to such obviously dangerous weapons as guns, knives, and the like, but can include virtually any object given appropriate circumstances.").

one court in the Capitol riots context has applied the "deadly or dangerous weapon" enhancement under U.S.S.G. §2A2.2(b)(2)(B). *United States v. Landon Copeland*, 21-cr-570 (APM). Judge Friedrich declined to apply this enhancement in *United States v. Philip S. Young*, 21-cr-617 (DLF) where the defendant acting alone had briefly pushed a bike rack against several officers to no avail.

The evidence at trial will demonstrate that the linked metal bike rack barrier was used as a deadly or dangerous weapon by the defendants. Specifically, video evidence and witness testimony will show that the defendants collectively lifted these heavy, metal bike rack barricades off the ground and drove them into officers to knock them out of their way if not incapacitate them. These metal barricades were interlocked together and then further bound to one another with snow fencing and zip ties such that the five defendants were able to add their strength to the already significant weight of the combined bike racks as they drove them into officers. This striking assault was capable of causing serious bodily injury, as made apparent by the fact that the assault *did* cause serious bodily injury to at least one of the officers attacked.

### C.  Authentication of Third-Party Video

Finally, Defendant James Grant indicated in a trial brief filed October 21, 2023 for the first time that he would object to the authenticity of video exhibits recorded by non-witnesses.[3] To address this issue, the government outlines the relevant framework for authentication and the manner by which the government intends to authenticate third-party video at trial.

**Legal framework for authentication**

---

[3] Grant also inaccurately states that the government will assert that third-party videos are self-authenticating and that "the last-minute nature of [Grant's] filing" was due to the government providing its final exhibit list on October 18, 2023. ECF No. 299 at 1. While the government provided an updated exhibit list on October 18, virtually all third-party videos listed there were also included on the government's preliminary exhibit list provided September 21, 2023. Grant has not yet identified any exhibits or witnesses to the government.

Under Federal Rule of Evidence 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 901(b) provides a non-exhaustive list of examples of evidence that satisfies this requirement. As relevant here, those examples include:

> (1) *Testimony of a Witness with Knowledge*. Testimony that an item is what it is claimed to be.
> . . .
> (3) *Comparison by an Expert Witness or the Trier of Fact*. A comparison with an authenticated specimen by an expert witness or the trier of fact.
> (4) *Distinctive Characteristics and the Like*. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.
> . . .
> (9) *Evidence About a Process or System*. Evidence describing a process or system and showing that it produces an accurate result.

Fed. R. Evid. 901(b)(1), (3), (4), (9).

As a general matter, establishing an item's authenticity is not "a particularly high hurdle." *United States v. Ortiz*, 966 F.2d 707, 716 (1st Cir. 1992). *See also United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) ("The burden to authenticate under Rule 901 is not high"); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 927 (3d Cir. 1986) ("The burden of proof for authentication is slight."); *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) ("The threshold for the Court's determination of authenticity is not high, . . . and the proponent's burden of proof for authentication is slight[.]") (citation and quotation marks omitted). Rule 901 "requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997) (citing cases). *See also, e.g.*, *United States v. Belfast*, 611 F.3d 783, 819 (11th Cir. 2010) ("[A]uthentication itself is 'merely . . . the process of presenting sufficient evidence to make

out a prima facie case that the proffered evidence is what it purports to be.'") (quoting *United States v. Caldwell*, 776 F.2d 989, 1002 (11th Cir. 1985)); *Vidacak*, 553 F.3d at 349 ("only a *prima facie* showing is required"). Stated differently, "[t]he standard the district court must apply in evaluating a document's authenticity is whether there is enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be." *United States v. Blanchard*, 867 F.3d 1, 6 (1st Cir. 2017) (quoting *United States v. Paulino*, 13 F.3d 20, 23 (1st Cir. 1994)). Once that showing is made, "[t]he factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury." *Vidacak*, 553 F.3d at 349; *see also, e.g.*, *Belfast*, 611 F.3d at 819 ("Once that *prima facie* case is established, the evidence is admitted and the ultimate question of authenticity is decided by the jury.").

To make out a *prima facie* showing, "circumstantial evidence of authenticity can be sufficient." *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981). *See, e.g.*, *United States v. Broomfield*, 591 F. App'x 847, 851 (11th Cir. 2014) (unpublished) ("Authentication may be established 'solely through the use of circumstantial evidence.'") (quoting *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990)). And, importantly, the party seeking to admit evidence need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994). Rather, "the government must only 'demonstrate that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated.'" *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) (quoting *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997)). *See, e.g.*, *United States v. Bowens*, 938 F.3d 790, 794-95 (6th Cir. 2019) (explaining that "[a]nyone could have used the defendants' Facebook accounts, just as the pictures could have depicted the men smoking tobacco cigars, and 'getting high' could have been a reference to

skydiving," but that there was sufficient circumstantial evidence "for the jury to infer that the accounts belonged to the defendants, and that the defendants were the authors of the posts about using marijuana"); *Broomfield*, 591 F. App'x at 852 (finding sufficient evidence of authenticity even though "there was no testimony establishing that the recording equipment was reliable or that the video was not altered or staged").

In deciding preliminary questions about the admissibility of these videos, "[t]he court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a). In other words, the government may rely upon otherwise inadmissible evidence in establishing the authenticity of video evidence, such as hearsay. *See, e.g.*, *United States v. White*, 116 F.3d 903, 914 (D.C. Cir. 1997).

**Authentication of third-party video**

The government intends to introduce video taken by journalists and others in and around Capitol grounds on January 6. The government anticipates authenticating these videos in a number of ways. As with CCV or body-worn-camera footage, if a witness is present in a video, the witness can authenticate the third-party video based upon his or her personal knowledge of its accuracy. Fed. R. 901(b)(1) (allowing authentication by "[t]estimony that an item is what it is claimed to be"). In addition, a witness can also (1) identify the locations depicted in the video; (2) establish that the video is generally consistent with their knowledge of events that occurred during the Capitol riot. *See, e.g.*, *Holmquist*, 36 F.3d at 169 ("A photograph's contents, buttressed by indirect or circumstantial evidence, can form a sufficient basis for authentication even without the testimony of the photographer or some other person who was present at the time it was taken."); *United States v. Kandiel*, 865 F.2d 967, 974 (8th Cir. 1989) ("The contents of the tape recordings have numerous references to people, places and activities that were corroborative of other

testimony in the record"); *Rembert*, 863 F.2d at 1028 (photographs from ATM machine's video system sufficiently authenticated by, among other things, "circumstantial evidence provided by the victim witnesses as to the occurrences at the ATM machines" and "the internal indicia of date, place, and event depicted in the evidence itself"); *United States v. Stearns*, 550 F.2d 1167, 1171 (9th Cir. 1977) (Kennedy, J.) ("the contents of a photograph itself, together with such other circumstantial or indirect evidence as bears upon the issue, may serve to explain and authenticate a photograph sufficiently to justify its admission into evidence."). Distinctive characteristics can also help authenticate a video. Fed. R. Evid. 901(b)(4).

"Under Rule 901, there is a wide variety of extrinsic and circumstantial proof that may be used to authenticate evidence, . . . and there need only be sufficient proof 'so that a reasonable juror could find in favor of authenticity or identification[.]'" *United States v. Hunt*, 534 F. Supp. 3d 233, 255 (E.D.N.Y. 2021) (quoting *United States v. Vayner*, 769 F.3d 125, at 129-30 (2d Cir. 2014). *Broomfield*, 591 Fed. Appx. 847, is instructive. There, the Eleventh Circuit affirmed the authentication of the FBI's copy of a YouTube clip depicting a defendant in possession of a firearm. When the FBI agent saw the YouTube video, he recognized defendant from a traffic stop and made a copy of the video, which the government presented as an exhibit. The Eleventh Circuit examined whether "the government made out a prima facie case that this YouTube video is what the government purports it to be—a video of Broomfield in possession of a firearm," even though the person who filmed the video did not testify, nor did anyone who appeared in it. *Id*. The Court of Appeals found that the district court did not err by finding the video properly authenticated: other evidence established that the individual in the video was Broomfield, as well as "where and approximately when the video was recorded, and . . . the specific rifle and ammunition depicted in the video." *Id*.

In addition, authenticated video or photographs can also authenticate other, substantially similar videos or photographs of the same scene. *See* Fed. R. Evid. 901(b)(3) (authentication by comparison with another authenticated specimen); *see. e.g.*, *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1371; 2021 WL 3628664, at \*8 (Fed. Cir. Aug. 17, 2021) ("Authentication by comparison is routine."); *Stearns*, 550 F.2d at 1171-72 (where circumstantial evidence established one photograph's authenticity, it "authenticates the other four pictures as to time"); *Diaz v. County of Ventura*, 512 F. Supp. 3d 1030, 1035 (C.D. Cal. 2021) ("Here, the videos can be authenticated through other evidence on the record—namely, other video and photographic evidence of the incident that Green provides."); *United States v. Safavian*, 435 F. Supp. 2d 36, 40 (D.D.C. 2006) ("e-mails that are not clearly identifiable on their own can be authenticated under Rule 901(b)(3)," by the jury's comparison with other "emails that already have been independently authenticated").

## IV.    EXHIBITS

The government has met and conferred with defense counsel about the exhibits it plans to offer into evidence. The government has provided a copy of the exhibits and its proposed exhibit list. The parties have also met and reviewed the list and exhibits. Defendants have submitted motions *in limine* to object to the relevance of certain government exhibits.

## V.    PENDING MOTIONS

On January 6, 2023, the government submitted notice regarding its intention to offer Rule 404(b) and Rule 609 evidence at trial. ECF 236. The government also submitted briefing in response to the decision in *United States v. Fischer* on May 15, 2023. ECF 261. Finally, the government submitted a Motion *in Limine* to Limit Unnecessary Discussion of Security Related Topics and to Admit Certain Statutes and Records. ECF 279.

Samsel filed a motion *in limine* seeking to exclude certain body-worn camera footage for an alleged discovery violation. Johnson and Grant filed motions *in limine* objecting to certain government exhibits on various grounds. ECF 278, 280, 282, 283. The government responded in opposition to these motions on October 10, 2023. ECF 287, 288. Samsel filed a reply. ECF 289. Johnson filed a motion to strike government exhibit 526. ECF 298. Samsel filed a second motion in limine to exclude the download of the Defendant's phone. ECF 300.

Dated: October 21, 2023

Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney

By:

ALEXANDRA F. FOSTER
D.C. Bar No. 470096
KYLE R. MIRABELLI
N.Y. Bar No. 5663166
J. HUTTON MARSHALL
D.C. Bar No. 1721890
CHRISTOPHER BRUNWIN
CA Bar No. 158939
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20579