**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-537-JMC** |
| **v.** | : | |
| | : | |
| **RYAN SAMSEL** | : | |
| **JAMES TATE GRANT** | : | |
| **PAUL RUSSEL JOHNSON** | : | |
| **STEPHEN CHASE RANDOLPH** | : | |
| **JASON BENJAMIN BLYTHE,** | : | |
| | : | |
| **Defendants.** | : | |

**UNITED STATES' SUBMISSION REGARDING**
**18 U.S.C. § 1752 *MENS REA* REQUIREMENT**

The United States respectfully submits this response to the Court's minute order issued December 12, 2023, inviting additional information pertinent to the required *mens rea* for 18 U.S.C. § 1752(a) in light of the pending appeal in *United States v Griffin*, No. 22-3042 (D.C. Cir.), and the decision in *United States v. Elizalde*, No. 1:23-cr-00170 (CJN), 2023 WL 83549432 (D.D.C. Dec. 1, 2023). Because *Elizalde* was wrongly decided, this Court should adhere to its original ruling of November 2, 2023 and decline to require proof of knowledge that the Vice President was present at the U.S. Capitol on January 6, 2023 to convict on Counts Five through Seven of the Fourth Superseding Indictment.

**BACKGROUND**

On January 6, 2021, former Vice President Mike Pence presided over a joint session of Congress convened to certify the results of the Electoral College vote in the 2020 U.S. Presidential Election. In anticipation of Vice President Pence and his family visiting the U.S. Capitol building for these proceedings, U.S. Capitol Police and the U.S. Secret Service established a secure perimeter around the Capitol building with linked metal bike racks, snow fencing, and signage that

1

read, "AREA CLOSED by Order of the U.S. Capitol Police Board." On the morning of January 6, 2021, U.S. Capitol Police officers were stationed at various points along the exterior perimeter.

Defendants Ryan Samsel, James Tate Grant, Paul Russell Johnson, Stephen Chase Randolph, and Jason Benjamin Blythe, along with others, were the first individuals to violently breach this perimeter that day, ultimately forcing the Joint Session of Congress inside to a halt. At approximately 12:53 p.m., Samsel opened a gap in the linked bike racks that marked the outermost point of the restricted area on the west side of the Capitol grounds. A crowd of rioters, including Samsel's four codefendants, entered the restricted area behind him. The five men then joined together to lift a second barrier of linked, metal bike racks and violently drove it into U.S. Capitol police officers guarding the area. This allowed thousands to flood onto Capitol grounds and overrun the restricted area.

As relevant here, Counts Five through Seven of the Fourth Superseding indictment charge the offenses of Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of Title 18, United States Code, Sections 1752(a)(1) and (b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of Title 18, United States Code, Sections 1752(a)(2) and (b)(1)(A); and Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, Resulting in Significant Bodily Injury, in violation of Title 18, United States Code, Sections 1752(a)(4), (b)(1)(A) and (b)(1)(B). ECF No. 245. The defendants entered not guilty pleas to these and other charges,[1] and the Court conducted a bench trial from October 23 to November 2, 2023.

---

[1] At the outset of trial, Defendant Grant pleaded guilty to Counts Fourteen and Fifteen of the Fourth Superseding Indictment, charging him with Entering and Remaining in Certain Rooms in the Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(C), and

On October 31, after the parties rested, all defendants with one exception moved in open court for judgment of acquittal on all counts pursuant to Rule 29.[2] With respect to Counts Five through Seven, on the evening before Rule 29 arguments, Defendant Johnson filed a supplement, ECF 311, to a trial brief and in that supplement, argued that § 1752 required proof of a defendant's knowledge that an area was restricted "due to the presence of a Secret Service protectee." ECF 311 at 3, 6-7 (citing *United States v. Bingert*, No. 1:21-CR-91-1-RCL, 2023 WL 3613237, at *1 (D.D.C. May 24, 2023)); *see also* Oct. 31, 2023 Transcript ("Tr.") at p. 20:6 (defendant's Rule 29 argument) (contending the government must prove "not only that the area was closed but that a Secret Service protectee was visiting."). The timing of Johnson's supplement did not allow the United States an opportunity to submit a responsive filing; instead, the prosecution provided reasons orally during the Rule 29 hearing supporting rejection of Johnson's demand for expansion of Section 1752(a)'s knowledge requirement. This Court deferred ruling on defendants' Rule 29 motions.

The Court also addressed the parties' proposed legal instructions after the parties rested on October 31, 2023. The government and Johnson filed competing instructions for what the government had to prove under § 1752. Johnson's proposed instructions required proof that "Mr. Johnson knew that the building or grounds was restricted and he knew he lacked lawful authority to enter or remain there," but included in the definitions section: "The term 'knowingly' requires the government to prove that Mr. Johnson knew that he was in a posted, cordoned off, or otherwise

---

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G). ECF No. 245; *see* Oct. 23, 2023 minute entry.

[2] Defendant Grant declined to move for a judgment of acquittal on the lesser included misdemeanor offenses for Sections 1752(a)(1), (a)(2), and (a)(4). *See* Oct. 31, 2023, Transcript of Proceedings at 16 ("[Counsel for Grant]: The lesser offenses we can argue, but I don't think the greater offense involving the use of a dangerous or deadly weapon can survive a Rule 29 motion in this case. So I'd ask you to dismiss all of those.").

restricted area, and that he knew it was such an area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." ECF No. 291 at 16, 17.

Relying in part on Judge McFadden's reasoning in *United States v. Couy Griffin*, No. 21-cr-92 (TNM), ECF No. 106, Tr. at 330-336 (D.D.C. March 22, 2023), the government opposed this definition of "knowingly," arguing during the October 31, 2023 proceedings that Johnson's legal instruction relied on an erroneous reading of the statute that imputed the term "knowingly" from the subsections stating the offense conduct to the definitional subsections where "knowingly" did not appear. On November 2, the Court rejected Johnson's proposed definition of "knowingly," stating that the Court agreed with the reasoning articulated by the government. November 2, 2023 Minute Order; *see* ECF 313 at p. 24.

On December 12, 2023, the Court provided an opportunity for the parties to submit additional information pertaining to the proper interpretation of § 1752, citing Judge Nichols' recent ruling in *United States v. Elizalde*, No. 1:23-cr-00170 (CJN), 2023 WL 8354932, (D.D.C. Dec. 1, 2023) and the pending appeal in *Griffin*. December 12, 2023 Minute Order. In response, the United States submits that *Elizalde* should not persuade this Court to revisit its prior ruling for the reasons stated below.

## **ARGUMENT**

This Court should decline to change its original ruling to follow the recent decision in *United States v. Elizalde*, No. 23-cr-170 (CJN), 2023 WL 8354932 (D.D.C. Dec. 1, 2023), where Judge Nichols held the government must prove the defendant knew the Vice President was visiting the Capitol building. 2023 WL 8354932; *accord United States v. Bingert*, No. 1:21-CR-91-1 (RCL), 2023 WL 3613237, at *1 (D.D.C. May 24, 2023) (same). A substantial number of judges

in this District have similarly employed the Section 1752 instruction adopted by the Court, which does not require the government to prove that a defendant knew why the Capitol and its grounds were restricted on January 6, 2021, or the additional fact of the presence of a protected person. Indeed, in response to a jury question, the presiding judge instructed the jury that it did *not* need to find that the defendant knew that the Vice President was visiting to establish the § 1752 offenses. *See United States v. Eicher*, Case No. 22-cr-38 (BAH), ECF 83 at 1 (jury notes); 6/14/23 Trial Tr. 8:7-22. This reading of Section 1752 is correct and, as explained more fully below, the government respectfully submits that the Section 1752 formulations in *Elizalde* and *Bingert*[3] were wrongly decided.

A.  The Text in Question

For ease of reference, the full text of 18 U.S.C. § 1752 is as follows:

(a) Whoever—

(1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

(3) knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, obstructs or impedes ingress or egress to or from any restricted building or grounds; or

(4) knowingly engages in any act of physical violence against any person or property in any restricted building or grounds;

(5) knowingly and willfully operates an unmanned aircraft system with the intent to knowingly and willfully direct or otherwise cause such unmanned aircraft system to enter or operate within or above a restricted building or grounds;

---

[3] We note, respectfully, that the *Bingert* court did not issue an opinion on the rationale for adopting this alternative instruction. The *Elizalde* court, however, did.

or attempts or conspires to do so, shall be punished as provided in subsection (b).

(b) The punishment for a violation of subsection (a) is—

(1) a fine under this title or imprisonment for not more than 10 years, or both, if—

(A) the person, during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm; or

(B) the offense results in significant bodily injury as defined by section 2118(e)(3); and

(2) a fine under this title or imprisonment for not more than one year, or both, in any other case.

(c) In this section—

(1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

(A) of the White House or its grounds, or the Vice President's official residence or its grounds;

(B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

(C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

(2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

As relevant here, the defendants are charged with violations of § 1752(a)(1) and (b)(1)(A) (Count Five, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) and § 1752(a)(2) and (b)(1)(A) (Count Six, Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon), and § 1752(a)(4), (b)(1)(A) and (b)(1)(B) (Count Seven, Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, Resulting in Significant Bodily Injury) for their conduct on January 6, 2021. Johnson argues that to be found guilty these offenses, the

government must introduce evidence that he knew that the Vice President would be visiting the U.S. Capitol on January 6 when he entered the restricted area.

B.   Section 1752(a)(1) and Congressional Intent[4]

"Whether a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent." *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (citation omitted). Courts begin with the presumption "that Congress intends to require a defendant to possess a culpable mental state regarding each of the statutory elements that criminalize otherwise innocent conduct." *Id.* (quotations and citations omitted). Although "[a]s 'a matter of ordinary English grammar,' [courts] normally read the statutory term 'knowingly' as applying to all the subsequently listed elements of the crime,'" *id.* at 2196 (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009)), ultimately, "the inquiry into a sentence's meaning is a contextual one." *Flores-Figueroa*, 556 U.S. at 652.

An examination of Section 1752(a)(1) is illustrative.  Here, this Court has previously and correctly ruled that the defendants need not have known the specific reason why the Capitol building and grounds were restricted on January 6, 2021, to be guilty of violating § 1752(a)(1). *See Eicher*, Case No. 22-cr-38 (BAH), ECF 83 at 1 (jury notes); 6/14/23 Trial Tr. 8:7-22. Rather, a defendant need only know that (1) he was entering or remaining in a posted, cordoned off, or otherwise restricted area, and that (2) he lacked lawful authority to do so.  This is made plain if language Congress chose to remove from Section 1752(a)(1), located now in the definition of "restricted building or grounds" from § 1752(c)(1), is re-inserted into § 1752(a)(1). The statute then applies to "whoever—

> knowingly enters or remains in any [posted, cordoned off, or otherwise restricted
> area—(A) of the White House or its grounds, or the Vice President's official

---

[4] This issue is part of the appeal in *Griffin*, 22-3042 (D.C. Cir.).

residence or its grounds; (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance,] without lawful authority to do so.

§ 1752(a)(1), (c)(1).

Where, as in the version of the statute referenced above, "the modifier 'knowingly' introduces a long statutory phrase, . . . questions may reasonably arise about how far into the statute the modifier extends." *Rehaif*, 139 S. Ct. at 2196 (citations omitted). In addition, in this case, the facts that constitute the offense and that criminalize otherwise innocent conduct are (a) that the defendants knew they were entering or remaining in a "posted, cordoned off, or otherwise restricted area," and (b) that they knew they lacked authority to do so. *See generally Bryan v. United States*, 524 U.S. 184, 193 (1998) ("unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense"). In this way, § 1752(a)(1) resembles typical trespassing statutes. *See* 3 Wayne R. LaFave, Substantive Criminal Law § 21.2(c) (3d ed. 2022) ("[T]he common requirement of criminal trespass offenses is that the actor be aware of the fact that he is making an unwarranted intrusion, which serves to exclude from criminal liability both the inadvertent trespasser and the trespasser who believes that he has received an express or implied permission to enter or remain.") (quotation marks omitted).

By contrast, there is nothing natural or logical about applying "knowingly" to the types of areas protected by the statute, whether it is the White House grounds, a building restricted in conjunction with an event designated as a special event of national significance, or, as here, a building or grounds where a person protected by the Secret Service is or will be temporarily visiting. Such a construction would defy Congress's intent, and there is no principled limitation on the defendant's proposed interpretation.

8

Imposing the *mens rea* term of "knowingly" on the entire definitional provision in subsection (c) invites more questions than it answers. Subsection (c)(2), for example, makes additional references to other sections of the U.S. Code that are carried into the definitional subsection by reference. *See* § 1752(c)(2) ("the term 'other person protected by the Secret Service' means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection"). By the defendants' logic, "knowingly" should also apply to those referenced sections—including knowledge that the person has not declined Secret Service protection—despite the grammatical --and logical-- unwieldiness of such a construction. Congress cannot have intended that result.

There are good reasons to conclude that Congress did not intend to require for conviction a defendant to know why a particular area is restricted because, for example, "the President or other person protected by the Secret Service is or will be temporarily visiting," or because it is "so restricted in conjunction with an event designated as a special event of national significance." § 1752(c)(1)(B)-(C). First, like jurisdictional elements, these requirements "have nothing to do with the wrongfulness of the defendant's conduct[.]" *Rehaif*, 139 S. Ct. at 2196. A defendant who enters an area he knows to be restricted, while knowing that he lacks authority to be there, has engaged in wrongful conduct regardless of whether he knows the area is restricted because, for example, a former First Lady or a "distinguished foreign visitor[ ] to the United States" is present. 18 U.S.C. § 3056(a)(3), (6).

Second, such a requirement would run contrary to Congress's intent in enacting "a statute designed to safeguard the President and other Secret Service protectees[.]" *Griffin*, 549 F. Supp. 3d at 57. If the statute "require[s] the Secret Service to somehow be telling people" a protectee is

present, that would tend to make the person less safe, not more. *United States v. Couy Griffin*, 21-CR-92 (TNM), Tr. of Bench Trial, Doc. 106, 330-32. It would make no sense for Congress to intend such a narrow application of § 1752 given the "overwhelming[ ] interest in protecting the safety of [the] Chief Executive." *Wood v. Moss*, 572 U.S. 744, 758 (2014) (quotations and citations omitted). *See generally United States v. Morgan*, 45 F.4th 192, 206 (D.C. Cir. 2022) (explaining that "the ordinary textual understanding of the operation of the word 'knowingly' in criminal statutes . . . is 'a contextual one,' subject to being overcome") (quoting *Flores-Figueroa*, 556 U.S. at 652).

Third, requiring proof that a defendant knew the reason an area is restricted is difficult to square with Congress's elimination of the statute's requirement that the defendant act "willfully." That change was meant to "correct and simplify" the statute, and to "clarif[y] that the penalties in § 1752 of Title 18 apply to those who knowingly enter or remain in any restricted building or grounds without lawful authority to do so." H.R. Rep. No. 112-9, at 1-2. When it eliminated the statute's "willfully" requirement, as noted above, Congress moved the language "any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting" from § 1752(a)(1) to a separate definitional provision. *Compare* 18 U.S.C. § 1752(a)(1) (2011) *with* 18 U.S.C. § 1752(a)(1) (2023). Nothing in this statutory amendment suggests that Congress meant to require the government to prove that a defendant knew why an area was posted, cordoned off, or otherwise restricted, or knew specifically that a protectee was or would be present. To the contrary, by eliminating the statute's requirement that a defendant act willfully and moving the relevant language to a separate statutory section, Congress made clear its intent to lower the bar for prosecutions under § 1752. *See Griffin*, 549 F. Supp. 3d at 56 ("But Congress did lower the mens

rea requirement, striking the requirement that a defendant act 'willfully.'").

Under either version, the relevant question is which of the words "'knowingly' modifies[.]" *Ruan v. United States*, 142 S. Ct. 2370, 2377 (2022) (citations omitted). For the reasons previously discussed, § 1752's text, structure, and context support the conclusion that Congress intended to require evidence that defendants knew they were entering or remaining in a "posted, cordoned off, or otherwise restricted area"—words that immediately follow "knowingly" when the definition of "restricted building or grounds" is re-inserted—and that they lacked lawful authority to be there, but not to make such conduct unlawful only when a defendant knew why the area was restricted, in this case because of a protectee's presence.

C. *Elizalde*

This Court referenced Judge Nichols's recent decision in *Elizalde* when it invited the parties to submit additional information on this issue. In *Elizalde*, the Court held that the word "knowingly" applied to a separate definitional subsection, 18 U.S.C. § 1752(c)(1)(B), to require proof a defendant knew not only that a location was a "posted, cordoned off, or otherwise restricted area" but that it was such an area "of building and grounds where a person protected by the Secret Service would be visiting." *Id*. at *3 (cleaned up).[5] In doing so, the Court rejected the government's

---

[5] The Court's opinion does not address follow-up questions that then arise (*see supra*): If "knowingly" applies to the existence of a protected person, why would it not also apply to the knowledge that an event is designated as a "special event of national significance"? *See* 18 U.S.C. § 1752(c)(1)(C). If "knowingly" applies to (c)(1) in its entirety, then why would it also not apply to (c)(2), which defines "other person protected by the Secret Service"? Similarly, must the government also prove knowledge that the protectee has not "declined such protection"? *Id*. What about the statutory cross-reference to 18 U.S.C. § 3056? All of these questions circle back to the original inquiry: what was Congress's intent? As discussed above, that intent—to protect designated individuals from harm— in light of the history of the statute and the plain words of the text, was not to impute additional and more stringent requirements onto a general trespass statute. While failing to sufficiently consider evidence of congressional intent, *Elizalde* suffers from the same flaw it incorrectly attributes to the government's reasoning, *see* 2023 WL 8354932 at *3, in

arguments, first stating that, while Congress did intend to protect Secret Service protectees, "concerns about practical enforceability are insufficient to outweigh the clarity of the text." 2023 WL 8354932 at *5 (citations omitted, quoting *Flores-Figueroa*, 556 U.S. at 656). But the government's interpretation of Section 1752 is not animated by concerns about practical enforceability. Rather, the point is one of Congressional intent, which is the ultimate touchstone of statutory interpretation.

If Congress's aim in passing § 1752 was to safeguard Secret Service protectees, it is implausible that Congress would have intended the statute to apply so narrowly, requiring public knowledge of a protectee's location for the statute's protections to operate. Moreover, the Court in *Flores-Figueroa*, relied upon in *Elizalde*, emphasized the importance of context to determine *mens rea*, *id*. at 652. The context here differs from *Flores-Figueroa* because Congress did intend to provide additional safeguards for protectees, in part by relaxing *mens rea* requirements but also because text at issue in *Flores-Figueroa* consisted of a single sentence and the "strong textual reasons", *id*. at 650, animating the interpretation in *Flores-Figueroa,* are also absent here. Even the *Elizalde* court was required to determine where to limit the reach of the term "knowingly" within Section 1752(c)'s definitions. Given that need, consideration of congressional intent, including as expressed through statutory history, is not only appropriate but necessary in light of *Rehaif. See also United States v. Griffin*, 549 F. Supp. 3d 46, 55 (D.D.C. 2021) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 352 (2012) for the propriety of considering statutory history).

---

that it provides no logical reason for the portion of the definitions it excludes from the reach of the word "knowingly."

The context for the offense construed in *Flores-Figueroa* also differs from Section 1752(a)(1) for textual reasons. And although *Elizalde* invoked certain portions of *Flores-Figueroa*, it failed to fully adopt its analysis and consider textual and grammatical differences with Section 1752. In *Flores-Figueroa*, the statutory language at issue consisted of a single sentence providing that a person who, in the commission of certain predicate crimes, "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person," confronted additional penalties. *Id*. at 648. The dispute in *Flores-Figueroa* concerned whether the word "knowingly" applied to the sentence's "last three words," *id*. at 650, consisting of the words "of another person." To reach the conclusion that "knowingly" applied to those words, the Court considered not only how a sentence is normally understood "[in] ordinary English," but also the absence of any "special context" for the statute, *id*. at 652 ("No special context is present here"). Both the word "knowingly" and the words it was found to modify were contained within the same sentence, and the rules of grammar and interpretation the Court utilized in *Flores-Figueroa* were applicable to analysis of how a sentence is understood. And even though it interpreted the statute as a matter of ordinary English grammar, the Court in *Flores-Figueroa* considered the additional factor of the statute's history (which here supports the government's interpretation).

*Elizalde* however, failed to consider meaningful differences between the disputed language in *Flores-Figueroa* and the provisions of Section 1752 at issue here. First, the disputed application of the term "knowingly" in Sections 1752(a)(1), (a)(2), and (a)(4) to a definition in Section 1752(c)(1)(B), is not limited to the confines of a single sentence (as in *Flores-Figueroa*) or even a single subsection of the same statute. Second, and as explained throughout this filing, Section 1752 not only exists in a special context, but its context also provides a clear showing of congressional intent consistent with this Court's prior ruling on this issue. Section 1752's statutory

history differs from the inconclusive legislative history considered in *Flores-Figueroa* and demonstrates a congressional intent that is consistent with this Court's and before it *Griffin*'s, ruling. Applying the same analytical steps taken in *Flores-Figueroa* to the different text, provisions, structure, and history of Section 1752 yields a different conclusion, and the *Elizalde*'s failure to follow that approach undermines its rationale.

A comparison of the different statutes in each case demonstrates why. Again, *Flores-Figueroa* addressed the provisions of 18 U.S.C. § 1028A(a)(1), which punishes commission of specified offenses where the perpetrator "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." As noted above, the disputed scope of "knowingly" in Section 1028A(a)(1) concerned only other words within the same sentence as the word "knowingly." Section 1752(a)(1), as one contrasting example, addresses an offender who "knowingly enters or remains in any restricted building or grounds without lawful authority to do so[.]" The argument here is not whether knowingly applies to any other word within that sentence but whether and how far it applies to a separate subsection, § 1752(c)(1)(B). Like Section 1752, Section 1028A is subject to definitions in a separate provision, 18 U.S.C. § 1028(d). Section 1028(d) contains a definition for "means of identification," which is the object of the sentence contained in Section 1028(A)(a)(1); however, that definition, 18 U.S.C. § 18 U.S.C. 1028(d)(7)(A-D) makes no mention of the words "of another person" disputed in *Flores-Figueroa*. No other definition in Section 1028(d) does so.

Thus, the focus in *Flores-Figueroa* on the ordinary way to interpret a word within a single sentence does not necessarily determine, or even have relevance to, the application of a word to provisions of a separate sentence in a separate section of a statute, as presents here. What magnifies this difference and makes it even more significant is the statutory history of Section 1752(a)(1),

which formerly contained language that Congress relocated to Section 1752(c)(1)(B), a subsection that does not contain the word "knowingly." This relocation, occurring when Congress also changed Section 1752(a)(1)'s *mens rea* from "willfully" to "knowingly", provides strong support for the commonsense conclusion that "knowingly" was not meant to modify the separate definitional section regarding what makes a location a "restricted building or grounds," that is, the presence or future presence of a protectee.

The *Elizalde* decision also does not address the differing text or structure of Sections 1028A(a)(1) and 1752(a)(1). Although it cites *Flores-Figueroa*, it fails to properly adopt its analysis by giving appropriate weight to congressional intent, as shown by the context of Section 1752(a)(1) and its history. When *Flores-Figueroa* is properly applied, the validity of the often-applied jury instruction for Section 1752(a)(1) and the rulings to have decided this issue in the government's favor is apparent.

*Elizalde* also appears to have misconstrued some of the government's arguments. According to the Court, "[t]he government's concession that 'knowingly' modifies 'restricted building or grounds' gives up the ballgame" because the term "restricted building or grounds" cannot have different meanings for the *actus reus* and *mens rea* purposes. 2023 WL 8354932 at *3; *see also id.* at *1 ("The government's proposed reading gives a single term in a single sentence two different meanings, which would be highly anomalous in any circumstance, but especially here, where Congress expressly defined the term."). Respectfully, this is not accurate.

The government's interpretation does not give the term "restricted building or grounds" two different meanings. Instead, the question is simply what information the defendants have to know to commit an offense. This same analysis was presented in *Morgan*, where the relevant statute applied to "[a] person who knowingly transports an individual who has not attained the age

of 18 years in interstate or foreign commerce[.]" *See* 45 F.4th 192 (discussing 18 U.S.C. 2423(a)). The D.C. Circuit held "that, while section 2423(a) required proof that J.T. in fact was underage (under 18 for purposes of the knowingly clause and under 16 for purposes of the intent clause), the statute did not require proof that Morgan *knew* J.T. was underage." *Id.* at 205 (emphasis added). But the D.C. Circuit did not thereby hold the phrase "individual who has not attained the age of 18" had two different meanings (a person under the age of 18 for *actus reus* purposes and a person under the age of 16 for *mens rea* purposes).

*Elizalde* attempted to distinguish *Morgan* as *sui generis*. 2023 WL 8354932, at *5 (describing child-sex crime cases as an exception to the general presumption of *mens rea*). But respectfully, in this context, it is not. The ruling in *Morgan* (dealing with child-sex crimes), no differently from *McFadden* (dealing with narcotics), did not depend—either implicitly or explicitly— on the special nature of the offenses. Rather, the special nature of the offenses helped inform the D.C. Circuit's consideration of Congressional intent when evaluating the scope of *mens rea*. Indeed, *Morgan* is exactly the type of analysis called for here, with the same result — in both cases Congress intended the protection of a specific group of persons identified by Congress, and such intent is evident through an ample and known statutory history. Moreover, the "historical tradition" *Morgan* referenced in *Elizalde*, *id.*, was borne out of the unique status of certain strict liability sex offenses, not whether all child-sex crimes are a different type of crime where the word "knowingly" travels less. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 n.2 (1994). The Court's use of *X-Citement* illustrates the problem: as *Elizalde* recognizes, the Supreme Court previously read a statute targeting the distribution of child pornography to require proof that a defendant knew that a child under 18 was depicted. *See* 2023 WL 8354932, at *6; *X-Citement*, 513 U.S. at 72 n.2, 73. That was because "[a]ge of minority [] indisputably possesses the same status

16

as an elemental fact because nonobscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment." *X-Citement*, 513 U.S. at 72. In other words, the "age of the performers is the *crucial* element separating legal innocence from wrongful conduct." *Id.* at 73 (emphasis added). In this case, not so. One who knowingly and criminally trespasses is already in the wrong – knowledge of an additional fact of a protectee's presence does not alter the analysis. Thus, the entire discussion about *Morgan* and *X-Citement* relating to child-sex crimes as outliers underscores the textual and legislative analysis that supports the government's position in the first place.

In *Elizalde* the government took the position that Section 1752(c)(1)'s initial language defining "restricted buildings or grounds" as "any posted, cordoned off or otherwise restricted area" states facts within the scope of Section 1752(a)(1)'s use of the word "knowingly" despite its separate location within the statute. This position, however, contrary to the misconception in *Elizalde*, does not "end the ballgame," *Elizalde,* 2023 WL 8354932,at *3, or provide a basis for extending *scienter* further to even more terms in the definition that follow. A principled reason exists to include the particular portion of the definition that the government agrees the defendants must know to be convicted. The terms "posted, cordoned off, or otherwise restricted area" separate wrongful from innocent acts. Thus, while the separate placement of Section 1752(c) and its length, subsections, and cross-references raise reasonable questions about the reach of Section 1752(a)(1)'s *scienter* requirement, *see Rehaif*, 139 S. Ct. at 2196, different considerations apply to elements that criminalize otherwise innocent conduct. For those provisions, a presumption applies that Congress intended a defendant to possess a culpable mental state. *Ruan* at 2195. Proof that a defendant knew an area was restricted, that is, "posted, cordoned off, or otherwise restricted" falls within the presumption that criminal statutes require a degree of knowledge sufficient to make "a

person legally responsible for his or her act or omission." *Id.*, citing Black's Law Dictionary 1547 (10th ed. 2014). Accordingly, that portion of Section 1752(c) should sensibly, if not presumptively, apply to the knowledge requirement of Section 1752(a)(1), a statute whose *actus reus* involves "entering or remaining in any restricted building or grounds without lawful authority to do so" because that application further separates wrongful from otherwise innocent conduct.

The Circuit's guidance in *Morgan* also provides a meaningful counterpoint to Judge Nichols' additional concern as described in footnote 1 of the *Elizalde* opinion:

> Under the government's interpretation, a person could "knowingly" enter a § 1752 "restricted building or grounds" even if the grounds are not restricted within the statutory definition. For instance, under the government's view, when one enters a cordoned off site knowing that it is cordoned off, he has not in fact *entered* a "restricted building or grounds" (because the construction site does not meet the statutory definition), yet the person has *knowingly* entered a "restricted building or grounds" (because the site is restricted in a colloquial sense). That strains credulity and the bounds of the English language. The far more natural reading is that "restricted building or grounds" means what its statutory definition says for all purposes, at least absent strong contextual evidence to the contrary.

2023 WL 8354032 at *3 n.1. But the same is true for transporting a minor under § 2423(a). One could "knowingly transport a minor" even if the person is not known to be a minor within the statutory definition because all a defendant needs to know to violate § 2423(a) is that he or she is transporting a person. The same is true with regard to proof that a defendant was distributing a controlled substance in violation of the Controlled Substances Act: for *actus reus* purposes, the government could prove the substance is heroin, while for *mens rea* purposes, the government could prove that the defendant knew "only that the substance he is dealing with is some unspecified substance listed on the federal drug schedules." *See McFadden v. United States*, 576 U.S. 186, 192 (2015). This divergence does not mean that the term "a controlled substance" means two different things.

In justifying its analysis, the *Elizalde* court speculated that "Congress may well have acted

cautiously to avoid sweeping up conduct that poses little threat to a Secret Service protectee." 2023 WL 8354932 at *5. According to the court, it seemed "unlikely that someone who ends up near a Secret Service protectee by happenstance, without knowing that the protectee is present, is there to cause the protectee harm." *Id.* Indeed, the court believed that Congress "may have written the statute to avoid unnecessarily sweeping up low-risk individuals." *Id.* This unsupported interpretation, as noted in *Griffin*, would essentially require the Secret Service to announce the presence of a protectee, in all circumstances in order to criminalize already wrongful conduct. *See Griffin*, 21-cr-92 (TNM), Tr. of Bench Trial, ECF No. 106, 330-32. This would unquestionably make the protectee less safe and frustrate congressional intent.

Rather than "act[ing] cautiously to avoid sweeping up conduct that poses little threat to a Secret Service protectee," 2023 WL 8354932 at *5, Congress chose to strengthen provisions providing greater safety for protectees. [6] *Id.* Because the statute requires a person to (a) know he is in a restricted area, and (b) know he lacks authority to be there, elements of a guilty *mens rea* for trespass are already present. In other words, to be guilty, defendants do not end up where they are "by happenstance," *id.* In order to be convicted, they have to knowingly enter or remain in a restricted area. Thus, *Elizalde*'s emphasis on the "low-risk" individual appears to supplant

---

[6] Respectfully, the *Elizalde* court also gave somewhat shorter shrift to the intent assessment required by *Rehaif*. For example, the "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting" language used to be in Section 1752(a)(1) itself. *See* 18 U.S.C. 1752(a)(1) (2006) ("(a) It shall be unlawful for any person or group of persons--(1) willfully and knowingly to enter or remain in any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting"). Under that version of the statute, there undoubtedly was a question as to how far into the statute the "knowingly" requirement applied. Congress cannot have intended to increase the reach of the word knowingly by moving the "restricted area" language to a definition. Under either version, one has to look to Congress's intent to determine what a defendant is required to have known.

Congress' intent altogether. *Id.* at * 5.[7] A person who knowingly disregards a restricted perimeter is exactly the type of person Congress intended to deter or punish.

    D.  <u>Section 1752(a)(2) and Congressional Intent</u>

    Whether knowingly separately travels into (a)(2) involves a separate analysis from (a)(1).

    In *Flores-Figueroa*, the Supreme Court reviewed how Section 1028A(a)(1) worked "as a matter of ordinary English grammar." 556 U.S. at 650. Since then, courts have looked at how a statute works grammatically to assess whether any impediment exists to applying "knowingly" to all of the subsequently listed elements of a crime. *E.g., Rehaif* at 2196.

    Although Section 1752(a)(2) differs from Section 1752(a)(1) in significant ways, its differences provide equally compelling reasons not to expand its *scienter* requirements to require knowledge of a protectee's presence or future presence. Section 1752(a)(2) applies to whoever "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or

---

[7] The low-risk concern described in *Elizalde* is respectfully misplaced in any event. Someone who knowingly trespasses clearly increases the risk to a protectee, regardless of whether that person knows or does not know of the existence of the protectee. In other words, knowledge of this additional fact does not square with the intent of Congress. For example, imagine a scenario where an armed aggressor mistakenly believes that the U.S. Speaker of the House of Representatives – not a designated protectee under § 1752 – is at an airport hangar converted into a restricted area, and intends to trespass into the restricted area. But, as it turns out, the person present at hanger is not the Speaker, but the Vice President. The risk from the armed aggressor, who might shoot before finding (or realizing the absence of) his intended target remains the same, and the *Elizalde* opinion provides no fact-based reason to equate knowledge of a protectee's presence with risk of harm. Moreover, under the government's interpretation of the statute, the person committed a knowing trespass, and that criminal trespass underscores the risk to any protected person. But under *Elizalde*'s reading, that person not only did *not* violate § 1752(a)(1), but at least by implication, is somehow an innocent bystander. The scenario set forth in *Elizalde* does little to support the idea that Congress intended to narrow protections of protectees to avoid allegedly "sweeping up" a "low-risk" individual in the process. *Id.* Even the converse scenario highlights the problem with *Elizalde*'s scenario; if the decision's hypothetical low-risk individual stumbled into a restricted area knowing a protectee was present, his or her knowledge of the protectee would not necessarily make that individual a greater risk.  Simply put, the *Elizalde* scenario does not withstand scrutiny.

official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions[.]" 18 U.S.C. § 1752(a)(2). The use of the words "when, or so that, such conduct" is an ordinary grammatical break that separates the application of "knowingly" from "such conduct [that] in fact, impedes or disrupts the orderly conduct of Government business or official functions[.]" Thus, the statute does not require that the guilty defendant know that his conduct impedes government business, but requires only that it "in fact" does. Similarly, the use of the phrase "within such proximity to" is an incomplete aside, again suggesting a grammatical stop before "any restricted building or grounds." Thus, the statute's grammar and structure do not require that the defendants know the presence of a "protected person." Instead, by setting those clauses apart from the gravamen of the offense, with respect to *mens rea*, Congress required that the defendants (1) knowingly engaged in disorderly or disruptive conduct; and (2) did so with the intent to impede or disrupt Congress's business. With respect to knowledge or intent, nothing more is required.

In *Elizalde*, the Court slightly altered the statutory text. At first blush, this rewording appears harmless. But, this rewording glosses over the grammatical pauses that effectively cabin how far "knowingly" travels. *See* 2023 WL 8354932 at *2 (describing that the "ordinary understanding" is that Congress prohibited disorderly or disruptive conduct by those "who know they are" in a "restricted building or grounds").

Once again, *Elizalde* fails to differentiate between the statute at issue in *Flores-Figueroa* and the statute at issue here. In *Flores-Figueroa,* the relevant language from Section 1028A(a)(1) consisted of a single and uncomplicated sentence. Here, the dispute over the reach of "knowingly" in Section 1752(a)(2) once again involves more than one sentence and separate subsections of the

same statute. Significantly, the language and grammar within Section 1752(a)(2) is even more complex, with the presence of grammatical breaks that courts have in other circumstances found limit the reach of terms such as "knowingly."

Despite these clear differences from the statute interpreted by the Supreme Court in *Flores-Figueroa*, the *Elizalde* decision adopted analogies that have no application here. Comparing Section 1752(a)(2) to other simple sentences such as "Smith knowingly transferred funds to the account of his brother," 2023 WL 8354932 at *2, may at least have some superficial similarity to the language of Section 1752(a)(1) (absent reference to the definitions in a separate subsection), but there is no similarity to the text, grammar, or structure of the language in Section 1752(a)(2). The sentence about a bank transfer is not a valid comparator for Section 1752(a)(2).

In addition to grammatical breaks of Section 1752(a)(2), there is an additional reason to limit rather than expand the reach of the word "knowingly." Section 1752(a)(2) has an additional, explicit, and specific intent requirement that Section 1752(a)(1) does not, requiring the specific "intent to impede or disrupt the orderly conduct of Government business or official functions." Because Congress wished to increase the required level of intent for a Section 1752 offense, it did so explicitly and within the subsection establishing the offense rather than in a separate subsection for definitions. *Compare* Section 1752(a)(5) (explicitly requiring the intent of "knowingly and willfully" operating an unmanned aircraft system with the further intent to "knowingly and willfully" direct or otherwise operate the unmanned aircraft system within or above a restricted building or grounds). The repetition of "knowingly and willfully" within the offense section for Section 1752(a)(5) provides a strong indication that Congress did not and would not implicitly establish intent through a separate definitional subsection. If it wished to make "knowingly" apply more broadly, Congress would have repeated terms such as "knowingly and willfully" to designate

the specific provisions in a Section 1752 offense which required proof of knowledge or intent. The clear drafting of Section 1752(a)(5) counsels against pushing the application of "knowingly" any further into 1752(c) beyond its initial words that are directly relevant to wrongfulness.

No such repetition is present within the definitions contained in Section 1752(c), although Congress was clearly capable of adding, if not repeating, language to require knowledge of a protectee's actual or anticipated presence. It did not do so, which is a further reason to find *Elizalde* unpersuasive. Indeed, despite the lengthier provisions of Section 1752(a)(2), Congress could have, but did not, elect to repeat the word "knowingly" to ensure its application to the phrasing at the statute's end. Like the offense addressed in *Morgan*, or the drug offense mentioned in *McFadden*, Section 1752(a)(2) provides an example of an offense requiring proof of a non-jurisdictional fact a defendant is not required to know. Thus, it is hardly a reach to conclude that facts in a separate definitional section do not require proof of knowledge, especially when the particular fact in question has no bearing on the wrongful nature of a defendant's conduct.

   **E.  <u>Section 1752(a)(4)</u>**

Unlike Sections Section 1752(a)(1) and (a)(2), no court has held that a defendant must have knowledge of a particular Secret Service protectee's presence to be held liable under Section 1752(a)(4), which penalizes anyone who "knowingly engages in any act of physical violence against any person or property in any restricted building or grounds." To the contrary, Courts have regularly adopted the jury instructions used by this Court, requiring proof that (1) the defendant engaged in an act of physical violence against any person or property in any restricted building or grounds; and (2) the defendant did so knowingly. *E.g.*, *United States v. Grider*, 651 F. Supp. 3d 1, 18 (D.D.C. 2022) (Kollar-Kotelly, J.).

As with Section 1752(a)(2), the reach of "knowingly" in Section 1752(a)(4) requires an

individualized analysis, but the reasoning above as to Sections 1752(a)(1) and (a)(2) applies with equal force in demonstrating that knowledge of a Secret Service protectee's presence is not required under Section 1752(a)(4). For instance, similar to Section 1752(a)(1), knowledge of a Secret Service protectee's presence is entirely unnecessary to distinguish innocent from guilty conduct. Section 1752(a)(4), which has a structure similar to Section 1752(a)(1), should therefore be evaluated in the same way, in light of its text and the principle stated in *Rehaif* and similar cases questioning how far a modifier such as "knowingly" extends into lengthy phraseology, such as that contained in Section 1752(c). *Rehaif* instructs that the answer to such a question lies in Congress' intent, and there is no principled reason or any evidence supporting a determination of that intent that differs from the intent shown above for Sections 1752(a)(1) and (a)(2). That intent is not consistent with requiring proof a defendant knew of a protectee's presence or future presence for the reasons stated above.

## CONCLUSION

For the foregoing reasons, this Court should decline to follow *Elizalde* and the defendants' Rule 29 motions as to Counts Five through Seven should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Kyle R. Mirabelli*
KYLE R. MIRABELLI
J. HUTTON MARSHALL
ALEXANDRA FOSTER
CHRISTOPHER BRUNWIN
Assistant U.S. Attorneys
NY Bar No. 5663166
601 D Street, N.W.

24

Washington, D.C. 20579
(202) 252-7884
kyle.mirabelli@usdoj.gov